**UNITED STATES of America, Plaintiff,**

v.

**Richard O. BERTOLI, Defendant.**

Cr. No. 89–218.

United States District Court,
D. New Jersey.

March 30, 1994.

988

John M. Fietkiewicz, Asst. U.S. Atty., and David M. Rosenfield, Sp. Asst. U.S. Atty., Office of the U.S. Atty., Newark, NJ, for the U.S.

Richard Levitt, New York City, and Albert Carilli, Franklin Lakes, NJ, for defendant Richard O. Bertoli.

## TABLE OF CONTENTS

Facts ------------------------------------------------------------------------------------------------ 991
Discussion ------------------------------------------------------------------------------------------ 1009
A. Renewed Motion to Dismiss Counts One and Two of the Redacted Second Superseding Indictment ............................................... 1009
 1. The Decision in Reves ............................................ 1009
 2. Statute of Limitations ........................................... 1013
 3. Charges of Frontrunning ......................................... 1014
B. Objections to the First Set of Cayman Islands Depositions Testimony and Documents .................................................... 1014
 1. Bertoli's Objections to the First Set of Cayman Islands Depositions In Their Entirety ................................................ 1017
 2. Bertoli's Objections to Specific Testimony From the First Set of Cayman Islands Depositions ............................................. 1021
 a. Deposition of Coleman ......................................... 1022
 b. Deposition of Rodney Bond ..................................... 1023
 c. Deposition of Gillooly ......................................... 1025
 d. Deposition of Duggan ......................................... 1025
 e. Deposition of Sheree Ebanks ................................... 1026
 f. Depositions of Chan–A–Sue and Bechard ......................... 1026
 g. Deposition of Meyeroff ........................................ 1026
 3. Government's Objections to Specific Testimony From the First Set of Cayman Islands Depositions ...................................... 1026
 a. Deposition of Coleman ......................................... 1026
 b. Deposition of Rodney Bond ..................................... 1027
 c. Deposition of Duggan ......................................... 1027

 d. Deposition of Lundie ........................................... 1027
 4. Bertoli's Objections to Documents From the First Set of Cayman Islands
 Depositions .................................................... 1027
 a. Documents of Greenshields ................................. 1029
 b. Documents from the Coleman Deposition ...................... 1032
 c. Documents of Euro Bank ................................... 1033
 5. Government's Objections to Documents from the First Set of Cayman
 Islands Depositions ............................................ 1034
C. Objections to the Second Set of Cayman Islands Depositions Testimony and
 Documents ......................................................... 1035
 1. Bertoli's Objections to Specific Testimony From the Second Set of Cayman
 Islands Depositions—Deposition of Ebanks ......................... 1035
 2. Government's Objections to Specific Testimony From the Second Set of
 Cayman Islands Depositions ...................................... 1036
 a. Deposition of Ebanks ...................................... 1036
 b. Deposition of Burgess ..................................... 1036
 c. Deposition of Rodney Bond ................................. 1036
D. Pre–Trial and Trial Motions and Objections by Bertoli ..................... 1036
 1. Motion to Sequester Government Witnesses ........................... 1036
 2. Motion to Suppress Use of Cayman Islands Documents By the Government
 Pursuant to 18 U.S.C. § 3505 .................................... 1038
 3. Motion to Turn Over Personnel Files of Government Witnesses and Agents.. 1039
 4. Motion to Suppress or, in the Alternative, to Obtain Letters of Request to
 Take the Testimony of Euro Bank Personnel Ebanks and Burgess ..... 1041
 5. Objection to Reading of Redacted Second Superseding Indictment to Jury.. 1042
 6. Motion to Question Eisenberg Regarding Charges Pending Against Him
 When He Pleaded Guilty.......................................... 1044
 7. Motions for a Mistrial ........................................... 1047
 8. Objection to Admission of Cayman Islands Documents After Beginning of
 Trial .......................................................... 1049
 9. Objections to the Government's Use of Summary Charts and Demonstrative
 Charts......................................................... 1049
 a. Summary Charts .......................................... 1050
 b. Demonstrative Charts ..................................... 1053
 c. Admission of Charts ...................................... 1054
 10. Objections to Evidence of Other Acts: Rule 404(b) ..................... 1056
 a. The 1977 Suit by Executive Securities Against Bertoli and Bertoli's
 Filing for Bankruptcy...................................... 1060
 b. The SEC Investigation and the SEC Action ................... 1063
 c. The SEC's 1979 Bar of Bertoli from Association with Broker–Dealers.. 1064
 d. Other 404(b) Evidence .................................... 1065
 i. Unindicted Stock Manipulation Schemes..................... 1065
 ii. The Government's Chart Evidence........................... 1066
 iii. Berco Trust Financial Statements and Corporate Records ....... 1067
 iv. The Swiss Bank Documents................................ 1067
 11. Objection to Special Verdict Sheet .................................. 1067
 12. Objection to Hard Copy of Jury Charges and Hard Copy of Trial Transcript
 Being Submitted to Deliberating Jury .............................. 1069
 13. Objection to Submission of Jury Books to Jury ....................... 1072
 14. Objection to Subsequent Charges to Jury ............................ 1073
E. Pre–Trial and Trial Motions and Objections by Government ................. 1076
 1. Motion to Preclude Bertoli From Presenting a Defense Based on Selective
 or Vindictive Prosecution or Governmental Misconduct................. 1076
 2. Motion to Quash Bertoli's Subpoena of Government's Case Agent ........ 1080
 3. Motion to Preclude Bertoli From Presenting Any Evidence That Charges
 Were Dismissed in This Case ..................................... 1087
 4. Motion to Preclude Bertoli From Introducing Evidence That Certain Gov-
 ernment Witnesses Used Narcotics or Alcohol ...................... 1087
F. Post–Trial Proceedings ............................................... 1089
 1. Bertoli's Motions for a New Trial Based on Allegations of Juror Misconduct
 During Trial ................................................... 1089

a. Jury Misconduct as a Basis for Granting a New Trial .............. 1094
b. Right of Defendants to Be Present During Court's Interview of Juror for Misconduct .............................................. 1100
 i. Fifth Amendment Right to be Present......................... 1100
 ii. Right to be Present Pursuant to Rule 43 ..................... 1101
 iii. Right to Have Counsel Present ............................... 1104
c. The Riepe Letter.............................................. 1104
2. Bertoli's Motion for New Trial Based on Allegations of Juror Misconduct During Voir Dire................................................ 1108
 a. Voir Dire ..................................................... 1108
 b. The Lawsuit against Juror Six ................................ 1109
 c. Motion for a New Trial Based on Answers to Jury Voir Dire ....... 1110
3. Bertoli's Motion to Recuse Court from Sentencing ..................... 1116
 a. Background ................................................... 1116
 b. 28 U.S.C. § 455(a).......................................... 1117
 c. Bertoli's Plan to Force Recusal................................. 1119
 d. Statements and Rulings of the Court ......................... 1120
4. Sentencing ...................................................... 1125
 a. Facts......................................................... 1126
 i. Bertoli's Activities at Executive Securities...................... 1126
 ii. The Stock Manipulation Schemes ............................. 1128
 iii. Obstruction of Justice ....................................... 1130
 b. Sentencing Computation ....................................... 1137
 i. Applicable Guidelines ........................................ 1137
 ii. Grouping the Offenses ....................................... 1138
 iii. Calculating the Offense Level ................................ 1144
 Group One ................................................ 1144
 Sections 2J1.2 and 2X3.1 .............................. 1144
 Section 2F1.1 ........................................ 1146
 Sections 2J1.7 and 3B1.1 .............................. 1149
 Group Two ................................................ 1151
 Group Three................................................ 1151
 The Total Offense Level .................................... 1152
 iv. Criminal History Category ................................... 1152
 v. Monetary Penalties.......................................... 1153
 Ability to Pay ............................................ 1155
5. Bertoli's Motion for Bail Pending Appeal ............................ 1155
 a. Background ................................................... 1156
 b. 18 U.S.C. § 3143(b)......................................... 1157
 i. The Risk of Flight.......................................... 1158
 ii. Danger to the Community ................................... 1161
 iii. Substantial Question of Law or Fact .......................... 1162
Conclusion ----------------------------------------------------------- 1164
Appendix A: * List of Pleadings and Related Documents ..................... App.1
Appendix B: Transcripts of Depositions and Proceedings in Cayman Islands .................................................... App.78
Appendix C: Transcripts of Trial Testimony ............................. App.79
Appendix D: Objections to Specific Testimony From the First Set of Cayman Islands Depositions .................................. App.102
Appendix E: Objections to Specific Testimony From the Second Set of Cayman Islands Depositions .............................. App.138

---

## OPINION

LECHNER, District Judge.

This is a criminal action which originated on 16 June 1989 when an indictment (the "Indictment") was returned against defendants Richard O. Bertoli ("Bertoli"), Richard S. Cannistraro ("Cannistraro") and Leo M.

---

\* Editor's Note: Appendices A–E not included for purposes of publication.

Eisenberg ("Eisenberg").[1] On 29 September 1989, a six count superseding indictment (the "Superseding Indictment")[2] was returned. On 21 January 1992, the Government returned an eight count second superseding indictment (the "Second Superseding Indictment") against Bertoli and Cannistraro (collectively the "Defendants").[3] Eisenberg is not a defendant in the Second Superseding Indictment although he is listed as a co-conspirator.[4]

Following a conviction on two counts of the Redacted Second Superseding Indictment, Bertoli filed numerous post-trial motions, including one for bail pending appeal of his conviction. In moving for bail pending appeal, Bertoli has raised several contentions of error and other issues regarding the trial and pre-trial proceedings. The following opinion addresses these issues and Bertoli's other post-trial motions and is intended to facilitate the appeal.[5]

*Facts*

The facts of this case have been set forth at length in other opinions, most recently in *Cannistraro,* 800 F.Supp. 30; *see also United States v. Cannistraro,* 799 F.Supp. 410 (D.N.J.1992); *United States v. Cannistraro,* 794 F.Supp. 1313 (D.N.J.1992); *United States v. Eisenberg,* 773 F.Supp. 662 (D.N.J. 1991); *United States v. Eisenberg,* 734 F.Supp. 1137 (D.N.J.1990).[6]

A. *The Redacted Second Superseding Indictment*

Count One ("Count One") of the Redacted Second Superseding Indictment charged Bertoli and Cannistraro with racketeering activities in violation of the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. § 1961, *et seq.* Count One described the pattern of racketeering engaged in by the Defendants and others, including Eisenberg, as consisting of predicate acts of mail fraud, wire fraud, interstate transportation of money taken by fraud, securities fraud and obstruction of justice. Count One, ¶ 9.

Specifically, the Redacted Second Superseding Indictment alleged Monarch Funding Corp. ("Monarch"), the enterprise, was a securities brokerage firm in New York City, New York, which was engaged in the business of underwriting, purchasing and selling securities primarily traded in the over-the-counter markets. *Id.,* ¶ 2. Count One alleged Bertoli was the former president of a brokerage firm[7] and controlled and had a

---

1. On 16 June 1989, the Indictment was sealed by order of United States Magistrate Judge Stanley R. Chesler.

2. On 29 September 1989, the Superseding Indictment was sealed by Magistrate Judge Chesler and was unsealed on 5 October 1989.

3. On 24 March 1993, Cannistraro pleaded guilty to an information charging him with conspiracy to obstruct justice, in violation of 18 U.S.C. § 371. *See* Transcript of Proceedings of 24 March 1993.

4. Eisenberg entered a plea of guilty to Count One of the Superseding Indictment on 23 January 1992. *See United States v. Cannistraro,* 800 F.Supp. 30, 36 n. 5 (D.N.J.1992).

 On 15 April 1993, in light of Cannistraro's guilty plea, the Government moved to dismiss portions of the Second Superseding Indictment and to redact/re-number the Second Superseding Indictment (the "Motion to Dismiss/Redact"). *See* Memorandum of Law Concerning the redaction and Dismissal of Various Portions of the Second Superseding Indictment, submitted 15 April 1993. By letter, dated 26 April 1993, Bertoli indicated he had no objection to the Govern-

ment's Motion to Dismiss/Redact. Accordingly, on 27 May 1993, the Motion the Motion to Dismiss/Redact was granted. *See* Transcript of proceedings of 27 May 1993 (the "27 May 1993 Tr.") at 9–11. For the purposes of this opinion, the redacted Second Superseding Indictment (the "Redacted Second Superseding Indictment") will be used. *See infra* n. 9 (discussing redactions). Specific Counts of the Redacted Second Superseding Indictment are cited as "Count ——, ¶ ——."

5. This opinion is also rendered pursuant to Rule 8(4) of the Rules of the United States Court of Appeals for the Third Circuit. This case presented an unusual number of pre-trial, trial and post-trial motions. Therefore, the length of this opinion was necessary to detail the complicated and extensive history of rulings in this case.

6. For a complete review of the facts in this case, see all prior opinions and orders in this case, as listed *infra* in Appendix A. This opinion is not meant to be a stand-alone opinion.

7. The name and specifics of this firm were not provided in the Redacted Second Superseding Indictment.

beneficial interest in several nominee brokerage accounts[8] maintained at Monarch. *Id.,* ¶ 3. These nominee brokerage accounts included accounts in the names of Bertoli family members and various Cayman Islands individuals and entities. *Id.*

Count One further alleged Cannistraro was a securities research analyst with Wood Gundy, Inc. ("Wood Gundy"), a brokerage firm located in New York City, New York. *Id.,* ¶ 4. It alleged Cannistraro controlled and had a beneficial interest in nominee brokerage accounts maintained at Monarch. *Id.* These nominee brokerage accounts included accounts in the names of Cannistraro relatives and various individuals and entities located in the Cayman Islands. *Id.*

With regard to Eisenberg, Count One alleged Eisenberg was the owner and president of Monarch. *Id.,* ¶ 5. It alleged Eisenberg controlled and had a beneficial interest in nominee brokerage accounts maintained at Monarch, which included accounts in the names of various Cayman Islands individuals and entities. *Id.*

Count One charged that, from about January 1982 to the present, in the District of New Jersey and elsewhere, Bertoli, Cannistraro and Eisenberg participated in the affairs of Monarch through a pattern of racketeering activity, the object of which was to "use Monarch as a vehicle to engage in fraudulent securities trading practices and thereby obtain money and other things of value for the [D]efendants ... [and] Eisenberg." *Id.,* ¶¶ 7–8. It identified the victims of the racketeering activity as the purchasers and sellers of securities recommended and traded by the Defendants and Eisenberg. *Id.,* ¶ 8. It alleged the means and methods used by the Defendants to conduct conspiracy included "attempts to conceal and cover-up their fraudulent activities." *Id.,* ¶ 9.

Count One charged the Defendants with engaging in racketeering activity through the execution of four separate fraudulent trading or concealment schemes involving the following three securities: Liquidation Control, Inc. ("LCI"), Toxic Waste Containment, Inc. ("Toxic Waste") and High Technology Capital Corp. ("High Tech").[9] *Id.*

With respect to the scheme involving LCI securities (the "LCI Scheme"), Count One charged that, between approximately October 1982 and November 1983, the Defendants and others, including Eisenberg, devised a scheme to defraud and obtain money "by means of false and fraudulent pretenses, representations, and promises" with respect to LCI[10] securities. *Id.,* ¶ 11. Count One described the LCI Scheme as one in which the Defendants and Eisenberg rigged and manipulated the market in order to raise and control the price of LCI securities and to create a greater demand for the same. *Id.,* ¶¶ 12–13.

Count One charged Bertoli with causing Monarch to underwrite the initial public of

---

**8.** A nominee brokerage account is a securities brokerage account which names a person or entity as its owner when in fact another person or entity has full or partial beneficial ownership or control over the account. Count One, ¶ 1(c).

**9.** Prior to the redaction, the Second Superseding Indictment charged Defendants with other separate fraudulent trading or concealment schemes involving the following six securities: Astrosystems, Inc. ("Astrosystems"); Nature's Bounty, Inc. ("Nature's Bounty"); Solar Age Manufacturing Corp. ("Solar Age"); LCI; Toxic Waste; and High Tech. As a result of the dismissal and redaction, the fraudulent schemes in Count One relating to Astrosystems, Nature's Bounty and Solar Age, along with the racketeering acts relating to those schemes, were dropped from the Redacted Second Superseding Indictment. The Government, however, retained the right to introduce evidence of trading in these companies "for the purpose of, among other things, showing that Bertoli participated in the operation and management of Monarch within the meaning of *Reves [v. Ernst & Young,* —— U.S. ——, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993)]." *See* Government's Memorandum of Law in Opposition to Bertoli's Motion to Dismiss the RICO Counts of the Indictment, submitted 12 April 1993, at 15–16 & n. 5. Count Eight of the Second Superseding Indictment, which charged Bertoli and Cannistraro with conspiracy to commit securities fraud in violation of 18 U.S.C. § 371, with regard to trading in Solar Age, was also dismissed and dropped from the Redacted Second Superseding Indictment. *Id.* at 16 n. 6.

**10.** LCI was a corporation that "purportedly engaged in the business of consulting and advising financially distressed companies." Count One, ¶ 6(c).

fering ("IPO") [11] of LCI securities (the "LCI IPO"). *Id.*, ¶14. It alleged Bertoli arranged for the LCI IPO to be sold in units; a unit consisted of one share of common stock and two warrants. *Id.*, ¶15. It alleged the Defendants and others, including Eisenberg, caused "virtually all of the securities in the LCI IPO to be sold to individuals and entities who were controlled by them, or who were under the control of individuals who had understandings with them concerning the manner in which these securities would be traded." *Id.*, ¶16. It alleged that, as a result, the Defendants and Eisenberg controlled the LCI securities traded in the market and enhanced their own ability to fraudulently manipulate the price of the LCI securities. *Id.*

Count One alleged that, during the LCI IPO and the first few days of aftermarket trading, the Defendants and Eisenberg purchased substantial amounts of LCI securities at minimal cost through nominee brokerage accounts, such as the brokerage account for Euro Bank Corp. ("Euro Bank") [12] at Monarch. *Id.*, ¶17. It further alleged Defendants and Eisenberg controlled pricing by, prior to the close of the LCI IPO, making arrangements with brokers and traders for the LCI securities to be traded according to the directions of Defendants and Eisenberg. It alleged these individuals bought and sold LCI securities at times and prices determined by the Defendants and Eisenberg, rather than by market forces. *Id.*, ¶18.

Count One alleged Defendants and Eisenberg bribed portfolio managers and research analysts of the M & I Growth Fund (the "M & I Fund") [13] and Aggressive Growth Shares, Inc. (the "Bullock Fund").[14] It alleged the Defendants and Eisenberg opened nominee brokerage accounts at Monarch for the bene-

fit of the M & I Fund and Bullock Fund managers and research analysts. These accounts were used to generate large sums of money through fraudulent trading of LCI securities. *Id.*, ¶19. The managers in turn bought large blocks of LCI securities for their respective funds. The research analysts caused Halswell Corp. ("Halswell") [15] to open an account at Monarch. *Id.*

Count One alleged Cannistraro wrote a research report to be circulated prior to the close of the LCI IPO which recommended the purchase of LCI securities (the "LCI Report"). *Id.*, ¶20. It alleged the Defendants caused a broker from G.K. Scott & Co., a securities brokerage firm, ("G.K. Scott") to claim authorship of and publish the LCI Report on G.K. Scott letterhead because Cannistraro was an officer and director and the largest shareholder of LCI. *Id.* It further alleged that, as part of the LCI Scheme, the Defendants and Eisenberg caused the LCI Report to be disseminated without disclosing that Cannistraro had actually authored it, or disclosing that the Defendants and Eisenberg were engaged in a scheme to manipulate the market and that the LCI Report was part of the scheme. *Id.*, ¶21.

Count One alleged that, during the first five days of aftermarket trading, the Defendants and Eisenberg caused the price of LCI securities to rise from the IPO unit price of twenty-five cents to $1.25 and that, by the end of February 1983, they caused the price to rise to $1.625 per share. *Id.*, ¶22. It alleged the Defendants and Eisenberg sold their LCI securities "without disclosing this fraudulent trading scheme" and "fraudulently obtained profits totalling at least $462,-000." *Id.*, ¶23. Count One identified, by date and content, four instances of mail fraud, five instances of wire fraud and one

---

11. An IPO is a procedure whereby a private company registers its securities with the Securities and Exchange Commission ("SEC") for sale to the general public as a means to raise capital; the company then becomes a public company. Count One, ¶1(e). The IPO purchasers are known as "subscribers." *Id.*

12. Euro Bank is a bank on Grand Cayman Island. Count One, ¶6(1).

13. The M & I Fund was a trust fund consisting of a portfolio of securities. It was managed by the Marshall & Ilsley Bank. Count One, ¶6(i).

14. The Bullock Fund was an investment company and mutual fund consisting of a portfolio of securities. It was managed by Calvin Bullock, Ltd., an investment advisor. Count One, ¶6(j).

15. Halswell was a corporation that purchased and sold various over-the-counter securities. Count One, ¶6(k).

instance of securities fraud in violation of Section 10(b) ("Section 10(b)") of the Securities Exchange Act of 1934 (the "Securities Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5 ("Rule 10b–5"), all perpetrated by the Defendants and others, including Eisenberg, in executing the LCI Scheme. *Id.*, ¶¶ 24–26.

Count One further charged that, between approximately December 1982 and October 1983, the Defendants and others, including Eisenberg, engaged in a scheme concerning Toxic Waste[16] securities (the "Toxic Waste Scheme"). *Id.*, ¶¶ 27–28. Count One described the Toxic Waste Scheme as one in which the Defendants and Eisenberg rigged and manipulated the market in order to raise and to control the price of Toxic Waste securities and to create a greater demand for the same, in order to ensure they could sell their Toxic Waste securities at a substantial profit. *Id.*, ¶¶ 28–29.

Count One alleged Bertoli caused Monarch to underwrite the IPO of Toxic Waste securities (the "Toxic Waste IPO"). *Id.*, ¶ 30. It alleged Bertoli caused the securities in the Toxic Waste IPO to be sold in units, each consisting of one share of common stock and two warrants. *Id.*, ¶ 31. It alleged the Defendants and others, including Eisenberg, caused "the securities in the Toxic Waste IPO to be sold to individuals and entities who were controlled by them, or who were under the control of individuals who had understandings with them concerning the manner in which these securities would be traded." *Id.*, ¶ 32. It alleged that, as a result, the Defendants and Eisenberg controlled the Toxic Waste securities being traded in the market and enhanced their ability to fraudulently manipulate the price of the Toxic Waste securities. *Id.*

Count One alleged that, during the Toxic Waste IPO and first days of aftermarket trading, the Defendants and Eisenberg purchased substantial amounts of Toxic Waste securities at minimal cost through nominee brokerage accounts in the names of Parsico Ltd. ("Parsico")[17] and Venture Partners "A" ("Venture Partners")[18] maintained at Monarch. *Id.*, 33. It further alleged Defendants and Eisenberg controlled pricing by, prior to the close of the Toxic Waste IPO, making arrangements with brokers and traders for the Toxic Waste securities to be traded according to the directions of Defendants and Eisenberg. It alleged these individuals bought and sold Toxic Waste securities at times and prices determined by the Defendants and Eisenberg, rather than by the market forces. *Id.*, ¶ 34.

Count One alleged that, in furtherance of the Toxic Waste Scheme, Defendants and Eisenberg opened nominee brokerage accounts at Monarch for the benefit of the managers and research analysts of the M & I Fund and the Bullock Fund. *Id.*, ¶ 35. It alleged the Defendants and Eisenberg bribed the managers of the M & I Fund and Bullock Fund to buy large blocks of Toxic Waste securities for their respective funds. Research analysts at the M & I Fund and Bullock Fund caused the Halswell brokerage account at Monarch to purchase large blocks of Toxic Waste securities. *Id.*

Count One alleged that, as part of the fraudulent scheme to inflate the price of Toxic Waste securities, Cannistraro wrote four research reports (the "Toxic Waste Reports") to be circulated prior to the close of the Toxic Waste IPO. These reports recommended the purchase of the Toxic Waste securities. *Id.*, ¶ 36. Count One alleged Cannistraro caused Wood Gundy to disseminate the Toxic Waste Reports to the investing public. *Id.* It alleged the Defendants and Eisenberg caused the Toxic Waste Reports to be disseminated without disclosing that the Defendants and Eisenberg were engaged in a

---

**16.** Toxic Waste was a corporation that "purportedly engaged in the business of marketing hazardous waste containment products." Count One, ¶ 6(d).

**17.** The Redacted Second Superseding Indictment alleged Parsico was located at Euro Bank. Count One, ¶ 6(1).

**18.** The Redacted Second Superseding Indictment alleged Venture Partners was located at Euro Bank. Count One, ¶ 6(1).

scheme to manipulate the market and that the reports were part of the scheme. *Id.*, ¶ 37. Count One alleged that, as part of the Toxic Waste Scheme, in or about March or April 1983, Bertoli and Eisenberg caused Monarch to disseminate to brokers, research analysts, securities newsletters and Monarch customers eighteen thousand copies of one of the Toxic Waste Reports. *Id.*, ¶ 38.

Count One alleged that, in or about March or April 1983, Cannistraro caused to be prepared and disseminated to the investing public articles in the "Portfolio Letter," dated 14 March 1983, and the securities investment newsletter "Ground Floor," dated 22 April 1983. *Id.*, ¶ 39. It alleged these articles discussed the Toxic Waste Reports and continued to recommend the purchase of Toxic Waste securities without disclosing the existence of the Toxic Waste Scheme. *Id.*

Count One alleged that, during the first three days of aftermarket trading, the Defendants and Eisenberg caused the price of Toxic Waste securities to rise from the IPO unit price of twenty-five cents to $1.25 per share of common stock and that, between 10 March 1983 and mid-June 1983, they caused the price to rise further to $4.50 per share. *Id.*, ¶ 40. Count One alleged the Defendants and Eisenberg sold their Toxic Waste securities "without disclosing this fraudulent trading scheme" and "fraudulently obtained profits totalling at least $4,240,000." *Id.*, ¶ 41. It identified, by date and content, eight instances of mail fraud, two instances of wire fraud, one instance of interstate transportation of money taken by fraud in violation of 18 U.S.C. § 2314 and one instance of securities fraud in violation of Section 10(b) and Rule 10b–5, all perpetrated by the Defendants and others, including Eisenberg, in executing the Toxic Waste Scheme. *Id.*, ¶¶ 42–45.

Count One further charged that, from approximately March 1983 to November 1984, in the District of New Jersey and elsewhere, the Defendants executed a scheme to conceal the identities of the promoter and beneficial owners of High Tech (the "Beneficial Owners

Concealment Scheme").[19] *Id.*, 46. It alleged that, in about March 1983, Bertoli became the promoter of High Tech, whereby he founded High Tech, appointed its officers, board of directors and advisory board, allocated the distribution of its securities and arranged for the IPO of its securities (the "High Tech IPO"), which IPO was underwritten by Monarch. *Id.*, ¶ 47.

Count One further alleged that, in March 1983, prior to the High Tech IPO, the Defendants and Eisenberg caused 3,100,000 shares of High Tech restricted common stock to be placed in the names of nominees while the shares were beneficially owned by the Defendants and Eisenberg. *Id.*, ¶ 48. It alleged the Defendants and Eisenberg did not disclose in High Tech's registration statements and prospectus the role of Bertoli as High Tech's promoter and the Defendants' and Eisenberg's beneficial ownership of more than ten percent of High Tech's common stock and of more than ten percent of High Tech's outstanding stock. *Id.*, ¶ 49.

Count One alleged that, having concealed such information, the Defendants raised $425,000 in capital for High Tech from the investing public and were able to direct the management and policies of High Tech to the benefit of the Defendants. *Id.*, ¶ 50. In addition, it alleged that, from approximately February 1984 to July 1984, the Defendants caused 3,100,000 shares of High Tech common stock beneficially owned by them to be sold for a profit of at least $115,000. *Id.*, ¶ 51. It identified, by date and content, three instances of mail fraud, two instances of wire fraud and two instances of securities fraud in violation of section 17 of the Securities Exchange Act, 15 U.S.C. § 77g, and sections 24, 10 and Schedule A(4) and (6) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77x, 77j(a)(1) and 77aa(4) and (6), all perpetrated by the Defendants and others, including Eisenberg, in executing the Beneficial Owners Concealment Scheme. *Id.*, ¶¶ 52–55.

Count One further charged that the Defendants and others, including Eisenberg, en-

---

**19.** High Tech was a corporation that "purportedly engaged in the venture capital business."

Count One, ¶ 6(e).

gaged in a scheme concerning High Tech securities from about March 1983 to about February 1984, in the District of New Jersey and elsewhere (the "High Tech Scheme"). *Id.,* ¶ 56. Count One described the High Tech Scheme as one in which the Defendants and Eisenberg rigged and manipulated the market in order to raise the price of, control the price of and create a greater demand for High Tech securities, in order to ensure they could sell their High Tech securities at a substantial profit. *Id.,* ¶¶ 57–58.

Count One alleged Bertoli caused Monarch to underwrite the IPO of High Tech securities. *Id.,* ¶ 59. It alleged Bertoli caused the securities in the High Tech IPO to be sold in units, consisting of one share of common stock and two warrants. *Id.,* ¶ 60. It alleged the Defendants and others, including Eisenberg, caused "the securities in the High Tech IPO to be sold to individuals and entities who were controlled by them, or who were under the control of individuals who had understandings with them concerning the manner in which these securities would be traded." *Id.,* ¶ 61. It charged that, as a result, the Defendants and Eisenberg controlled the High Tech securities being traded in the market and enhanced their ability to fraudulently manipulate the price of the High Tech securities. *Id.*

Count One alleged that, during the High Tech IPO and first few days of aftermarket trading, the Defendants and Eisenberg purchased substantial amounts of High Tech securities at minimal cost through nominee brokerage accounts maintained at Monarch in the names of Parsico, Venture Partners, VPI Ltd. ("VPI") [20] and Roger Rowland ("Rowland").[21] *Id.,* ¶ 62. It further alleged Defendants and Eisenberg controlled pricing by, prior to the close of the High Tech IPO, making arrangements with brokers and traders for the High Tech securities to be traded according to the directions of Defendants and Eisenberg. It alleged this trading procedure allowed High Tech securities to be bought and sold at times and prices determined by the Defendants and Eisenberg, rather than

by market forces. *Id.,* ¶ 63. It charged that, as part of the High Tech Scheme, the Defendants and Eisenberg bribed a research analyst (the "Research Analyst") in an attempt to cause the buying of large blocks of High Tech securities. *Id.,* ¶ 64.

Count One alleged the Defendants and Eisenberg allocated securities in the High Tech IPO to the Research Analyst's nominee brokerage account at Monarch. *Id.* In exchange for such allocation, and in exchange for money which the Defendants and Eisenberg provided to the Research Analyst "through the trading of LCI and Toxic Waste securities in his nominee accounts at Monarch, the [R]esearch [A]nalyst caused the Halswell brokerage account at Monarch to purchase a large block of High Tech securities." *Id.*

Count One alleged that, as part of the fraudulent scheme to inflate the price of High Tech securities, Cannistraro recommended the purchase of High Tech securities to various brokers at Wood Gundy, without disclosing that the Defendants and Eisenberg were engaged in a scheme to manipulate the market and that the recommendation was part of the scheme. *Id.,* ¶ 65. It alleged the Defendants and Eisenberg caused the price of High Tech securities to rise in the first six days of aftermarket trading from the IPO price of $.50 to $2.25 per share of common stock; between 15 June and mid-October 1983 the price further increased to $3.25 per common share. *Id.,* ¶ 66.

Count One charged that, from about June 1983 to about February 1984, the Defendants sold their High Tech securities to the investing public, without disclosing the existence of the fraudulent trading scheme, for a profit of at least $1,720,000. *Id.,* ¶ 67. It identified, by date and content, six instances of mail fraud and one instance of securities fraud in violation of Section 10(b) and Rule 10b–5, all perpetrated by the Defendants and others, including Eisenberg, in executing the High Tech Scheme. *Id.,* ¶¶ 68–69.

---

**20.** The Redacted Second Superseding Indictment alleged VPI was located at Euro Bank. Count One, ¶ 6(1).

**21.** The Redacted Second Superseding Indictment alleged Rowland was located at Euro Bank. Count One, ¶ 6(1).

Finally, Count One charged the Defendants obstructed justice to conceal their wrongdoing (the "Cover–Up Scheme"). Count One alleged a subpoena by a grand jury empaneled in the District of New Jersey[22] was served on one of Cannistraro's nominees on or about 24 January 1986, requiring the nominee to produce documents and to testify before the grand jury. *Id.*, ¶ 71. It alleged Cannistraro instructed and directed this nominee, in return for cash payments, to conceal Cannistraro's beneficial ownership in the nominee's Monarch account. *Id.*, ¶ 72.

Count One charged Bertoli engaged in conduct to obstruct justice and to cover up the fraudulent trading schemes by shredding and destroying documents in the Cayman Islands in June and November 1987, by removing documents and hiding the proceeds from the racketeering activities and by submitting false and fraudulent affidavits to the court. *Id.*, ¶ 73.

Count Two of the Redacted Second Superseding Indictment ("Count Two") charged the Defendants with conspiracy to violate section 1962(c) of RICO, 18 U.S.C. § 1962(c), by agreeing with others, including Eisenberg, to conduct the affairs of Monarch through a pattern of racketeering. Count Two, ¶ 2. It charged the conspiracy existed from about January 1982 to at least January 1989, in the District of New Jersey and elsewhere. *Id.* It alleged the pattern of racketeering consisted of the racketeering acts (the "Racketeering Acts") charged in Count One of the Redacted Second Superseding Indictment. *Id.*

Count Three of the Redacted Second Superseding Indictment ("Count Three") charged Bertoli with conspiracy to obstruct justice, in violation of 18 U.S.C. § 371, in connection with (1) an investigation, beginning in July 1983, by the SEC of allegedly fraudulent and manipulative trading at LCI and Toxic Waste (the "SEC Investigation"), (2) a civil action brought in 1985 by the SEC

against the Defendants, Eisenberg and Steven Cloyes ("Cloyes"), a securities broker at Monarch (the "SEC Action"), (3) the 1985–86 Grand Jury Investigations, (4) the prosecution of Cannistraro in 1987 (the "1987 Cannistraro Prosecution") and (5) this action. Count Three, ¶ 14. It charged the conspiracy began as early as March 1983 and continued through the date of trial. *Id.*

Count Three described the object of the conspiracy as being "to cover-up, conceal, and eventually avoid civil and criminal liability for, the illegal racketeering activities of ... Bertoli, ... Cannistraro and ... Eisenberg, and to prevent evidence of their ... beneficial ownership of money and accounts in the Cayman Islands, from being considered and used" in the civil and criminal actions against them. *Id.*, ¶ 15. It alleged the conspiracy was achieved by causing brokers or nominees to lie to or to conceal evidence from investigators and the grand jury. *Id.*, ¶¶ 16–28. As a result, Cayman Islands banks did not produce documents requested pursuant to an informal agreement between the United States Department of Justice and the Cayman Islands authorities. Moreover, Defendants concealed documents at Monarch that were subpoenaed by the grand jury, destroyed documents relating to the nominee accounts at Euro Bank, filed a false financial disclosure form with the United States Probation Office, transferred funds in the Cayman Islands and submitted false affidavits during the course of this prosecution. *Id.*

Count Three listed thirty-three overt acts committed by the Defendants and Eisenberg in furtherance of this conspiracy between March 1983 and the return of the Second Superseding Indictment. Although these overt acts are too numerous to set forth in full in this opinion, they included several meetings and telephone calls between the Defendants and other parties and several false and misleading statements by the Defendants and other parties.[23]

---

**22.** This grand jury was empaneled on 10 September 1985. Count One, ¶¶ 70–71. A second grand jury was empaneled on 30 January 1986. *Id.*, ¶ 70. Both of these grand juries were investigating, *inter alia,* alleged criminal acts involving LCI and Toxic Waste securities transactions

in the District of New Jersey and elsewhere (the "1985–86 Grand Jury Investigations"). *Id.*

**23.** The overt acts alleged in Count Three included calls in March and August 1983 among or between Bertoli and/or Eisenberg and a broker

Count Four of the Redacted Second Superseding Indictment ("Count Four") charged Bertoli with obstruction of justice in violation of 18 U.S.C. §§ 1502 and 1503. Count Four, ¶ 4. It alleged that, in or about June 1987, Bertoli and Eisenberg, after a grand jury returned the indictment in the 1987 Cannistraro Prosecution (the "1987 Cannistraro Indictment"), shredded and destroyed documents from the Cayman Islands which were relevant to the investigations of a separate grand jury, empaneled on 30 January 1986. *Id.*, ¶¶ 2–4.

Count Five of the Redacted Second Superseding Indictment ("Count Five") also charged Bertoli with obstruction of justice in violation of 18 U.S.C. §§ 1502 and 1503. Count Five, ¶ 3. It alleged that, in or about November 1987, Bertoli shredded and destroyed documents in the Cayman Islands that were relevant to the investigations of a grand jury empaneled on 17 March 1987. *Id.*, ¶¶ 2–3.

Count Six of the Redacted Second Superseding Indictment ("Count Six") charged Bertoli with obstruction of justice in violation of 18 U.S.C. §§ 1502 and 1503. Count Six, ¶ 2. Count Six alleged that, in or about April 1990, in the District of New Jersey and elsewhere, Bertoli and others, including Eisenberg, "caused the racketeering proceeds and documents relating to those racketeering proceeds to be transferred from the custody and control of [a Paget–Brown & Co. ("Paget Brown")] [24] employee and then caused the racketeering proceeds to be moved from the Cayman Islands to the Principality of Andorra in Europe." *Id.*

Count Seven of the Redacted Second Superseding Indictment ("Count Seven") charged Bertoli with obstruction of justice in violation of 18 U.S.C. §§ 1502 and 1503. Count Seven, ¶ 5. It alleged that, on or about 6 December 1991 Bertoli "submitted three purported "Affidavits in Contemplation of Death" by Jack Isaacson [25] (the "Isaacson Affidavits"),[26] which stated, *inter alia,* that Isaacson and another individual were the sole beneficial owners of the Cayman Islands bank and brokerage accounts ... relevant to the present RICO prosecution." *Id.*, ¶¶ 2–3 (footnotes added). Count Seven alleged the Isaacson Affidavits were false and fraudulent and Bertoli was aware of this. *Id.*, ¶ 4. It further alleged Bertoli was aware the Isaacson Affidavits "had been prepared for the use of ... Bertoli and others, including ... Cannistraro and ... Eisenberg, in attempting to fraudulently exculpate themselves...." *Id.*

B. *History of the Cayman Islands Depositions*

On 6 November 1989, the Government filed a motion, pursuant to Fed.R.Crim.P. 15, for depositions in the Cayman Islands (the "First Set of Cayman Islands Depositions") and for the issuance of a request for foreign judicial assistance (the "Cayman Islands Discovery Motion").[27] First Cayman Discovery

---

from G.K. Scott, *see* Count Three, Overt Act Nos. 1, 3–4 and 6, and false and misleading statements provided by a G.K. Scott broker to SEC investigators or to the SEC, *see id.,* Overt Act Nos. 2 and 5.

In addition, the overt acts included: false and misleading statements made by Eisenberg to the SEC, *see id.,* Overt Act Nos. 7–8; telephone calls or meetings between Cannistraro and his nominees and subsequent false statements by the nominees to the SEC or the grand jury, *see id.,* Overt Acts Nos. 9–11, 16–17, 21; flights by the Defendants to the Cayman Islands, *see id.,* Overt Acts Nos. 12–15, 18–20, 22–24; the shredding of documents in the Cayman Islands, *see id.,* Overt Acts Nos. 25, 27; a meeting between Bertoli and Eisenberg in New York, New York, *see id.,* Overt Act No. 30; and the providing of false documents or affidavits to the court or the United States Probation Office, *see id.,* Overt Acts Nos. 26, 31–33.

**24.** Paget Brown is a company which sets up and administers corporations in the Cayman Islands for foreign entities and individuals. This business includes setting up and administering bank accounts. *See* Coleman Dep.Tr. at 7–10.

**25.** Jack Isaacson ("Isaacson"), died on 15 January 1988. Bertoli was the executor of Isaacson's estate. *See* Appendix to Affidavit of Richard Bertoli In Support of the Motion to Dismiss for Pre-Indictment Delay, filed 9 December 1991, Ex. B.

**26.** The Isaacson Affidavits were undated.

**27.** Prior to filing the Cayman Island Discovery Motion, the Government had sought to obtain the requested information through informal political channels. These efforts were unsuccessful. *See* Letter–Opinion, filed 29 June 1990, at 4–6 (the "First Cayman Discovery Opinion").

Opinion at 7. Defendants opposed the motion. *Id.* at 6–9.

On 11 December 1989, Bertoli applied *ex parte* to the Grand Court of the Cayman Islands (the "Cayman Grand Court") for an injunction (the "Cayman Islands *Ex Parte* Injunction") prohibiting the Government from applying to the Cayman Islands for the discovery described in the Cayman Islands Discovery Motion.[28] The Cayman Islands *Ex Parte* Injunction was granted on 4 January 1990. *Id.* at 8.

On 4 April 1990, the Government filed a treaty request (the "MLA Treaty Request") with the Cayman Grand Court seeking evidence located in the Cayman Islands pursuant to the Treaty Between the United States and the United Kingdom of Great Britain and Northern Ireland Concerning the Cayman Islands and Relating to Mutual Legal Assistance in Criminal Matters (the "MLA Treaty"), S. Treaty Doc. No. 100–8, 100th Cong., 1st Sess. (1990). First Cayman Discovery Opinion at 3. Also on 4 April 1990, the Government filed an amended Rule 15 motion (the "Amended Cayman Islands Discovery Motion"), retaining its request to take Cayman Islands depositions but withdrawing its motion for the issuance of a request for foreign judicial assistance and advising it was proceeding under the MLA Treaty. First Cayman Discovery Opinion at 8–9.

On 24 April 1990, an order was issued allowing the Government to take foreign depositions and to obtain documents in the Cayman Islands. *See* Order, filed 24 April 1990 (the "24 April 1990 Cayman Discovery Order"). Significantly, the 24 April 1990 Cayman Discovery Order stated:

28. For a more complete description of the deceptive conduct of then-counsel for Bertoli, Franklin M. Sachs ("Sachs."), surrounding this *ex parte* application, see *Eisenberg*, 734 F.Supp. at 1142–43. Generally, on 17 November 1989, Bertoli filed opposition to the Government's Cayman Islands Discovery Motion. Bertoli then filed a series of additional motions. While these motions were pending, Bertoli requested a delay of the decision on the Government's Cayman Islands Discovery Motion, and effectively brought the case to a stand-still. Upon obtaining this delay, Bertoli applied for and obtained, on an *ex parte* basis, an injunction from the Cayman Grand Court prohibiting the Government from

IT FURTHER APPEARING that, for the purposes of Rule 15 only, the [D]efendants do not contest that the deposition testimony and documents sought in the Cayman Islands are relevant and material to the trial of this matter; and

. . . . .

IT FURTHER APPEARING that, for purposes of Rule 15 only, [D]efendants do not contest that due to the exceptional circumstances of this case, it is in the interest of justice that the request of the United States for leave to take foreign depositions for use at trial of this matter pursuant to a[n] [MLA] Treaty Request be granted; and

IT FURTHER APPEARING that [D]efendants consent to the issuance of this Order, and that such consent has been given, in part, in reliance upon the [MLA] Treaty Request of 4 April 1990; and

IT FURTHER APPEARING that the consent of [D]efendants to the granting of this Order shall not act as a waiver of any right of [D]efendants to contest either the right of the United States to have proceeded under the [MLA] Treaty or the constitutionality of that Treaty; nor shall this consent be construed as consent of [D]efendants that the United States is entitled to any depositions or documents pursuant to the [MLA] Treaty Request of April 4, 1990;

. . . . .

IT IS FURTHER ORDERED that [D]efendants' consent to entry of this Order shall preclude [their] objection based on Rule 15 to the use or admissibility at trial of any evidence obtained hereunder,[29]

applying in the Cayman Islands for the discovery described in the Cayman Islands Discovery Motion. The court was unaware of Bertoli's application for the Cayman Islands *Ex Parte* Injunction until a copy of the injunction itself was forwarded to the court by the Government.

29. Despite this consent order precluding the Defendants from making objections based on Rule 15, Bertoli later attempted to withdraw his consent to the 24 April Cayman Discovery Order and objected to the First Set of Cayman Islands Depositions on the ground that they violated Rule 15.

but [their] consent shall not operate as a waiver of any other rights [D]efendants may have to object to the admissibility of any such evidence at trial on any other ground.

24 April 1990 Cayman Discovery Order at 2–3.

On 10 July 1990, the Defendants commenced a separate civil action (the "Cayman Civil Action") in the Cayman Grand Court, seeking to enjoin the Government from pursuing the MLA Treaty Request. *See* Letter Opinion, filed 9 January 1992 (the "Second Cayman Discovery Opinion"), at 5. On the same day, the Cayman Grand Court filed an order dismissing the Cayman Civil Action (the "10 July 1990 Cayman Order"). *Id.* at 6.

On 28 November 1990, the Cayman Islands Court of Appeals (the "Cayman Appeals Court") affirmed the 10 July 1990 Cayman Order. *Id.* The Defendants then sought leave to appeal the Cayman Appeals Court's affirmance to the Privy Council for the United Kingdom (the "Privy Council").[30] *Id.* On 5 December 1990, the Cayman Appeals Court granted the Defendants leave to appeal and stayed processing of the MLA

Treaty Request pending appeal to the Privy Council. *Id.* On 22 April 1991, the Privy Council affirmed the order of the Cayman Appeals Court. *Id.* Accordingly, this case was delayed approximately one year from the issuance of the Cayman Islands *Ex Parte* Injunction to the decision of the Privy Council.

The Cayman Central Authority (the "Cayman Authority") scheduled document production in the Cayman Islands for the period 13 May 1991 through 21 May 1991, with the First Set of Cayman Islands Depositions to commence thereafter. *Id.* Subsequently, the Government and the Defendants agreed to postpone document production until 15 July 1991 and to postpone the First Set of Cayman Islands Depositions until 4 September 1991. *Id.*

On 4 September 1991, the First Set of Cayman Islands Depositions commenced in the Cayman Islands before presiding Judge Sir Denis Malone ("Judge Malone").[31] Attending the First Set of Cayman Islands Depositions were the Government and Bertoli. Neither Cannistraro nor his then-counsel were present[32] at the First Set of Cayman

---

**30.** The Privy Council is the highest court in the United Kingdom that hears matters arising in the Cayman Islands.

**31.** Depositions were conducted of the following individuals: Nicholas Duggan ("Duggan"), records custodian of Butterfield International Cayman, Ltd. ("Butterfield"); Sheree Ebanks, manager of Butterfield; M.F.B. Gillooly ("Gillooly"), former directing manager of Butterfield; David Meyeroff ("Meyeroff"), financial controller and internal auditor of Swiss Bank; Cecil Chan–A–Sue ("Chan–A–Sue"), records custodian of Royal Bank of Canada ("Royal Bank"); Timothy Bechard ("Bechard"), resident manager of Grand Cayman branch of Richardson Greenshields of Canada ("Greenshields"); Delano Solomon ("Solomon"), Registrar General for the Cayman Islands; Brian Lundie ("Lundie"), general manager of Cable and Wireless; Rodney Bond ("Rodney Bond"), resident manager of Swiss Bank; Susan Rivers ("Rivers"), secretary at Euro Bank; Sidney Coleman ("Coleman"), executive chief officer of Paget Brown. Proceedings by the Cayman Authority are referred to herein as "—— Sept. Proceedings Tr. at ——". The factual witnesses were videotaped and audiotaped; the records witnesses were not videotaped pursuant to the decision of the Cayman Authority. 4 Sept. Proceedings Tr. at 22.

**32.** By letter, dated 8 August 1991, Cannistraro requested that the Government pay for travel expenses, pursuant to Fed.R.Crim.P. 15, for his counsel to attend the First Set of Cayman Islands Depositions (the "Rule 15 Letter Request"). Letter to court, dated 8 August 1991. The reason stated was that Cannistraro had been incarcerated for the past four years as a result of his plea of guilty to the 1987 Cannistraro Indictment. *Id.* The Government objected to the Rule 15 Letter Request because Cannistraro had never requested appointment of an attorney under the Criminal Justice Act, 18 U.S.C. § 3006A. *See* Letter to court, dated 14 August 1991. The Government further opposed the Rule 15 Letter Request on the ground that evidence revealed Cannistraro had significant assets in an off-shore bank account. *Id.*

On 19 August 1991, the Rule 15 Letter Request was denied. Letter from court to Cannistraro, dated 19 August 1991. By letter, dated 22 August 1991, then-counsel to Cannistraro stated Cannistraro requested reconsideration of the decision to deny the Rule 15 Letter Request because Cannistraro was "financially unable to bear the costs attendant to three weeks of depositions in the Cayman Islands." Letter to court, dated 22 August 1991. Because an affidavit of indigency was not submitted, the request for reconsideration was denied. Letter from court, dated 23 August 1991.

Islands Depositions. The First Set of Cayman Island Depositions concluded on 16 September 1991.

At a hearing at the start of the First Set of Cayman Islands Depositions (the "MLA Treaty Hearing"), Judge Malone explained the procedure for the depositions. He stated Cayman law, rather than United States law, would be the background law, but it would not be rigidly applied. 4 September Proceedings Tr. at 16. Judge Malone also explained the "records in the proceedings will be those requested by the United States authorities." *Id.* at 17. He stated the proceedings must be kept within the parameters of the MLA Treaty and that collateral issues should not be pursued widely. *Id.* at 33.

With respect to cross-examination, he stated: "[Q]uestions which affect the credibility of a witness by attacking his character, but are not otherwise relevant to the actual inquiry, ought not to be asked unless there are reasonable grounds for thinking that the implication conveyed by the question is well-founded or true." *Id.* Judge Malone explained issues of admissibility were matters for the trial judge in the United States. *Id.* at 34. He reminded the parties that Article Seven of the MLA Treaty limits the use of

information obtained through the MLA Treaty. *Id.*

During the course of the First Set of Cayman Islands Depositions, the Judge Malone explained Bertoli would not be permitted to *voir dire* the witnesses with respect to documents introduced by records custodians.[33] *See* Duggan Dep. Tr. at 21–23. Nevertheless, during the First Set of Cayman Islands Depositions, Bertoli cross-examined all of the witnesses and re-crossed document witness Bechard.[34] At the close of the First Set of Cayman Islands Depositions, Bertoli objected to the fact that the Government did not call four witnesses it had subpoenaed for depositions. 17 Sept. 1991 Proceedings Tr. at 6–7. Judge Malone explained he could not require the Government to call witnesses. *Id.* at 7.

As a result of the First Set of Cayman Islands Depositions, the Government discovered the existence of additional relevant documents in the Cayman Islands. *See* Second Cayman Discovery Opinion at 8. In a letter, dated 20 September 1991 (the "20 September 1991 Letter"), the Government informed the court of its intention to obtain these additional documents through a supplemental request under the MLA Treaty (the "Supplemental Treaty Request"). *Id.* In addition,

By letter, dated 26 August 1991, the Government submitted additional opposition to the Rule 15 Letter Request. The Government argued Cannistraro had "failed to establish, in a sworn affidavit or other appropriate court filing detailing his assets and liabilities, that he does not have the financial ability to bear these costs." Letter to court, dated 26 August 1991. The Government reiterated it had evidence Cannistraro had control of foreign bank accounts. *Id.* It further stated Cannistraro's then-counsel had previously traveled to the Cayman Islands to review the documents produced pursuant to the MLA Treaty Request in July 1991. *Id.*

By letter, dated 29 August 1991, then-counsel to Cannistraro advised the court that he would not attend the First Set of Cayman Islands Depositions. On 21 July 1992, it was found Cannistraro had voluntarily waived his right to participate in the First Set of Cayman Islands Depositions. *Cannistraro*, 800 F.Supp. at 71–72.

**33.** During the First Set of Cayman Islands Depositions, the Government sought to introduce documents through an expedited procedure whereby the witness was shown the file of documents prior to the depositions to review and confirm

that the records were produced by his place of employment. *See* Transcript of Deposition of Duggan, taken 4 September 1991 (the "Duggan Dep.Tr."), at 20–21. Bertoli objected to the use of this procedure because he wanted to *voir dire* the witnesses with respect to the documents. *Id.* at 21. Judge Malone was unfamiliar with the suggested *voir dire* procedure and ruled that it would not allow such *voir dire*. *Id.* at 21–22.

**34.** After the Government conducted re-direct examination of Coleman, Bertoli sought to re-cross Coleman. Coleman Dep.Tr. at 300. Judge Malone did not permit re-cross examination. He stated: "There's no Recross here. There's Examination in Chief, there's Cross Examination and there's a Re-examination." *Id.* Bertoli, therefore, moved to strike the re-direct testimony on the grounds that he was denied an opportunity to re-cross. *Id.* at 302. The issue of Bertoli's right to re-cross witnesses was resolved by this court during a hearing on 10 September 1992 (the "10 September Hearing"). Bertoli was granted the right to re-cross when the Government brought out new information during re-direct. Transcript of Proceedings of 10 September 1992 (the "10 Sept. 1992 Tr."), at 6–7.

the 20 September 1991 Letter indicated the Government's intention to introduce, under 18 U.S.C. § 3505, any documents obtained through the Supplemental Treaty Request. *Id.* On 25 October 1991, the Government submitted the Supplemental Treaty Request to the Cayman Grand Court seeking production of corporate documents.[35]

On 31 October 1991, Bertoli responded by letter to the Supplemental Treaty Request. Letter to court, dated 31 October 1991 (the "31 October 1991 Letter"); Second Cayman Discovery Opinion at 8. The 31 October 1991 Letter objected to the Supplemental Treaty Request on the ground that it was not authorized under Rule 15 and because Bertoli had allegedly withdrawn his consent to the 24 April 1990 Cayman Discovery Order. *See* Second Cayman Discovery Opinion at 8–9. On 4 November 1991, and again on 7 November 1991, Bertoli requested leave to file a motion to enjoin the Supplemental Treaty Request. *Id.* at 15. On 15 November 1991, a scheduling conference was held at which filing dates were set for the then-proposed motion to enjoin the Supplemental Treaty Request. *Id.* This motion was denied on 9 January 1992. *Id.* at 15.

In addition, following the First Set of Cayman Islands Depositions, Bertoli moved in this court for leave to depose three witnesses in the Cayman Islands, all of whom had previously been subpoenaed but not called by the Government. Notice of Motion, filed 12 November 1991. On 19 December 1991, Bertoli was given leave to depose George Ebanks ("Ebanks"), deputy managing director of Euro Bank, Joan Bond, assistant

secretary of Euro Bank, and Patrick Holmes ("Holmes"), an officer at the Guardian Bank and Trust (Cayman) Limited (collectively, the "Second Set of Cayman Islands Depositions"). Letter Opinion and Order, filed 19 December 1991. In February 1992, a Letter Rogatory was submitted to the Cayman Authority (the "Letter Rogatory") requesting that the Second Set of Cayman Islands Depositions be conducted.

As mentioned, in January 1992, the Second Superseding Indictment was returned, adding obstruction of justice charges which alleged Bertoli had shredded documents in the Cayman Islands, caused fraudulent affidavits concerning the Cayman Islands to be filed with the court and caused racketeering proceeds to be transferred from the Cayman Islands to the principality of Andorra. *See supra,* at 997–998. Subsequent to the return of the Second Superseding Indictment, the Defendants filed their second set of pre-trial motions seeking, *inter alia,* to exclude the First Set of Cayman Islands Depositions from evidence at trial on several grounds.[36] *See Cannistraro,* 800 F.Supp. at 65–72.

Bertoli argued that, as a result of the changes in the Second Superseding Indictment, the depositions of Coleman and Rodney Bond were inadmissible because he did not have the requisite similarity of motive for cross examination required by Fed.R.Evid. 804(b)(1). *Cannistraro,* 800 F.Supp. at 65. Moreover, Bertoli sought to exclude the Coleman and Rodney Bond depositions because he was not permitted to re-cross examine those witnesses. *Id.* Cannistraro argued the First Set of Cayman Islands Depo-

**35.** Specifically, the Government sought documents from ten corporations: Cosco, Ltd., Midco, Ltd., Whiteco, Ltd., Centurion Enterprises ("Centurion"), Beechum, Eastern Funds, Nuco/Newco, George Town Mortgage, S.A. ("George Town"), Island Mortgage, S.A., Groco, Ltd., Toxco, Ltd. and Berco Trust. These documents were sought on the ground that bank accounts in the names of these corporations contained the proceeds of Bertoli's allegedly manipulative trading. Second Cayman Discovery Opinion at 8 n. 6.

**36.** In addition, in February 1992, Bertoli submitted an unnecessarily broad request for discovery. Bertoli sent the Government twenty-four subpoenas *duces tecum* to be issued to such diverse

entities as the SEC, the United States Department of Defense (the "Defense Department"), the United States Department of Commerce, the Central Intelligence Agency, the Internal Revenue Service and the Environmental Protection Agency (the "EPA"). *See* Letter–Opinion, filed 6 May 1992, at 4–5. All totalled, these subpoenas sought information from over two hundred fifty individuals, agencies or corporations and a potentially unlimited number of documents, covering periods of time as long as ten years. As an example, Bertoli's request from the Defense Department and the EPA sought various documents relating to *all* sites known by these entities to be contaminated with toxic substances. *Id.* at 4 n. 11, 5 n. 16.

sitions were inadmissible because his right to confrontation had been violated as a result of the court's refusal to order the Government to pay the travel expenses of his counsel and because he did not participate in the First Set of Cayman Islands Depositions. *Id.*

Following a hearing held on 19 June 1992, the motion to preclude the First Set of Cayman Island Depositions was denied. However, because Bertoli had already been given leave to file the Letter Rogatory and to take a Second Set of Cayman Islands Depositions, Bertoli was granted permission to amend the Letter Rogatory to depose Burgess and to re-cross Coleman and Rodney Bond. *See id.* at 68–70; *see also* Transcript of Proceedings of 19 June 1992 (the "19 June 1992 Tr.") at 16–20.

Although Cannistraro's argument regarding violation of his right to confrontation was rejected, Cannistraro was directed to identify which of the witnesses previously deposed by the Government he wanted to depose. Cannistraro was so directed because Bertoli had already been given leave to take the Second Set of Cayman Islands Depositions. *Cannistraro,* 800 F.Supp. at 70–72; *see also* 19 June 1992 Tr. at 19–20. After a delay of a month on the part of Cannistraro,[37] Cannistraro indicated he wished to depose all of the previ-

ously-deposed Cayman Islands witnesses.[38] *See* Letter from Cannistraro to court, dated 16 July 1992, at 2. Cannistraro was given the opportunity to depose those witnesses as part of the Second Set of Cayman Island Depositions. *Cannistraro,* 800 F.Supp. at 72.

Following repeated objections by Bertoli to the Government's proposed Supplemental Letter of Request to Cayman Islands (the "Supplemental Letter Request"), a hearing was held on 10 September 1992 to finalize the language of the Supplemental Letter Request.[39] *See* 10 Sept. 1992 Tr. at 4–16, 23–32. On 30 September 1992, the Supplemental Letter Request[40] was executed and an order was signed granting the Defendants leave to depose the Cayman Islands witnesses. *See* Supplemental Letter Request; Order, filed 30 September 1992.

The Second Set of Cayman Islands Depositions were originally scheduled to commence on 3 November 1992. *See* Order, filed 17 March 1993 (the "17 March 1993 Order") at 2; *see also* Letter from Government, dated 6 October 1992 (the "6 Oct. 1992 Letter"). Nevertheless, the Second Set of Cayman Islands Depositions were postponed until 30 November 1992 because Defendants failed to

---

**37.** On 22 June 1992, instead of supplying a list of witnesses he wished to depose, Cannistraro filed a letter request for severance and demanded his trial be scheduled for 18 August 1992. *See* Letter Request, filed 22 June 1992 (the "22 June 1992 Letter Request"); *see also* Letter to court, dated 30 June 1992. In addition, in the 22 June 1992 Letter Request, Cannistraro stated he could not identify the witnesses he wanted to depose unless he received a complete set of transcripts, documents and videotapes. After awaiting submissions from the Government, this request for severance and scheduling of trial was denied. *See* Order, filed 8 July 1992; Order, filed 10 July 1992 (the "10 July 1992 Order"). The Government was ordered, however, to make arrangements for Cannistraro to view the videotapes of the First Set of Cayman Island Depositions in the United States Post Office and Courthouse in Newark, New Jersey. *See* 10 July 1992 Order at 1–2. On 15 July 1992, Cannistraro viewed the videotapes and was given a copy set of videotapes.

**38.** Cannistraro expressed a desire to depose all of the First Set of Cayman Islands Depositions witnesses despite the fact that only two of those witnesses even mentioned his name.

**39.** While the wording of the Supplemental Letter Request was being litigated, the Cayman Grand Court advised that it was prepared to execute Bertoli's Letter Rogatory. *See* Government's Memorandum of Law in Connection With Various Issues Relating to the Possible Second Round of Cayman Islands Depositions (the "Government Cayman Brief") at 13. The Cayman Grand Court also indicated that a Jamaican Judge would preside over the Second Set of Cayman Islands Depositions and that he would be available to commence the depositions in September 1992. *Id.* The Office of International Affairs (the "OIA") of the United States Department of Justice advised the Central Cayman Authority that additional depositions would be taken and that the Supplemental Letter Request would be forthcoming. *Id.* The OIA also requested that the Second Set of Cayman Islands Depositions proceed expeditiously and be scheduled for the Fall of 1992. *Id.*

**40.** The Supplemental Letter Request, *inter alia,* listed the witnesses to be deposed and described the manner of examination. *See* Supplemental Letter Request.

obtain local Cayman Islands counsel, as required by the Cayman Grand Court, for the purpose of arranging for the Second Set of Cayman Islands Depositions. 17 March 1993 Order at 2. Defendants' failure to obtain local Cayman Islands counsel occurred despite their having received notice on five occasions that local Cayman Islands counsel was required. *See* 10 Sept. 1992 Tr. at 32; Letter from Government, dated 16 September 1992; Letter from Government, dated 30 September 1992; 6 Oct. 1992 Letter; Letter from court, dated 8 October 1992.

On 15 October 1992, the Government moved to limit the scope and time of the examinations by Bertoli and by Cannistraro during the Second Set of Cayman Islands Depositions. *See* Notice of Motion, filed 15 October 1992. Following a hearing held on 27 October 1992, the Government's motion to limit the examinations by Bertoli and Cannistraro was granted.[41] *See* 27 Oct. 1992 Order; *see also* Transcript of Proceedings of 27 October 1992, 30–43 ("27 Oct. 1992 Tr.").

On 27 October 1992, Bertoli informed the court that he had procured local Cayman Islands counsel. *See* 27 Oct. 1992 Tr. at 28. Nevertheless, despite numerous attempts by

this court to expedite the taking of the Second Set of Cayman Islands Depositions,[42] the conduct of the Defendants continued to delay the taking of the Depositions. *See* 5 Nov. 1992 Tr.; 12 Nov. 1992 Tr. at 6–15. For instance, at no point prior to his pleading guilty in March 1993 did Cannistraro obtain local Cayman Islands counsel. *See* 5 Nov. 1992 Tr. at 2–10; Transcript of Proceedings of 12 March 1993 (the "12 March 1993 Tr.") at 4–6.

On 8 December 1992, Bertoli filed a summons (the "Originating Summons") in the Cayman Islands, naming the Government and Cannistraro as defendants (the "Second Cayman Action"). *See* Letter from Government, dated 8 February 1993. The Originating Summons sought, *inter alia*, a determination on the allocation of costs with regard to the Second Set of Cayman Islands Depositions. *See* Originating Summons. Bertoli insisted that the Originating Summons was the proper way to effect taking of the Second Set of Cayman Islands Depositions. *See* Letter from Bertoli, dated 8 February 1993; Letter from Bertoli, dated 1 January 1993. Bertoli so stated despite the fact that the Solicitor General of the Cayman Islands (the

41. As originally outlined in *Cannistraro*, 800 F.Supp. at 68–72, Bertoli was limited in his examination to the following two subject areas: (1) matters raised during the Government's redirect examinations of Rodney Bond and Coleman during the First Set of Cayman Island Depositions and (2) matters about which Bertoli would have examined Rodney Bond and Coleman during the First Set of Cayman Islands Depositions had he been aware of the obstruction of justice charges contained in the Second Superseding Indictment. *See* Order, filed 27 October 1992 (the "27 Oct. 1992 Order") at 2.

42. For instance, by letter and by telephonic conversation with Judge Malone of the Cayman Grand Court, the court attempted to find ways to expedite the taking of the Second Set of Cayman Island Depositions, such as permitting Cannistraro to proceed without local Cayman Counsel or with an attorney from the United States temporarily certified to practice in the Cayman Islands. *See* Transcript of Proceedings of 5 November 1992 (the "5 Nov. 1992 Tr.") at 6, 21–22; Transcript of Proceedings of 12 November 1992 (the "12 Nov. 1992 Tr.") at 7–11, 14–15, 30; Transcript of Proceedings of 12 January 1993 (the "12 Jan. 1993 Tr.") at 24–26. Both of these suggestions were rejected by the Cayman Grand Court. *See* 12 March 1993 Tr. at 4.

With specific regard to Cannistraro, the court accepted Cannistraro's representation of indigency, meaning that the costs of local Cayman counsel would have been borne by the United States pursuant to the Criminal Justice Act, 18 U.S.C. § 3006A(e). Moreover, the court offered to write a letter to the United States Bureau of Prisons suggesting early release of Cannistraro and later, proposed to release (and, on 21 January 1993, did release) Cannistraro on bail, in order to allow him to secure local Cayman counsel and attend the Second Set of Cayman Islands Depositions in person. *See* 5 Nov. 1992 Tr. at 6–9, 13; 12 Nov. 1992 Tr. at 2–6, 12–15; 12 Jan. 1993 Tr. at 36. In both instances, Cannistraro vigorously and disingenuously resisted release from prison. *See* 5 Nov. 1992 Tr. at 8; 12 Nov. 1992 Tr. at 3–4, 12–13; 12 Jan. 1993 Tr. at 36; *see also* Letter to court, dated 25 November 1992; Letter to court, dated 17 December 1992).

Finally, the court allowed Bertoli to travel to Cayman Islands, during the latter part of November 1992, on the representation of Bertoli that such a visit would "expedite things in the Cayman Islands." 12 Nov. 1992 Tr. at 16–17. It appears, however, that this representation was untruthful and that Bertoli used this visit to file a second law suit against the United States in the Cayman Islands.

"Cayman Solicitor General") had indicated that (1) the Second Cayman Action was "misconceived," (2) the Cayman Grand Court had no jurisdiction to hear the Second Cayman Action and (3) the proper method was for the Defendants to proceed, through local Cayman counsel, to process the Supplemental Letter Request. *See* Letter for Cayman Solicitor General, dated 27 January 1993; Letter from Cayman Solicitor General, dated 16 February 1993; *see also* 12 Jan. 1993 Tr. at 15–22.

The Second Set of Cayman Islands Depositions was next scheduled for 29 March 1993. *See* 12 Jan. 1993 Tr. at 15–16. On 22 February 1993, the Government and the Defendants were ordered to show cause why trial should not commence on 3 May 1993. *See* Order to Show Cause, filed 22 February 1993, at 2. In the meantime, the Government moved to revoke permission given to the Defendants to take the Second Set of Cayman Islands Depositions or, in the alternative, to set a deadline by which the depositions were to occur. *See* Government Cayman Brief at 16–60, 64–67.

After extensive written submissions from the parties, and a hearing on 12 March 1993 (the "12 March 1993 Hearing"), it was ordered that (1) the Second Set of Cayman Island Depositions were to be completed by 16 April 1993,[43] (2) a hearing pursuant to Fed.R.Evid. 104 (the "Rule 104 Hearing") would commence on 26 April 1993 and (3) a final pre-trial conference would be held and, immediately thereafter, trial would commence on 3 May 1993. 17 March 1993 Order at 3–7; *see also* 12 March 1993 Tr. at 27.

During the 12 March 1993 Hearing, Bertoli indicated he would drop the Second Cayman Action and have local Cayman counsel process the Supplemental Letter Request on his behalf. 12 March 1993 Tr. at 7. Nevertheless, Bertoli contended it would be "physically impossible" to complete the Second Set of

Cayman Islands Depositions by 16 April 1993. *Id.* at 28. On 15 March 1993, Bertoli moved for reconsideration of the 16 April 1993 deadline. *See* Letter Brief, dated 15 March 1993. Bertoli represented that he only intended to depose Ebanks, Burgess, Coleman and Rodney Bond and that he had already made application to the Grand Court to commence taking the Second Set of Cayman Islands Depositions. *Id.* Accordingly, the 17 March 1993 Order was modified to permit the Second Set of Cayman Island Depositions to continue beyond 16 April 1993, provided the deposition commenced on that date and proceeded uninterrupted until complete. *See* Order, filed 26 March 1993.

Finally, on 15 April 1993, the Second Set of Cayman Islands Depositions commenced with the taking of the depositions of Burgess, Ebanks and Rodney Bond.

### C. *Significant Pre–Trial and Trial Proceedings*

Given the extensive delays in scheduling the Second Set of Cayman Islands Depositions, on 22 February 1993, the parties were ordered to show cause why the matter should not proceed to trial on 3 May 1993. *See* Order to Show Cause, filed 22 February 1993. As indicated, following the 12 March 1993 Hearing, *see* 12 March 1993 Tr., it was ordered that (1) the Rule 104 Hearing would commence on 26 April 1993, (2) a final pre-trial conference would commence on 3 May 1993 and (3) trial would commence on 3 May 1993 immediately following the final pre-trial conference. *See* 17 March 1993 Order.[44]

Also in March 1993, Podvey, Sachs, Meanor, Catenacci, Hildner & Cocoziello ("Podvey Sachs Meanor") moved for a stay of an order, filed 11 February 1992 (the "11 Feb. 1992 Order"), requiring Podvey Sachs Meanor to serve as court stand-by counsel for Bertoli.[45] On 25 March 1993, the motion for

---

**43.** The Government motion to revoke the permission given to the Defendants to take the Second Set of Cayman Islands Depositions was denied. *See* Order, filed 17 March 1993 (the "17 March 1993 Order") at 3.

**44.** As previously discussed, the 17 March 1993 Order also required the Second Set of Cayman

Islands Depositions to be completed by 16 April 1993. *See* 17 March 1993 Order.

**45.** On 28 August 1991, Bertoli moved to proceed *pro se* for the purpose of attending the First Set of Cayman Islands Depositions but, in all other respects to continue to be represented by Podvey Sachs Meanor. *See* Notice of Motion, filed 28 August 1991. After a hearing on 3 September

a stay was denied. *See* Order, filed 25 March 1993 (the "25 March 1993 Order"). Podvey Sachs Meanor appealed the 25 March 1993 Order and, on 8 April 1993, the Circuit granted a stay of the 11 Feb. 1992 Order insofar as it required Podvey Sachs Meanor to supply stand-by counsel to attend the Second Set of Cayman Islands Depositions. *See* Circuit Order, dated 8 April 1993. In all other respects, the Podvey Sachs Meanor motion for a stay was taken under advisement by the Circuit. *See id.*

On Friday, 23 April 1993, at 3:20 p.m., with the Rule 104 Hearing to commence at 9:00 a.m. on Monday, 26 April 1993, the Circuit by facsimile transmission to the court and to the parties granted the remainder of the Podvey Sachs Meanor motion for a stay. *See* Circuit Order, dated 23 April 1993. The Circuit ordered that the Rule 104 Hearing and the trial, scheduled to commence on 3 May 1993, be stayed until resolution of Podvey Sachs Meanor's pending mandamus petition to withdraw as Bertoli's stand-by counsel. *See id.*

On 7 May 1993, the Circuit affirmed the 11 Feb. 1992 Order insofar as it required Podvey Sachs Meanor to serve as stand-by counsel for Bertoli.[46] However, it granted the Podvey Sachs Meanor mandamus petition insofar as it required Podvey Sachs Meanor to be present in the Cayman Islands and to provide specific attorneys to serve as counsel for Bertoli should Bertoli withdraw his *pro se*

status.[47] *See* Circuit Order, dated 7 May 1993 (the "7 May 1993 Circuit Order"); Writ of Mandamus, dated 7 May 1993. The 7 May 1993 Circuit Order also dissolved the stay previously imposed by the Circuit on the Rule 104 Hearing and trial. *Id.*

By Order, filed 10 May 1993 (the "10 May 1993 Order"), in compliance with the decision of the Circuit, Podvey Sachs Meanor was ordered to "continue to serve as stand-by counsel for Bertoli" and to "provide a competent attorney at all pre-trial hearings (other than the trial depositions in the Cayman Islands) and at trial from the time of jury selection to the return of verdict." 10 May 1993 Order at 2. In addition, the 10 May 1993 Order scheduled the Rule 104 Hearing and trial to commence on 17 May 1993 and 1 June 1993 respectively. *See id.* at 2–3.

The Rule 104 Hearing was held from 17 May 1993 to 19 May 1993, for the purpose of determining, prior to trial, a significant number of Bertoli's objections to proposed exhibits by the Government. *See* Transcript of Proceedings of 17 May 1993; Transcript of Proceedings of 18 May 1993; Transcript of Proceedings of 19 May 1993 (collectively, the "Rule 104 Hearing Tr."). At the conclusion of the Rule 104 Hearing, all Government exhibits offered were ruled admissible. *See* Rule 104 Hearing Tr. During the first half of the Rule 104 Hearing, Bertoli was represent-

---

1991, Bertoli's motion to proceed *pro se* for the purpose of attending the First Set of Cayman Islands Depositions was denied. *See* Order, filed 4 September 1991. However, Bertoli was permitted to proceed *pro se* for all purposes for the duration of pre-trial and trial proceedings, and Podvey Sachs Meanor was ordered to serve as stand-by counsel for Bertoli. *See id.*

On 8 November 1991, Podvey Sachs Meanor moved to be relieved as stand-by counsel. *See* Notice of Motion, filed 8 November 1991. After a hearing on 27 January 1992, the motion to be relieved was denied. *See* 11 Feb. 1992 Order. On 1 April 1992, Podvey Sachs Meanor filed a petition for a writ of mandamus with the Third Circuit, seeking reversal of the 11 Feb. 1992 Order and arguing it should be allowed to withdraw as stand-by counsel for Bertoli. *See* Notice of Appeal, filed 1 April 1992. Almost one year after it was filed with the Circuit, this mandamus petition was still pending at the time the 17 March 1993 Order was entered.

**46.** The Circuit explained:

> We hold that the district court has inherent power to compel attorneys who have entered an appearance for a criminal defendant in a complex criminal case to continue to serve, but as stand-by counsel for a client who later exercises his right to proceed *pro se*.... We are unable to say, under the circumstances of this case, that the district court clearly abused its discretion when it decided Podvey Sachs' offer, which did not provide for an attorney's presence in the courtroom during trial, was inadequate.

*United States v. Bertoli*, 994 F.2d 1002, 1005–06 (3d Cir.1993).

**47.** The 11 Feb. 1992 Order required Podvey Sachs Meanor attorneys Sachs or H. Richard Chattman to serve as stand-by counsel for Bertoli during trial, for the reason that those specific attorneys had already extensively represented Bertoli in this matter. *See* 11 Feb. 1992 Order.

ed by H. Curtis Meanor ("Meanor") of Podvey Sachs Meanor.[48]

Following the Rule 104 Hearing, final pretrial conferences (the "Final Pre-trial Conferences") were held on 27 May 1993 and 28 May 1993. *See* Transcript of Proceedings of 27 May 1993 (the "27 May 1993 Tr."); Transcript of Proceedings of 28 May 1993 (the "28 May 1993 Tr."). During the Final Pre-trial Conferences, numerous pending motions were decided and final issues for trial discussed. *See* 27 May 1993 Tr. at 1–15; 28 May 1993 Tr. at 1–83; *see also infra* Appendix A.

At the Final Pre-trial Conference held on 28 May 1993, Podvey Sachs Meanor indicated that it had hired an outside attorney, Albert Carilli, Esq. ("Carilli"), to serve as stand-by counsel for Bertoli in lieu of an attorney from Podvey Sachs Meanor. *See* 28 May 1993 Tr. at 2–17. After a discussion concerning the ability of Carilli to begin serving as stand-by counsel so late in the proceedings, Carilli assumed the role of stand-by counsel in lieu of an attorney from Podvey Sachs Meanor.[49]

Trial commenced with jury selection on 1 June 1993. *See* Minutes of Proceedings of 1 June 1993. As already discussed, Bertoli began trial representing himself *pro se,* with the assistance of Carilli as stand-by counsel. *Id.* After jury selection, opening arguments commenced on 4 June 1993. *See* Minutes of Proceedings of 4 June 1993. Although Bertoli had initially stated his opening statement would last two to three hours, *see* transcript of hearing (the "27 April 1993 Hearing"),

held 27 April 1993 (the "27 April 1993 Tr.") at 31; 28 May 1993 Tr. at 54, Bertoli's opening statement actually lasted more than seven hours, and spanned from 4 June 1993 to 7 June 1993.[50] *See* Trial Transcript at 355–438, 511–94.

On 7 June 1993, the Government commenced presenting its case against Bertoli. *See* Minutes of Proceedings of 7 June 1993. On 24 June 1993, the Government called Eisenberg as a witness. The Government's direct examination of Eisenberg covered approximately two and one half days of trial. *See* Trial Transcript at 2247–347, 2353–475, 2492–581. Bertoli's cross examination of Eisenberg lasted nearly twice that time, beginning on 29 June 1993 and concluding on 6 July 1993. *See id.* at 2582–678, 2687–839, 2843–938, 2943–3067, 3079–155; *see also* Appendix C (direct examination of Eisenberg covered 311 transcript pages, while cross examination covered 543 transcript pages). Despite the excessive, repetitive and sometimes abusive nature of Bertoli's cross examination of Eisenberg, the cross examination was not limited.

On 22 July 1993, the Government rested. *See* Minutes of Proceedings of 22 July 1993. At that point, Bertoli moved for a one week adjournment of trial. *See* Trial Transcript at 4991–95. Bertoli represented that "the additional time requested would, if granted, probably end up saving substantial time by permitting the defense to focus its case and present it more succinctly." *See id.* at 4991 (quoting Letter from Bertoli to court, dated 21 July 1993). Bertoli also represented that,

---

**48.** During the Rule 104 Hearing a potential conflict arising out of proceedings in which Bertoli was involved in 1977 was raised. In 1977, Bertoli was named in a seventy-seven count indictment charging him with conspiracy, mail fraud, securities fraud, maintenance of false records and submission of false records to the SEC (the "1977 Indictment"). *See* Rule 104 Hearing Tr. at 10. Bertoli pled *nolo contendere* to all seventy-seven counts of the 1977 Indictment, and received a five-year probationary sentence and a fine of $10,000.00; no custodial sentence was imposed. *Id.* at 10–11. Meanor, then a Federal judge, imposed this sentence on Bertoli. *Id.* at 8. At the Rule 104 Hearing, Bertoli waived any claim of conflict which may have resulted from Meanor's representing him during the Rule 104 Hearing. *Id.* at 13–14, 17–19.

**49.** The court's position on the substitution of Carilli was stated as follows:

> COURT: I am not going to rule on his [Carilli's] adequacy. From what you told me, it appears that from a legal experience point of view, he has the experience. I don't know whether he has the factual background to be of effective assistance.... I'm relying on Podvey Sachs [Meanor] to discharge the obligation placed upon them by the Circuit of making sure that Mr. Bertoli has adequate standby counsel. With that said, I have nothing else to offer.

28 May 1993 Tr. at 6.

**50.** In contrast, the Government's opening lasted approximately two hours. *See* Trial Transcript at 285–332, 335–52.

if granted the adjournment, he would "have everything packaged, have the witnesses lined up and we can run a drill and move them very quickly." *Id.* at 5128. Based on Bertoli's representations, the adjournment was granted and trial was scheduled to recommence on 28 July 1993. *See id.* at 5127–30.

Notwithstanding Bertoli's prior representations, the court received notification late on the afternoon of Friday, 23 July 1993 that, for the purpose of presenting his defense case, Bertoli intended to revoke his *pro se* status and desired the representation of Richard Levitt, Esq. ("Levitt"). *See* Letter from Levitt to court, dated 23 July 1993 at 1. Levitt represented that he was "familiar with both the pre-trial and trial proceedings in this matter and therefore [would] be prepared to begin the defense case on schedule." *Id.* at 1. Levitt also represented that his participation "[would] help focus and streamline the case, and therefore bring it to a speedier conclusion, consistent with the legitimate interests of all concerned." *Id.*

On 27 July 1993, a hearing was held to consider the application of Levitt to be admitted *pro hac vice* for the purpose of presenting Bertoli's defense. *See* Minutes of Proceedings of 27 July 1993. Based upon Levitt's representations concerning both his prior experience with the case [51] and his abil-

ity to further focus and streamline the defense effort, Levitt was permitted to represent Bertoli. *See id.; see also* Trial Transcript at 5147.

On 28 July 1993, despite the repeated representations of Bertoli and Levitt that the defense would be able to proceed expeditiously if granted the previously-discussed adjournment, there was yet another request for an additional adjournment to allow the defense to collect documents subpoenaed from witnesses.[52] *See* Trial Transcript at 5475–89. With the stipulation that there would be no further delays or adjournments for the purpose of gathering documents or scheduling witnesses, this additional adjournment was granted until 3 August 1993.[53] *See id.* at 5488–91.

On 3 August 1993, the defense case recommenced. *See* Minutes of Proceedings of 3 August 1993. On 5 August 1993, outside the presence of the jury, Bertoli was sworn and stated he had decided not to testify in the case. *See* Trial Transcript at 6028–31. Also on 5 August 1993, the defense rested and the Government chose not present a rebuttal case. *See* Minutes of Proceedings of 5 August 1993. On 6 August 1993, a charge conference was held.[54] *See* 6 August 1993 Minutes.

---

51. It is clear that, despite Bertoli's nominal *pro se* status, Levitt had been assisting Bertoli with his case from behind the scenes for a number of months. Trial Transcript at 5136 (Levitt: "I was helping ... Bertoli draft many of the motions that were submitted to the court."). In point of fact a paralegal whom Bertoli told the jury he had hired had in fact been hired by Levitt in May 1993 for the purpose of assisting in the Bertoli defense.

52. As pointed out at the time, the failure of the defense to be in possession of documents subpoenaed from witnesses arose from Bertoli's repeated resistance to suggestions by the court to serve subpoenas and to produce documents prior to trial. *See* Trial Transcript at 5478–82.

53. Specifically, the Trial Transcript reads as follows:

COURT: .... If I give you yet an additional period of time and right on the heels on Mr. Bertoli's representations to me, will you represent to me that there will be no further delays,

[and] the Government will have everything ahead of time?
LEVITT: Yes, I can make that representation.... [B]arring ... an unusual contingency, I will represent to the court that everything that we want to put in, will be identified for the Government, give[n] to the Government or in many cases g[otten] from the Government because they have them.
COURT: This is what I'm willing to do. Take the witnesses you have now, we'll go through them. I'll adjourn tomorrow, Friday and I'll adjourn Monday. We'll pick up Tuesday, but there will be no further adjournments. If you're not ready to go, you forfeit the witness. If you don't have the documents, you'll forfeit the documents.
LEVITT: I understand. That's fine, Judge.
Trial Transcript at 5490–91.

54. Also on 6 August 1993, Bertoli moved for a judgment of acquittal pursuant to Fed.R.Crim.P. 29. *See* Minutes of Proceedings of 6 August 1993 (the "6 Aug. 1993 Minutes"). The motion was denied. *Id.*

From 9 August 1993 to 10 August 1993, summations occurred. *See* Trial Transcript at 6374–6705. On 11 August 1993, the jury was charged and it began its deliberations. *See id.* at 6718–6849.

On 17 August 1993, the jury forwarded the following communication: "[A]fter careful deliberation and consideration we have only reached a unanimous agreement on two counts of the indictment. At this point, we are unable to reach agreements on any of the other counts remaining." *See* Trial Transcript at 6906. After receiving further instructions,[55] the jury was directed to return to the jury room to continue deliberations. *See id.* at 6906–11.

On 19 August 1993, the jury forwarded the following additional communication:

> [I]t is at this point that *we ask for some guidance.* We have reread your charge to us very carefully and have taken your additional advice very seriously. However, after completely examining and taking notes on every act included in each count, we have concluded with an eleven [to] one vote on the majority of them. This places us in a standstill as to how to arrive at a unanimous vote while still being fair and impartial. We would like you to know that we have reached agreement on three counts of the indictment, but want to know if you can *give* us *further instructions* or suggestions as to where we go from here. Thank you for your patience and cooperation. The jury.

*Id.* at 6918 (emphasis added). Again the jury was re-instructed and directed to continue deliberations. *Id.* at 6921–23.

On 24 August 1993, the jury returned with a verdict, finding Bertoli guilty on Counts Three and Six and not guilty on Counts One, Two, Four, Five and Seven. Minutes of Proceedings of 24 August 1993. The jury was polled and unanimously agreed with the verdict entered by the foreperson. *Id.*

### Discussion

**A.** *Renewed Motion to Dismiss Counts One and Two of the Redacted Second Superseding Indictment*

On 12 April 1993, pursuant to Fed. R.Crim.P. 7(c)(1) and 12(b)(2), Bertoli moved for dismissal of Counts One and Two of the Redacted Second Superseding Indictment in light of the then recent Supreme Court decision in *Reves,* —— U.S. ——, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993).[56] Bertoli Dismissal Brief at 1. Bertoli argued that, because the predicate offenses alleged in Count One did not adequately set forth his "operation or management of Monarch Funding through a pattern of racketeering activity," dismissal was required. *Id.* at 1–2. Bertoli also argued the previous decisions by this court, holding that (1) the practice of "frontrunning" can be the basis for a RICO prosecution and (2) this prosecution did not violate the statute of limitations, should be revisited in light of *Reves. Id.* at 2.

### 1. *The Decision in Reves*

*Reves* involved a suit by the trustee in bankruptcy, on behalf of the Farmer's Cooperative of Arkansas and Oklahoma, Inc. (the "Co-op") and certain noteholders against, *inter alia,* Arthur Young & Co. ("Arthur

---

**55.** The content of the supplemental instructions given to the jury is set forth *infra* in the Discussion, § D.14.

**56.** Bertoli moved to dismiss Counts One and Two on two other occasions. Bertoli's motions to dismiss based on a failure to state an offense under securities laws are discussed in *Eisenberg,* 773 F.Supp. at 717–724, and *Cannistraro,* 800 F.Supp. at 80–84. In addition, Bertoli previously moved to dismiss based on the statute of limitations. *See Cannistraro,* 800 F.Supp. at 72–80. Although Bertoli's current motion was directed to the Second Superseding Indictment, only the allegations in the Redacted Second Superseding Indictment were considered for the

purpose of this motion, given that significant portions of the Second Superseding Indictment had been dismissed or redacted.

In support of the motion to dismiss, Bertoli submitted the following: Memorandum of Law in Support of Richard Bertoli's Motion to Dismiss Counts I and II of the Second Superseding Indictment (the "Bertoli Dismissal Brief").

In opposition to the motion to dismiss, the Government submitted the following: Government's Memorandum of Law in Opposition to Bertoli's Motion to Dismiss the RICO Counts of the Indictment (the "Government Dismissal Brief").

Young").[57] —— U.S. at ——, 113 S.Ct. at 1167–68. Arthur Young was charged with violations of RICO, 18 U.S.C. § 1962(c),[58] and securities fraud for failing to inform the Co-op, following two audits, that the value previously attributed to a particular asset by another auditor was incorrect. *Id.* —— U.S. at ——, 113 S.Ct. at 1168.

Applying the "operation or management" test set forth in *Bennett v. Berg,* 710 F.2d 1361, 1364 (8th Cir.1983) (*en banc*), *cert. denied sub nom., Prudential Ins. Co. of America v. Bennett,* 464 U.S. 1008, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983), the district court granted summary judgment in favor of Arthur Young. The district court held:

> Plaintiffs have failed to show anything more than that the accountants reviewed a series of completed transactions, and certified the Co-op's records as fairly portraying its financial status as of a date three or four months preceding the meeting of the directors and the shareholders at which they presented their reports. We do not hesitate to declare that such activities fail to satisfy the degree of management required by *Bennett v. Berg.*

—— U.S. at ——, 113 S.Ct. at 1168 (quotation omitted).

On appeal, the Eighth Circuit affirmed the grant of summary judgment in favor of Arthur Young on the RICO claim. *Id.* —— U.S. at ——, 113 S.Ct. at 1169. Eighth Circuit applied the "operation or management" test of *Bennett* and held "that Arthur Young's conduct did not rise to the level of participation in the management or operation of the Co-op." *Id.* (quotation omitted).

The Supreme Court considered only "the narrow question" of the meaning of the phrase in the RICO statute " 'to conduct or participate, directly or indirectly, in the conduct of [a RICO] enterprise's affairs.' " —— U.S. at ——, 113 S.Ct. at 1169 (quoting 18 U.S.C. § 1962(c)). Upon acknowledging RICO's "liberal construction" clause and considering the legislative history of RICO, the *Reves* Court adopted the "operation and management" test advocated by the Eighth Circuit and the District of Columbia Circuit. *See Bennett,* 710 F.2d at 1364; *Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Local Union 639,* 913 F.2d 948, 954 (D.C.Cir. 1990) (*en banc*), *cert. denied,* 501 U.S. 1222, 111 S.Ct. 2839, 115 L.Ed.2d 1007 (1991). The *Reves* Court held: " '[T]o conduct or participate, directly or indirectly, in the conduct of [a RICO] enterprise's affairs,' one must participate in the operation or management of the enterprise itself." —— U.S. at ——, 113 S.Ct. at 1173. Accordingly, the *Reves* court determined Section 1962(c) did not extend to "complete 'outsiders' because liability depends on showing that the defendants conducted or participated in the conduct of the '*enterprise's* affairs,' not just their own affairs." *Id.* (emphasis in original).

The *Reves* Court, however, emphasized that liability under section 1962(c) "is not limited to upper management." *Id.* —— U.S. at ——, 113 S.Ct. at 1173. According to the Court: "Lower-rung participants in the enterprise who are under the direction of upper management," as well as "others 'associated with' the enterprise who exert control over it as, for example, by bribery," may be liable. *Id.*

---

57. Arthur Young later became Ernst & Young. *Reves,* —— U.S. at ——, 113 S.Ct. at 1167–68.

58. RICO section 1962(c) provides:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). RICO section 1962(d) also provides:

It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section.

18 U.S.C. § 1962(d). Racketeering activity is defined in the RICO statute to include mail fraud in violation of 18 U.S.C. § 1343, wire fraud in violation of 18 U.S.C. § 1343, obstruction of justice in violation of 18 U.S.C. § 1503 and any offense involving fraud in the sale of securities. See 18 U.S.C. § 1961(1)(B). As well, a "pattern of racketeering" is defined as "at least two acts of racketeering activity, ... the last of which occurred within ten years ... after the commission of a prior act of racketeering...." *See* 18 U.S.C. § 1961(5).

Applying its holding to Arthur Young, the *Reves* Court stated:

[I]t is undisputed that Arthur Young relied upon existing Co-op records in preparing the 1981 and 1982 audit reports [as permitted by professional accounting standards.] It is also undisputed that Arthur Young's audit reports revealed to the Co-op's board that the value of the gasohol plant had been calculated based on the Co-op's investment in the plant.... Thus, we only could conclude that Arthur Young participated in the operation or management of the Co-op itself if Arthur Young's failure to tell the Co-op's board that the plant should have been given its fair market value constituted such participation. We think that Arthur Young's failure in this respect is not sufficient to give rise to liability under [section] 1962(c).

*Id.* —— U.S. at ——, 113 S.Ct. at 1174.

The Court, in *Reves,* described the issue considered as a "narrow question." It did not, for instance, speak in terms of any "nexus" requirement between the pattern of racketeering activity and the enterprise—a component of numerous differing tests employed prior to *Reves* by some circuits.[59] By adopting the "operation and management" test of *Bennett* and *Yellow Bus,* the *Reves* Court rejected the various tests employed by the Second, Third, Fifth, Seventh, Ninth and Eleventh Circuits.

In adopting the most restrictive of the tests applied by the circuits, the Court stated that the "liberal construction" clause of the RICO statute

obviously seeks to ensure that Congress' intent is not frustrated by an overly narrow reading of [RICO], but it is not an invitation to apply RICO to new purposes that Congress never intended.... In this case it is clear that Congress did not intend to extend RICO liability under [section] 1962(c) beyond *those who participate in the operation or management of an enterprise* through a pattern of racketeering activity.

*Id.* —— U.S. at ——, 113 S.Ct. at 1172 (emphasis added). Accordingly, the question presented in this motion was whether the Redacted Second Superseding Indictment alleged Bertoli participated, directly or indirectly, in the operation or management of Monarch through a pattern of racketeering activity. *Id.* —— U.S. at ——, 113 S.Ct. at 1173.

As a general matter, the Redacted Second Superseding Indictment charged that "Bertoli, with the acquiescence and assistance of ... Eisenberg, directed the trading of various securities at Monarch," including the securities of Nature's Bounty, LCI, Toxic Waste, and High Tech. *See* Count One, ¶ 3. The Redacted Second Superseding Indictment further stated: "The principal object of the racketeering activity was to use Monarch as a vehicle to engage in fraudulent securities trading practices, and thereby obtain money and other things of value...." *Id.,* ¶ 8. Defendants "achieved the purposes of the racketeering activity and conducted and participated in the affairs of [Monarch] through various means and methods, including their fraudulent trading of the securities of Nature's Bounty, LCI, Toxic Waste, and High

---

**59.** For instance, some circuits had held that "[o]ne conducts the activities of an enterprise through a pattern of racketeering when (1) one is enabled to commit the predicate offenses solely by virtue of [one's] position in the enterprise or involvement in or control over the affairs of the enterprise, or (2) the predicate offenses are related to the activities of that enterprise." *United States v. Scotto,* 641 F.2d 47, 54 (2d Cir.1980), *cert. denied,* 452 U.S. 961, 101 S.Ct. 3109, 69 L.Ed.2d 971 (1981); *see also United States v. Provenzano,* 688 F.2d 194, 200 (3d Cir.), *cert. denied,* 459 U.S. 1071, 103 S.Ct. 492, 74 L.Ed.2d 634 (1982) (same); *Sun Sav. & Loan Ass'n v. Dierdorff,* 825 F.2d 187, 195 (9th Cir.1987) (same). Other circuits had held that "(1) a de-

fendant must commit the racketeering act, (2) the defendant's position in the enterprise must facilitate the commission of the racketeering acts, and (3) the predicate acts must have some effect directly or indirectly on the enterprise." *United States v. Cauble,* 706 F.2d 1322, 1332 (5th Cir.1983), *cert. denied,* 465 U.S. 1005, 104 S.Ct. 996, 79 L.Ed.2d 229 (1984); *see also United States v. Horak,* 833 F.2d 1235, 1239 (7th Cir. 1987) (same). Finally, the Eleventh Circuit had held that proof was required "that the facilities and services of the enterprise were regularly and repeatedly utilized to make possible the racketeering activity." *United States v. Carter,* 721 F.2d 1514, 1527 (11th Cir.), *cert. denied,* 469 U.S. 819, 105 S.Ct. 89, 83 L.Ed.2d 36 (1984).

Tech, and their attempts to conceal and cover-up their fraudulent activities." *Id.*, ¶ 9.

Contrary to Bertoli's contentions, the Redacted Second Superseding Indictment amply satisfied the "operation or management" requirement of *Reves*. A pattern of racketeering activity was alleged which demonstrated Bertoli exercised the requisite element of direction over the activities of Monarch.

For instance, Racketeering Act 3(j) charged that Bertoli, in effecting the LCI Schéme, caused Monarch to act as the underwriter of the LCI IPO. *Id.*, ¶ 14. The Redacted Second Superseding Indictment further charged that, through Monarch,[60] Bertoli (1) caused the securities in the LCI IPO to be sold in the form of units, with each unit consisting of one share of common stock and two warrants, *id.*, ¶ 15, (2) caused virtually all of the securities in the LCI IPO to be sold to individuals and entities who were controlled by Bertoli, Eisenberg or Cannistraro, *id.*, ¶ 16, and (3) purchased substantial amounts of LCI securities at minimal cost through nominee accounts such as the Euro Bank brokerage account at Monarch, *id.*, ¶ 17—all in violation of Federal securities laws. *Id.*, ¶ 26.

Racketeering Act 4(l) charged that Bertoli, in effecting the Toxic Waste Scheme, caused Monarch to act as the underwriter of the IPO of Toxic Waste securities. *Id.*, ¶ 30. The Redacted Second Superseding Indictment further charged that, through Monarch, Bertoli (1) caused the securities in the Toxic Waste IPO to be sold in the form of units, with each unit consisting of one share of common stock and two warrants, *id.*, ¶ 31, (2) caused virtually all of the securities in the Toxic Waste IPO to be sold to individuals and entities controlled by Bertoli, Eisenberg or Cannistraro, *id.*, ¶ 32, (3) purchased substantial amounts of Toxic Waste securities at minimal cost through nominee accounts, such as brokerage accounts at Monarch in the names of Parsico and Venture Partners, *id.*, ¶ 33, and (4) caused Monarch to disseminate to brokers, research analysts, securities newsletters, publishers, Monarch customers and others throughout the United States, more than 18,000 copies of the Toxic Waste Reports recommending the purchase of Toxic Waste securities, *id.*, ¶ 38—all in violation of Federal securities laws. *Id.*, ¶ 43.

Racketeering Act 5(a) involved the mailings by Monarch of the fraudulent High Tech prospectus to various Monarch customers who had purchased High Tech securities in the High Tech IPO. *Id.*, ¶ 69. Racketeering Acts 5(f) and 5(g) charged that Bertoli, in effecting the Beneficial Owners Concealment Scheme, (1) caused Monarch to be the underwriter for the High Tech IPO, *id.*, ¶ 47, and (2) through Monarch, ensured that the registration statements and prospectus concealed information from the SEC and the investing public, *id.*, ¶ 49, in violation of Federal securities laws. *Id.*, ¶¶ 54–55.

Racketeering Act 6(g) charged that Bertoli, in effecting the High Tech Scheme, caused Monarch to act as the underwriter of the IPO of High Tech securities. *Id.*, ¶ 59. The Redacted Second Superseding Indictment further charged that, through Monarch, Bertoli (1) caused the securities in the High Tech IPO to be sold in the form of units, with each unit consisting of one share of common stock and two warrants, *id.*, ¶ 60, (2) caused virtually all of the securities in the High Tech IPO to be sold to individuals and entities controlled by Bertoli, Eisenberg or Cannistraro, *id.*, ¶ 61, and (3) purchased substantial amounts of High Tech securities at minimal cost through nominee accounts, such as brokerage accounts at Monarch in the names of Parsico, Venture Partners, VPI and Rowland, *id.*, ¶ 62—all in violation of Federal securities laws. *Id.*, ¶ 69. Numerous aspects of the securities fraud were also alleged by the Redacted Second Superseding Indictment to have been committed through use of nominee accounts at Monarch. *Id.*, ¶ 64.

Finally, as described previously in the Facts Section of this opinion, the Racketeering Acts set forth in the description of the Cover–Up Scheme charged Bertoli with (1)

---

**60.** As the underwriter, Monarch was the brokerage firm responsible for selling and distributing the LCI securities to subscribers during the public offering. See Count One, ¶ 1(f) (defining "underwriter").

shredding and removing documents from Monarch and elsewhere, (2) hiding proceeds of racketeering activity and (3) submitting false and fraudulent affidavits to the court. *Id.,* ¶ 73.

The numerous Racketeering Acts alleged in Count One of the Redacted Second Superseding Indictment adequately charged that Bertoli "participated in the operation or management of [Monarch] itself." *Reves,* —— U.S. at ——, 113 S.Ct. at 1173. The Racketeering Acts alleged demonstrated Bertoli was able to cause Monarch to act as the underwriter for the LCI, Toxic Waste and High Tech IPO's.[61] It was adequately alleged Bertoli exercised such control over Monarch that he was able to cause Monarch to act in contravention of its responsibilities as underwriter.

As well, the allegations of the Redacted Second Superseding Indictment adequately charged that, under Bertoli's direction, Monarch concealed subpoenaed documents from the grand jury, disseminated false information and structured the sale of shares so as to further Bertoli's fraudulent schemes. *See* Count One, ¶¶ 11–50, 72–73. In addition, it was adequately charged that, because of the control he exercised over Monarch, Bertoli was able to use numerous nominee brokerage accounts at Monarch to reap substantial profits without interference or inquiry. *See id.,* ¶¶ 2–9.

Accordingly, Bertoli's motion to dismiss Counts One and Two for failure to meet the "operation and management" requirement of *Reves* was denied.

### 2. *Statute of Limitations*

Bertoli contended the holding in *Reves* provided a basis for reconsideration of his claim that the RICO charges in the Redacted Second Superseding Indictment were barred by the statute of limitations. Bertoli argued:

Given the requirement of [*Reves* ] that the pattern of racketeering activity evidence the defendant's control or management of the enterprise, activity post-dating the demise of the enterprise can hardly qualify

as "racketeering acts" under RICO; one cannot conduct the affairs, or conspire to conduct the affairs, of an "enterprise" which no longer was involved in the affairs which supposedly represented the charged racketeering activity. For this reason, the charges of obstruction of justice which post-date Monarch's demise may not be considered racketeering conduct under RICO; such acts cannot possibly be evidence of Bertoli's control or management of the enterprise—as they must under [*Reves* ]—as the enterprise did not at the time exist.

Bertoli Dismissal Brief at 13.

■ The holding in *Reves* does not support Bertoli's argument that "specified crimes may be 'racketeering predicates' under RICO only if they further the defendant's 'participat[ion] in the operation or management of' the named enterprise—here Monarch." *See* Bertoli Dismissal Brief at 4. The decision in *Reves* focussed on determining who may be charged with a RICO violation. The Court held that, only if a defendant has conducted or participated directly or indirectly in the conduct of an enterprise through a pattern of racketeering activity, may the defendant then be charged. *Reves,* —— U.S. at ——, 113 S.Ct. at 1173. Neither the statute nor the decision in *Reves* required that *only* those predicate acts demonstrating control may be included in the pattern of racketeering activity charged.

To be charged under 18 U.S.C. § 1962(c), a defendant must have participated directly or indirectly in the operation or management of the enterprise. For an act, however, to be included as a predicate act in a pattern of racketeering activity, the act must meet the requirements of relatedness and continuity set forth in *H.J. Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). The decision in *Reves* did not discuss *H.J. Inc.* or the pattern of racketeering activity requirement. It did not describe a selection process whereby certain predicate acts may be charged because they demonstrate an element of direction over the enterprise and certain predicate

---

61. Bertoli's assertion that he was alleged to have caused Monarch to act as the underwriter for

only the High Tech IPO, see Bertoli Dismissal Brief at 11, is erroneous.

acts must be dismissed because they lack that element. *Reves* addressed a "narrow question." —— U.S. at ——, 113 S.Ct. at 1169. It described to whom liability under RICO extends. *Id.* —— U.S. at ——, 113 S.Ct. at 1172. There is no basis to interpret the decision in *Reves* as overruling or displacing the requirements of *H.J. Inc.*

The question of whether Counts One and Two should be dismissed, as barred by the statute of limitations, was extensively considered in *Cannistraro,* 800 F.Supp. at 72–80, and rejected. Significantly, Bertoli failed to present any new facts and *Reves* did not present any basis for reconsideration of this issue. Accordingly, Bertoli's motion to dismiss Counts One and Two as barred by the statute of limitations was denied.

### 3. *Charges of Frontrunning*

Bertoli contended that, in light of *Reves,* this court should reconsider its previous decisions holding that "frontrunning" research reports is a violation of the securities laws. Bertoli Dismissal Brief at 14. Bertoli argued that "frontrunning" extended RICO to a " 'new purpose Congress never intended.' " *Id.* (quoting *Reves,* —— U.S. at ——, 113 S.Ct. at 1172).

On *two* prior occasions, the validity of the Government's theory of securities fraud was raised by Bertoli, extensively briefed by the parties and reviewed by this court. *See Eisenberg,* 773 F.Supp. at 717–25; *Cannistraro,* 800 F.Supp. at 80–84. Bertoli did not present any basis for reconsideration of those decisions. Accordingly, Bertoli's motion to dismiss Counts One and Two for failure to state a violation of the securities laws was denied.

### B. *Objections to the First Set of Cayman Islands Depositions Testimony and Documents*

On 24 July 1992, the parties were directed "to brief the admissibility of prior statements by a witness and former testimony the part[ies] intend[ed] to introduce at trial." *See* Order, filed 24 July 1992 (the "24 July 1992 Order").

On 1 September 1992, the Government submitted a Memorandum of Law Concerning the Admissibility of Former Testimony (the "Government 1 Sept. 1992 Brief") in response to the 24 July 1992 Order. The Government indicated it intended to use at trial "some or all" of the First Set of Cayman Islands Depositions, arguing "these depositions will be admissible as former testimony, pursuant to Rule 15 of the Federal Rules of Criminal Procedure and Rule 804(b)(1) of the Federal Rules of Evidence." Government 1 Sept. 1992 Brief at 3.

On 10 September 1992, Bertoli filed a letter reply memorandum (the "Bertoli 10 Sept. 1992 Reply Brief") in opposition to the Government 1 Sept. 1992 Brief. The Bertoli 10 Sept. 1992 Reply Brief was two pages in length and cited no case law. Bertoli argued he was unable to make specific objections to the Government's introduction of Cayman Islands testimony, due to the Government's lack of specificity. Bertoli 10 Sept. 1992 Reply Brief at 1. Bertoli stated:

> The [G]overnment has not stated which parts of the Cayman Islands depositions it intends to introduce into evidence. As a result, this defendant cannot make specific objections at this time. However, the testimony of the Cayman witnesses is packed with objectionable questions including but not limited to:
>
> 1. Leading questions;
> 2. Compound questions;
> 3. Questions assuming facts not in evidence;
> 4. Testifying questions.

Bertoli 10 Sept. 1992 Reply Brief at 1. In addition, Bertoli indicated his intent to object to "[a]ll of the Cayman Islands documents and testimony" on the ground that "they were obtained in violation of Rule 15." *Id.* at 2.

Bertoli indicated that, as to all of the documents obtained as a result of the First Set of Cayman Islands Depositions (the "First Set of Cayman Islands Documents"), he could not make specific objections because "the [G]overnment has not stated which specific documents obtained from the Cayman Islands it intends to introduce into evidence."

*Id.* Bertoli did indicate that possible objections included:

1. The time of preparation of some documents makes the evidence untrustworthy;

2. the handwritten notations on some documents should be redacted because there has been no opportunity to confront the author;

3. the genuineness of a number of documents are questionable;

4. the inaccuracies in certain documents make them unreliable and therefore inadmissible;

5. the documents, in some instances, are prejudicial and the prejudice outweighs their usefulness in aiding the jury in understanding the issues.

*Id.* at 2.

On 14 September 1992, Bertoli submitted a supplemental letter brief (the "Bertoli 14 Sept. 1992 Supp. Brief"), again in response to the 24 July 1992 Order. The Bertoli 14 Sept. 1992 Supp. Brief was three pages long and cited some case law. Bertoli 14 Sept. 1992 Supp. Brief at 2–3. As before, Bertoli indicated he would object to a large portion of the testimony he believed would be offered by the Government, specifically the entire First Set of Cayman Islands Depositions and a number of unspecified documents from the First Set of Cayman Islands Documents. *Id.* at 3.

On 2 October 1992, the Government submitted a letter brief (the "Government 2 Oct. 1992 Reply Brief") which essentially responded to the issues raised in the Bertoli 14 Sept. 1992 Supp. Brief. Government 2 Oct. 1992 Reply Brief at 2. The Government 2 Oct. 1992 Reply Brief was seven pages long and discussed the appropriate rules of evidence and case law as they related, *inter alia*, to Bertoli's objections to the First Set of Cayman Islands Depositions. *Id.* at 5–6.

In light of the nonspecific and unhelpful submissions received with regard to the 24 July 1992 Order, and in an attempt to resolve many of the admissibility issues before trial, the parties were directed, on 16 October 1992 (the "16 October 1992 Order"),[62] as follows:

Bertoli and Cannistraro have expressed their intent to object to the entire First Set of Cayman Islands Depositions, as well as to specific questions and answers within those depositions.

Concerning Bertoli's and Cannistraro's objection to the First Set of Cayman Islands Depositions as a whole, the Defendants are directed to submit a brief to support their request to exclude these depositions, stating the legal and factual grounds as to why the First Set of Cayman Islands Depositions should be suppressed *in their entirety.*

. . . . .

Concerning Bertoli's and Cannistraro's objections to the *specific questions or testimony* contained in the First Set of Cayman Islands Depositions, Bertoli and Cannistraro are to assume that all direct and re-direct testimony will be introduced as evidence by the Government at trial. Bertoli and Cannistraro must document their separate objections to the First Set of Cayman Islands Transcripts on a transcript-by-transcript, question-by-question, answer-by-answer, line-by-line basis. A separate objection must be made for *each* question or answer and *each* and *every* *objection* must:

(1) State the name of the witness whose transcript is being reviewed;

(2) State the page number and line number of the question or testimony being objected to;

(3) State the precise nature of the objection(s) (*i.e.* hearsay, leading question, etc.); and

(4) State the precise legal bases, including relevant rules and case law, for each objection.

---

**62.** On 7 December 1992, that portion of the 16 Oct. 1992 Order which established a schedule for the parties to follow with regard to briefing their objections to the First Set of Cayman Islands Deposition testimony and documents was vacated. See Order, filed 7 December 1992 (the "7 Dec. 1992 Order"), at 4. With the exception of scheduling, however, the terms governing the parties' filings were left intact. *See id.* at 6–8.

Similarly, the Government is to assume that all cross and re-cross examinations contained in the First Set of Cayman Islands Depositions will be introduced as evidence by Bertoli and/or Cannistraro at trial. The Government must document its separate objections to the First Set of Cayman Islands Transcripts on a transcript-by-transcript, question-by-question, answer-by-answer, line-by-line basis. A separate objection must be made for *each* question or answer and *each* and *every objection* must:

(1) State the name of the witness whose transcript is being reviewed;

(2) state the page number and line number of the question or testimony being objected to;

(3) state the precise nature of the objection(s) (*i.e.* hearsay, leading question, etc.); and

(4) state the precise legal bases, including relevant rules and case law, for each objection.

. . . . .

The parties are advised that this is their opportunity to object both the First Set of Cayman Islands transcripts in their entirety and to any specific questions or testimony contained in the First Set of Cayman Islands Depositions. Failure to object at this time will be considered a waiver and will preclude any future objection.

16 Oct. 1992 Order at 3–5 (emphasis in original).

Regarding documents obtained during the First Set of Cayman Islands Depositions, the 16 Oct. 1992 Order directed the parties as follows:

Bertoli has objected to the admission of the First Set of Cayman Islands Documents. To the extent the Defendants and the Government plan to object to the admission of the First Set of Cayman Islands Documents, objections must be made on a document-by-document basis. A separate objection must be made for *each* and *every document* and the objection must:

(1) State the witness from whom the document was obtained;

(2) state the transcript(s), page number(s) and line number(s) which discuss the document;

(3) state precisely why the document or portion of the document is objectionable (*i.e.* authenticity, chain of possession, etc.); and

(4) state precisely why the document should be excluded, including citation to relevant legal rules and case law.

An attempt to merely address in bulk all of the First Set of Cayman Islands Documents, or even on a category basis, will neither be sufficient nor will it be accepted. In addition, one copy of each document to which objections have been made must be submitted at the time the brief is filed.

. . . . .

The parties are advised that this is their opportunity to object to any of the First Set of Cayman Islands Documents. Failure to object to any of the First Set of Cayman Islands Documents at this time will be considered a waiver and will preclude any future objection.

*Id.* at 5–6 (emphasis in original).

The various objections of Bertoli and the Government to testimony and documents from the First Set of Cayman Islands Depositions are discussed below.[63] Bertoli objected to the First Set of Cayman Islands Depo-

**63.** In connection with these objections, Bertoli submitted the following: Letter Brief (the "Bertoli Objections Brief"), filed 6 January 1993; Letter Reply Brief to Government's Memorandum of Law Concerning Its Objections to Cayman Island's Evidence (the "Bertoli Objections Response Brief"), filed 29 January 1993.

In connection with these objections, the Government submitted the following: Government's Memorandum of Law Concerning Its Objections to the Cayman Islands Evidence (the "Government Objections Brief"), filed 31 December 1992; Government's Supplemental Memorandum of Law Concerning its Objections to the Cayman Islands Evidence (the "Government Supp.Objections Brief"); Government's Memorandum of law in Response to Defendants' Objections to the Cayman Islands Evidence (the "Government Response Brief").

Rulings on the parties' objections to the First Set of Cayman Islands Depositions were originally made at the Final Pre–Trial Conference held 28 May 1993. See 28 May 1993 Tr. at 23–28.

sitions in their entirety. As well, both Bertoli and the Government objected to specific items of testimony and specific documents from the First Set of Cayman Islands Depositions.

1. *Bertoli's Objections to the First Set of Cayman Islands Depositions In Their Entirety*

Bertoli argued the First Set of Cayman islands Depositions "should be suppressed in their entirety because they violate the intent and the wording of Rule 15 of the Federal Rules of Criminal Procedure." Bertoli Objections Brief at 1. According to Bertoli:

> Rule 15 was designed to preserve evidence and not be used for purposes of discovery. Although prior counsel for defendant Bertoli waived any objection as to materiality with respect to the First Superseding Indictment, returned on September 29, 1989, no waiver was given with respect to the Second Superseding Indictment returned on January 17, 1992.

> The [G]overnment admits the use of information obtained for the first time as a result of the [F]irst [S]et of Cayman Islands [D]epositions to obtain the Second Superseding Indictment. Further, the [G]overnment admits that the [MLA T]reaty hearings were used for the purposes of discovery. As a result thereof, the [G]overnment cannot claim a waiver of the requirements of Rule 15 with respect to the Second Superseding Indictment.

Bertoli Objections Brief at 1-2. Bertoli also argued his counsel signed the 24 April 1990 Cayman Discovery Order only because "[i]f counsel did not sign the [C]onsent [O]rder, the [D]efendants would not have been able to participate in the [MLA] Treaty discovery request of the Government." Bertoli Objections Brief at 2..

Bertoli also disputed the constitutionality of the MLA Treaty and of the MLA Treaty Hearing. Regarding the MLA Treaty, Bertoli argued "[t]he [MLA] Treaty violates the Sixth [A]mendment constitutional right to a fair and public trial because it provides no rights to a Defendant." *Id.* The same argument was made with regard to the [MLA] Treaty Hearings. *Id.* Bertoli stated:

> The [MLA] Treaty [H]earings were not conducted in accordance with U.S. law but in a hybrid of Cayman and British law.... Cross examination was limited with no attacks on credibility or bias allowed and no Voir Dire of documents permitted. Further, defendant Bertoli was prohibited from introducing exhibits through witnesses, and as described by [Judge] Malone, the [MLA] Treaty Hearings are a one way street for the United States.

Bertoli Objections Brief at 2. Finally, Bertoli contended the MLA Treaty "is unconstitutional because the [G]overnment has sought to apply it retrospectively in violation of the [C]onstitutional guarantee of substantive due process under the Fifth [A]mendment." *Id.* at 2.

■ These arguments were without merit. With regard to the Government's compliance with Fed.R.Crim.P. 15(a), the use of depositions in a criminal case is permitted by Rule 15. The Rule provides:

> Whenever due to exceptional circumstances of the case it is in the interest of justice that the testimony of a prospective witness or a party be taken and preserved for use at trial, the court may upon motion of such party and notice to the parties order that the testimony of such witness be taken by deposition and that any designated book, paper, document, record, recording or other material not privileged, be produced at the same time and place....

> [Such evidence,] so far as admissible under the rules of evidence, may be used as substantive evidence if the witness is unavailable as ... defined in Rule 804(a)....[64]

*Id.*

In this case, the Government fully complied with Rule 15 procedures and require-

---

**64.** Rule 804(b) provides, in pertinent part:

(b) Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

(1) Former Testimony. Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the

ments. In conjunction with the MLA Treaty Request, the Government filed, on 4 April 1992, an amended motion for depositions in the Cayman Islands pursuant to Rule 15.[65] First Cayman Discovery Opinion at 7. The Defendants had notice of and initially submitted opposition to the motion. *Id.* at 6–9. Accordingly, the procedural requirements of Rule 15 were met.[66]

■ Bertoli argued that the procedures followed during the First Set of Cayman Islands Depositions violated Rule 15(d)(2) [67] by applying a mixture of Cayman Islands and British law, by limiting the scope and manner of examination and cross examination, by disallowing attacks on credibility or bias and voir dire of documents and by prohibiting Bertoli from introducing exhibits through witnesses. Bertoli Objections Brief at 1–2. Bertoli did not supply legal authority

same or another proceeding, if the party against whom the testimony is now offered ... had an opportunity and similar motive to develop the testimony by direct, cross, or re-direct examination.
Fed.R.Evid. 804(b)(1).

65. As discussed, the Government had earlier filed a Rule 15 motion for foreign depositions and for the issuance of a request for foreign judicial assistance. First Cayman Discovery Opinion at 8–9. The request for judicial assistance was withdrawn when the Government advised it was proceeding under the MLA Treaty. Id.

66. In any event, Bertoli, by his consent to the 24 April 1990 Cayman Discovery Order, waived his right to object under Rule 15 to the First Set of Cayman Islands Depositions. Rule 15(g) provides:
Nothing in this Rule shall preclude the taking of a deposition, orally or upon written questions, or the use of a deposition, by agreement of the parties with consent of the court.
Fed.R.Civ.P. 15(g).
As indicated, the 24 April 1990 Cayman Discovery Order provided, inter *alia*, that Defendants consented to the taking of the First Set of Cayman Islands Depositions and were precluded from objecting under Rule 15 to the use or admissibility of the depositions at trial. 24 April 1990 Cayman Discovery Order at 2–3. Bertoli's consent to these provisions precluded his objection to the First Set of Cayman Islands Depositions on Rule 15 grounds.

67. Rule 15(d) provides in pertinent part:
Subject to such additional conditions as the court shall provide, a deposition shall be taken and filed in the manner provided in a civil

for this position; nor was the position legally sound.[68]

■ The application of foreign law to the taking of foreign depositions in criminal matters does not *per se* require the exclusion from evidence of those depositions. *See United States v. Sturman*, 951 F.2d 1466, 1480–81 (6th Cir.1991) (taking of deposition of foreign witness pursuant to Swiss law did not violate Rule 15), *cert. denied*, —— U.S. ——, 112 S.Ct. 2964, 119 L.Ed.2d 586 (1992); *United States v. Casamento*, 887 F.2d 1141, 1175 (2d Cir.1989) (same), *cert. denied*, 493 U.S. 1081, 110 S.Ct. 1138, 107 L.Ed.2d 1043 (1990); *United States v. Salim*, 855 F.2d 944, 949–52 (2d Cir.1988) (same; French law). As one court has stated in a similar context:
We ... must be willing to acquiesce in the insistence of the French court that French law be applied to the taking of the Rouhani

action except as otherwise provided in these rules, provided that (1) in no event shall a deposition be taken of a party defendant without that defendant's consent, and (2) the scope and manner of examination and cross-examination shall be such as would be allowed in the trial itself.
Fed.R.Crim.P. 15(d).

68. Bertoli also argued that the Government misused Rule 15 for discovery purposes rather than, as envisioned by Fed.R.Crim.P. 15(a), for the purpose of preserving evidence for trial. Bertoli's only support for this argument was the fact that, after the First Set of Cayman Islands Depositions had been taken, the Second Superseding Indictment was returned with new facts and counts based upon those depositions.
This argument too was without merit. Bertoli offered no evidence to indicate that the Government, in seeking to take Cayman Islands depositions under Rule 15, attempted to do anything more than obtain evidence for use at trial, from witnesses and entities who were beyond the jurisdiction of the court and could not be compelled by subpoena to testify at trial. In fact, with the exception of additional obstruction of justice charges, the Second Superseding Indictment was fundamentally the same as the First Superseding Indictment. See *Cannistraro*, 800 F.Supp. at 68. Simply because the Government, in attempting to preserve evidence for trial, uncovered evidence of subsequent wrongdoing by Bertoli, such an occurrence did not support excluding the First Set of Cayman Islands Depositions as a whole. Certainly, Bertoli provided no legal authority for such a position.

deposition ... unless the manner of examination required by the law of the host nation is so incompatible with our fundamental principles of fairness or so prone to inaccuracy or bias as to render the testimony inherently unreliable [or] ... so devoid of substance or probative value as to warrant its exclusion altogether.

*Salim*, 855 F.2d at 953; *accord Sturman*, 951 F.2d at 1480–81; *Casamento*, 887 F.2d at 1175.

Nothing in this case indicated that the First Set of Cayman Island Depositions should have been excluded on the basis of the law or procedures employed by the Cayman Grand Court. Contrary to Bertoli's argument, the transcripts from the First Set of Cayman Islands Depositions indicated the Cayman Grand Court permitted direct, cross and re-direct examination of both fact and document witnesses and permitted objections to be made.[69] Bertoli was able to and did cross examine both fact and document witnesses in detail,[70] and was also permitted to attack the credibility of fact witnesses.[71]

As for Bertoli's argument that he was denied the opportunity to re-cross examine, this argument was not entirely true. On occasion, Bertoli was allowed to re-cross examine witnesses. *See* Bechard Dep. Tr. at 31. Although the Cayman Grand Court precluded re-cross examination in most instances, Bertoli was able to specify only one such instance in which he was entitled to re-cross examination under *United States v. Riggi*, 951 F.2d 1368, 1376 (3d Cir.1991).[72] Bertoli was given leave to cure this defect by taking additional depositions in the Cayman Islands. *See Cannistraro*, 800 F.Supp. at 70.

■ Bertoli's objections to the First Set of Cayman Islands Depositions on constitutional grounds were equally without merit. First, there was no basis for Bertoli's argument that the depositions violated the Sixth Amendment because the proceedings were closed to the public.[73] *See* Bertoli Objections Brief at 2. Any evidence obtained from the First Set of Cayman Islands Depositions, including documents and testimony, were openly used and tested in this court and, if admissible, were offered into evidence at a public trial. *See United States v. Tunnell*, 667 F.2d 1182, 1187 (5th Cir.1982) (citing *California v. Green*, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970)). Accordingly, Bertoli's Sixth Amendment right to a fair and public trial was not violated by the First Set of Cayman Islands Depositions.

**69.** For instance, during the First Set of Cayman Islands Depositions, Bertoli made a large number of objections. See, *e.g.*, Deposition Transcript of Timothy Bechard, dated 5 September 1991 (the "Bechard Dep.Tr.") at 10; Deposition Transcript of Rodney Bond, dated 6, 11 & 13 September 1991 (the "Rodney Bond Dep.Tr.") at 19–20, 29, 40–41, 44–45, 49, 51–53, 63–64, 79, 85, 134–36, 144, 168, 189, 191, 225, 306, 326–28, 338, 348–50, 352–53; Deposition Transcript of Cecil Chan–A–Sue, dated 5 September 1991 (the "Chan–A–Sue Dep.Tr.") at 9; Deposition Transcript of Sydney Coleman, dated 12 & 13 September 1991 (the "Coleman Dep.Tr.") at 12, 41, 110, 295, 297; Duggan Dep.Tr. at 11, 13, 21–23, 25, 32–34, 37–38, 40–42; Deposition Transcript of Sheree Ebanks, dated 4 September 1991 (the "Sheree Ebanks Dep.Tr.") at 9–10, 23–24, 31, 41; Deposition Transcript of M.F.B. Gillooly, dated 4 & 5 September 1991 (the "Gillooly Dep.Tr.") at 42, 56; Deposition Transcript of Brian Lundie, dated 6 September 1991 (the "Lundie Dep.Tr.") at 12, 14.

**70.** In fact, Bertoli engaged in extensive cross examination during the First Set of Cayman Islands Depositions. See, *e.g.*, Bechard Dep.Tr. at 19–30; Rodney Bond Dep.Tr. at 203–334; Chan–A–Sue Dep.Tr. 15–19; Coleman Dep.Tr. at 121–

286; Duggan Dep.Tr. at 46–55; Sheree Ebanks Dep.Tr. 25–41; Gillooly Dep.Tr. at 80–96; Lundie Dep.Tr. 19–30.

**71.** Contrary to Bertoli's argument, Bertoli was able to test the credibility and, specifically, the recollection of witnesses during the First Set of Cayman Islands depositions. See, *e.g.*, Rodney Bond Dep.Tr. at 212, 221–22, 254–55, 261–62, 267–68, 271–72, 274–77, 281–83, 292–93, 297–98, 315–24, 326; Coleman Dep.Tr. at 123–24, 132–36, 141–43, 150–51, 156, 158–59, 163, 167–68, 178–80, 190–96, 200–06, 215–40, 243–44, 252–66, 278–83, 285–86; Duggan Dep.Tr. at 47–48, 50–51, 54; Sheree Ebanks Dep.Tr. at 33, 36–39; Gillooly Dep.Tr. at 92–93.

**72.** Under *Riggi*, a party is entitled to re-cross examination only where "new information is brought out on re-direct examination." 951 F.2d at 1376. The application of *Riggi* to the First Set of Cayman Islands Depositions was previously considered. *See Cannistraro*, 800 F.Supp. at 69–70; 10 Sept. 1992 Tr. at 6–7.

**73.** It appears the proceedings in the Cayman Islands, similar to depositions taken in the United States, were not open to the public.

Bertoli's argument that the MLA Treaty violates "the Sixth Amendment right to a fair and public trial because it provides no rights to a defendant" was similarly baseless. Rule 15(d) required the Cayman Islands Depositions to conform to the same scope and manner of direct examination and cross-examination as would be allowed in the trial itself. As discussed, Bertoli was not deprived of any protection normally accorded to defendants.

■ Even if Bertoli had been deprived of rights such as cross and re-cross examination during the First Set of Cayman Islands Depositions—a deprivation which the deposition transcripts definitively indicate did not occur,[74] *see supra* at pp. 82–83 & notes therein—Bertoli's argument was still meritless. Regardless of what occurred in the Cayman Islands, Bertoli was able to oppose, and did oppose, the admission into evidence of any testimony or documents obtained as a result of the First Set of Cayman Island Depositions.[75] *See Salim,* 855 F.2d at 948–52 (preservation of testimony and ultimate admissibility of evidence obtained in foreign deposition are separate questions; admissibility can be determined later in accordance with Federal Rules of Evidence).

Finally, Bertoli argued the MLA Treaty was "unconstitutional because the [G]overnment has sought to apply it retrospectively in violation of the constitutional guarantee of substantive due process under the Fifth Amendment." Bertoli Objections Brief at 2. This argument required little response; Bertoli offered no legal authority or reasoning to support or explain his position. In fact, all that Bertoli offered on this point was the above-quoted sentence. *See id.* Put simply, there was no basis for this argument.

In light of the foregoing, Bertoli's objections to the First Set of Cayman Islands

---

74. As the Government pointed out in a prior submission which Bertoli failed to rebut:

> [N]umerous procedural safeguards were employed by the Cayman [Grand Court]. The witnesses were sworn under oath; an attorney representing the Cayman Islands Attorney General's office was present at all times to assist the Cayman [Grand Court] when procedural disputes arose; the [D]efendants and their counsel were permitted to attend the depositions, to object to questions posed by the Government, and to extensively cross-examine the witnesses; the depositions were stenographically transcribed, verbatim, by court reporters; and the depositions of fact witnesses were videotaped.

Brief of the United States in Opposition to the Defendants' Second Set of Pretrial Motions, filed 4 May 1992, (the "Government 4 May 1992 Brief") at 98 n. 51. The procedural safeguards accorded Bertoli significantly exceeded the level that has been found to be acceptable in other cases. *See, e.g., United States v. Kelly,* 892 F.2d 255, 260–63 (3d Cir.1989), *cert. denied sub nom Gifford v. United States,* 497 U.S. 1006, 110 S.Ct. 3243, 111 L.Ed.2d 754 (1990); *Salim,* 855 F.2d at 948–55.

75. As the Government conceded, the deposition testimony was offered for its truth and constituted hearsay evidence. See Government Response Brief at 18. Nevertheless, the Government argued the testimony from the First Set of Cayman Islands Depositions was admissible as a hearsay exception for former testimony, pursuant to Fed. R.Evid. 804(b)(1). *Id.*

Under Rule 804(b)(1), former testimony is admissible so long as (1) the declarant is unavailable, (2) the testimony was given in a deposition taken in compliance with the law, and (3) the party against whom the testimony is offered had an opportunity and similar motive to develop the testimony by direct, cross or re-direct examination. Fed.R.Evid. 804(b)(1). The former testimony exception is firmly rooted in American jurisprudence. *Kelly,* 892 F.2d at 262 (3d Cir.) (citing *Mattox v. United States,* 156 U.S. 237, 15 S.Ct. 337, 39 L.Ed. 409 (1895)); *see also Ohio v. Roberts,* 448 U.S. 56, 66 n. 8, 100 S.Ct. 2531, 2539 n. 8, 65 L.Ed.2d 597 (1980) (admission of prior testimony does not violate confrontation clause).

In this case, all three elements were satisfied. First, because the Cayman Islands witnesses were beyond the compulsory process of the United States in general and of this court in particular, they were "unavailable" for trial. *See Kelly,* 892 F.2d at 262. Second, as discussed previously, the First Set of Cayman Islands Depositions were taken in substantial compliance with the laws of the United States. *See supra,* at 84 and accompanying notes; *see also Kelly,* 892 F.2d at 262; *Salim,* 855 F.2d at 952–53. Third, also as discussed previously, Bertoli had an opportunity and a similar motive to develop the testimony through cross-examination. *See supra* note 70; *see also Kelly,* 892 F.2d at 262–63; *Salim,* 855 F.2d at 953–54; *Cannistraro,* 800 F.Supp. at 65–70 (finding Bertoli had adequate opportunity and similar motive to cross-examine witnesses with respect to both First and Second Superseding Indictments and that any alleged deficiency was corrected by allowing Bertoli to take Second Set of Cayman Islands Depositions). Accordingly, the testimony from the First Set of Cayman Islands Depositions was admissible pursuant to Fed.R.Evid. 804(b)(1).

Depositions in their entirety were rejected. The depositions were taken in a manner that satisfied both the requirements and the spirit of Fed.R.Crim.P. 15 and the Constitution of the United States. *See Sturman*, 951 F.2d at 1481 ("substantial compliance with Rule 15 rebuts any claims based on due process").

### 2. *Bertoli's Objections to Specific Testimony From the First Set of Cayman Islands Depositions*

Bertoli made 158 specific objections to the testimony taken in the First Set of Cayman Island Depositions. Although each of these specific objections was individually considered, a discussion of some general points is appropriate.

■ Of the 158 specific objections made by Bertoli, only six were raised at the time of the depositions. Federal Rule of Criminal Procedure 15(f) specifically states: "Objections to deposition testimony or evidence or parts thereof and the grounds for the objection *shall be made at the time of the taking of the deposition." Id.* (emphasis added). The Advisory Committee Notes to Rule 15 specifically explain:

> Subdivision (f) is intended to insure that a record of objections and the grounds for the objections is made at the time the deposition is taken when the witness is available so that the witness can be examined further, if necessary, on the point of the objection so that there will be an ade-

quate record for the court's later ruling upon the objection.

Fed.R.Crim.P. 15(f), Advisory Comm. Note (discussing 1974 Amendment).

As listed *infra* in Appendix D, a significant portion of Bertoli's specific objections to testimony were objections regarding the form of the question—such as, leading question, compound question and the assumption of facts not in evidence. Objections to form should have been made at the time the objectionable question was asked during the First Set of Cayman Islands Depositions. *See* Fed. R.Crim.P. 15(f); McCormick, *Evidence,* § 306 at 319-20 (4th ed. 1992). In this way, assuming Bertoli's objections were meritorious, the Government could have re-phrased the objectionable questions. *Id.; see also* McLaughlin, *Fed.R.Evid.Prac. Guide,* § 16.-17[2] at 16-17 (1992). To have considered Bertoli's objections to form after the fact would have deprived the Government of the opportunity to re-phrase and would have been unfair.[76]

Unquestionably, Bertoli was permitted by Judge Malone to make objections.[77] Moreover, Bertoli was aware of his responsibility to make and to preserve his objections[78] for the record.[79] Accordingly, the majority of specific objections made by Bertoli pursuant to the 16 Oct. 1992 Order were untimely; they were not made during the First Set of Cayman Islands Depositions.

**76.** As the Government pointed out, Bertoli made numerous objections based on form during the First Set of Cayman Islands Depositions. See Duggan Dep.Tr. at 11–2; Sheree Ebanks Dep.Tr. at 23–24; Rodney Bond Dep.Tr. at 63–64, 87, 338.

**77.** See *supra* note 69; *see also* 4 Sept. 1991 Proceedings Tr. at 32–34 (in setting out procedures for taking First Set of Cayman Islands Depositions, Judge Malone explained that his "approach to issues of admissibility will be to note an objection when there is one, but require an answer.... [as] most questions of admissibility will be a matter for the trial judge in the United States....").

**78.** Bertoli was aware of the requirements of Fed. R.Civ.P. 15(f), given that (1) in 1989, Bertoli opposed the Government's initial motion for leave to take foreign depositions pursuant to Rule 15 by filing a thirty-one page brief analyzing Rule 15 and relevant case law, see Bertoli Oppo-

sition Brief, filed 17 November 1989, and (2) during the First Set of Cayman Islands Depositions, Bertoli discussed procedures under Rule 15. *See* 12 Sept. 1991 Proceedings Tr. at 10.

**79.** For instance, during the deposition of Rodney Bond, Bertoli objected to questions relating to Monarch records, explaining that he was "making a record for the United States so the prosecutors would not argue that I did not move to strike." 10 Sept. 1991 Proceedings Tr. at 7. Indeed, the record of the First Set of Cayman Islands Depositions is replete with references by Bertoli that he was making an objection "to preserve" a record of the objection for review by this court. *See, e.g.,* 4 Sept. 1991 Proceedings Tr. at 17; 16 Sept. 1991 Proceedings Tr. at 5, 7; 17 Sept. 1991 Proceedings Tr. at 4; Rodney Bond Dep.Tr. at 135–36, 191, 328; Duggan Dep. Tr. at 23; Sheree Ebanks Tr. at 24.

### a. *Deposition of Coleman*

Bertoli objected to the "complete testimony" of Coleman on the ground that "he was incompetent to testify" because he lacked the capacity to perceive and remember the events he claimed to have witnessed. Bertoli Objections Brief at 5. Bertoli further argued:

> The Coleman [t]estimony was evasive and his answers unresponsive to the questions with a virtual total lack of memory as to time and events. Coleman was not called in compliance with the procedures of the Rule 15 of the Federal Rules of criminal procedure. Coleman was not scheduled as a witness in the Cayman Depositions until the proceedings commenced and therefore the notice requirement of Rule 15(a) was not adhered to.

Bertoli Objections Brief at 5.

 Bertoli's argument that Coleman was an incompetent witness who gave unresponsive answers was rejected. A review of the extensive transcript of Coleman's deposition—consisting of 303 pages covering one and one half days of testimony—indicated that Coleman was a competent witness who remembered a substantial number of facts regarding the various companies he administered, while employed at Paget Brown, for Bertoli, Eisenberg and Cannistraro. Moreover, to the extent Coleman's answers may have been non-responsive, Bertoli had the opportunity to seek and should have sought to confront such answers.

 Bertoli's objection that the notice requirements of Rule 15 were not met was also without merit. Rule 15(b) provides:

> The party at whose instance a deposition is to be taken shall give to every party *reasonable* written notice of the time and place for taking the deposition. The notice shall state the name and address of each person to be examined.

Fed.R.Crim.P. 15(b) (emphasis added). Significantly, Rule 15(b) provides no specific time for advance notice but, instead, only requires that notice of deposition be "reason-

able." Bertoli was given reasonable notice of the Coleman deposition.

In April 1990, Bertoli was initially put on notice that Coleman was a potential Cayman Islands witness. At that time, Coleman was included in Appendices 5 and 6 of the MLA Treaty Request as one of the persons to be deposed in the Cayman Islands. *See* MLA Treaty Request, App. 5–6. On 4 September 1991, prior to the taking of any of the First Set of Cayman Islands Depositions, the Government, in the presence of Bertoli and his stand-by counsel, requested permission from Judge Malone to depose Coleman.[80] *See* 4 Sept. 1991 Proceedings Tr. at 11–13. Judge Malone approved the request and tentatively set the Coleman deposition for 10 September 1991. *See id.* No objection was made by Bertoli to the request to depose Coleman or to the date set by Judge Malone. *See id.* On 6 September 1991, the Government reiterated its request to depose Coleman and advised both Bertoli and Judge Malone that Coleman had agreed to appear on 10 September 1991 to be deposed. *See* 10 Sept. 1991 Proceedings Tr. at 6–7. Again, no objection was made by Bertoli.

Coleman's testimony did not actually commence until 12 September 1991. Immediately prior to the beginning of the Coleman deposition, Bertoli objected, for the first time, that he had insufficient notice to conduct a cross examination of Coleman. *See* 12 Sept. 1991 Proceedings Tr. at 16–17. Despite this claim, Bertoli conducted an extensive cross examination of Coleman which, in fact, exceeded the length of the Government's direct examination of Coleman. *See* Coleman Dep. Tr. at 121–286 (Bertoli's cross).

There was no question that Bertoli received reasonable notice of Coleman's deposition and that the notice requirements of Rule 15(b) were satisfied. From April 1990 to August 1991, Bertoli was aware that the Government intended to depose Coleman and had almost one and one half years to prepare for that deposition. Although the Government briefly changed its mind, Bertoli was

---

80. Although Coleman had been included in the MLA Treaty Request, in August 1991, the Government indicated it would not depose Coleman.

See Government Response Brief at 49. Shortly thereafter, the Government renewed its request to depose Coleman.

again adequately notified of the intent to depose Coleman. Bertoli failed, on two occasions, to object to the rescheduling of the Coleman deposition at that time or to request an extension of time to prepare for the Coleman deposition. Moreover, the extensive nature of Bertoli's cross examination of Coleman indicated the notice given was sufficient and Bertoli suffered no prejudice from the taking of the Coleman deposition.[81]

Of Bertoli's sixty-five objections to specific testimony from the Cayman Islands deposition of Coleman, only one specific objection was made at the time of the Coleman deposition. For this and other reasons specified *infra* in Appendix D, Bertoli's objections to the specific testimony of Coleman were largely overruled. Bertoli's objection to page 162, lines 1–6 of the Coleman deposition was timely-made and was sustained.

 In addition, Bertoli's objection to testimony at page 110, lines 11–15 was rendered moot because the Government represented it would "not offer this passage into evidence." *See* Government Response Brief at 62; *see also infra* Appendix D (containing detailed listing of Bertoli's objections to specific testimony of Coleman from First Set of Cayman Islands Depositions, as well as bases for disposition of those objections).

#### b. *Deposition of Rodney Bond*

Bertoli objected to "all testimony" of Rodney Bond on the ground that such testimony violated Rule 612 of the Federal Rules of Evidence.[82] Bertoli Objections Brief at 8–9. According to Bertoli:

> Government prosecutor David Rosenfield [ ("Rosenfield") ], over the objection of defendant Bertoli and outside the presence of the Chief Justice Sir Denis Malone, presented witness Rodney Bond with a large

pile of what was purported to be copies of Monarch Funding Corp. records, at a break between testimony. *See* [Rodney] Bond [Dep. Tr.] at 40–41, 42–54; 10 Sept. 1991 Proceedings Tr. at 3–7. Rosenfield further mislead the Cayman Court … when he stated: "Secondly, your Honor, there is nothing in the Federal Rules of Evidence that requires a witness to exhaust his memory before documents are shown to him to see what those documents may or may not mean to that witness." Rosenfield knew or should have known that that statement was false.

Bertoli Objections Brief at 8. Bertoli argued the alleged actions of Rosenfield "place[d] serious doubt on all testimony of [Rodney] Bond after transcript page 61"[83] because (1) Bertoli was denied the opportunity to see the documents allegedly shown to Rodney Bond, in violation of Rule 612 and (2) "the trier of fact will never know what influence those unknown documents had upon the witness Rodney Bond." *Id.* at 8–9. Bertoli insisted that if the relevant testimony was not stricken and was presented at trial, a mistrial was appropriate. *Id.* at 9.

 Bertoli's arguments were without merit. First, significant portions of the Rodney Bond testimony to which Bertoli objected did not in any way discuss the documents which were provided to Rodney Bond by the Government. The documents provided to Rodney Bond consisted of a set of Monarch and Irving Trust records, all related to Euro Bank. *See* Government Response Brief at 30–31. Because the Government's questioning and Rodney Bond's testimony from pages 59–90, 92–97 and 335–58 of the deposition did not relate to these documents or to their subject matter, Bertoli's objection with regard to this testimony was without merit.

---

81. For example, the Government pointed out that Bertoli questioned Coleman at length regarding the "Arawak Trust" matter—a matter of which the Government was unaware. See Government Response Brief at 51 (citing Coleman Dep.Tr. at 216–38).

82. In accordance with Fed.R.Evid. 612, a party may seek to refresh the recollection of a witness if the witness testifies that his recollection is exhausted and he cannot recall the matter form-

ing the subject of his inquiry. Graham, Federal Practice § 6571 at 167. However, "[t]here is no required, ritualistic formula for finding exhaustion of memory." *Bankers Trust Co. v. Publicker Industries, Inc.*, 641 F.2d 1361, 1363 (2d Cir. 1981).

83. At another page in the Bertoli Objections Brief, Bertoli indicated he objected to all testimony in the Rodney Bond Dep.Tr. from "page 40 forward." Bertoli Objections Brief at 4.

■ Second, although the Government conceded that its questioning and Rodney Bond's testimony from pages 99–132, 140–191 and 196–202 of the deposition concerned the documents presented to Rodney Bond by the Government, the deposition transcript indicated that at no point during Rodney Bond's testimony did the Government use the documents to refresh the recollection of Rodney Bond with respect to the documents or the subject matter of the documents. Instead, the Government presented Rodney Bond with documents so that he could identify and explain those documents. Accordingly, because the documents were not used for the purpose of refreshing recollection, Fed. R.Evid. 612(2) did not apply. There was therefore, contrary to Bertoli's argument, no need for the Government to ensure that Rodney Bond's memory was exhausted or to provide Bertoli with copies of those documents.[84] *See Sporck v. Peil,* 759 F.2d 312, 317–18 (3d Cir.) (no right under Rule 612 to documents shown to witness if not used to refresh recollection) (citing *United States v. Wright,* 489 F.2d 1181, 1188–89 (D.C.Cir. 1973)), *cert. denied,* 474 U.S. 903, 106 S.Ct. 232, 88 L.Ed.2d 230 (1985).

In essence, Bertoli objected to a process which, under the Federal Rules of Evidence,

was appropriate. A witness may be presented with documents for the purposes of determining whether he or she had knowledge of those documents and of having the witness explain the documents. *See* McLaughlin, *Federal Evidence Practice,* § 6.10[2] at 6–122 to 6–125; *id.,* § 12.03[2] at 12–69. In this case, the documents examined by Rodney Bond were admitted into evidence at trial pursuant to Fed.R.Evid. 803(6) and 18 U.S.C. § 3505.[85] Accordingly, Bertoli's objection was without merit.[86]

■ Bertoli also objected to the testimony of Rodney Bond relating to Government exhibit 2500 ("Exhibit 2500"),[87] *see* Rodney Bond Dep. Tr. at 347–48, 354, 357, on the ground that Exhibit 2500 violated the "best evidence rule" of Fed.R.Evid. 1002.[88] *See* Bertoli Objections Brief at 9. This argument was without merit. Rule 1002 must be read in conjunction with Rule 1003, which provides that a "duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original." Fed.R.Evid. 1003. Bertoli provided no basis for concluding that the admission of Exhibit 2500 would be unfair or

---

84. In any event, the record established that Bertoli was provided with copies of the records shown to Rodney Bond prior to testimony by Rodney Bond on those documents. See Rodney Bond Dep.Tr. at 90–91, 98–99.

85. The documents in question were Government exhibits 333(a)–(d)(1), 726(b)(1)(a), 726(b)(2)(b), 726(b)(2)(d), 726(b)(2)(e)–(5)(b), 1033(a)–(c), 1033(e)(1), 1033(f)(1)–(5), 1033(g)(1), 1033(i)(1), 1071(a)2453(a), 2453(a)(1), 2453(b)(1), 2453(b)(2), 2453(c)(1), 2453(d), 2453(d)3–(7), 2453(e)(1), 2453(f)(1); 2453(g)(3), 2453(h)–(h)(2), 2453(i)(1)–(4), 2453(o)–(s), 2453(t)–(u), 2453(v)(1)–(4), 2453(w), 2453(x)(1)–(26), 2453(y), 2453(z), 2453(aa)–(bb), 2453(cc)(1)–(2). See Rodney Bond Dep.Tr. at 99–191.

86. With regard to the documents reviewed by Rodney Bond, it was difficult to understand what, if any, undue prejudice was caused to Bertoli by Rodney Bond's review of the documents. Rodney Bond's testimony was extremely limited with regard to Monarch documents because he testified he did not recognize the Monarch records. See Rodney Bond Dep.Tr. at 99–101, 104–05, 111–14, 125–28. Although Rodney

Bond recognized the Euro Bank documents, he did not recall the transactions reflected in those records; his testimony was limited to explaining what the records were and how they were maintained at Euro Bank, and to identifying his initials on the documents. *See id.* at 105–10, 128–32, 141–91. Finally, Rodney Bond's brief testimony with regard to the Irving Trust records, which records consisted of a single monthly account statement of Euro Bank at Irving Trust and a deposit ticket relating to the account, merely recognized the documents and discussed the general banking relationship between Euro Bank and Irving Trust. *See id.* at 101–04.

87. Exhibit 2500 was a copy of an unsigned letter, dated 7 February 1986, from the Cayman Islands law firm of C.S. Gill & Co. to Euro Bank. See Government Response Brief at 70.

88. Fed.R.Evid. 1002, known as the "best evidence rule," provides that, "[t]o prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, *except as otherwise provided in these rules* or by an Act of Congress." Fed.R.Evid. 1002 (emphasis added).

that the original was not authentic.[89]

Of Bertoli's sixty-eight objections to specific testimony from the Cayman Islands deposition of Rodney Bond, the vast majority were not made at the time of Rodney Bond's deposition. For this and other reasons specified *infra* in Appendix D, Bertoli's objections to the specific testimony of Rodney Bond were largely overruled. The objection to testimony at page 79, line 22 to page 80, line 1 of Rodney Bond's deposition was timely-made and was sustained. *See also infra* Appendix D, § B (containing detailed listing of Bertoli's objections to specific testimony of Rodney Bond from the First Set of Cayman Islands Depositions, as well as bases for disposition of those objections).[90]

### c. *Deposition of Gillooly*

Bertoli's only general objection to testimony of Gillooly was that the testimony from page 14, line 17 to page 40, line 19 and page 66, line 23 to page 79, line 22 of the deposition should be stricken because Gillooly was presented with documents prior to the exhaustion of his memory. *See* Bertoli Objections Brief at 4. This objection was not

made at the time of Gillooly's deposition and was not considered pursuant to Fed. R.Crim.P. 15(f).[91]

Of Bertoli's twenty objections to specific testimony from the Cayman Islands deposition of Gillooly, not one of these objections was made at the time of the Gillooly deposition. For this and other reasons specified *infra* in Appendix D, Bertoli's objections to the specific testimony of Gillooly were overruled. *See infra* Appendix D (containing detailed listing of Bertoli's objections to specific testimony of Gillooly from the First Set of Cayman Islands Depositions, as well as bases for disposition of those objections).

### d. *Deposition of Duggan*

Bertoli's only general objection to testimony of Duggan was that the testimony from page 24, line 9 to page 46, line 19 of the deposition should be stricken because Duggan was presented with documents prior to the exhaustion of his memory. *See* Bertoli Objections Brief at 4. This objection was not made at the time of Duggan's deposition and was not considered pursuant to Fed. R.Crim.P. 15(f).[92]

**89.** Although Bertoli later attacked the authenticity of the original version of Exhibit 2500, suggesting that it was "hardly likely that [Exhibit 2500] was ever sent by C.S. Gill & Co.," Rodney Bond testified that he recalled receiving the letter during his employment at Euro Bank. See Rodney Bond Dep.Tr. at 348. Similarly, at trial, Exhibit 2500 was introduced into evidence during the testimony of Eisenberg, who testified that he received the document from Bertoli. See 29 June 1993 Tr. at 2537–38. Bertoli's further objection that the document was a draft rather than an original, see id. at 2538, went to weight rather than admissibility.

**90.** In addition, Bertoli's objections to the following testimony of Rodney Bond during his deposition were rendered moot because the Government represented it would not offer these passages into evidence: Page 19, line 3 to page 23, line 1; page 44, line 19 to page 54, line 1; page 63, line 17 to page 64, line 3; page 84, line 24 to page 85, line 7; page 96, line 17 to page 97, line 8; page 97, lines 13–22; page 99, lines 15–14; page 100, line 14 to page 101, line 3; page 113, lines 6–8; page 126, line 24 to page 127, line 22; page 147, lines 4–8; page 169, lines 15–19; page 182, lines 2–8. See Government Response Brief at 72–73, 77, 80–81, 84, 88, 91, 94–95.

**91.** In any event, as discussed with regard to Rodney Bond's deposition, there appeared to be

little, if any, merit to this objection. Among other things, much of the testimony objected to by Bertoli did not address or concern the documents presented to Gillooly. See Gillooly Dep. Tr. at 16, line 15 to page 17, line 13; page 19, lines 8 to 11; page 19, line 24 to page 20, line 16; page 21, lines 4–9, 16–20; page 26, line 15 to page 27, line 14; page 30, lines 4–8; page 33, lines 1–15; and page 33, line 23 to page 34, line 16.

**92.** In any event, as discussed with regard to the Rodney Bond deposition, there appeared to be little, if any merit to this objection. Among other things, Duggan testified as a records custodian for Butterfield documents. Accordingly, he was presented with documents from Butterfield which he identified and authenticated as documents made in the regular course of business, pursuant to Fed.R.Evid. 803(6). See Duggan Dep.Tr. at 23–27, 29–31, 36–40, 45–46. As the Government suggested, the testimony of Duggan was the appropriate and standard testimony of a record custodian authenticating business records. Indeed, absent showing Duggan the documents in question, it was unclear how Bertoli would have had the Government authenticate those documents. In addition, the record reflects Bertoli was provided with copies of the documents shown to Duggan. See id. at 10, 13.

Of Bertoli's three objections to specific testimony from the Cayman Islands deposition of Duggan, not one of these objections was made at the time of the Duggan deposition. For this and other reasons specified *infra* in Appendix D, Bertoli's objections to the specific testimony of Duggan were overruled. In addition, Bertoli's objections to testimony at page 41, line 1 to page 45, line 6 and page 45, line 16 to page 46, line 5 of the deposition were rendered moot because the Government represented it would not offer these passages into evidence. *See* Government Response Brief at 105–06; *see also infra* Appendix D (containing detailed listing of Bertoli's objections to specific testimony of Duggan from First Set of Cayman Islands Depositions, as well as bases for disposition of those objections).

### e. *Deposition of Sheree Ebanks*

Bertoli's only general objection to testimony of Sheree Ebanks was that the testimony from page 19, line 14 to page 25, line 18 of the deposition should be stricken because Sheree Ebanks was presented with documents prior to the exhaustion of her memory. *See* Bertoli Objections Brief at 4. This objection was not made at the time of Sheree Ebanks' deposition and was not considered pursuant to Fed.R.Crim.P. 15(f).[93]

Of Bertoli's two objections to specific testimony from the Cayman Islands deposition of Sheree Ebanks, only one of these objections was made at the time of Sheree Ebanks' deposition. For this and other reasons specified *infra* in Appendix D, Bertoli's objection to the specific testimony of Sheree Ebanks at page 24, line 19 to page 25 line 118 of the deposition was overruled. Bertoli's objection to the specific testimony of Sheree Ebanks at

page 23, lines 13–18, which was made at the deposition, was sustained. *See infra* Appendix D (containing detailed listing of Bertoli's objections to specific testimony of Sheree Ebanks from First Set of Cayman Islands Depositions, as well as bases for disposition of those objections).

### f. *Depositions of Chan–A–Sue and Bechard*

The Government indicated it did not plan to introduce into evidence testimony from the Cayman Islands depositions of either Chan–A–Sue or Bechard and, indeed, did not introduce any of that testimony. *See* Government Response Brief at 36 n. 9. Accordingly, Bertoli's objections with regard to these witnesses, *see* Bertoli Objections Brief at 15, were moot and were not considered.

### g. *Deposition of Meyeroff*

Bertoli's only objection with respect to the testimony of Meyeroff from the First Set of Cayman Islands Depositions was timely made. *See* Deposition Transcript of David Meyeroff, dated 5 September 1991 (the "Meyeroff Dep. Tr."), 16, lines 12–22 (objecting to page 13, line 11 to end of deposition). For the reasons detailed *infra* in Appendix D, Bertoli's objection to the specific deposition testimony of Meyeroff was overruled.

### 3. *Government's Objections to Specific Testimony From the First Set of Cayman Islands Depositions* [94]

### a. *Deposition of Coleman*

Of the Government's three objections to specific testimony from the Cayman Islands deposition of Coleman, only one of those objections was made at the time of Coleman's

---

**93.** In any event, as discussed with regard to the Rodney Bond deposition, there appeared to be little, if any merit to this objection. Like Duggan, Sheree Ebanks testified as a records custodian for Butterfield documents. Accordingly, she was presented with documents from Butterfield which she identified and authenticated as documents made in the regular course of business, pursuant to Fed.R.Evid. 803(6). See Sheree Ebanks Dep.Tr. at 19–25. As the Government suggested, the testimony of Sheree Ebanks was appropriate and standard testimony of a record custodian authenticating business records. Indeed, absent showing Sheree Ebanks the docu-

ments in question, it was unclear how Bertoli would have had the Government authenticate those documents. In addition, the record reflects Bertoli was provided with copies of the documents shown to Sheree Ebanks. *See id.* at 12.

**94.** The Government made no objections to the testimony of Gillooly, Sheree Ebanks or Meyeroff from the First Set of Cayman Islands Depositions. Neither party objected to any testimony from the depositions of Solomon or Rivers.

deposition. For this reason, the Government's objection's to the specific deposition testimony of Coleman at page 122, lines 4–11 and at page 125, lines 15–13 were overruled. The Government's objection to the specific testimony of Coleman at page 125, line 24 to page 129, line 25 was timely made and was sustained. *See infra* Appendix D (containing detailed listing of Government's objections to specific testimony of Coleman from First Set of Cayman Islands Depositions, as well as bases for disposition of those objections).

### b. *Deposition of Rodney Bond*

The Government's only objection to testimony from the Cayman Islands deposition of Rodney Bond was not made at the time of Rodney Bond's deposition. For this reason, the Government's objection to the specific testimony of Rodney Bond at page 334, lines 2–5 was overruled. *See infra* Appendix D (containing detailed listing of Government's objection to specific testimony of Rodney Bond from First Set of Cayman Islands Depositions, as well as bases for disposition of that objection).

### c. *Deposition of Duggan*

The Government's only objection to testimony from the Cayman Islands deposition of Duggan was not made at the time of Duggan's deposition. For this reason, the Government's objection to the specific testimony of Duggan at page 50, line 24 to page 51, line 3 was overruled. *See infra* Appendix D (containing detailed listing of Government's objection to specific testimony of Duggan from First Set of Cayman Islands Depositions, as well as bases for disposition of that objection).

### d. *Deposition of Lundie*

The Government's only objection to testimony from the Cayman Islands deposition of Lundie was made at the time of Lundie's deposition and was sustained. *See infra* Appendix D (containing detailed listing of Government's objection to specific testimony of Lundie from First Set of Cayman Islands

Depositions, as well as bases for disposition of that objection).

### 4. *Bertoli's Objections to Documents From the First Set of Cayman Islands Depositions*

■ By the 16 October 1992 Order, the parties were directed, *inter alia,* to brief their objections to the First Set of Cayman Islands Documents by 23 November 1992. The 16 October 1992 Order advised the parties "that this [was] their opportunity to object to any of the First Set of Cayman Islands Documents; failure to object to any of the First Set of Cayman Islands Documents at this time will be considered a waiver and will preclude any future objections." 16 October 1992 Order at 6.[95] Initially, Bertoli argued the court abused its discretion by "order[ing] the defendants to object to documents that may never be offered into evidence by the Government or to waive the constitutional right to object at trial." Bertoli Objections Brief at 3.

This argument was without merit. The First Set of Cayman Island Documents were admissible into evidence at trial pursuant to 18 U.S.C. § 3505. Section 3505(b) provides:

> At the arraignment or as soon as practicable thereafter, a party intending to offer into evidence under this section a foreign record of regularly conducted activity shall provide written notice of that intention to each other party. A motion opposing admission in evidence of such records shall be made by the opposing party and determined by the court *before trial.* Failure to file such a motion before trial shall constitute a *waiver* of objection of such record or duplicate.

18 U.S.C. § 3505(b) (emphasis added).

Section 3505(b) is drafted in mandatory terms, requiring the admissibility of evidence to be introduced pursuant to section 3505 be determined prior to trial. The order requiring Bertoli to object to the First Set of Cayman Islands Documents prior to trial was made pursuant to the mandatory direction of

---

**95.** The 16 October 1992 Order contained similar provisions with regard to objections to the First

Set of Cayman Islands Depositions. 16 October 1992 Order at 3.

section 3505(b).[96] Similarly, by ordering that a failure to make objections would constitute a waiver of any such objections, the express language of section 3505(b) was followed.[97]

"[T]he conduct of trial is left to the broad discretion of the trial judge." *Stich v. United States,* 730 F.2d 115, 117 (3d Cir.), *cert. denied,* 469 U.S. 917, 105 S.Ct. 294, 83 L.Ed.2d 229 (1984); *see also Geders v. United States,* 425 U.S. 80, 87, 96 S.Ct. 1330, 1334–35, 47 L.Ed.2d 592 (1976). Rule 104 of the Federal Rules of Evidence permits a court to hold a pretrial hearing to determine "preliminary questions concerning ... the admissibility of evidence." *See* Fed.R.Evid. 104(a), (c); *see also* Advisory Comm. Notes, Fed.R.Evid. 104(c) ("[a] great deal must be left to the discretion of the trial judge who will act as the interests of justice require"); Fed.R.Crim.P. 12(b), (c), (e) (court may decide objections prior to trial).

In this case, the record demonstrated the need for a decision, prior to trial, on the objections concerning the First Set of Cayman Islands Depositions and Documents. As was explained in a letter, dated 16 October 1992 (the "16 Oct. 1992 Letter"), which accompanied the 16 October 1992 Order:

> The 24 July [1992] Order[98] was issued for purpose of resolving, prior to trial, a number of evidentiary issues which undoubtedly will arise in the course of trying this matter. Because the First Set of Cayman Islands Depositions were completed on 16 September 1991, and because it was clear that the Defendants planned to object to the use of these depositions by the Government, the 24 July Order was particularly

aimed at resolving disputes over the admissibility of the First Set of Cayman Islands Depositions, as well as [D]ocuments, as soon as possible. These purposes remain relevant.

The necessity of resolving evidentiary issues concerning the First Set of Cayman Islands Depositions becomes more pressing with the Second Set of Cayman Islands Depositions scheduled to begin on 3 November 1992. Moreover, given the Defendants' history of attempting to block efforts by the Government to obtain evidence—as demonstrated, for instance, by the Cayman Civil [Action], the ... Cayman Islands [*Ex parte*] Injunction, the objections by Bertoli to the Supplemental Treaty Request—it was, and still is, anticipated that resolving the Defendants' objections will require a significant amount of time and attention, and is a process best commenced as soon as possible. Finally, the necessity of resolving as many issues as possible prior to trial is highlighted by the Defendants' previous motion practice and requests for discovery. For more than three years, the court has patiently dealt with an onslaught of motions by the Defendants which [as of 16 October 1992] total thirty-two motions, seven letter requests, one thousand two hundred eighty-one pages of motion papers and two thousand three hundred seventeen pages of exhibits....

In a similar fashion, Bertoli's requests for discovery have been immense. For instance, in February 1992, Bertoli sent the

---

**96.** Bertoli did not argue that the Government had failed to provide notice of its intent to introduce the First Set of Cayman islands Documents pursuant to 18 U.S.C. § 3505. Indeed, the record indicated the contrary was true. By letter, dated 19 September 1991, the Government indicated to Bertoli that it intended to introduce documents of Euro Bank from the Cayman Islands into evidence pursuant to 18 U.S.C. § 3505. *See* Government Response Brief, Ex. 1 (copy of letter). Then, in letters which were dated 20 September 1991, 12 November 1991 and 6 December 1991, the Government indicated its intent to introduce into evidence all of the First Set of Cayman Islands Documents. *See id.,* Exs. 2–4 (copies of letters). Finally, in a letter, dated 4 September 1992, the Government identified with specificity the documents it intended to

introduce into evidence pursuant to 18 U.S.C. § 3505. *See id.,* Ex. 5 (copy of letter).

**97.** Bertoli argued in passing that "the actions of th[e] court are a serious breach of its discretion because it shifts the burden of the introduction of documents as exhibits from the Government to the defendants." Bertoli Objections Brief at 19. In fact, no obligation to introduce documents was placed upon Bertoli. Rather, Bertoli was merely required to brief his objections to documents which the Government had stated it planned to introduce at trial.

**98.** As previously explained, the 24 July 1992 Order required the parties to brief the admissibility of prior statements by a witness. *See* 24 July 1992 Order at 1.

Government twenty-four subpoenas duces tecum to be issued to such diverse entities as the SEC, the [Defense Department], the United States Department of Commerce, the Central Intelligence Agency, the Internal Revenue Service and the [EPA]. Letter–Opinion, filed 6 May 1992, at 4–5. All totalled, these subpoenas sought information from over two hundred fifty individuals, agencies or corporations and a potentially unlimited number of documents, covering periods of time as long as ten years. *Id.* at 4–8. Recently, Bertoli sought to from the Clerk of this District fifty trial subpoenas for the trial presently-scheduled for 11 January 1993.

Bertoli's pre-trial practices and trial strategy are characterized by co-defendant Cannistraro in his request for a separate trial. As Cannistraro contends in his letter brief, filed 22 September 1992: "The Government states that trial is projected to last two to four months. If Defendant Bertoli was not involved in the trial that estimate might be easily met. With defendant Bertoli involved there is no way that trial could be completed in a four month span. Mr. Bertoli is currently preparing more than 700 defense witnesses. When one looks at a past litigation history of cases involving [Bertoli], one may expect many days of examination for a single witness. A trial with defendant Bertoli could very well surpass the record in this district. Two to four years might be a more reasonable estimate than two to four months." *Id.* at 2 . . . .

Put simply, in a case of this magnitude, a court has an obligation to control the proceedings. The size of the task which confronts the court and the parties requires pre-trial efforts to organize the presentation of such a potentially large mass of evidence in the most efficient manner possible. Succinctly stated, a trial court, in a case such as this, must insist upon specificity concerning potential evidence issues before allowing a massive factual controversy to proceed. The directives that follow have been formulated with this in mind and in keeping with the goals originally contemplated by the 24 July Order. 16 Oct. 1992 Letter at 12–15. Based upon the record in this case, as well as the broad discretion over trial proceedings and the presentation of evidence vested with the trial judge, Bertoli's abuse of discretion argument was without merit.[99]

### a. *Documents of Greenshields*

■ Bertoli objected to documents of Greenshields, specifically Government exhibits 2201 ("Exhibit 2201") and 2202 ("Exhibit 2202"), on the ground that Greenshields records custodian Bechard was "not a qualified witness and [could] not be used to authenticate the documents." Bertoli Objections Brief at 17. Bertoli argued Bechard "had no knowledge of the documents, how they were recorded or how they were maintained." *Id.* According to Bertoli, Bechard "received the documents from Winnipeg, Canada and turned them over to the Cayman authority within days of their receipt in the Cayman Islands." *Id.* Thus, Bertoli argued Exhibits 2201 and 2202 had failed to meet the authentication requirements of Fed.R.Evid. 901 and the foundation requirements of Fed.R.Evid. 803(6). Bertoli Objections Brief at 17.

The Government indicated that the documents of Greenshields would not be introduced pursuant to Fed.R.Evid. 803(6), as argued by Bertoli, but rather would be introduced pursuant to 18 U.S.C. § 3505. *See* Government Response Brief at 118. Because the Greenshields documents satisfied the requirements of admissibility pursuant to 18 U.S.C. § 3505 and were introduced under that provision, Bertoli's objection to the Greenshields documents was rejected.

As a general matter, the purpose of Congress in enacting section 3505 was "to make foreign kept business records more readily admissible into evidence in criminal trials," H.R.Rep. No. 907, 98th Cong. Sess. 2, *re-*

---

99. At the arraignment on the Second Superseding Indictment, the Defendants specifically asked for an opportunity to file motions to suppress the Cayman Islands evidence *thirty days after receipt* of that evidence. *See* Transcript of Proceedings of 27 January 1992 at 8–11. In other words, the Defendants requested an opportunity to object to the First Set of Cayman Islands Depositions and Documents prior to trial.

*printed in* 1984 U.S.C.C.A.N. 3182, 3578–3580, by creating a "simple, inexpensive substitute for the cumbersome and expensive procedures presently required for the admission of foreign business records." *United States v. Strickland,* 935 F.2d 822, 830 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 884, 116 L.Ed.2d 787 (1992). Put simply, "section [3505] was not intended to add technical roadblocks to the admission of foreign records, but, rather, to streamline the admission of such records."[100] *Id.* at 831.

 As an initial matter, there must be timely notice of an intention to submit foreign documents. As discussed, the opposing party must file objections pre-trial, and the court must rule on objections pre-trial. The failure to file a motion or make an objection, absent good cause, constitutes waiver. *See* 18 U.S.C. § 3505(b); *United States v. Hing Shair Chan,* 680 F.Supp. 521, 523–524 (E.D.N.Y.1988).

 In addition to notice, Section 3505 requires a foreign certification. A foreign certification is defined by section 3505(c)(2) as:

> A written declaration made and signed in a foreign country by the custodian of a foreign record of regularly conducted activity or another qualified person that, if falsely made, would subject the maker to criminal penalty under the laws of that country.

18 U.S.C. § 3505(c)(2). Foreign records can be "certified" by affidavits or certificates of authenticity, which dispense with the need of calling live witnesses to establish authenticity. *Sturman,* 951 F.2d at 1489.

 A sworn statement fulfills the demands of section 3505(c)(2). Certification "does not require the use of a 'magic form' upon which the employee/record-provider of foreign company must certify that he is aware that his answers come under penalty of perjury." *Strickland,* 935 F.2d at 831. A foreign certification serves to authenticate the records, *Sturman,* 951 F.2d at 1489, so long as specified attestations are met. *United States v. Gleave,* 786 F.Supp. 258, 277–278 (W.D.N.Y.1992), *aff'd in part, rev'd in part on other grounds sub nom. United States v. Knoll,* 16 F.3d 1313 (2d Cir.1994). The specified attestations, in accordance with section 3505(a)(1)(A–D) are as follows:

1. Certificates should be signed by a person acting in the capacity of custodian or by a person with knowledge of the matters;

2. Certificates should indicate that the records were made or received in the regular course of business;

3. Certificates should indicate the records were made as a regular business practice;

4. Certificates should indicate records were made or received at the time, or within a reasonable time thereafter, of the recorded event;

5. If such record is not an original, such record is a duplicate of the original.

*See Sturman,* 951 F.2d at 1489; *see also* 18 U.S.C. § 3505(a)(1). Only substantial compliance is required to find a proper foreign certification to authenticate the records.[101]

---

**100.** Section 3505 does not violate the Sixth Amendment Confrontation Clause. The Confrontation Clause "establishes 'a preference for face-to-face confrontation at trial,' but not an absolute requirement that would exclude all hearsay." *United States v. Miller,* 830 F.2d 1073, 1077 (9th Cir.1987), *cert. denied,* 485 U.S. 1033, 108 S.Ct. 1592, 99 L.Ed.2d 907 (1988) (citing *Roberts,* 448 U.S. at 63, 100 S.Ct. at 2537); *see Kelly,* 892 F.2d at 261. "The admission of business records is a firmly rooted exception to the hearsay rule." *Miller,* 830 F.2d at 1077; *see Roberts,* 448 U.S. at 66 n. 8, 100 S.Ct. at 2539 n. 8. An out of court statement which falls within a firmly rooted hearsay exception "is presumed to have sufficient indicia of reliability" to satisfy the Confrontation Clause. *Kelly,* 892 F.2d at 261 (citing *Bourjaily v. United States,* 483 U.S. 171,

183, 107 S.Ct. 2775, 2782–83, 97 L.Ed.2d 144 (1987)); *see Miller,* 830 F.2d at 1077 ("Firmly rooted hearsay exceptions to the hearsay rule do not offend the Confrontation Clause.").

**101.** A liberal approach to the introduction of documents pursuant to 18 U.S.C. § 3505 has been adopted. For instance, in *Gleave,* the court found that (1) a custodian's signature does not need to be legible or include a position and address, (2) a custodian does not need to "aver making false statements would subject [him or her] to criminal sanctions" or say what penalties may be imposed and (3) certifications do not need to specify if the custodian "swore" or "affirmed" (swearing under oath) under penalty of perjury. 786 F.Supp. at 278–79; *see also Sturman,* 951 F.2d at 1489 (certification does not

*See* 951 F.2d at 1489 (admitting documents upon finding that "these attestations satisfy *most* of the provisions of [section] 3505").

Finally, section 3505 "did not change the benchmark question in this and every situation involving the admission of documentary evidence: do the documents bear the indicia of reliability?" *Strickland,* 935 F.2d at 831. Documents are to be admitted under section 3505(a)(1) unless they are shown to be unreliable. As a general rule, certain types of records are nearly always found to be reliable. For instance, bank records are inherently reliable "because banks depend on keeping accurate records," and will be admitted unless "untrustworthiness" is shown. *Miller,* 830 F.2d at 1077; *Gleave,* 786 F.Supp. at 279.

Reliability has also been established simply by the record custodian's attestation. "Attestation by the record custodian pursuant to [section] 3505(c)(2) that he will be subject to criminal liability for a false certification affords the records sufficient degree of reliability." *Gleave,* 786 F.Supp. at 279; *see also Chan,* 680 F.Supp. at 526.

In *Gleave,* the defendants were charged with conspiracy, concealment of assets in bankruptcy, money laundering and other offenses. The court dealt directly with the issue of submitting bank records from the Cayman Islands into evidence. The court "took judicial notice of the fact" that the Cayman Islands "is a member of the United Kingdom with business practices like those in the United States" and therefore the records had the requisite indicia of reliability. *Gleave,* 786 F.Supp. at 279; *cf. Chan,* 680 F.Supp. at 525 (court, in finding hotel records reliable, stated Hong Kong is a British colony with business practices much like those in the United States).

In *Miller,* the court also dealt with documents from the Cayman Islands. In that case, the defendant was convicted of wire fraud and of swindling a recent German immigrant out of an inheritance of more than one million dollars. The court found reliability through the attestations of bank officials, indicating that bank records are independently accurate and are "the most common type of business record routinely used in our courts." 830 F.2d at 1077.

As previously discussed, *see supra* note 96, the Government supplied Bertoli with timely notice of its intent to introduce documents pursuant to section 3505. In addition, Bechard, acting as the record custodian of Greenshields, submitted two affidavits certifying the documents under section 3505. *See* Affidavit of Bechard, sworn to on 4 April 1991 (the "4 April 1991 Bechard Aff.) (attached as Ex. 14 to Government Response Brief); Affidavit of Bechard, sworn to on 28 August 1991 (the "28 Aug. 1991 Bechard Aff.") (also attached as Ex. 14 of Government Response Brief.)

The Bechard affidavits satisfied the certification requirements of 18 U.S.C. § 3505. First, each affidavit stated that Bechard was Resident Manager of Greenshields and that "as a result of [his] duties and responsibilities [he was] aware of the manner in which the books and records of the Company are kept." *See* 4 April 1991 Bechard Aff., ¶¶ 3–5; 28 Aug. 1991 Bechard Aff., ¶ 1. Second, as to each document of Greenshields, the Bechard affidavits indicated the document (1) was made at or near the time of the occurrence of the matters set forth therein, (2) was made by a person with knowledge of the matters recorded or from information transmitted by persons with such knowledge, (3) was prepared and kept in the course of regularly conducted business and (4) was a duplicate of an original document of Greenshields. *See* 4 April 1991 Bechard Aff., ¶¶ 6–9, 12–15; 28 Aug. 1991 Bechard Aff., ¶¶ 4–5, 8–11; *see Sturman,* 951 F.2d at 1489; 18 U.S.C. § 3505(a)(1).

The reliability of the Greenshields documents was established by the record custodian's attestation. *See Gleave,* 786 F.Supp. at 279; *see also Chan,* 680 F.Supp. at 526. In fact, not only did the Bechard affidavits further state that it was the "regular practice" of Greenshields "to check the correctness of" and "to rely on" records of the kind being certified, *see* 4 April 1991 Bechard Aff.,

---

need to be, physically attached to records or identify specific records being authenticated);

*Chan,* 680 F.Supp. at 523 ("copy" of a record is permissible).

¶¶ 10–11; 28 Aug. 1991 Bechard Aff., ¶¶ 6–7, but case law indicates a presumption of reliability surrounds bank documents in general and Cayman Islands bank documents in particular.[102] *See Miller,* 830 F.2d at 1077; *Gleave,* 786 F.Supp. at 279.

Accordingly, the Greenshields documents satisfied the requirements of 18 U.S.C. § 3505 and were admitted into evidence. *See* Trial Transcript at 3223–24.

### b. *Documents From the Coleman Deposition*

Bertoli objected to a number of documents introduced during Coleman's deposition which the Government described as "about 30 pages of handwritten notes contained in the Paget–Brown document production." Government Response Brief at 109; *see also* Bertoli Objections Brief at 17–18. These documents were divided as follows: (1) Document SJC 14 ("Document 14"), pages 2491–2515; (2) Document SJC 1.1 ("Document 1.1"), pages 095–096; (3) Document SJC 2.1 ("Document 2.1"), page 270; (4) Document SJC 3.1A ("Document 3.1A"), page 544; and (5) Document SJC 5.1 ("Document 5.1"), page 980. *See* Bertoli Objections Brief at 18–19.

■■■ With regard to Document 2.1, Document 3.1A and Document 5.1, Bertoli's objection was moot because the Government indicated it would not—and in fact did not—offer these documents into evidence. *See* Government Response Brief at 130. The objections to the other two documents was overruled for the following reasons.

■■■ Document 14 was admissible pursuant to 18 U.S.C. § 3505.[103] Document 14 was accompanied a certification of Coleman which satisfied the requirements of section 3505. *See* Further Supplemental Affidavit of Coleman, sworn to 10 Jan. 1992 (the "10 Jan. 1992 Coleman Aff."). The 10 Jan. 1992 Coleman Aff. stated that Document 14(1) consisted of notes made by Coleman himself based upon information received as Chief Executive Officer of Paget Brown, thereby satisfying the personal knowledge requirement of section 3505, (2) was made in the regular course of Paget Brown's business and were obtained from Paget Brown's archives, (3) was made by Coleman as part of his ordinary practice of making file notes and (4) was copied from original Paget Brown documents. *See* 10 Jan. 1992 Coleman Aff., ¶¶ 2–4; *see also* 18 U.S.C. § 3505(a)(1).

The 10 Jan. 1992 Coleman Aff. stated Document 14 "was not made contemporaneous with the underlying events but [was] a short history of the matters contained therein made by [Coleman] in late 1989." 10 Jan. 1992 Coleman Aff., ¶ 6. This statement, however, did not defeat the 10 Jan. 1992 Coleman Aff. as a valid certification pursuant to 18 U.S.C. § 3505(a)(1). First, the 10 Jan. 1992 Coleman Aff. substantially complied with the requirements of section 3505, which was all that was required.[104] *See Sturman,* 951 F.2d at 1489. Second, the documents of Paget Brown underlying the 10 Jan. 1992 Coleman Aff. were independently reliable. *See Strickland,* 935 F.2d at 830–31. Not only did the documents benefit from the presumption of validity previously discussed,[105]

---

**102.** As indicated, Greenshields was a Cayman Islands financial institution. *See* 4 April 1991 Bechard Aff., ¶ 2.

**103.** Document 14 consisted of handwritten notes made by Coleman concerning (1) Coleman's meeting with Bertoli in October 1989, (2) George Town and (3) Paget Brown's administration of companies on behalf of Bertoli, Cannistraro, Eisenberg and Isaacson. *See* Government Response Brief, Ex. 19 (copy of Document 14).

**104.** Moreover, because certain portions of Document 14 pertained to events occurring in October 1989, and the notes were made in "late 1989," *see* 10 Jan. 1992 Coleman Aff., ¶ 6, these portions did satisfy the contemporaneous making requirement of 18 U.S.C. § 3505(a)(1).

**105.** As indicated, Paget Brown is a company which sets up and administers corporations in the Cayman Islands for foreign entities and individuals. This business includes setting up and administering bank accounts. *See* Coleman Dep. Tr. at 7–10. Because accurate records were essential to the business of Paget Brown, those records were entitled to a presumption of reliability. *See Gleave,* 786 F.Supp. at 279; *Chan,* 680 F.Supp. at 525. In addition, the 10 Jan. 1992 Coleman Aff. stated that it was the "regular practice of the business of [Paget Brown] to rely on the records" of the kind contained in Document 14. *See id.,* ¶ 5.

but the testimony of Coleman during the First Set of Cayman Islands Depositions corroborated the substance of those notes. *See, e.g.,* Coleman Dep. Tr. at 86–87, 92–98, 125, 129 (corresponding to pages 2491–96 of Document 14). Accordingly, Document 14 was admitted pursuant to 18 U.S.C. § 3505 and Bertoli's objection was overruled.[106]

Document 1.1 was also admitted pursuant to 18 U.S.C. § 3505.[107] Like Document 14, Document 1.1 was supported by the 10 Jan. 1992 Coleman Aff. which, as already discussed, satisfied the requirements of section 3505(a)(1)(A)–(C). Moreover, there was no question Document 1.1 satisfied the requirement of section 3505(a)(1)(D) that the document be made "near" the time of the occurrences set forth in the document. *See* 18 U.S.C. § 3505(a)(1)(D). As Bertoli conceded, Document 1.1 was written on 14 February 1990, little more than two weeks after the occurrence of the events discussed in the document. *See* Bertoli Objections Brief at 18. Similarly, there was no question that Document 1.1 was reliable.[108]

c. *Documents of Euro Bank*

■ Bertoli objected to three Euro Bank documents referred to during Rodney Bond's deposition: Government exhibits 2453(aa) ("Exhibit 2453(aa)"), 2453(y) ("Exhibit 2453(y)") and Exhibit 2500. *See* Bertoli Objections Brief at 19. Bertoli's objection to the first two documents was as follows:

Rodney Bond testified at page 119/121 and page 230/231 that without the underlying documentation, there [was] no way of determining what the debits and credits relate to on the statements, and exhibit 2453(aa) and 2453(y) would not be admitted.

*Id.*

Bertoli's objection was meritless; the documents were admitted pursuant to 18 U.S.C. § 3505. The documents were certified by an affidavit submitted by Ivan Burgess ("Burgess"), the records custodian of Euro Bank, which affidavit complied with the requirements of section 3505(a)(1). *See* Affidavit of Burgess, dated 2 September 1991 (the "2 Sept. 1991 Burgess Aff.") (attached as Ex. 18 to Government Response Brief).

The 2 Sept. 1991 Burgess Aff. stated that Burgess had knowledge of the manner in which the books and records of Euro Bank were kept as a result of his "duties and responsibilities" at Euro Bank, and that the documents in question (1) were made at or near the time of the occurrences set forth therein, (2) were prepared by persons with knowledge of the matters recorded or from information transmitted by persons with such knowledge and (3) were kept in the regular course of business and these types of records were made as a regular business practice.[109] *See* 2 Sept. 1991 Burgess Aff., ¶¶ 9–10, 13–16; *see also* 18 U.S.C. § 3505(a)(1).

---

**106.** Bertoli's additional objections on the grounds of hearsay and violation of Bertoli's Sixth Amendment right to confrontation were meritless. Regarding the hearsay objection, the Government stated Document 14 constituted hearsay and Bertoli's statements within Document 14 constituted a second level of hearsay. *See* Government Response Brief at 126–27. Nevertheless, the hearsay objection to Document 14 was overcome by section 3505. With regard to Bertoli's statements within Document 14, those statements were not hearsay, but rather constituted an admission, excluded from the definition of hearsay by Fed.R.Evid. 801(d)(2)(A). Regarding the Confrontation Clause objection, courts have repeatedly held that reliable documents submitted pursuant to section 3505, as in this case, do not violate the Confrontation Clause. *See Miller,* 830 F.2d at 1077 (citing *Roberts,* 448 U.S. at 63, 100 S.Ct. at 2537); *Kelly,* 892 F.2d at 261.

**107.** Document 1.1 consisted of two pages of handwritten notes relating to the transfer of administration of Centurion from Paget Brown to Business Services International ("Business Services") at the end of January 1990. *See* Government Response Brief, Ex. 21 (copy of Document 1.1).

**108.** First, as discussed, the Paget Brown documents are presumptively reliable. *See supra* note 105. Second, Document 1.1 and the events described therein were corroborated by the testimony of Coleman, *see* Coleman Dep.Tr. at 41, 44, 75–76, 109–10, and by other documents produced by Paget Brown, *see* Government Response Brief, Ex. 22 (copies of corroborating documents).

**109.** The 2 Sept. 1991 Burgess Aff. did not state that the documents were copies because, in fact, they were originals. *See* Government Response Brief at 121.

Regarding reliability, the Euro Bank documents enjoyed a presumption of reliability given they were the documents of a Cayman Islands bank. *See Gleave*, 786 F.Supp. at 279; *Miller*, 830 F.2d at 1077. In addition, the 2 Sept. 1991 Burgess Aff. stated that "it was the regular practice of [Euro] Bank to check the correctness of" and to "rely on" the types of documents certified. *See id.,* ¶¶ 11–12. Finally, the reliability of these documents was further supported by the fact that Rodney Bond, during his deposition, recognized and identified these documents as original Euro Bank documents. *See* Rodney Bond Dep. Tr. at 182–83.

Accordingly, Exhibits 2453(y) and 2453(aa) were admitted pursuant to 18 U.S.C. § 3505. As the Government argued, *see* Government Response Brief at 121, Bertoli's objection regarding the lack of underlying documentation to explain the contents of these exhibits was a comment on the weight to be given to the documents, rather than an objection to their admissibility.

Bertoli also objected to Exhibit 2500 on the grounds that its contents were unreliable and no proper foundation was laid prior to the introduction of the document. *See* Bertoli Objections Brief at 19. This objection was rejected. *See supra* note 89.

5. *Government's Objections to Documents from the First Set of Cayman Islands Depositions*

The Government made numerous objections to documents from the First Set of Cayman Islands Depositions. *See* Government Objections Brief at 4–53. Those objections and the resolutions thereof were as follows:

First, the Government objected to three documents related to Isaacson on the ground that, if the documents were offered by Bertoli for the truth of the matters asserted therein, the documents would constitute inadmissible hearsay. These documents were marked 2541(b–d) (the "2541 Documents"). *See* Government Objection Brief at 4, 12, 17, Exs. 1(b), 2.

The Government's objections to the 2541 Documents were sustained on the ground asserted by the Government. *See* 28 May 1993 Tr. at 28. The documents failed to satisfy either the requirements of Fed. R.Evid. 803(6) or 18 U.S.C. § 3505.[110] *See United States v. Pelullo*, 964 F.2d 193, 200 (3d Cir.1992) (setting forth requirements for admission under Fed.R.Evid. 803(6)). The certification of these documents, *see* Government Objections Brief, Ex. 1(a), did not fulfill the requirements of section 3505 and significant questions of reliability existed. *See supra*, at 114–115 (setting forth attestations required for admission under 18 U.S.C. § 3505).

The Government also objected to several documents provided by Bertoli to Rodney Bond during Rodney Bond's deposition on the ground that, if the documents were offered by Bertoli for the truth of the matters asserted therein, the documents would constitute inadmissible hearsay. *See* Government Objections Brief at 19–37. These documents were marked RB Exhibits 4–13 (the "RB Exhibits"). *See* Rodney Bond Dep. Tr. at 308–11. The Government also objected to the RB Exhibits on the ground of relevance. *See* Government Objections Brief at 91–37.

The objections to the RB Exhibits were sustained. *See* 28 May 1993 Tr. at 28. These documents failed to satisfy the requirements of Fed.R.Evid. 803(6). *See Pelullo*, 964 F.2d at 200. The only person who testified regarding these documents was Rodney Bond; Rodney Bond's testimony did not satisfy the authentication requirements of Rule 803(6). *See* Rodney Bond Dep. Tr. at 308–11.

The Government also objected to a six page document of handwritten notes of Coleman regarding a meeting Coleman had with Bertoli on 25 October 1989. *See* Government Objections Brief, Ex. 14. Much of these notes was a summary of statements made by Bertoli to Coleman. *See id.* Although the Government conceded these notes were admissible pursuant to 18 U.S.C. § 3505, to the

---

**110.** In addition, Exhibit 2541(c), an undated document entitled "Affidavit of Jack Isaacson in Contemplation of Death," failed to satisfy the requirements of either Rule 804(b)(2) or 804(b)(3).

extent those notes summarized statements made by Bertoli, those statements constituted hearsay within hearsay and were inadmissible pursuant to Fed.R.Evid. 801(c). *See* Government Objections Brief at 39–41. Moreover, the Government objected on the ground of relevance. *Id.*

Although the court was initially inclined to reserve ruling on this objection until trial, Bertoli conceded the document should not be admitted into evidence. *See* Bertoli Supp. Objections Brief at 3. Accordingly, the Government's objection was sustained. *See* 28 May 1993 Tr. at 28.

The Government further objected to a copy of a letter, dated 24 February 1988, to Coleman at Paget–Brown. *See* Government Objections Brief, Ex. 15. The Government objected to introduction of this document on the ground that, if offered for truth of the matter asserted, it constituted inadmissible hearsay. *See* Government Objections Brief at 45.

Although the court was initially inclined to reserve ruling on this objection until trial, Bertoli conceded the document should not be admitted into evidence. *See* Bertoli Supp. Objections Brief at 3. Accordingly, the Government's objection to this document was sustained. *See* 28 May 1993 Tr. at 28.

The Government also objected to a letter from Bertoli to Coleman, dated 13 April 1990, a letter from Cannistraro to Paget–Brown, dated 22 September 1987, an undated document entitled "Affidavit in Contemplation of Death," purportedly signed by Isaacson and produced by Paget–Brown and an undated document appearing to be a Paget–Brown file note summarizing discussions with Bertoli regarding George Town. *See* Government Objections Brief, Exs. 16, 17, 24, 25. The Government objected to introduction of these documents on the ground that, if offered for truth of the matter asserted, they constituted inadmissible hearsay. *See* Government Objections Brief at 2, 4, 49, 51. Although a decision on these objections was reserved for trial, *see* 28 May 1993 Tr. at 28, these documents were not offered at trial.

### C. Objections to the Second Set of Cayman Islands Depositions Testimony and Documents [111]

#### 1. Bertoli's Objections to Specific Testimony From the Second Set of Cayman Islands Depositions—Deposition of Ebanks

Of Bertoli's two objections to specific testimony from the Cayman Islands deposition of Ebanks, only one of these objections was made at the time of Ebanks' deposition. For this and other reasons specified *infra* in Appendix E, Bertoli's objections to the specific testimony of Ebanks at page 85, line 21 to page 87, line 6 and at page 98, lines 17–19 of his deposition were overruled. Bertoli's objection to the specific testimony of Ebanks at page 98, lines 22–23 of his deposition was timely made and was sustained.[112] *See infra*

**111.** In connection with the objections to the Second Set of Cayman Islands Depositions, Bertoli submitted the following: Letter Brief, dated 4 May 1993 (the "Bertoli Second Set Objections Brief"); Richard Bertoli's Memorandum of Law Concerning Response to the Government's Objections to Bertoli's Cayman Island Deposition of Ivan Burgess and Ebanks (the "Bertoli Second Set Response Brief I"); Richard Bertoli's Memorandum of Law Concerning Response to the Government's Objections to Bertoli's Cayman Island Deposition of Rodney Bond (the "Bertoli Second Set Response Brief II").

In connection with the objections to the Second Set of Cayman Islands Depositions, the Government submitted the following: Government's Memorandum of Law Concerning Its Objections to Bertoli's Cayman Islands Depositions of Ivan Burgess and George Ebanks (the "Government Second Set Objections Brief I"); Government's Memorandum of Law Concerning Its Objections to Bertoli's Cayman Islands Deposition of Rodney Bond; Letter Brief, dated 17 May 1993 (the "Government Second Set Response Brief").

Rulings on the parties' objections to the Second Set of Cayman Islands Depositions were originally made at Final Pretrial Conferences. *See* 28 May 1993 Tr. at 28–29.

**112.** The Bertoli Second Set Objections Brief also stated: "See objection at page 92 and 93, 112, 130–131 and 140–141." *See* Bertoli Second Set Objections Brief at 2. These objections were not considered. By Order, filed 17 March 1993 (the "17 March 1993 Order"), the parties were directed that objections to the Second Set of Cayman Islands Depositions had to specify each objection (1) on a transcript-by-transcript, question-by-question, answer-by-answer, line-by-line basis, and (2) for each question, identify the precise nature of the objection(s) and the precise legal bases, including relevant rules of evidence and

Appendix E (containing detailed listing of Bertoli's objections to specific testimony of Ebanks from Second Set of Cayman Islands Depositions, as well as bases for disposition of those objections).

2. *Government's Objections to Specific Testimony From the Second Set of Cayman Islands Depositions*

a. *Deposition of Ebanks*

Of the Government's nine objections to specific testimony from the Cayman Islands deposition of Ebanks, the majority were not made at the time of Ebanks' deposition. For this and other reasons specified *infra* in Appendix E, the Government's objections to the specific testimony of Ebanks were largely overruled. The following objections were timely-made and were sustained: Testimony at page 63, line 21 to page 64, line 15; testimony at page 159, line 10. *See infra* Appendix E (containing detailed listing of Government's objections to specific testimony of Ebanks from Second Set of Cayman Islands Depositions, as well as bases for disposition of those objections).

b. *Deposition of Burgess*

Of the Government's nineteen objections to specific testimony from the Cayman Islands deposition of Burgess, fourteen of these objections were made at the time of the Burgess deposition. Several of the objections to specific testimony of Burgess were timely made and were sustained; [113] the Government's other objections to the specific testimony of Burgess were overruled. *See infra* Appendix E (containing detailed listing of Government's objections to specific testimony of Burgess from Second Set of Cayman Islands Depositions, as well as bases for disposition of those objections).

c. *Deposition of Rodney Bond*

Each of the Government's fifty-six objections to specific testimony from the second Cayman Islands deposition of Rodney Bond was made at the time of Rodney Bond's deposition. Several of the objections to the specific testimony of Rodney Bond were sustained; [114] the Government's other objections to the specific testimony of Rodney Bond were overruled. *See infra* Appendix E (containing detailed listing of Government's objections to specific testimony of Rodney Bond from Second Set of Cayman Islands Depositions, as well as bases for disposition of those objections).

D. *Pre–Trial and Trial Motions and Objections by Bertoli*

1. *Motion to Sequester Government Witnesses*

On 29 March 1993, Bertoli moved to sequester all trial witnesses (the "Motion to Sequester") pursuant to Fed.R.Evid. 615,

case law. *See id.* at 5. Bertoli's objection, however, refers only to the general page numbers of the transcript of Ebanks' deposition without stating on which lines the testimony appears or to which question Bertoli objects. Bertoli also fails to provide any legal basis for the objection. Because Bertoli failed to follow the procedure set forth in the 17 March 1993 Order, the objections "at page 92–93, 112, 130–31 and 140–141" were not considered.

**113.** Specifically, the objections to the specific testimony at the following deposition transcript pages were sustained: Page 38, line 24 to page 40, line 15; page 40, line 17 to page 41, line 11; page 41, lines 13–17; page 41, line 24 to page 42, line 3; page 42, lines 4–5; page 42, lines 9–11; page 42, line 12; page 43, line 21 to page 44, line 3; page 44, lines 4–7; page 44, lines 9–11; page 44, lines 13–18; page 51, lines 5–9; page 51, lines 11–13; page 51, lines 15–18.

**114.** Specifically, the objections to the specific testimony at the following deposition transcript

pages were sustained: Page 182, lines 1–13; page 192, line 24 to page 193, line 18; page 193, lines 20 to page 194, line 1; page 194, lines 3–15; page 194, lines 17–24; page 195, lines 2–4; page 195, lines 7–24; page 196, lines 2–7; page 197, lines 2–6; page 197, lines 8–16; page 199, line 21 to page 200, line 16; page 200, line 18 to page 201, line 6; page 201, lines 8–12; page 201, lines 14–19; page 201, lines 21 to page 202, line 1; page 202, lines 7–10; page 204, line 15 to page 205, line 6; page 205, line 8–11; page 205, lines 13–14; page 205, lines 15–17; page 205, line 19 to page 206, line 21; page 206, line 23 to page 207, line 3; page 207, lines 6–8; page 207, line 22 to page 208, line 1; page 208, lines 3–9; page 208, lines 11–15; page 208, lines 17–21; page 208, line 23 to page 209, line 6; page 209, lines 8–11; page 209, lines 13–16; page 209, line 18 to page 210, line 13; page 210, lines 15–22; page 210, line 24 to page 211, line 7; page 211, lines 9–12; page 211, lines 14–20.

"with the exception of the Government's chief investigating agent" who Bertoli recognized could remain in the courtroom throughout the proceedings.[115] *See* 29 March 1993 Sequestration Brief at 1 (citing *United States v. Parodi,* 703 F.2d 768, 773 (4th Cir.1983)).

In response, the Government argued that ruling on the Motion to Sequester should be deferred until the start of trial so that it could determine which, if any, agents who were potential witnesses were needed to assist at trial. *See* 2 April 1993 Government Sequestration Brief at 1. The Government also argued that, pursuant to *United States v. Mohney,* 949 F.2d 1397 (6th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1940, 118 L.Ed.2d 546 (1992) and *United States v. Strauss,* 473 F.2d 1262 (3d Cir.1973), the Government's summary witnesses need not be sequestered. *See* 2 April 1993 Government Sequestration Brief at 1.

In responding to the 2 April 1993 Government Sequestration Brief, Bertoli stated: "This defendant is in agreement that the Government's agents and investigators, who are potential witnesses, not be sequestered until the trial commences." 8 April 1993 Sequestration Brief at 1. Nevertheless, Bertoli opposed delay of an order for sequestration. *See id.* Bertoli insisted that summary witnesses should be sequestered. *See id.; see also* 29 April 1993 Sequestration Brief at 1–3.

On 13 May 1992, the Government responded to Bertoli's 8 April 1993 Sequestration Brief and 29 April 1993 Sequestration Brief by maintaining that summary witnesses need not be sequestered. *See* 13 May 1993 Government Sequestration Brief at 1. Moreover, the Government indicated it did not intend to use agents as witnesses at trial, and therefore the sequestration of agents need not occur. *Id.*

At the 27 April 1993 Hearing, the Motion for Sequestration was denied insofar as Ber-

toli requested immediate sequestration to occur. *See* 27 April 1993 Tr. at 3. It was indicated, however, that sequestration would occur at the time of trial. *See id.* Sequestration as to summary witnesses was denied. *See* 27 April 1993 Tr. at 7–8.

Fed.R.Evid. 615 provides:

At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion. This rule does not authorize exclusion of (1) a party who is a natural person, or (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, or (3) a person whose presence is shown by a party to be essential to the presentation of the party's case.

*Id.*

■ Absent a showing of prejudice under Rule 615(3), the Government is ordinarily entitled to the presence of one Government agent in the courtroom. *See, e.g., United States v. Pulley,* 922 F.2d 1283, 1286–87, *reh'g denied en banc,* 1991 U.S.App. LEXIS 5144 (6th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 67, 116 L.Ed.2d 42 (1991); *United States v. Kosko,* 870 F.2d 162, 164 (4th Cir.), *cert. denied,* 491 U.S. 909, 109 S.Ct. 3197, 105 L.Ed.2d 704 (1989); *United States v. Farnham,* 791 F.2d 331, 334 (4th Cir.1986); *see also United States v. Alvarado,* 647 F.2d 537, 540 (5th Cir.1981) (Rule 615 authorizes presence of more than one agent in courtroom).

■ It is also established, in this Circuit and elsewhere, that summary witnesses need *not* be sequestered. *See Mohney,* 949 F.2d at 1404–05; *Strauss,* 473 F.2d at 1263. As the Circuit recognized twenty years ago in *Strauss:*

[T]he purpose for sequestering a witness is "to prevent the shaping of testimony by witnesses to match that given by other witnesses." *United States v. Cozzetti,* 441 F.2d 344, 350 (9th Cir.1971). Since [the witness'] testimony related only the sum-

---

115. In support of the Motion to Sequester, Bertoli submitted the following: Letter Brief, dated 29 March 1993 (the "29 March 1993 Sequestration Brief"); Letter Reply Brief, dated 8 April 1993 (the "8 April 1993 Sequestration Brief"); Letter Brief, dated 29 April 1993 (the "29 April 1993 Sequestration Brief").

In opposition to the Motion to Sequester, the Government submitted the following: Letter Brief, dated 2 April 1993 (the "2 April 1993 Government Sequestration Brief"); Letter Brief, dated 13 May 1993 (the "13 May 1993 Government Sequestration Brief").

mary of records ... and did not depend upon any prior testimony, even the rationale for ... sequestration ... was absent in this case.

473 F.2d at 1263.

Similarly, the court in *Mohney* recognized: "[T]he presence of an expert witness who does not testify to the facts of the case but rather gives his opinion based upon the testimony of others hardly seems suspect and will in most cases be beneficial, for he will be more likely to base his expert opinion on a more accurate understanding of the testimony as it evolves before the jury."

949 F.2d at 1404 (quoting *Morvant v. Construction Aggregates Corp.*, 570 F.2d 626, 629–30 (6th Cir.), *cert. dismissed*, 439 U.S. 801, 99 S.Ct. 44, 58 L.Ed.2d 94 (1978)); *accord United States v. Kosko*, 870 F.2d 162, 164 (4th Cir.1989). The *Mohney* court concluded that such witnesses were "essential" witnesses pursuant to Rule 615(3) and, therefore, were able to avoid sequestration. 949 F.2d at 1405. Like experts, summary witnesses do not testify to the facts of the case, but rather testify "based on the testimony of others." *Id.* at 1404.

In this case, the Government represented that the summary witness, Loreto Fuentes ("Fuentes"),[116] would be used to introduce summary charts at trial and would not be testifying as to facts known independently or based upon her own perception. *See* 13 May

1993 Government Sequestration Brief at 1; 27 May 1993 Tr. at 7. Based upon this representation [117] and the case law discussed herein, the Motion to Sequester summary witnesses was denied. *See* 27 May 1993 Tr. at 7–8.

2. *Motion to Suppress Use of Cayman Islands Documents By the Government Pursuant to 18 U.S.C. § 3505*

On 5 April 1993, Bertoli again moved to suppress documents received by the Government from the Cayman Islands (the "Motion to Suppress Cayman Documents").[118] *See* 5 April 1993 Letter at 1–2. Specifically, without a single citation, Bertoli objected to the introduction of all records of Butterfield, Royal Bank, Swiss Bank and Greenshields "on the grounds that the alleged custodians of the records specifically stated they had no personal knowledge of the documents, and the alleged Butterfield custodian stated he had no knowledge of the accounting system which produced the records." *Id.* at 2.

On 13 April 1993, the Government responded to the Motion to Suppress Cayman Documents. *See* 13 April 1993 Government Brief at 1–3. The Government first argued that, with the exception of certain Cayman Islands documents then recently received by the Government, Bertoli had all other Cayman Islands documents no later than early 1992.[119] *Id.* at 1. Accordingly, the Govern-

---

**116.** Fuentes is a representative of the National Association of Security Dealers (the "NASD") assigned to work with the Government on this case. *See* Trial Transcript at 1205.

**117.** At the Rule 104 Hearing and at trial, the representation of the Government held true as Fuentes testified only as a summary witness and not with regard to facts independently perceived. *See* 19 May 1993 Tr. at 439–519; Trial Transcript at 1205–354, 1475–505, 3788–806, 3812–14, 4846–53.

**118.** In support of the Motion to Suppress Cayman Documents, Bertoli submitted the following: Letter Brief, dated 5 April 1993 (the "5 April 1993 Brief").

In Opposition to the Motion to Suppress Cayman Documents, the Government submitted the following: Letter Response Brief, dated 13 April 1993 (the "13 April 1993 Government Brief").

**119.** By letter, dated 30 March 1993, the Government informed Bertoli it had received additional

documents from the Cayman Islands and it intended to introduce those documents into evidence pursuant to 18 U.S.C. § 3505. By letter to Bertoli, dated 1 April 1993, the Government enclosed copies of those newly-received documents marked as Government exhibits.

At the Final Pre-trial Conference, the Government explained that these documents were discovered, in early March 1993, in a search of Euro Bank by the Cayman Islands police pursuant to a search warrant. *See* 28 May 1993 Tr. at 30–33; 13 April 1993 Government Letter at 2. The Government first examined the documents on 14 May 1993, the day before the Second Set of Cayman Islands Depositions commenced. *Id.*

Bertoli's argument regarding these newly-discovered documents was that they should not be admitted into evidence because the Government failed to give him an opportunity to review the documents prior to commencing the Second Set of Cayman Islands Depositions, in violation of 18 U.S.C. § 3505 and the Confrontation Clause of

ment argued that, pursuant to the 16 Oct. 1992 Order and the 7 Dec. 1992 Order, Bertoli had waived any objections to the First Set of Cayman Islands Documents not previously made. *See* 13 April 1993 Government Brief at 1–2. With regard to new documents received by the Government from the Cayman Islands, the Government argued it had obtained appropriate certifications to introduce those documents pursuant to 18 U.S.C. § 3505. *Id.* at 2–3.

At the Final Pre-trial Conference, the Motion to Suppress Cayman Documents was denied, subject to the Government establishing at trial the requirements for admissibility under 18 U.S.C. § 3505 for any Cayman Islands documents it intended to offer into evidence.[120] *See* 28 May 1993 Tr. at 29–35. All Cayman Islands documents admitted into evidence satisfied the requirements of section 3505(a)(1).

### 3. *Motion to Turn Over Personnel Files of Government Witnesses and Agents* [121]

By letter to the Government, dated 27 January 1992, Bertoli requested that the Government turn over to him "all personnel files for all employees of the Government expected to testify at trial." *See* Government Personnel Files Brief at 2. In March 1993, Bertoli requested that the court order the Government to provide him with the person-

the Sixth Amendment. *See id.* at 30, 33. Nevertheless, Bertoli conceded this argument was without merit with respect to section 3505 when he recognized there is nothing "under [section] 3505 or any case interpreting [section] 3505 which requires notice to [him] or the ability for [him] to confront the witness in order to have these documents admitted under [section] 3505." *See* 28 May 1993 Tr. at 34. Moreover, as previously discussed, the right to confrontation is not violated by the admission of documents pursuant to 18 U.S.C. § 3505.

120. This ruling was construed in accordance with other rulings. For instance, as already discussed, pursuant to the 16 Oct. 1992 Order and 7 Dec. 1992 Order, Bertoli waived any objections to any of the First Set of Cayman Islands Documents not made in a timely fashion. Moreover, in response to Bertoli's objections to the First Set of Cayman Islands Documents, certain documents were ruled admissible pursuant to 18 U.S.C. § 3505. *See* 28 May 1993 Tr. at 26–27

nel file of the Government witness who would testify with regard to summary charts.[122] *See* 19 March 1993 Letter at 1. Bertoli failed to cite the specific grounds for his request, although he indicated his request was based upon *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). *See* 23 April 1993 Letter Brief at 1–2. By letter from the court, dated 7 May 1993, the Personnel Files Motion was denied.

A defendant has no absolute right to the personnel files of Government employees who will testify. For instance, in *United States v. Lafayette,* 983 F.2d 1102 (D.C.Cir. 1993), the court made it clear that there must be a reason or specific purpose behind the request for personnel files of the opposing party or such a request will be denied. *Id.* at 1104. The *Lafayette* court stated: "We are especially unconvinced by appellants' argument as to these two officers, as nothing in appellants' brief informs us why they have any reason to believe that the personnel files would provide any useful evidence whatsoever." *Id.* at 1106; *see also Stabilus, Div. of Fichtel & Sachs Industr. v. Haynsworth, Baldwin, Johnson & Greaves, P.A.,* 144 F.R.D. 258, 267 (E.D.Pa.1992) (rejecting request for personnel files as "overly broad and unduly burdensome").

Similarly, in *United States v. Driscoll,* 970 F.2d 1472 (6th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1056, 122 L.Ed.2d 362

(Richardson Greenshields documents, selected Euro Bank documents and selected Paget Brown documents).

121. In support of the motion for personnel files (the "Personnel Files Motion"), Bertoli submitted the following: Letter, dated 19 March 1993 (the "19 March 1993 Letter Brief"); Letter, dated 23 April 1993 (the "23 April 1993 Letter Brief").

In opposition to the Personnel Files Motion, the Government submitted the following: Government's Memorandum of Law Concerning the Personnel Files of Government Agents and Employee (the "Government Personnel Files Brief"), filed 19 April 1993.

122. The two Government witnesses who testified at trial were Fuentes of the NASD and Patrick Ford, Special Agent with the FBI ("Special Agent Ford"). *See* Trial Transcript at 739. The summary charts introduced by those witnesses are discussed in another section of the opinion. *See infra,* at 1049.

(1993), the defendant attempted to acquire personnel files of an officer testifying against him, in an effort to cast doubt on the officer's credibility. Although the defendant relied upon *Brady* for his request, the *Driscoll* court rejected the request for personnel files because the defendant offered no support for his contention that the personnel files he sought might contain information important to his case. The *Driscoll* court stated: "The Supreme Court has made clear that the *Brady* rule is not an evidentiary rule which grants broad discovery powers to a defendant and that 'there is no general constitutional right to discovery in a criminal case.'" 970 F.2d at 1482 (quoting *United States v. Todd,* 920 F.2d 399, 405 (6th Cir.1990) (quoting *Weatherford v. Bursey,* 429 U.S. 545, 559, 97 S.Ct. 837, 845–46, 51 L.Ed.2d 30 (1977))).

Similar results were reached in *United States v. Andrus,* 775 F.2d 825, 843 (7th Cir.1985) (defendant was "not entitled to the personnel files of the law enforcement witnesses without even a hint that impeaching material was contained therein"), and in *United States v. Navarro,* 737 F.2d 625, 631–32 (7th Cir.), *cert. denied sub nom., Mugercia v. United States,* 469 U.S. 1020, 105 S.Ct. 438, 83 L.Ed.2d 364 (1984) (it is not enough for defendant to argue that personnel file "might" contain *Brady* material, particularly when defendant "offered nothing to rebut the [G]overnment's explicit representation" that no *Brady* material existed).

In *United States v. Henthorn,* 931 F.2d 29 (9th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1588, 118 L.Ed.2d 306 (1992), the Ninth Circuit rejected the approach which requires a defendant, in the first instance, to make a showing of materiality with regard to the information contained in the files. *See*

*id.* at 31. Rather, the *Henthorn* court stated:

> [T]he [G]overnment has a duty to examine personnel files upon a defendant's request for their production. Absent such an examination, it cannot ordinarily determine whether it is obligated to turn over the files. . . . The obligation to examine the files arises by virtue of the making of a demand for their production. However, following that examination, the files need not be furnished to the defendant or the court unless they contain information that is or may be material to the defendant's case.

*Id.*

In response to *Henthorn,* the Department of Justice developed a policy regarding the review of personnel files. This policy was explained and upheld in *United States v. Jennings,* 960 F.2d 1488 (9th Cir.1992):

> Counsel for the [G]overnment informs us that the Department of Justice has instituted a policy designed to implement the holding of *Henthorn.* Under this policy, the files of law enforcement officers are to be examined by the appropriate agency's attorney or his [or her] staff. The agency legal staff will notify the [F]ederal prosecutor assigned to the case if any potential *Brady* material is found, and the [Assistant United States Attorney (the "AUSA")] will then determine whether the information should be disclosed or whether an in camera review by the district court is appropriate.

*Id.* at 1492 n. 2. The *Jennings* court concluded that "[a]dherence to this procedure would indicate that the AUSA is fulfilling his [or her] responsibility for ensuring [G]overnment compliance with *Brady.*" [123] *Id.* at 1492; *see also United States v. Brooks,* 966

---

**123.** In reaching this result, the *Jennings* court rejected the finding of the district court, which had held that the AUSA must personally review the personnel files of the testifying officers and employees. 960 F.2d at 1490. The *Jennings* court concluded personal review was not necessary:

> [T]he presumption is that official duty will be done, and hence that the procedure instituted by the Department of Justice to ensure compliance with *Henthorn* will be tailored to those concerns. . . . Personal review by the AUSA

*after* being alerted to the presence of potential *Brady* material by agency staff lessens the chance that exculpatory information will go undiscovered by personnel unfamiliar with the facts of the case or the relevant criminal law involved. In addition, the court and the [G]overnment understand that the prosecutor's duty to the court extends to ensuring the [G]overnment's compliance with our decision in *Henthorn.*

*Id.* at 1492 (emphasis added).

F.2d 1500, 1504–05 (D.C.Cir.1992) (review of police department files by police department itself or by AUSA was sufficient and no *in camera* review was required); [124] *cf. Pennsylvania v. Ritchie*, 480 U.S. 39, 59, 107 S.Ct. 989, 1002, 94 L.Ed.2d 40 (1987) (when general request for *Brady* material made, "the State decides which information must be disclosed).

In this case, the Personnel Files Motion failed under either line of cases. As an initial matter, Bertoli's request for personnel files was overly broad in that it failed to identify either specific witnesses or specific exculpatory or impeachment evidence which Bertoli believed would be contained in those files. *Lafayette*, 983 F.2d at 1104–06; *Driscoll*, 970 F.2d at 1482; *Stabilus*, 144 F.R.D. at 267. Bertoli was not entitled to the personnel files of the law enforcement witnesses "without [providing] even a hint that impeaching material was contained therein." *Andrus*, 775 F.2d at 843; *see also Lafayette*, 983 F.2d at 1104–06; *Navarro*, 737 F.2d at 631–32.

Even applying the approach of the Ninth Circuit in *Henthorn*, the Government represented at the time of the Personnel Files Motion that it had followed the procedure described and adopted in *Jennings* and *Brooks*. *See* Government Personnel Files Brief at 5. The Government stated:

> The Government is complying with, and will continue to comply with, the Department of Justice's *Henthorn* policy concerning the personnel files of all Government agents and all present or former Government employees expected to testify at trial. Thus far, the U.S. Attorney's offices has been notified by the appropriate Federal agencies that no *Brady* material has been found in the personnel files of any of the Government agents or present or former employees expected to testify at trial. The U.S. Attorney's Office has also been notified by the appropriate agency that no *Brady* material has been found in the personnel file of the witness who will testify about the summary charts.

*Id.* at 6.

In accordance with *Jennings* and *Brooks*, and particularly given Bertoli's failure to identify any specific exculpatory material which might have been found in the requested personnel files, these representations were accepted and the Personnel Files Motion was denied. [125] *See Jennings*, 960 F.2d at 1492 & n. 2; *Brooks*, 966 F.2d at 1504–05; *Ritchie*, 480 U.S. at 59, 107 S.Ct. at 1002 (when general request for *Brady* material made, "the State decides which information must be disclosed").

### 4. Motion to Suppress or, in the Alternative, to Obtain Letters of Request to Take the Testimony of Euro Bank Personnel Ebanks and Burgess

On 12 May 1993, Bertoli moved to suppress certain documents received from the Cayman Islands pursuant to what Bertoli described as "an unnoticed and unauthorized

---

**124.** One case, *United States v. Kiszewski*, 877 F.2d 210 (2d Cir.1989), required *in camera* review of personnel files. This case is inapposite. In *Kiszewski*, the defendant was charged with providing false testimony to two grand juries during an unrelated trial. The case against the defendant turned on the testimony of two FBI agents. *See* 877 F.2d at 212. Under these circumstances, where the trial itself concerned "false declarations" and where "the central issue in the case and the evidence presented at trial consist[ed] of opposing stories presented by the defendant and government agents," *id.* at 216, the *Kiszewski* court indicated the district court should review the files *in camera*. In contrast, in the case *sub judice*, the compelling concerns of *Kiszewski* simply were not present, nor was the request for discovery framed with specificity. *See United States v. Pou*, 953 F.2d 363, 367 (8th Cir.), *cert. denied*, — U.S. —, 112 S.Ct. 1982, 118 L.Ed.2d 580 (1992), (*in camera* review required in *Kiszewski* because *Brady* request sought "[v]ery specific documents ... with possible impeachment value").

**125.** Bertoli argued, without any citation to legal authority, that the Government's representation should not have been accepted "without identifying the agency or the specifics of the request made by the [United States] Attorney's office." 23 April 1993 Letter at 1. In support of this statement, Bertoli described allegations of sexual misconduct against unnamed former employees of the "SEC Washington Regional Office" and allegations against two SEC investigators regarding false testimony. Bertoli's allegations were made without reference or citation to any documents of record and without any explanation as to relevance. Accordingly, Bertoli's argument was rejected.

[MLA] Treaty request."[126] *See* 12 May 1992 Letter Brief at 1. According to Bertoli:

> The Government, without requesting leave of the Court or noticing this defendant, made an MLA [Treaty] request for documents of Seuro Ltd., Nugco Ltd., and other documentation. None of the foregoing companies were mentioned in the original letter of request by this Court. . . .

*Id.*

Bertoli argued that he attempted to question Burgess regarding this information during the Second Set of Cayman Islands Depositions, but was prohibited by the hearing officer from doing so. *Id.* at 2. Bertoli further argued:

> This was clearly unfair discovery under the guise of the MLA [Treaty] and the documents should not be admitted under 18 U.S.C. § 3505 because this defendant was denied his confrontational [*sic*] rights under the Sixth Amendment.

*Id.* Bertoli requested that, if the documents were admitted into evidence, "the Court issue a letter of request to the Cayman Islands" to allow Bertoli to re-depose Burgess and Ebanks regarding the documents in question. *Id.*

Bertoli's objections were without merit. As an initial matter, the documents to which Bertoli objected were responsive to the MLA Treaty Request of 4 April 1990 or the Supplemental Treaty Request of 25 October 1991. *See* 21 May 1993 Government Letter Brief at 2. As described above, these documents were seized by the Cayman Islands police after Euro Bank had failed to produce the documents as required by the treaty requests. *See id.*

■ As previously discussed, these documents were properly admitted pursuant to 18 U.S.C. § 3505. Moreover, Bertoli's argument regarding the Confrontation Clause was without merit because (1) as Bertoli conceded, there is nothing "under [section] 3505 or any case interpreting [section] 3505 which requires notice to [him] or the ability for [him] to confront the witness in order to have these documents admitted under [section] 3505," 28 May 1993 Tr. at 34, and (2) the right to confrontation is not violated by the admission of documents pursuant to 18 U.S.C. § 3505. Accordingly, Bertoli was not entitled to suppression of the Cayman Islands documents to which he objected or to issuance of a supplemental treaty request for the purpose of re-deposing Burgess and Ebanks regarding those documents.[127] This motion was denied on 28 May 1993. *See* 28 May 1993 Tr. at 35.

### 5. *Objection to Reading of Redacted Second Superseding Indictment to Jury*

■ Bertoli objected to the reading of the Redacted Second Superseding Indictment to the jury pool prior to jury selection. *See* Letter from Bertoli to court, dated 26 April 1993; 27 April 1993 Tr. at 28–30. According to Bertoli, reading of the Redacted Second Superseding Indictment would have had the effect of "pre-grooming" the jury with the Government's version of the case.[128]

■ A court has broad discretion in determining how best to conduct *voir dire. Rosales–Lopez v. United States,* 451 U.S. 182, 189, 101 S.Ct. 1629, 1634–35, 68 L.Ed.2d 22 (1981); *Ristaino v. Ross,* 424 U.S. 589, 594, 96 S.Ct. 1017, 1020, 47 L.Ed.2d 258 (1976); *United States v. De Peri,* 778 F.2d 963, 971–72 (3d Cir.1985), *cert. denied sub nom., Pecic v. United States,* 475 U.S. 1110, 106 S.Ct. 1518, 89 L.Ed.2d 916 (1986); *see*

---

**126.** In support of this motion, Bertoli submitted the following: Letter Brief, dated 12 May 1993 (the "12 May 1993 Letter Brief").

In opposition to this motion, the Government submitted the following: Letter Brief, dated 21 May 1993 (the "21 May 1993 Government Letter Brief").

**127.** Bertoli had already deposed Burgess and Ebanks at length with regard to Euro Bank documents and their knowledge of Euro Bank records and record-keeping procedures. *See* Transcript of deposition of Burgess ("Burgess Dep.Tr.") at 24–45, 50–52; Transcript of deposition of Ebanks ("Ebanks Dep.Tr.") at 56–65, 147–60.

**128.** Significantly, despite this initial objection by Bertoli to reading of the Redacted Second Superseding Indictment to the jury, on 9 August 1993, counsel for Bertoli indicated, late in the trial, that there was no objection to the Redacted Second Superseding Indictment having been read to the jury at the beginning of the case. *See* Trial Transcript at 6373.

*also United States v. Guy,* 924 F.2d 702, 708 (7th Cir.1991). In exercising this discretion, a trial court must keep in mind that the purpose of *voir dire* is to ensure that the defendant will have an impartial jury. *See Guy,* 924 F.2d at 707; *United States v. Boise,* 916 F.2d 497, 504 (9th Cir.1990), *cert. denied,* 500 U.S. 934, 111 S.Ct. 2057, 114 L.Ed.2d 462 (1991). Indeed, as one court has stated: "The trial court has the duty in a criminal case to properly voir dire prospective jurors to ensure the Sixth Amendment guarantee of an impartial jury is met." *United States v. Frank,* 901 F.2d 846, 848 (10th Cir.1990).

In this case, the purpose of reading the Redacted Second Superseding Indictment to prospective jurors was to determine whether they had any opinions concerning the allegations and charges, whether they knew anything about the case prior to its inception, and whether they had formed any opinions based on that knowledge. *See* 27 April 1993 Tr. at 30. In keeping with this purpose, the prospective jurors, after having the Redacted Second Superseding Indictment read to them, were instructed as follows: "I point out to you that the indictment is not evidence of guilt of the defendant." Trial Transcript at 76. As well, the entire panel was instructed, before the proposed members were questioned, as to the purpose of an indictment.[129] *See id.* This instruction was repeated during the charge to the jury. *See id.* at 6729.

Bertoli's argument that the jury should have been kept in the dark concerning the allegations and charges of the Redacted Second Superseding Indictment was without merit. As an initial matter, the reading of an indictment to prospective jurors during *voir dire* is appropriate. *See, e.g., United States v. Blevins,* No. 91–10437, 1992 WL 225405, at *1, 1992 U.S.App.LEXIS 22898, at *2 (9th Cir. 16 Sept. 1992); *United States v. Dickens,* 695 F.2d 765, 774 (3d Cir.1982), *cert.*

*denied sub nom., Conerly v. United States,* 460 U.S. 1092, 103 S.Ct. 1792, 76 L.Ed.2d 359 (1983); *United States v. Corbett,* 518 F.2d 113, 116 (8th Cir.1975). In addition, not only was the Redacted Second Superseding Indictment read for the purposes of ensuring Bertoli's right to an impartial jury[130] but, contrary to Bertoli's suggestion, "it is not required ... that jurors be totally ignorant of the facts and issues involved in a case." *United States v. Bakker,* 925 F.2d 728, 734 (4th Cir.1991) (citing *Irvin v. Dowd,* 366 U.S. 717, 722–23, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961)); *See United States v. Peete,* 919 F.2d 1168, 1178 (6th Cir.1990); *United States v. Bates,* 852 F.2d 212, 219 (7th Cir.1988).

■ Even when a prospective juror has a pre-conceived notion of guilt or innocence, and even when prospective jurors have been subject to influences more prejudicial than the mere reading of an indictment, exclusion of those jurors is not required. So long as a juror can lay aside his or her impression or opinion and render a verdict based one the evidence presented in court, a defendant is not prejudiced by inclusion of such a juror. *Dobbert v. Florida,* 432 U.S. 282, 302, 97 S.Ct. 2290, 2302–2303, 53 L.Ed.2d 344, *reh'g denied,* 434 U.S. 882, 98 S.Ct. 246, 54 L.Ed.2d 166 (1977); *Murphy v. Florida,* 421 U.S. 794, 800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975); *Irvin,* 366 U.S. at 722–23, 81 S.Ct. at 1642; *see, e.g., Bakker,* 925 F.2d at 734 (not error to empanel jurors aware of high pretrial negative publicity surrounding case); *Peete,* 919 F.2d at 1177–78 (same); *Lincoln v. Sunn,* 807 F.2d 805, 815 (9th Cir.1987) (same); *De Peri,* 778 F.2d at 972 (3d Cir.) (same).

Accordingly, to the extent reading the Redacted Second Superseding Indictment had any affect on prospective jurors, that affect could only be characterized as minimal and caused no prejudice to Bertoli. Moreover,

---

**129.** Specifically, the panel was instructed:

The defendant stands before this Court on an indictment found by the Grand Jury charging him with the crimes that I referred to and which are reflected in the indictment the Government attorney just read to you. I point out to you that indictment is not evidence of the guilt of the defendant. It's merely a formal charge, an informative pleading that evidences

a step in the proceedings to bring a matter such as this before a court and jury for final disposition as to guilt or innocence with regard to the charges.
Trial Transcript at 76.

**130.** Logically, jurors need to know the allegations against a defendant if an impartial jury is to be selected.

during *voir dire*, each prospective juror was asked forty-three detailed questions to test prejudice, including:

> Number 1 ... [D]o you know anything about this case or have you heard anything about the case?
>
> Number 32, is there anything about the nature of the charges concerning the defendant which would prevent you from rendering a fair and impartial verdict?
>
> Number 37, do you have any prejudice against the defendant merely because he is named as a defendant?
>
> Number 39, after hearing all of the evidence presented, you must make findings of fact based only upon the evidence presented to you during the course of this trail. As well, you must accept and apply the law as I instruct you regardless of what you think the law is or should be. Is there anyone among you who cannot do this?
>
> Number 40, do any of you disagree with the components of a fair trial I mentioned to you a few moments ago?
>
> Number 41, if you were the defendant on trial here today or his standby counsel or the Assistant United States Attorney charged with the responsibility of prosecuting this case, do you know of any reason why you would not be content to have your case tried by somebody in your present frame of mind?
>
> Number 43, is there any reason, aside from the questions I've already asked, which would cause you to feel you would rather not sit on this particular case?

Trial Transcript at 78–85.

Each juror empaneled answered these questions in the negative and indicated he or she could be fair and impartial and base a decision only upon the facts of the case. *See id.* at 85–166, 167–95, 197–260. The reading of the Redacted Second Superseding Indictment was neither improper nor prejudicial.

### 6. Motion to Question Eisenberg Regarding Charges Pending Against Him When He Pleaded Guilty

 During trial, by letter, dated 2 July 1993 (the "2 July 1993 Letter"), Bertoli objected to alleged limitations on his cross examination of Eisenberg. Bertoli stated:

> By this letter the undersigned respectfully reasserts his entitlement to question Leo Eisenberg regarding the charges which were pending against him when he pleaded guilty.

2 July 1993 Letter at 1. After conceding that "Eisenberg has provided the most significant and inculpatory testimony in this case thus far," *id.*, Bertoli further stated:

> Given the importance of Eisenberg's testimony, the court can surely understand the overriding importance of cross-examination. One of the most important areas of cross is Eisenberg's fear that the charges pending against him when he pleaded guilty would have likely resulted in a conviction at trial and lengthy prison sentence. To pursue this area of cross, [Bertoli] must, of course, establish Eisenberg understood the charges he was facing. This sort of cross is entirely unremarkable and unquestionably appropriate.
>
> The court's refusal to permit the requested cross examination has closed off an area of inquiry which is critical to the defense of this case. Should the court deny this application, [Bertoli] requests that a mistrial be declared.

*Id.* at 1.

Not only did the 2 July 1993 Letter fail to cite any legal authority to support the right to cross examination professed by Bertoli, it did not include any citation to the Trial Transcript indicating Bertoli had been denied the opportunity to cross examine Eisenberg with regard to the charges pending against Eisenberg at the time of his guilty plea.[131] In fact, a review of the Trial Transcript indicates that at no time was Bertoli cut off or limited

---

131. During trial, the stenographic record was transcribed on a daily basis; the parties were provided with copies of a day's testimony on that evening or on the morning of the following day. Because the majority of Bertoli's cross-examination of Eisenberg occurred from 29 June 1993 to 1 July 1993, Bertoli had ample opportunity to review and cite the record for the purpose of supporting the 2 July 1993 Letter.

in his cross examination of Eisenberg with regard to this area of inquiry.

On the morning of 2 July 1993, out of the presence of the jury, Bertoli was asked to explain the 2 July 1993 Letter and to provide a citation to the point where he was allegedly cut off. *See* Trial Transcript at 2943–50. The Trial Transcript reveals the following:

BERTOLI: Your Honor, I was specifically referring to Tele Dynamics. Tele Dynamics is a company that was underwritten by Monarch Funding Corporation sometime in 1986, 1987. Involved in Tele Dynamics was Eisenberg's two sons, Michael and Paul Eisenberg, as well as Cooper. The pattern that was used by Monarch Funding, that's Leo Eisenberg and his two sons and Cooper, was exactly the same type of a plan that he's claiming that Leo Eisenberg and myself had. He's been testifying basically that he knows nothing, that Richard Bertoli did everything, he did everything at Richard Bertoli's direction, that he really didn't know how to do this.

COURT: .... How does that concern the [2 July 1993] Letter you've written? ...

BERTOLI: Your honor, [Eisenberg] had charges pending against him from the [NASD]. He was under investigation, criminal investigation with respect to those charges. His two sons were also under the same investigation.

COURT: His sons have nothing to do with this. We've been through that a number of times. I want to see the page and paragraph where I cut you off. Do you have it?

BERTOLI: I'm flipping to it now, your Honor. If I may have a moment.

*Id.* No portion of the transcript was ever presented by Bertoli to support his argument that he had been cut off or limited.

In fact, as the record indicates, Bertoli's cross examination of Eisenberg was extensive. *See* Trial Transcript at 2582–678, 2687–839, 2843–938, 2943–3067, 3079–155. It covered five days, 543 pages of transcript and exceeded the Government's direct examination by two days and 232 pages. *See id.* at 2247–347 (direct examination of Eisenberg), 2353–475 (same), 2492–581 (same). Bertoli

was permitted to cross examine, and did cross examine, Eisenberg regarding:

(1) Prior criminal activity and convictions, *see id.* at 2582–84, 2586–88, 2643–44, 2673–74, 2920;

(2) prior non-criminal acts of dishonesty, *see id.* at 2584, 2631–33;

(3) the consent decree entered into by Eisenberg with the NASD, barring Eisenberg from being a broker/dealer, *see id.* at 2595–603, 2636–37;

(4) discussions between Eisenberg and the Government, including plea negotiations, as well as the cooperation agreement entered into by Eisenberg with the Government, *see id.* at 2601–02, 2625–28, 2632–33, 2648–52, 2854–55, 2859–60, 2875;

(5) the charges in this case against Eisenberg as well as Eisenberg's understanding of the maximum sentences for those charges, *see id.* at 2615–18, 2622, 2627–28;

(6) charges pending against Eisenberg's sons at the time Eisenberg pleaded guilty, as well as Eisenberg's understanding of the "deals" made by Eisenberg's sons with the Government, and whether Eisenberg's "deal" was related to the charges against his sons, *see id.* at 2605, 2607–11, 2622–25, 2628–31, 2647–48.

The record, moreover, contains numerous passages which indicate Bertoli was permitted to cross-examine Eisenberg regarding charges pending against Eisenberg and against his sons for the purpose of revealing Eisenberg's motivation for pleading guilty. For instance, the Trial Transcript reveals the following:

COURT: The fact of the matter is, if you want to go into something concerning why he pled, why he's testifying, that's fine, but as to the underlying conduct of his sons, that's an entirely separate and collateral issue.... If you want to suggest to the jury that he's lying and the reason's he's lying is to save his sons, and you've got the argument, go ahead and do it, but why his sons did what they did or what they did on a certain date is irrelevant.

BERTOLI: Your Honor, perhaps I misspoke earlier.... I have no intention of

going into any specific dates or any specific acts....

COURT: Fine.... [I]f you want to go into the [area of] did you enter this plea agreement to help your sons, did you enter the plea agreement to get your sons a better deal, fine.

*Id.* at 2609–10.

COURT: .... Now, as I said before, if you want to go into his motive, fine.

*Id.* at 2613–14.

COURT: .... You have the right to go after this guy hammer and tong with regard to whatever you think he's made up or lied about or whatever deal he's cut for himself.

*Id.* at 2620.

The record also contains passages in which Bertoli did question Eisenberg with regard to Tele Dynamics, the NASD and any charges pending against Eisenberg and his sons. *See id.* at 2595–603, 2605, 2607–11, 2615–18, 2622–25, 2627–31, 2636–37, 2636–37. For instance, the Trial Transcript reveals the following:

BERTOLI: [W]ere you guilty of defrauding the public in the underwriting and sale of Tele Dynamics?

EISENBERG: Yes.

BERTOLI: And, in fact, you were a defendant in a 1990 complaint by the [NASD] along with your sons Michael Eisenberg, Paul Eisenberg and Robert Cooper involving Tele Dynamics. Isn't that true....

EISENBERG: That's correct.

*Id.* at 2602–03.

BERTOLI: At any rate, Mr. Eisenberg, you faced a total of enough years to make it a life sentence. Was that correct:

EISENBERG: If that's what it says, yes.

BERTOLI: And late in 1990, you found out that both of your sons, Michael and Paul Eisenberg, were being investigated. Is that correct?

EISENBERG: That's correct.

BERTOLI: ... Mr. Eisenberg, does your plea agreement and the plea agreements of your sons, are they totally separate?

EISENBERG: Yes, they are.

BERTOLI: They have nothing to do with each other. Is that what your telling us?

EISENBERG: I'm saying that my plea agreement and my son's plea agreements, they stand on their own. The Government always told me that I stand on my own.

BERTOLI: ... And you were under pressure at home at that time as a result of the problems your sons were having. Isn't that correct?

EISENBERG: I was under [a] certain amount of pressure, yes.

BERTOLI: And that was because your sons told your wife and their mother that they wouldn't have problem except for you. Isn't that correct?

EISENBERG: I don't remember [them] saying that.

*Id.* at 2622–25.

The record indicates an extensive cross examination of Eisenberg was conducted by Bertoli. Bertoli was given a virtually unlimited scope of inquiry with regard to matters of Eisenberg's credibility, including Eisenberg's motivation for testifying and the fact that Eisenberg had engaged in the manipulation of Tele Dynamics stock. In light of this, Bertoli's suggestion that he was prejudicially limited in his examination of Eisenberg was factually baseless and without merit.[132]

---

**132.** During Bertoli's cross examination of Eisenberg, Bertoli was limited in his opportunity to question Eisenberg with regard to the specific facts of the Tele Dynamics manipulation. This subject matter was irrelevant and unnecessary under Fed.R.Evid. 401–403.

As pointed out at the time, Eisenberg candidly admitted his manipulation with regard to Tele Dynamics, his signing of the consent decree with the NASD and the involvement of his sons. *See* Trial Transcript at 2605–06. Moreover, as also indicated at the time, the fact that Eisenberg had prior familiarity with units, manipulation and

IPOs was irrelevant to whether Bertoli told him to manipulate the stock of LCI, High Tech or Toxic Waste, as testified to by Eisenberg on direct examination. *Id.* at 2606–07. In fact, at the time, Bertoli himself indicated he did not intend to inquire as to specific dates or acts, but only wished to question Eisenberg on whether certain crimes were committed. *See id.* at 2609–10.

Accordingly, Bertoli was permitted to question and did question Eisenberg as to whether he and his sons manipulated Tele Dynamics stock, as well as what charges resulted therefrom; pursuant to Fed.R.Evid 401–403, however, Bertoli was

### 7. Motions for a Mistrial

 On 29 June 1993, Bertoli moved for a mistrial based on certain comments, outside of the presence of the jury, to Bertoli (the "29 June Motion for Mistrial"). *See* Trial Transcript at 2680. The motion was denied. *See id.* at 2681. In the 2 July 1993 Letter, Bertoli summarized these comments as follows: "[T]he court has told the parties in no uncertain terms that it believes Eisenberg to be a credible witness—a statement which unmistakably evidences the court's view that it believes the undersigned to be guilty." 2 July 1993 Letter at 1.

"The decision whether to grant a mistrial is within the sound discretion of the trial court...." *United States v. Saldarriaga,* 987 F.2d 1526, 1531 (11th Cir.1993); *see United States v. Clair,* 934 F.2d 943, 945 (8th Cir.1991); *United States v. Rocha,* 916 F.2d 219, 234 (5th Cir.1990), *cert. denied sub nom., Hinojosa v. United States,* 500 U.S. 934, 111 S.Ct. 2057, 114 L.Ed.2d 462 (1991); *United States v. Crosley,* 634 F.Supp. 28, 32 (E.D.Pa.1985), *aff'd mem.,* 787 F.2d 584 (3d Cir.1986). "[T]he single most important factor in making [this] determination is the extent to which the defendant has been prejudiced." *United States v. Tarantino,* 846 F.2d 1384, 1413 (D.C.Cir.), *cert. denied,* 488 U.S. 867, 109 S.Ct. 174, 102 L.Ed.2d 143 (1988); *see United States v. Moore,* 917 F.2d 215, 220 (6th Cir.1990), *cert. denied,* 499 U.S. 963, 111 S.Ct. 1590, 113 L.Ed.2d 654 (1991); *United States v. Vastola,* 899 F.2d 211, 235 (3d Cir.), *vacated on other grounds,* 497 U.S. 1001, 110 S.Ct. 3233, 111 L.Ed.2d 744 (1990); *Brown v. Doe,* 803 F.Supp. 932, 942 (S.D.N.Y.1992).

As an initial matter, Bertoli's characterization of the comments upon which he based the 29 June Motion for Mistrial was incorrect. The Trial Transcript reads:

> precluded from inquiring into the facts of the Tele Dynamics manipulation, facts which were collateral, irrelevant to the issues in this case and would unduly consume time and confuse the jury.

**133.** Under most circumstances, an instruction to the jury to disregard a question or response will cure any prejudice resulting from that question or response. *Clair,* 934 F.2d at 945; *accord United States v. Canino,* 949 F.2d 928, 937 (7th

BERTOLI: Your honor, it's my contention that Leo Eisenberg cut a deal, created a story to come up with a family package to get his two sons off the hook and himself....

COURT: Let's assume all of what you say is correct. The underlying conduct is irrelevant. It has nothing to do with it. If he was trying to lie and, frankly, the story he related here is so internally consistent, so consistent with everybody else's testimony that your argument really does not strike a true note here, *but that's for the jury to make up their mind.* If I was the finder of fact, I would reject it out of hand. All the documents support him, as the documents support [Government witness Louis] Foti [ ("Foti") ].

*Id.* at 2608 (emphasis added).

This comment merely observed that Eisenberg's testimony was internally consistent and consistent with that of other witnesses. *See id.* at 2946. The comment did not suggest Bertoli was guilty. It was merely stated that, given the internal consistency of Eisenberg's testimony, the court would reject the argument then offered by Bertoli on that point. In fact, as the record reflects, it was specifically explained to Bertoli: "The only view I have is that you're presumed innocent. I have [so] instructed the jury and I've operated that way." *Id.* at 2946–47.

There was no basis for a mistrial in light of these comments. The comments and any subsequent discussion regarding the comments were made outside of the presence of the jury. As Bertoli was reminded on more than one occasion, fact finding and credibility determinations were the province of the jury, who remained unaware of the comment to which Bertoli objected.[133] *See id.* at 2608, 2681–82. Moreover, the jury was instructed

Cir.1991), *reh'g denied en banc,* 1992 U.S.App. LEXIS 432 (7th Cir. Jan. 14, 1992), *cert. denied,* —— U.S. ——, 112 S.Ct. 1940, 118 L.Ed.2d 546 (1992); *United States v. Eyster,* 948 F.2d 1196, 1214 (11th Cir.1991). Accordingly, if a curative instruction is sufficient to prevent a mistrial when improper comments are heard by the jury, no mistrial should be necessary when the comments were neither improper nor heard by the jury.

at both the beginning and the end of the case that Bertoli was to be presumed innocent, *see id.* at 6729–30, 6809, that the jury was the sole judge of the facts, *see id.* at 280, 282–83, 6721, 6723–25, 6732, 6805, and that the court maintained no position in the case. *See id.* at 277, 6719, 6732, 6734–35. Because Bertoli suffered no prejudice as a result of the comments he cited, and because his argument was factually baseless, his 29 June Motion for Mistrial was denied. *See Tarantino,* 846 F.2d at 1413.

Bertoli again moved for a mistrial on 6 July 1993 (the "6 July Motion for Mistrial"). The basis for this motion was also a comment made at sidebar, outside the presence of the jury. Bertoli made specific reference to an exchange which followed certain improper comments made by Bertoli during his cross-examination of Eisenberg. Bertoli concluded his cross-examination of Eisenberg with a sarcastic, testimonial question regarding Eisenberg's criminal history. *See* Trial Transcript at 3152 ("Bottom line, Mr. Eisenberg, you say you're a stand-up guy and you haven't spent a day in jail, have you?"). Bertoli then sarcastically stated: "I have no further use for this witness, your honor." *Id.* at 3153.

Following the Government's objection to these comments, a sidebar conference was convened. The conference took place at the side of the bench farthest from the jury. The jury's view of the parties was blocked by the bench, and the court's back was to the jury box. In a firm, low voice, Bertoli was admonished about the impropriety of offering testimony while questioning a witness:

> The last two comments are way out of line. I have been cautioning you constantly.... You have abused your right of cross-examination. Don't do it again. I've given you another warning. You're totally out of line. ...
>
> Your sarcasm—all that's meant to do is to try to testify. You want to testify, you take the stand. You do not have the right to do that [while questioning another witness]. You're acting as an attorney....

*Id.* at 3154.

Following a recess, Bertoli moved for a mistrial. Bertoli argued: "At the sidebar, his Honor impacted on my Sixth [*sic*] Amendment [134] right to testify or not to testify because you were loud enough to be heard, not only at this table, but back in the rear. Clearly the jury must have heard that." [135] *Id.* at 3156. Bertoli's motion, being meritless, was denied. *Id.*

Bertoli's motion was baseless as a factual matter. As indicated, the comments of which Bertoli complained were made at sidebar, well out of the range of the jury's hearing. The denial of Bertoli's 6 July Motion for Mistrial was based on the factual finding that the jury could not possibly have heard the comments cited by Bertoli. [136] Bertoli has introduced no reason to revisit that factual finding. Because Bertoli could not have been prejudiced by the comments of which he complained, his 6 July Motion for Mistrial

---

**134.** Bertoli, now represented by counsel, states he intended to refer to his rights under the Fifth Amendment.

**135.** In connection with his motion for bail pending appeal, Bertoli makes reference to another statement responding to an attempt by Bertoli to testify while questioning a witness. 19 Jan. 1994 Bertoli Brief at 39 n. 8. Bertoli was instructed: "[Y]ou must ask a question. You are not there to testify at this point." Contrary to Bertoli's suggestion, this comment was not improper. It merely restated the well-established principle that an attorney may not testify while examining a witness. It was, in fact, the same comment that would have been made if Bertoli were represented by counsel during trial and his counsel had attempted to do the same thing—testify while examining a witness.

**136.** In the initial instructions to the jury, before the beginning of testimony, the jury was instructed that "the idea of a sidebar conference is obvious; we don't want you to hear what we're talking about." Trial Transcript at 277. Similarly, during the final jury charge, the jury was instructed:

> During the course of trial, we've had sidebars, as you observed. These conferences concern legal questions upon which I've ruled.... If you heard any comments by anybody during the sidebar, you must disregard them in their entirety. They are not evidence.

*Id.* at 6733–34. These instructions adequately warned the jury against purposefully attempting to listen in on sidebar conferences, and ensured that any remarks overheard would not be considered during deliberations.

was properly denied.[137] *See Tarantino*, 846 F.2d at 1413.

8. *Objection to Admission of Cayman Islands Documents After Beginning of Trial*

■ During trial, Bertoli objected to the admission, pursuant to 18 U.S.C. § 3505, of certain immigration records received from the Cayman Islands Government after the beginning of the trial. *See* Trial Transcript at 4772, 4788. In so doing, Bertoli relied on the unpublished decision in *United States v. Marcos*, No. 87 Cr. 598 (JFK), 1990 WL 37845, 1990 U.S.Dist. LEXIS 3280 (S.D.N.Y. 27 March 1990). Bertoli's objection was without merit.

Section 3505 provides that a party intending to offer foreign records must provide written notice of the intention "[a]t the arraignment or *as soon after the arraignment as practicable.*" 18 U.S.C. § 3505. Moreover, as previously discussed, section 3505 requires that a motion opposing the introduction into evidence of foreign documents "shall be made by the opposing party and determined by the Court before trial." *Id.*

In *Marcos*, the court held, pursuant to section 3505, that foreign documents could not be submitted following the commencement of trial. *See Marcos*, 1990 WL 37845, at *6–7, 1990 U.S.Dist. LEXIS 3280, at **17–18. The *Marcos* court reasoned that, because section 3505 required that a motion to exclude documents under section 3505, as well as a ruling on that motion, be made prior to trial, section 3505 "plainly foreclosed" the introduction of documents pursuant to section 3505 after trial had commenced. *Id.*

■ Contrary to the explanation in *Marcos*, section 3505 does not explicitly require that only documents provided prior to trial are admissible under section 3505. Instead, section 3505 provides a flexible rule, allowing the documents to be produced "as soon after the arraignment as practicable." 18 U.S.C. § 3505(b). In this case, because the immigration records in question were not provided to the Government by the Cayman Islands Government until after trial had commenced, the Government produced the documents to Bertoli as soon as "practicable" under the circumstances, in compliance with Section 3505(b).

Neither the rationale of *Marcos* nor Bertoli provided a convincing reason for excluding evidence which was otherwise relevant and reliable simply because the Government received that evidence, through no fault of its own, after trial had commenced. The *Marcos* reasoning appears to impose a restriction on the operation of section 3505 that simply is not present in the statute. To the extent section 3505(b) requires a motion opposing the admission of foreign documents pursuant to section 3505 be made and decided prior to trial, the more reasonable, consistent and fair interpretation of that language is to require that such a motion and ruling be made when, contrary to this situation, the parties have notice of the foreign documents prior to trial. Indeed, as already discussed, section 3505 "was not intended to add technical roadblocks to the admission of foreign records, but, rather, to streamline the admission of such records." *United States v. Strickland*, 935 F.2d 822, 831 (7th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 884, 116 L.Ed.2d 787 (1992).

9. *Objections to the Government's Use of Summary Charts and Demonstrative Charts*

■ Both during the pretrial Rule 104 Hearing and at trial, Bertoli objected to the Government's use of charts to summarize and simplify certain complex issues in the case. The charts introduced by the Government fell into two categories—summary charts and demonstrative charts. Summary

---

**137.** In addition, because the jury did not hear the comments cited by Bertoli, no curative instruction was required with respect to these comments. In any event, the jury was instructed, during the charge:

A defendant in a criminal case has a constitutional right not to take the witness stand and testify. You are not to consider for any purpose or in any manner in arriving at your verdict the fact that the defendant did not testify, nor should that fact enter into your deliberations or discussions in any way, manner or at any time.

Trial Transcript at 6729–30.

charts are admissible at trial, pursuant to Fed.R.Evid. 1006, to summarize voluminous documents, which need not have been previously admitted into evidence, because in-court review of those documents would be inconvenient or impracticable. Demonstrative charts, on the other hand, are allowed under Fed.R.Evid. 611(a) to summarize or otherwise aid the jury's understanding of complex documents or testimony which have already been admitted into evidence. Bertoli objected to the Government's use of both summary charts and demonstrative charts.

### a. *Summary Charts*

Fed.R.Evid. 1006 allows a party to prove the contents of voluminous writings which cannot be examined in court without inconvenience by presenting evidence of the contents of those documents in the form of charts, summaries or calculations. *See Pelullo*, 964 F.2d at 204; *see also Martin v. Funtime, Inc.*, 963 F.2d 110, 115–16 (6th Cir.1992); *Harris Mkt. Research v. Marshall Mktg. & Communications, Inc.*, 948 F.2d 1518, 1525 (10th Cir.1991); *United States v. Evans*, 910 F.2d 790, 800 (11th Cir.1990), *aff'd*, —— U.S. ——, 112 S.Ct. 1881, 119 L.Ed.2d 57 (1992). Specifically, Rule 1006 states:

> The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at [a] reasonable time and place. The court may order that they be produced in court.

Fed.R.Evid. 1006.

> The language of Rule 1006 recognizes that it often takes a great deal of court time to introduce a legion of documents to establish a single point. As the Advisory Committee notes indicate, it would be a grueling waste of time to exam-

ine all of the underlying evidence in court, and hence charts and summaries are permitted within the court's discretion.

*United States v. Strissel*, 920 F.2d 1162, 1163–64 (4th Cir.1990). In addition, courts "cannot rationally expect an average jury to compile summaries and to create sophisticated flow charts to reveal patterns that provide important inferences about the defendants' guilt." *United States v. Duncan*, 919 F.2d 981, 988 (5th Cir.1990), *cert. denied*, 500 U.S. 926, 111 S.Ct. 2036, 114 L.Ed.2d 121 (1991).

Rule 1006 does not require "that it be literally impossible to examine all the underlying records [before a summary chart may be utilized], but only that in-court examination would be an inconvenience." *United States v. Possick*, 849 F.2d 332, 339 (8th Cir.1988); *see United States v. Briscoe*, 896 F.2d 1476, 1495 (7th Cir.), *cert. denied sub nom.*, *Usman v. United States*, 498 U.S. 863, 111 S.Ct. 173, 112 L.Ed.2d 137 (1990); *United States v. Stephens*, 779 F.2d 232, 239 (5th Cir.1985); *United States v. Jennings*, 724 F.2d 436, 441–42 (5th Cir.), *cert. denied*, 467 U.S. 1227, 104 S.Ct. 2682, 81 L.Ed.2d 877 (1984); *United States v. Scales*, 594 F.2d 558, 562 (6th Cir.), *cert. denied*, 441 U.S. 946, 99 S.Ct. 2168, 60 L.Ed.2d 1049 (1979). For example,

> [w]here a fact could be ascertained only by the inspection of a large number of documents made up of very *numerous detailed statements*[,] . . . it is obvious that it would often be practically out of the question to . . . requir[e] the production of the entire mass of documents and entries to be perused by the jury or read aloud to them.

4 Wigmore, *Evidence* § 1230 at 535 (1972) (emphasis in original); *see also Fagiola v. National Gypsum Co.*, 906 F.2d 53, 57 (2d Cir.1990); *Jennings*, 724 F.2d at 441–42.

██ One of the most significant aspects of Rule 1006 is that there is no prerequisite that the underlying documents have been submitted into evidence.[138] *See Strissel*, 920

---

**138.** However, the use of Rule 1006 summary charts may be appropriate even if the underlying documents have been admitted into evidence. *See United States v. Osum*, 943 F.2d 1394, 1405 (5th Cir.1991); *United States v. Winn*, 948 F.2d 145, 158 (5th Cir.1991), *cert. denied*, —— U.S.

—— , 112 S.Ct. 1599, 118 L.Ed.2d 313 (1992); *Duncan*, 919 F.2d at 988; *Stephens*, 779 F.2d at 238–39. In *Stephens*, the court explained that the determining factor was the volume of documents summarized by the chart, not whether the

F.2d at 1163–64; *United States v. Meyers,* 847 F.2d 1408, 1412 (9th Cir.1988); *United States v. Clements,* 588 F.2d 1030, 1039 (5th Cir.), *cert. denied,* 440 U.S. 982, 99 S.Ct. 1792, 60 L.Ed.2d 243 (1979). As long as summary charts meet the following requirements, they are admissible: (1) the underlying documents must be admissible, even if they are never admitted; (2) the underlying documents must be too voluminous for convenient in-court review; (3) the charts must accurately summarize the underlying documents; (4) the summary charts and the underlying documents must have been made available at a reasonable time and place for inspection by the opposing side; and (5) the person who prepared the charts must have been made available for cross examination. *See Pelullo,* 964 F.2d at 204; *Stich,* 730 F.2d at 119; *see also United States v. Nivica,* 887 F.2d 1110, 1125 (1st Cir.1989), *cert. denied,* 494 U.S. 1005, 110 S.Ct. 1300, 108 L.Ed.2d 477 (1990); *Davis & Cox v. Summa Corp.,* 751 F.2d 1507, 1516 (9th Cir.1985).

■ Once it is determined the charts have met the above-listed requirements, their admission is committed to the discretion of the trial court. *United States v. Paulino,* 935 F.2d 739, 753 (6th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 323, 116 L.Ed.2d 264 (1991); *see Nivica,* 887 F.2d at 1126; *United States v. Norton,* 867 F.2d 1354, 1362 (11th Cir.), *cert. denied,* 491 U.S. 907, 109 S.Ct. 3192, 105 L.Ed.2d 701 (1989). Upon being found admissible under Rule 1006, the summary charts are considered evidence. *Winn,* 948 F.2d at 158; *United States v. Smyth,* 556 F.2d 1179, 1184, *reh'g denied,* 557 F.2d 823 (5th Cir.), *cert. denied,* 434 U.S. 862, 98 S.Ct. 190, 54 L.Ed.2d 135 (1977); *see Osum,* 943 F.2d at 1405 n. 9; *Gomez v. Great Lakes Steel Div., Nat'l Steel Corp.,* 803 F.2d 250, 257 (6th Cir.1986). Indeed, where the chart summarizes data not in evidence, the chart is the only evidence available for the jury's consideration of the matters set forth therein.

■ The summary charts used by the Government in the instant case were introduced through Fuentes (the "Fuentes Summary Charts"), who was assigned by the NASD to work with the Government preparing charts depicting the fraudulent trading schemes. Trial Transcript at 1205–06. The Fuentes Summary Charts, for the most part, summarized information regarding the LCI Scheme, the Toxic Waste Scheme and the High Tech Scheme. They consisted of four categories of charts: (1) charts listing the names of customers who purchased units in the LCI IPO, the Toxic Waste IPO and the High Tech IPO and the quantity of units they purchased, (2) charts depicting trading by individual accounts in the securities of LCI, Toxic Waste, High Tech, Nature's Bounty, Solar Age and Cinematronics (the "Individual Charts"), (3) daily trading charts showing trading at Monarch in the securities of LCI, Toxic Waste and High Tech in the first few days after the closing dates of their respective IPOs and (4) graphs showing the highest sale prices paid at Monarch for the securities of LCI, Toxic Waste, High Tech, Nature's Bounty and Solar Age. *Id.* at 1211–25; Rule 104 Hearing Transcript at 443–52.

The Fuentes Summary Charts were prepared using information gathered from various Monarch trading documents including, order tickets, the purchase and sales blotter, customer confirmations, broker-dealer confirmations, monthly account statements, customer ledger sheets, stock transfer sheets and the stock delivery and receipt blotter. *Id.* The underlying Monarch trading records were voluminous; in-court examination during the trial would have been impracticable and inconvenient. The admissibility of those underlying documents was considered at the Rule 104 Hearing.

During the course of the Rule 104 Hearing, the Government called Fuentes[139] to introduce and describe the Fuentes Summary Charts. Rule 104 Hearing Transcript

underlying documents had been previously admitted into evidence. 779 F.2d at 238–39.

**139.** In addition to Fuentes, the Government also called witnesses to establish the admissibility of

the underlying documents as business records pursuant to Fed.R.Evid. 803(6). *See generally* Rule 104 Hearing Transcript.

at 438. The purpose of the pretrial introduction of the charts was to determine the admissibility of the underlying documents, many of which were not introduced at trial, and to give Bertoli the opportunity to raise any objections regarding the accuracy of the charts.[140] In her testimony, Fuentes explained, *seriatim,* how the charts were prepared and described the underlying materials used in their preparation. *Id.* at 443–508. She testified the charts accurately summarized the underlying documents upon which they were based and described the methods by which she had satisfied herself of that accuracy. Part way through that exercise, Bertoli was asked by the Government

> to stipulate that the[ Fuentes Summary Charts] fairly and accurately represent the backup materials used to prepare them and that the figures shown in the summary trading sections of the charts are accurate.

*Id.* at 509. Bertoli so stipulated.[141] *Id.*

When Bertoli was asked whether he had any objections concerning the Fuentes Summary Charts, Bertoli replied:

> [W]ith respect to the posting accuracy of the charts I take no exception. With respect to the underlying documentation, my objection would be continuing. It's my belief that the underlying documentation with respect to Monarch ... is not accurate, so the basic documents themselves are unreliable.

*Id.; see also id.* at 525 (objection, pursuant to Fed.R.Evid. 404(b), to Fuentes Summary Charts which concerned Nature's Bounty). Bertoli also objected that one particular chart was not based on voluminous documents. *Id.* at 510. In response, the Government explained:

> [W]hat we have done is taken all these charts and put all the information on one huge chart, all the trading records of [the] account[s].... [I]t's clear that when you take the records all together, they're voluminous. We've simply broken them down in different charts.

*Id.*

At the conclusion of direct questioning of Fuentes by the Government during the Rule 104 Hearing, Bertoli cross examined her about the charts. *Id.* at 519–20. Primarily, Bertoli's questions went to the accuracy of the underlying documents. However, he was instructed to limit his questions, for purposes of the Rule 104 Hearing, to the charts.[142] *Id.*

The Fuentes Summary Charts met all of the requirements of Rule 1006. First, the underlying documents were found to be admissible under the business records exception and the public records exception, pursuant to Fed.R.Evid. 803(6) and (8). Rule 104 Hearing Transcript at 430, 436–37. Second, the Monarch trading documents which formed the bases for the charts were voluminous, and in-court examination of those documents by the jury would have created substantial inconvenience and delay. Third, Bertoli agreed that the Fuentes Summary Charts accurately reflected the underlying documents. *Id.* at 510. Fourth, the Fuentes Summary Charts and the underlying documents were made available to Bertoli in advance of the Rule 104 Hearing for his inspection. *See id.* at 509. Fifth, Fuentes, the person who prepared the charts, was made available to Bertoli for cross examination

140. Bertoli was provided with copies of the Fuentes Summary Charts and the underlying documents in advance of the Rule 104 Hearing so that he could prepare for cross examination of the chart witness and determine what objections he had to the charts. *See* Rule 104 Hearing Transcript at 509.

141. With Bertoli's agreement, the remaining Fuentes Summary Charts were introduced in groups designated by subject matter rather than one at a time. Rule 104 Hearing Transcript at 509.

142. Bertoli began his cross examination of Fuentes by questioning her about her knowledge of the underlying documents. *See* Rule 104

Hearing Transcript at 519. The Government objected because Fuentes was called only to testify to the accuracy of the charts; Fuentes was never characterized as having any knowledge regarding the underlying documents. *Id.* at 520. Bertoli was instructed that the accuracy of the underlying documents was an improper area of questioning for that witness at the Rule 104 Hearing; at that point, Bertoli stated he had no further questions. *Id.* Bertoli, however, was permitted to raise issues concerning the of accuracy of the underlying documents at trial. *See* Trial Transcript at 1354–71, 1383–1475.

both at the Rule 104 Hearing and at trial. *See id.* at 519–20; Trial Transcript at 1354–71, 1383–1475. Accordingly, the Fuentes Summary Charts were admissible under Rule 1006. *See Pelullo,* 964 F.2d at 204; *Stich,* 730 F.2d at 119; *Nivica,* 887 F.2d at 1125.

### b. *Demonstrative Charts*

Compilations or charts which are used only to summarize or organize testimony or documents which have themselves been admitted into evidence are distinguished from those used as evidence pursuant to Rule 1006. Where the summaries or charts are "pedagogical devices 'more akin to argument than evidence' [because] they organize the jury's examination of testimony and documents already admitted into evidence," they do not come within Rule 1006. *Paulino,* 935 F.2d at 753. These pedagogical devices, unlike Rule 1006 summaries, are not evidence, but only a party's organization of the evidence already presented. The difference between Rule 1006 summary charts and demonstrative charts has been explained as follows:

> [T]here is a distinction between a Rule 1006 summary and a so-called "pedagogical" summary. The former is admitted as substantive evidence, without requiring that the underlying documents themselves be in evidence; the latter is simply a demonstrative aid which undertakes to summarize or organize other evidence already admitted.... [A] pedagogical summary can itself be admitted into evidence where the trier of fact will find it helpful and will not be unduly influenced thereby.

*White Indus. v. Cessna Aircraft Co.,* 611 F.Supp. 1049, 1069–70 (W.D.Mo.1985); *see United States v. Pinto,* 850 F.2d 927, 935 (2d Cir.), *cert. denied sub nom., Vence v. United States,* 488 U.S. 867, 109 S.Ct. 174, 102 L.Ed.2d 143 (1988); *Possick,* 849 F.2d at 339; *United States v. Gardner,* 611 F.2d 770, 776 (9th Cir.1980); *Scales,* 594 F.2d at 563–64; *Smyth,* 556 F.2d at 1182–84; *accord United States v. Goichman,* 407 F.Supp. 980, 998 (E.D.Pa.), *aff'd,* 547 F.2d 778 (3d Cir.1976); *Bader Coal Co. v. Quemahoning Coal Co.,* 14 F.2d 743, 747 (3d Cir.1926).

Rule 611(a), which permits trial judges to make common-sense determinations as to how the trial should be run, allows the introduction of demonstrative summaries and charts. Specifically, Rule 611(a) provides:

> Control by Court: The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment.

Fed.R.Evid. 611(a). As discussed in the Advisory Committee's Note to Rule 611, the rule covers such matters as the presentation of evidence, the use of demonstrative evidence and "the many other questions arising during the course of a trial which can be solved only by the judge's common sense and fairness in view of the particular circumstances." Fed.R.Evid. 611 Advisory Committee's Note. Demonstrative evidence "is universally offered and submitted as an aid to understanding." Fed.R.Evid. 401 Advisory Committee's Note.

The use of demonstrative charts to "aid the jury's comprehension is well within the court's discretion." *Possick,* 849 F.2d at 339; *Paulino,* 935 F.2d at 753; *Gardner,* 611 F.2d at 776. However, when Rule 611 charts are used, it is required the charts be accompanied by an instruction from the court which "informs the jury of the summary's purpose and that it does not constitute evidence." *Paulino,* 935 F.2d at 753; *see Holland v. United States,* 348 U.S. 121, 128, 75 S.Ct. 127, 131–32, 99 L.Ed. 150 (1954), *reh'g denied,* 348 U.S. 932, 75 S.Ct. 334, 99 L.Ed. 731 (1955); *Scales,* 594 F.2d at 561–62.

In the instant case, the demonstrative charts presented by the Government were introduced at trial by Fuentes (the "Fuentes Demonstrative Charts") and Special Agent Ford (the "Ford Demonstrative Charts"). Trial Transcript at 1224–43, 4854–4945, 4965–89. The Fuentes Demonstrative Charts included: (1) charts summarizing the research reports prepared by Cannistraro for Wood Gundy on Toxic Waste, High Tech, Nature's Bounty and Solar Age (the "Wood

Gundy Reports"); (2) charts combining information from the Individual Charts and the Wood Gundy Reports; and (3) charts illustrating Wood Gundy sales of the common stock of Toxic Waste, High Tech, Nature's Bounty and Solar Age to various Wood Gundy customers. *Id.* at 1224–43. The Fuentes Demonstrative Charts were based on evidence previously admitted at trial; each of the charts listed on its face the Government exhibits on it was based.

The Ford Demonstrative Charts [143] were all part of the 7000 series of Government exhibits, specifically exhibit numbers 7000–7029. They were flow charts illustrating the movement of money into and out of the Cayman Islands accounts in connection with trading in the securities of LCI, Toxic Waste, High Tech, Nature's Bounty and Mega Energy. Trial Transcript at 4854–4945, 4965–89. The Ford Demonstrative Charts also summarized documents and testimony which had been previously introduced into evidence. The charts were organized so that each listed its sources and was presented together with its underlying documents. *See id.* at 4854. Special Agent Ford testified about what the charts were meant to summarize and explained how the charts made use of the previously admitted evidence.

### c. *Admission of Charts*

During the trial, on 10 June 1993, Fuentes was called to testify regarding the Fuentes Summary Charts and the Fuentes Demonstrative Charts. At the conclusion of her direct testimony, the Government submitted "Government Exhibit A," a list of the charts prepared by Fuentes. Trial Transcript at 1243. The charts listed on Government Exhibit A were admitted; the jury was given the following instruction regarding the difference between summary charts and demonstrative charts:

The sources for the information on the demonstrative charts are noted right on the notes [on the bottom of the chart].... That will give you an indication they're demonstrative charts as I use that term.

Th[e demonstrative] charts are shown to you ... in order to make the other evidence in this case more meaningful and aid you in considering all the evidence, all the underlying data.

The information on these demonstrative charts is based upon other exhibits which are in evidence and upon testimony presented during the course of this case....

[T]hese demonstrative charts ... are no better than the testimony or the documents upon which they are based and ... the charts themselves are not independent evidence....

It's for you to decide whether the demonstrative charts correctly present the evidence contained in the testimony and exhibits upon which they are based....

[S]ummary charts don't have sources listed, they are offered into evidence in lieu of underlying documents. The summary charts are based upon the principle that the underlying documents are so voluminous that these summary charts are just that, summaries of underlying documentation.

[T]he Rules of Evidence permit the presentation of such summary charts in order to save time and to simplify your task of considering all of the exhibits that have been admitted into evidence....

These summary charts are themselves evidence and you should consider these summary charts as you would any other evidence and give them such weight as you determine they deserve.

*Id.* at 1249–51.[144]

At that time, Bertoli objected, pursuant to Rule 404(b) and 403, to the charts marked within exhibit series 200 and 1300.[145] *Id.*

---

**143.** Special Agent Ford did not prepare the charts; they were created by the Government. Special Agent Ford did, however, review the underlying documents; he testified to the accuracy of the Ford Demonstrative Charts based on that review. *See* Trial Transcript at 4854.

**144.** During the charge to the jury at the close of the trial, the difference between summary charts and demonstrative charts was again explained. *Id.* at 6726–28.

**145.** The Fuentes Charts came within several exhibit series, including the 200, 300, 400, 500, 600 and 1300 series.

Those exhibit series dealt with the trading schemes involving Nature's Bounty and Solar Age. Bertoli also renewed his objections raised during the pretrial Rule 104 Hearing regarding the Fuentes Summary Charts. *Id.* at 1249. Bertoli's objections were overruled. *Id.* He then cross examined Fuentes at length as to the preparation of the charts and attempted to point out inaccuracies in those charts. *See id.* at 1354–71, 1383–1475.

At a later point in the trial, on 22 July 1993, at a hearing outside the presence of the jury, some of the Ford Demonstrative Charts, specifically exhibit numbers 7022–7029, were discussed. Bertoli objected to the use of those charts for a variety of reasons: (1) he contended one chart, Government exhibit 7028, was argumentative and "highly prejudicial" in violation of Fed.R.Evid. 403, Trial Transcript at 4980–81; (2) he argued that another chart, Government exhibit 7026, neither summarized multiple documents nor was based on issues which were "confusing" or in need of summarization, *id.* at 4967; (3) he argued that another chart, Government exhibit 7024, violated Fed.R.Evid. 403, and 18 U.S.C. § 3505, Trial Transcript at 4968; and (4) he objected to several charts, Government exhibits 7024, 7022 and 7025, on the ground that the underlying facts were in dispute. *See id.* at 4968, 4983, 4984. Each of the objections was overruled. *Id.* at 4967, 4969, 4982, 4983, 4984, 4985. When the Government concluded its direct examination of Special Agent Ford, Bertoli cross examined Special Agent Ford about the Ford Demonstrative Charts and attempted to point out inaccuracies in the charts. *Id.* at 4945–58, 4997–5007, 5016.

Given the complexity of the facts in the case and the volume of documents and exhibits used to illustrate the fraudulent trading schemes, the charts, which summarized trading activities and cash flows, were tools likely to aid the jury in comprehending the case. In-court examination of all the underlying documents would have been burdensome, time-consuming and confusing without the aid of the charts.

 The use of the charts in this case was accompanied by the necessary safeguards. The charts were introduced by persons familiar with the underlying documents and how the charts were prepared. Because charts may be introduced either through a person who prepared the chart or a person who has reviewed the underlying documents and confirmed the accuracy of the chart, both Fuentes and Special Agent Ford were proper chart witnesses. *See United States v. Caswell,* 825 F.2d 1228, 1235–36 (8th Cir.1987); *United States v. Lemire,* 720 F.2d 1327, 1349 (D.C.Cir.), *cert. denied,* 467 U.S. 1226, 104 S.Ct. 2678, 81 L.Ed.2d 874 (1983); *Scales,* 594 F.2d at 563. Furthermore, Bertoli had ample opportunity to point out any inaccuracies reflected in the charts during his cross examination of Fuentes and Special Agent Ford, who he questioned at length about the underlying documents. *See* Rule 104 Hearing Transcript at 519–20; Trial Transcript at 1354–71, 1383–1475, 3806–14, 4994–58, 4997–5007, 5016. The jury, therefore, was presented with evidence from both sides and was well-equipped to draw its own conclusions as to whether the information summarized in the charts was accurate.

In light of the above-described safeguards, Bertoli's objections to the use of the summary and demonstrative charts were without merit. In general, his objections concerned the accuracy and admissibility [146] of the underlying documents and did not address the charts themselves.[147] *See* Trial Transcript at

---

**146.** To the extent Bertoli objected to the admissibility of the underlying documents, pursuant to Fed.R.Evid. 403, 404(b) and 18 U.S.C. § 3505, the nature of those objections are discussed in other sections of the opinion. *See supra,* at 1038; *infra,* at 1066.

**147.** The two exceptions were Bertoli's objections that a particular Fuentes Summary Chart and a particular Ford Demonstrative Chart were not based on voluminous underlying documents. Trial Transcript at 4967; Rule 104 Hearing Transcript at 510. It is beyond dispute, however, that the Monarch trading records on which the Fuentes Summary Charts were based were voluminous; in-court examination of those documents would have been impracticable. With regard to the Ford Demonstrative Chart, there is no requirement that demonstrative charts be based on voluminous documents. Rather, the determining factor is whether the charts will aid the jury in understanding the case. *See Paulino,* 935 F.2d at 753; *Possick,* 849 F.2d at 339; *Gardner,* 611 F.2d at 776.

at 1244–45, 4968, 4983–85; Rule 104 Hearing Transcript at 509–10, 525.

■ The objections based on the assertion that the underlying documents were inaccurate, *see* Trial Transcript at 4968, 4983–85; Rule 104 Hearing Transcript at 509–501, were not grounds for disallowing the charts. Charts may summarize records that the opposing side claims are inaccurate or incomplete. As the court in *Evans* stated: "In an adversarial proceeding, it is not unusual for testimony offered by one side to be contradicted by testimony by the opposing side." 910 F.2d at 800. In such cases, the charts are nevertheless permissible as long as the other requirements are met and the charts are made available to the other side so that a proper cross examination can be developed. *In re Richardson–Merrell, Inc. "Bendectin" Prod. Liability Litig.,* 624 F.Supp. 1212, 1224–26 (S.D.Ohio 1985), *aff'd,* 857 F.2d 290 (6th Cir.1988), *cert. denied sub nom., Hoffman v. Merrell Dow Pharmaceutical, Inc.,* 488 U.S. 1006, 109 S.Ct. 788, 102 L.Ed.2d 779 (1989); *see Strissel,* 920 F.2d at 1164; *Nivica,* 887 F.2d at 1125–26; *United States v. Porter,* 821 F.2d 968, 974–75 (4th Cir.1987), *cert. denied,* 485 U.S. 934, 108 S.Ct. 1108, 99 L.Ed.2d 269 (1988); *United States v. Driver,* 798 F.2d 248, 253 (7th Cir.1986); *see also Fagiola,* 906 F.2d at 57–58. The ability to cross examine " 'alleviat[es] any danger of inaccuracy or unfair characterization.' " *Paulino,* 935 F.2d at 753 (citation omitted). Accordingly, any complaints Bertoli had with regard to the accuracy of the information reflected in the charts should have been and was addressed during his cross examination of Fuentes and Special Agent Ford.

■ Bertoli also contended that a particular Ford Demonstrative Chart, Government exhibit 7028, was based on Government inferences and assumptions about the case rather than undisputed facts. Trial Transcript at 4980–81. That objection was also not a ground for disallowing the use of that chart. The fact that certain conclusions reflected by a summary chart are based on assumptions or inferences made by the party introducing the chart does not render the chart inadmissible. *See United States v. Radseck,* 718 F.2d 233, 237–38 (7th Cir.1983), *cert. denied,*

465 U.S. 1029, 104 S.Ct. 1291, 79 L.Ed.2d 693 (1984). Such assumptions are allowed where they are supported by the underlying documents. *See id.; Norton,* 867 F.2d at 1362; *Jennings,* 724 F.2d at 441–42. " '[T]he essential requirement is not that the charts be free from reliance on any assumptions, but rather that these assumptions be supported by evidence in the record.' " *Jennings,* 724 F.2d at 442 (citation omitted); *see Norton,* 867 F.2d at 1363. The trial court is charged with the discretion to determine whether the chart is unduly argumentative. *Possick,* 849 F.2d at 339; *Driver,* 798 F.2d at 253. In the instant case, it was determined that the chart was not argumentative; any inferences made in the chart were supported by the evidence. *See* Trial Transcript at 4982.

### 10. *Objections to Evidence of Other Acts: Rule 404(b)*

During the proceedings, Bertoli made several objections to 'other act' evidence proffered by the Government. This evidence related to prior misconduct by Bertoli which was not charged in the Redacted Second Superseding Indictment.

Rule 404(b) of the Federal Rules of Evidence provides in relevant part:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident....

Fed.R.Evid. 404(b).

As indicated by its language, Rule 404(b) concerns evidence of "*other* crimes, wrongs or acts." *Id.* (emphasis added). Evidence of prior acts which are part and parcel of the charged conduct is not covered by Rule 404(b). As the Second Circuit has stated:

> [E]vidence of uncharged criminal activity is not considered "other crimes" evidence under Fed.R.Evid. 404(b) if it "arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is

necessary to complete the story of the crime on trial."

*United States v. Towne,* 870 F.2d 880, 886 (2d Cir.) (quoting *United States v. Weeks,* 716 F.2d 830, 832 (11th Cir.1983)), *cert. denied,* 490 U.S. 1101, 109 S.Ct. 2456, 104 L.Ed.2d 1010 (1989); *see United States v. Blyden,* 964 F.2d 1375, 1378 (3d Cir.1992) ("Rule 404(b) presupposes the existence of *other* crimes. When evidence of another crime is necessary to establish an element of the offense being tried, there is no 'other crime.'" (emphasis in original)); *United States v. Williams,* 900 F.2d 823, 825 (5th Cir.1990) (acts "inextricably intertwined" with charged conduct not barred by Rule 404(b)); *United States v. Brownlee,* 890 F.2d 1036, 1039 (8th Cir.1989) (same); *United States v. Foster,* 889 F.2d 1049, 1053 (11th Cir.1989) ("Evidence that forms integral and natural part of the witness's accounts of the circumstances surrounding the offenses for which the defendant was indicted is admissible even if it tends to reflect negatively on the defendant's character.").

■■■ Where, as here, the crime charged requires the establishment of the defendant's continuing pattern of criminal activity,[148] other acts which are part of the pattern may be used to prove the existence of the pattern without invoking the restrictions of Rule 404(b). In *United States v. Gonzalez,* 921 F.2d 1530 (11th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 178, 116 L.Ed.2d 140 (1991), the court addressed the objection of a RICO defendant to the admission of evidence of prior crimes not listed as predicate acts in the indictment. The Circuit held that the prior acts "were clearly admissible nonetheless," and did not refer to Rule 404(b)'s restrictions:

> In addition to predicate crimes, a RICO conspiracy charge requires proof of an enterprise, of the continuity of racketeering activity, and of the defendant's knowledge of, agreement to, and participation in the conspiracy. [The prior acts], while not to be used as RICO predicates, are clearly

relevant and admissible in proving RICO's other elements.

921 F.2d at 1547; *see United States v. Kaplan,* 886 F.2d 536, 544 (2d Cir.1989) (prior uncharged acts of racketeering admissible to prove continuity of racketeering activity in RICO case), *cert. denied,* 493 U.S. 1076, 110 S.Ct. 1127, 107 L.Ed.2d 1033 (1990); *United States v. Perholtz,* 842 F.2d 343, 359 (D.C.Cir.) (Evidence of racketeering schemes not included in RICO charge were admissible "to prove the association-in-fact had a continuity of structure and personnel in order to establish the existence of an enterprise"; Rule 404(b) issue expressly not reached), *cert. denied,* 488 U.S. 821, 109 S.Ct. 65, 102 L.Ed.2d 42 (1988); *United States v. Finestone,* 816 F.2d 583, 587 (11th Cir.) (Unindicted prior acts "were admissible to prove a pattern of racketeering activity and overt acts, elements of the ... RICO conspiracy. Furthermore, those events were admissible to prove the membership and participation in the RICO conspiracy...."), *cert. denied,* 484 U.S. 948, 108 S.Ct. 338, 98 L.Ed.2d 365 (1987), *reh'g denied,* 485 U.S. 972, 108 S.Ct. 1252, 99 L.Ed.2d 449 (1988); *United States v. Neapolitan,* 791 F.2d 489, 501 (7th Cir.) (Unindicted acts "would be admissible as circumstantial evidence that [defendant] was a member of a conspiracy."), *cert. denied,* 479 U.S. 940, 107 S.Ct. 422, 93 L.Ed.2d 372 (1986); *see also Carter v. Hewitt,* 617 F.2d 961, 967 (3d Cir.1980) (Prior false complaints were admissible because they "prove the plans [to file false complaints] directly and not inferentially [and therefore], they fall outside the scope of [R]ule 404. The [complaints] are not evidence of other acts used as indirect proof of a plan, but direct evidence of the existence of the plan itself.").

Even where evidence of other acts is not inextricably intertwined with the charged conduct, such evidence may yet be admissible under Rule 404(b) "if it is logically relevant ... to any other issue than the defendant's propensity to commit the [charged] crime."

---

**148.** RICO provides, in relevant part:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct of participate, directly or indirectly, in the conduct of such enterprise's affairs through a *pattern of racketeering activity* or collection of unlawful debt.

18 U.S.C. § 1962(c) (emphasis added).

*United States v. Sampson,* 980 F.2d 883, 886 (3d Cir.1992). Rule 404(b) "is inclusive, not exclusive, and emphasizes admissibility." *Id.; see Government of Virgin Islands v. Edwards,* 903 F.2d 267, 270 (3d Cir.1990); *United States v. Scarfo,* 850 F.2d 1015, 1019 (3d Cir.), *cert. denied,* 488 U.S. 910, 109 S.Ct. 263, 102 L.Ed.2d 251 (1988).

The Supreme Court and the Third Circuit have recognized four requirements for the admission of other act evidence under Rule 404(b):

> (1) the evidence must have a proper purpose under Rule 404(b); (2) it must be relevant under Rule 402; (3) its probative value must outweigh its prejudicial effect under Rule 403; and (4) the court must charge the jury to consider the evidence only for the limited purpose for which it is admitted.

*Sampson,* 980 F.2d at 886; *see Huddleston v. United States,* 485 U.S. 681, 691, 108 S.Ct. 1496, 1502, 99 L.Ed.2d 771 (1988); *United States v. McGlory,* 968 F.2d 309, 338 (3d Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1388, 122 L.Ed.2d 763 (1993); *Government of Virgin Islands v. Pinney,* 967 F.2d 912, 914 (3d Cir.1992).

"Proper purposes" under Rule 404(b) include proving "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed.R.Evid. 404(b); *see Sampson,* 980 F.2d at 887. "The possible uses of 'other crimes' evidence listed in Rule 404(b) 'are not the only proper ones.'" *McGlory,* 968 F.2d at 338 (quoting *Scarfo,* 850 F.2d at 1015). "[O]ther crime evidence is admissible if offered for [any] proper purpose apart from showing that the defendant is a person of criminal character." *Pinney,* 967 F.2d at 914.

■ In a RICO or other type of fraud case, evidence of unindicted acts similar to or in furtherance of those charged will often be admissible under Rule 404(b) to prove the defendant's motive, intent or absence of mistake. *See United States v. Scop,* 940 F.2d 1004, 1008 (7th Cir.1991) (In securities fraud action, evidence of unindicted acts of securities fraud may be properly be used to prove a defendant's "intent, opportunity, or plan to engage in the [securities fraud] or ... rela-

tionship with another defendant."); *United States v. Johnson,* 893 F.2d 451, 453 (1st Cir.1990) (unindicted acts of tax fraud admissible in tax fraud prosecution to show intent, absence of mistake); *United States v. Traitz,* 871 F.2d 368, 389 (3d Cir.) (unindicted acts of violence admissible in RICO extortion case to show "shared tradition of violence," "symbiotic relationship" between defendants and "the background of the charges, the parties' familiarity with one another and their concert of action"), *cert. denied,* 493 U.S. 821, 110 S.Ct. 78, 107 L.Ed.2d 44 (1989); *United States v. Rivera–Medina,* 845 F.2d 12, 15–16 (1st Cir.) (evidence of extortion scheme identical to one charged in indictment, with close temporal proximity and same co-conspirators, was admissible to "prove absence of mistake, knowledge and intent"), *cert. denied,* 488 U.S. 862, 109 S.Ct. 160, 102 L.Ed.2d 131 (1988); *United States v. Davis,* 576 F.2d 1065, 1067–68 (3d Cir.1978) (evidence of unindicted acts of racketeering admissible in RICO case to prove intent or motive), *cert. denied,* 439 U.S. 836, 99 S.Ct. 119, 58 L.Ed.2d 132 (1978).

"Courts have long held that evidence of financial difficulties, [such as a personal bankruptcy filing or financial reports,] is admissible in fraud prosecutions to demonstrate knowledge, motive, intent, design and absence of mistake." *United States v. Metallo,* 908 F.2d 795, 798, *reh'g denied en banc,* 917 F.2d 570 (11th Cir.1990), *cert. denied,* —— U.S. ——, 112 S.Ct. 1483, 117 L.Ed.2d 625 (1992); *see United States v. Bonnett,* 877 F.2d 1450, 1461 (10th Cir.1989) (in bank fraud case, evidence that defendant frequently had insufficient funds to cover checks in bank account and that defendant was at legal lending limit at various banks was admissible to show "a pattern, practice, and method of obtaining the illegal use of bank funds for his own gain"); *United States v. Whaley,* 786 F.2d 1229, 1233 (4th Cir.1986); *United States v. Pichnarcik,* 427 F.2d 1290, 1291 (9th Cir. 1970).

■ As stated, if the proffered 'other act' evidence is relevant and has a proper purpose under Rule 404(b), the evidence will be admissible if its probative value is not sub-

stantially outweighed by the danger of unfair prejudice.[149] *See Huddleston,* 485 U.S. at 691, 108 S.Ct. at 1502; *Sampson,* 980 F.2d at 886. A relevant example of this balancing test is provided by *Scop,* 940 F.2d 1004. In *Scop,* the defendants were indicted for several counts of securities fraud. Specifically, the defendants were charged with the manipulation of the prices of certain stocks listed in the indictment. *See id.* at 1008. At trial, the Government proffered evidence that the defendants had manipulated the prices of other stocks not named in the indictment. *Id.* The district court admitted the evidence under Rule 404(b); upon conviction, the defendants appealed.

On appeal, the defendants argued the 'other act' evidence should not have been admitted under Rule 404(b) because "the probative value of this evidence was substantially outweighed by the danger of unfair prejudice." *Id.* at 1009. The Seventh Circuit rejected the defendants' argument:

> [T]he evidence regarding [the manipulation of other stocks] was highly probative because it revealed a common and indeed inseparable scheme. The defendants traded in the [non-named securities] at the same time they allegedly carried out the fraudulent ... trades [named in the indictment]. They victimized some of the same investors in manipulating the [named and unnamed] stocks. The defendants used identical methods of price manipulation with respect to the stock in each company.... The evidence about the manipulation of [the stocks not named in the indictment] was properly used to reveal the common pattern of a crime that is not commonplace.

Some of the evidence was also critical to the jury's understanding of the relationship between the defendants. ... Other acts evidence is admissible to complete the story of defendants' familiarity or relationship. Here the evidence was helpful and even necessary to round out the jury's understanding of the conspirators' debts and attachments to one another.

The evidence also was not unduly prejudicial. It concerned truly similar criminal activities rather than inflammatory criminal acts. Though undoubtedly much evidence at trial concerned [the unnamed stocks], there was no shortage of evidence regarding [the defendants'] use of nominee accounts, for example, to buy [the named stocks].

*Id.* at 1009. The Circuit concluded that the 'other act' evidence was properly admitted by the district court. *See id.; see also United States v. Eufrasio,* 935 F.2d 553, 573 (3d Cir.) ("[T]he uncharged Mafia crimes evidence admitted in this case went to prove important elements of the RICO counts charged ...: the existence and nature of the [criminal] enterprise and conspiracy, acts undertaken in furtherance of it, and [defendants'] knowing association with it.... Thus, the relevance of the uncharged crimes evidence to the government's case against [defendants] was substantial, certainly enough to offset its potential to cause prejudice for [defendants]."), *cert. denied sub nom., Idone v. United States,* — U.S. —, 112 S.Ct. 340, 116 L.Ed.2d 280 (1991); *Rivera–Medina,* 845 F.2d at 16 (in extortion case, tendency of evidence of prior extortion scheme "to prove absence of mistake, knowledge and intent clearly exceeds its admittedly prejudicial impact"); *Perholtz,* 842 F.2d at 358 (script made in furtherance of RICO scheme was more probative than prejudicial because script was "closely tied to the crimes charged and only indirectly suggests distinct offenses").

The fourth and final requirement for the admission of other act evidence is that "the court must charge the jury to consider the evidence only for the limited purpose for which it was admitted." *Sampson,* 980 F.2d at 886; *see Huddleston,* 485 U.S. at 691–92, 108 S.Ct. at 1502. However, "it is not error for a trial court to fail to [so] instruct the jury ... in the absence of a proper request

---

**149.** Federal Rule of Evidence 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Fed.R.Evid. 403.

by counsel." *United States v. Record,* 873 F.2d 1363, 1376 (10th Cir.1989); *see United States v. Barbee,* 968 F.2d 1026, 1032 (10th Cir.1992) ("Absent an appropriate objection [to jury charge during trial], we review the record only for plain error"); *Jordan v. Clayton Brokerage Co. of St. Louis, Inc.,* 861 F.2d 172, 177 (8th Cir.1988) ("[W]e cannot say that the trial court's failure to give, *sua sponte,* a cautionary instruction during the course of the proceedings constituted an abuse of discretion."), *vacated on other grounds,* 499 U.S. 914, 111 S.Ct. 1298, 113 L.Ed.2d 233 (1991). Moreover, the time during trial at which to give the limiting instructions is within the discretion of the trial court. *See Murray v. Superintendent, Kentucky State Penitentiary,* 651 F.2d 451, 454 (6th Cir.1981).

Additionally, in criminal proceedings, Rule 404(b) requires that the prosecution "shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any ['other act'] evidence it intends to introduce at trial." Fed.R.Evid. 404(b).

In the instant case, the Government sought to admit evidence of several prior acts not listed in the Redacted Second Superseding Indictment. Because Bertoli was convicted only on Counts Three and Six of the Redacted Second Superseding Indictment, only those 'other act' proffers made in support of those counts will be addressed in this opinion.

a. *The 1977 Suit by Executive Securities Against Bertoli and Bertoli's Filing for Bankruptcy*

 In 1977, Executive Securities Corp. ("Executive Securities")[150] filed suit against Bertoli in the United States District Court for the Southern District of New York, seeking approximately $2.9 million in damages (the "SIPC Suit"). Trial Transcript at 675–79. In 1982, the complaint in the SIPC Suit was amended to add Securities Investor Protection Corporation ("SIPC")[151] as a plaintiff. *Id.* at 679. At trial in the instant matter, the Government sought to introduce certain documents evidencing the existence of the SIPC Suit.[152] *Id.* at 678, 680, 682.

The Government explained that the existence of this large potential liability was "relevant to show one of Bertoli's motives for not owning stock in his own name, for using secret Cayman Islands accounts, for attempting to prevent the Government from obtaining evidence of those Cayman Islands accounts, and for destroying Cayman Islands [r]ecords." Government's 21 May 1993 Brief at 5. Bertoli objected to the introduction of such evidence under Rule 404(b). Trial Transcript at 678, 680, 682.

On or about 11 October 1983, Bertoli filed for personal bankruptcy protection under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 1101, *et seq.,* in the United States Bankruptcy Court (the "Bankruptcy Court") for the District of New Jersey (the "Bankruptcy Petition"). Trial Transcript at 682. At trial, the Government sought to introduce various filings made by Bertoli in relation to the Bankruptcy Petition, which filings the Government argued failed to list certain of Bertoli's assets (the "Bankruptcy Filings"). *See* Government's 21 May 1993 Brief at 2; Trial Transcript at 697, 735, 914–15. The Government argued this evidence was probative of Bertoli's motive to obstruct justice and participate in the charged racketeering activity:

---

**150.** Executive Securities was a brokerage house in New York City of which Bertoli was chief executive officer and president. Trial Transcript at 676–77. Prior to 1977, Executive Securities was "placed in liquidation" by the United States District Court for the Southern District of New York. *Id.* at 676. In 1977, the trustee in bankruptcy of Executive Securities filed a suit against Bertoli on behalf of the corporation. *Id.* at 677.

**151.** The SIPC is "a Government sponsored agency that ... insures people who deposit money

with brokerage houses." Trial Transcript at 676–77.

**152.** The Government did not seek to introduce any evidence relating to the underlying facts of the SIPC Suit; the documents offered regarding the SIPC Suit related only to the existence of the action. *See* Brief of the Government, dated 21 May 1993 (the "Government's 21 May 1993 Brief") at 1 n. 1. The complaint in the SIPC action was appropriately redacted. *See* Trial Transcript at 678.

If Bertoli had traded openly in his own name and had made money, ... he would not have been able to file for bankruptcy and would have been vulnerable to the [almost] three million dollar claim made in the SIPC Suit. Thus, Bertoli used nominee and secret accounts to shield his true assets, thereby allowing him to file for bankruptcy and stay the SIPC [S]uit.

The [B]ankruptcy [Petition] and financial statements subsequently filed in the bankruptcy action are relevant to show one of Bertoli's motives for attempting to prevent the Government from obtaining evidence of Bertoli's Cayman Islands accounts and for destroying records in the Cayman Islands. In both the original [B]ankruptcy [P]etition and the financial statements, Bertoli was required to set forth all his assets. Bertoli, however, failed to disclose in the petition and subsequent financial statements various accounts in the Cayman Islands. As noted above, one of Bertoli's motives for concealing these accounts was to shield his assets from the SIPC suit.... Such evidence could also have supported bankruptcy fraud, tax fraud, and perjury or false statement charges against Bertoli. Thus, Bertoli's attempts to prevent the Government from obtaining evidence of his accounts in the Cayman Islands and his destruction of Cayman Islands documents served to conceal the fraudulent nature of the [B]ankruptcy [P]etition and his subsequent financial statements.

Government's 21 May 1993 Brief at 5–6. Bertoli objected to this evidence under Rule 404(b). Trial Transcript at 697, 735.

Evidence relating to the SIPC Suit, the Bankruptcy Petition and the Bankruptcy Filings was admitted into evidence. It was recognized that the evidence relating to these events may not in fact have been evidence of "other crimes, wrongs or acts," within the meaning of Rule 404(b). It was noted: "[T]here is a substantial basis to argue that this evidence is intertwined inextricably with the other aspects of the [Redacted Second Superseding Indictment] and a strong argument can [therefore] be made under that aspect that it is not [Rule] 404(b) evidence, but essential evidence." Trial Transcript at 708.

The SIPC Suit, the Bankruptcy Petition and the Bankruptcy Filings formed essential background information for the allegations of racketeering activity contained in Counts One and Two. As stated by the Government, these events were necessary in explaining Bertoli's motivation for engaging in the charged racketeering activity. *See* Government's 21 May 1993 Brief at 5–6. Moreover, these events helped to form the context and manner in which Bertoli obstructed justice, as alleged in Counts One, Three, Four, Five and Six. *See Id.* at 6. Evidence relating to the SIPC Suit, the Bankruptcy Petition and the Bankruptcy Filings "arose out of the same transaction or series of transactions as the charged offense, [and was] necessary to complete the story of the crime on trial." *Towne,* 870 F.2d at 886. Accordingly, such evidence was not 'other act' evidence and could not be barred by Rule 404(b). *Id.; see Blyden,* 964 F.2d at 1378.

■ Even if evidence of the SIPC Suit, the Bankruptcy Petition and the Bankruptcy Filings were considered 'other act' evidence, and Rule 404(b) were applicable, such evidence was admissible under Rule 404(b)'s inclusion guidelines.[153] As noted at trial, evidence relating to the SIPC Suit and the Bankruptcy Petition was "offered for a purpose other than to prove propensity or other than character purpose. They do have a proper basis." Trial Transcript at 707; *see Sampson,* 980 F.2d at 886.

---

**153.** The Government provided Bertoli with notice of its intent to present evidence of the Bankruptcy Petition and Bankruptcy Filings by letter, dated 10 March 1993. The Government provided Bertoli with notice of its intent to present evidence of the SIPC Suit by letter, dated 25 March 1993. Both of these notices were given more than two months before trial. Accordingly, the Government fulfilled Rule 404(b)'s "reasonable notice" requirement with respect to the Bankruptcy Petition, Bankruptcy Filings and SIPC Suit. *See United States v. Kern,* 12 F.3d 122, 124 (8th Cir.1993) (notice fourteen days prior to trial sufficient under Rule 404(b)); *United States v. Evangelista,* 813 F.Supp. 294, 302 (D.N.J.1993) (notice ten business days prior to trial sufficient under Rule 404(b)).

As stated, the SIPC Suit and Bankruptcy Petition were relevant to prove Bertoli's motive and intent to engage in the racketeering activity alleged in Counts One and Two and the obstruction of justice alleged in Counts One, Three, Four, Five and Six. *See Huddleston,* 485 U.S. at 691, 108 S.Ct. at 1502 (other act evidence may be properly used to prove motive or intent). Moreover, this evidence was relevant to prove Bertoli's overarching plan and design of racketeering activity and obstruction of justice. *See Scop,* 940 F.2d at 1008; *Traitz,* 871 F.2d at 389 (unindicted acts admissible in RICO case to show "background of the charges, the parties' familiarity with one another and their concert of action").

As indicated during the proceedings in this case, the existence of the SIPC Suit and the Bankruptcy Petition:

goes ... to the ... reason or motive [Bertoli] would try to conceal documents or impede the Government in getting evidence concerning frauds, Monarch or any other frauds in this case or, indeed, bankruptcy fraud.

28 May 1993 Tr. at 43. It was further explained:

[O]bviously, the [SIPC Suit] with the approximately $3 million in contingent liability provides the motive to hide assets. The [evidence of the] [B]ankruptcy [F]ilings is obvious with regard to motive.

It also goes to the intent as to why certain conduct was carried out and they're both helpful.

The fact of the matter is the jury can clearly find that this [SIPC Suit] was filed, that these other documents were filed as were the [B]ankruptcy [Filings]. The evidence in both these categories demonstrates the reason why there would be ongoing efforts with regard to the schemes and conduct charged in the indictment.

Trial Transcript at 707–08.

The Bankruptcy Filings were particularly relevant to the Government's case, as they evidenced under-reported assets, and therefore evidenced further fraudulent conduct on Bertoli's part. As stated, unindicted acts of fraud related to those charged in the indict-ment are relevant to prove the existence of a plan or scheme of fraudulent or racketeering activity. *See Scop,* 940 F.2d at 1008; *Traitz,* 871 F.2d at 389. Moreover, the Bankruptcy Petition, evidencing as it does Bertoli's financial difficulties, was relevant "to demonstrate knowledge, motive, intent, design and absence of mistake." *Metallo,* 908 F.2d at 798. As was observed at trial:

With regard to these bankruptcy documents, they're entirely appropriate under [Rule] 404(b)....

They demonstrate the motive or the reason with regard to hiding assets, transferring documents—transferring funds, to demonstrate benefit to Mr. Bertoli. It shows that he's—some of them show that he's more than an agent.

With regard to the monthly [Bankruptcy] [F]ilings, [the relevance] is obvious with regard to the minimization of assets and the hiding of assets.

Trial Transcript at 916.

The probative value of the evidence concerning the SIPC Suit, the Bankruptcy Petition and the Bankruptcy Filings outweighed any potential undue prejudicial effect this evidence might have had. As recognized at trial:

The 403 Balancing is obvious. As I said, there is a genuine need for this evidence. The chance that there would be improper use by the jury is remote, at best, when evaluating this and considering the impact on the jury, [the purpose of the evidence is] obvious.... It's not inflammatory. Clearly, the probative value does ... substantial[ly] outweigh any prejudice. The confusion or waste of time issue is clearly not something of substance with regard to this testimony.

Keeping in mind that all relevant evidence is prejudicial, this is not unduly prejudicial. It seems to me that as I pointed out, it's not inflammatory and the acts do have a clear relevance. There is no necessity that the jury pursue any extended or complex chain of inferences in order to arrive at what the Government is seeking to prove here. The evidence is certainly sufficient to support a finding with regard to the 404(b) conduct.

Trial Transcript at 708; *see Scop*, 940 F.2d at 1009; *Eufrasio*, 935 F.2d at 573; *Rivera–Medina*, 845 F.2d at 16. Moreover, the likelihood of undue prejudice from evidence of the SIPC Suit was particularly slight in light of the Government's agreement to stipulate that Bertoli contested the SIPC Suit. *See* Trial Transcript at 556.

Finally, any potential for improper use of the evidence of the SIPC Suit, the Bankruptcy Petition and Bankruptcy Filings was curbed by appropriate limiting instructions to the jury. *See Sampson*, 980 F.2d at 886. These instructions were given at Bertoli's request when certain documents relating to the SIPC Suit, the Bankruptcy Petition and the Bankruptcy Filings were offered into evidence.[154] *See Murray*, 651 F.2d at 454 (time during trial during which to give limiting instruction is within discretion of trial judge). It was stated:

> As you'll recall yesterday, I admitted in[to] evidence a series of documents, ... together with the additional documents this morning.
>
> The documents yesterday concern the [SIPC Suit], [and] one document concerned [the] [B]ankruptcy [Petition]. The documents today concern [the] [B]ankruptcy [Petition].
>
> I want you to understand that the Government has offered this evidence or will be offering other evidence, indeed, by which the Government will attempt to prove that on different occasions Mr. Bertoli engaged in conduct similar to the charges in the indictment.
>
> In that connection, I point out to you, Mr. Bertoli is not on trial for committing these other acts which are not charged in the indictment. Accordingly, you may not consider this evidence of other acts as substitute for proof that the defendant, Mr. Bertoli, committed the crimes charged

in the indictment. Nor may you consider this evidence as proof that Mr. Bertoli has a criminal personality or bad character.

> The evidence of other acts has been admitted, and if others are offered may be admitted, for a much more limited purpose. You may consider this evidence only for the limited purpose.
>
> If you determine that the defendant committed the other acts as these documents are concerned with and the testimony is concerned with, *then you may but need not consider this evidence for other purposes such as proof of Mr. Bertoli's motive or intent or plan, knowledge, identity, absence of mistake or other related matters* to the indictment.
>
> Now, this evidence of other acts—and I'll use that term, sort of a generic term— *may not be used by you for any other purpose. You may not use this evidence to conclude that if or because the defendant committed other acts, he must also have committed the acts charged in the indictment.* It's not to be used for that purpose and would be inappropriate. You would be violating your duty if you did use it for that purpose. This is just used to demonstrate motive, intent, plan, knowledge, *et cetera.*

Trial Transcript at 735–737 (emphasis added). These instructions insured that the jury would not use the evidence relating to the SIPC Suit, the Bankruptcy Petition and the Bankruptcy Filings in a manner prohibited by Rule 404(b).[155]

b. *The SEC Investigation and the SEC Action*

██ In or about January 1983, the SEC commenced the SEC Investigation into fraudulent and manipulative trading in LCI securities. In or about March 1983, the SEC

---

154. Bertoli at first stated he did not desire a limiting instruction for any of the evidence introduced by the Government under Rule 404(b). Trial Transcript at 499. Bertoli later assented to the suggestion that limiting instructions be given when Bertoli requested such instructions. *Id.* at 500; *see Record*, 873 F.2d at 1376 (not error for trial court not to instruct jury absent proper request by defendant).

155. A substantially identical limiting instruction was given as part of the jury charge. *See* Trial Transcript at 6719–20. This latter instruction, by its terms, encompassed any situation in which "the United States offered evidence tending to show that on different occasions [Bertoli] engaged in conduct similar to the charges in the indictment or engaged in other conduct not charged in the indictment." *Id.*

Investigation was expanded to inquire into fraudulent and manipulative trading in Toxic Waste securities. In June 1983, in connection with the SEC Investigation, the SEC began subpoenaing documents and taking sworn testimony. Trial Transcript at 1194.

On 9 September 1985, as a result of the SEC Investigation, the SEC filed the SEC Action against Bertoli, Cannistraro, Eisenberg, Monarch and a former Monarch broker, Cloyes. Trial Transcript at 1197–98. The SEC Action alleged certain manipulative and fraudulent conduct on the part of these defendants in connection with the trading of LCI and Toxic Waste securities. Trial Transcript at 1198. In the SEC Action, the SEC sought a permanent injunction and other equitable relief. *Id.*

At trial, the Government sought to introduce into evidence certain documents relating to the SEC Investigation and to the SEC Action, including the complaint in the SEC Action (the "SEC Complaint"). Trial Transcript at 927, 1189. Bertoli objected to the introduction of the SEC Complaint on Rule 404(b) grounds. Trial Transcript at 927.

The SEC Complaint was admitted into evidence because it was not in fact 'other act' evidence under Rule 404(b). Trial Transcript at 929, 1192. As stated, Count Three of the Redacted Second Superseding Indictment charged, *inter alia*, that Bertoli was involved in a conspiracy to obstruct both the SEC Investigation and the SEC Action. *See* Redacted Second Superseding Indictment, Count Three, ¶ 14. As indicated at trial, the SEC Complaint was evidence of the SEC Action and as such was direct evidence relating to Count Three. Trial Transcript at 929.

It was, therefore, not 'other act' evidence within the meaning of Rule 404(b). *See Towne,* 870 F.2d at 886. Accordingly, Rule 404(b) could not operate to exclude the SEC Complaint, or any other evidence relating to the SEC Action or SEC Investigation.[156] *See id.*

c. *The SEC's 1979 Bar of Bertoli from Association with Broker–Dealers*

In July 1975, the SEC brought administrative proceedings against Bertoli in connection with his activities at Executive Securities (the "1975 SEC Proceedings"). During the 1975 SEC Proceedings, the SEC alleged Bertoli and another employee of Executive Securities had violated anti-fraud provisions of the Federal securities laws. On 25 September 1979, the SEC ordered that Bertoli be "barred from association with any broker or dealer [(the "SEC Bar")] . . . ." Trial Transcript at 616.

The existence of the SEC Bar was relevant to and probative of Bertoli's motive to unlawfully conceal his role at Monarch and High Tech. Moreover, the existence of the SEC Bar was probative of Bertoli's motive to obstruct the SEC Investigation and the SEC Action, as charged in Count Three of the Redacted Second Superseding Indictment. Accordingly, the Government sought to offer evidence of the existence of the SEC Bar into evidence at trial.[157] Bertoli at first indicated his opposition to the introduction of evidence of the SEC Bar, but later stipulated to its admissibility. Trial Transcript at 503, 615.

Bertoli did not request a limiting instruction relating specifically to the SEC Bar either when the SEC Bar was introduced or

---

**156.** Bertoli also objected to the introduction of the SEC Complaint under Rule 403. Trial Transcript at 927. As stated, relevant evidence may be barred under Rule 403 if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion or the issues, or misleading of the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed.R.Evid. 403.

Bertoli's Rule 403 objection was overruled because the probative value of the SEC Complaint was not outweighed by the potential for undue prejudice or any of the other evils listed in Rule 403. First, as indicated, the SEC Complaint was direct evidence of the conduct charged in Count

Three and was therefore highly probative. Moreover, any potential for undue prejudice was curbed by the Government's consent to introduce only those portions of the SEC Complaint which related specifically to Count Three, paragraph five of the Redacted Second Superseding Indictment. Trial Transcript at 928. As stated at trial: "It's a part of the substantive charge in Count Three. . . . There is no violation of Rule 403. It is not unduly prejudicial." Trial Transcript at 929.

**157.** The Government offered only the existence of the SEC Bar, and not the facts surrounding it. *See* Trial Transcript at 505, 615.

at any other time during trial. *See* Trial Transcript at 615 (SEC Bar admitted *into* evidence, no 404(b) limiting instruction requested); *Record,* 873 F.2d at 1376 (court not obligated to give limiting instruction absent request by defendant). In any event, the 404(b) limiting instruction given during the jury charge encompassed the use of the SEC Bar; this instruction related to all 'other act' evidence introduced by the Government. *See* Trial Transcript at 6719–20.

#### d. *Other 404(b) Evidence*

Bertoli objected to the introduction of certain other evidence which he contended constituted prohibited 'other act' evidence under Rule 404(b). Although these items do not relate to Counts Three and Six, they will be discussed briefly:

##### i. *Unindicted Stock Manipulation Schemes*

 The Government sought to introduce evidence of two stock manipulation schemes in which Bertoli was involved, but which were not listed in Count One of the Redacted Second Superseding Indictment. These schemes related to the securities of Nature's Bounty (the "Nature's Bounty Scheme") and Solar Age (the "Solar Age Scheme") (collectively, the "Unindicted Schemes"). *See* Brief of Government, dated 28 May 1993 (the "Government's 28 May 1993 Brief") at 2. Bertoli objected under Rule 404(b) to the introduction of any evidence relating to these unindicted stock manipulation schemes. *See, e.g.,* Trial Transcript at 875, 1076.

Evidence of the Unindicted Schemes was admitted over the objection by Bertoli. As recognized at trial, this evidence was not 'other act' evidence within the meaning of Rule 404(b). The Unindicted Schemes provided essential background information to the indicted racketeering schemes. *See* Trial Transcript at 916–17; *Towne,* 870 F.2d at 886. Moreover, the Unindicted Schemes provided direct evidence of the existence of "an enterprise, of the continuity of racketeering activity, and of [Bertoli's] knowledge of, agreement to, and participation in the conspiracy." *Gonzalez,* 921 F.2d at 1530. All of these were elements of the RICO and RICO conspiracy charges contained in Counts One and Two. *See* 18 U.S.C. § 1962; *Reves,* — U.S. at —— ——, 113 S.Ct. at 1169–70; *Shearin v. E.F. Hutton Group, Inc.,* 885 F.2d 1162, 1165 (3d Cir.1989). Because the evidence of the Unindicted Schemes was direct evidence of elements of the Government's case, such evidence was not 'other act' evidence, and as such could not be excluded under Rule 404(b). *See Blyden,* 964 F.2d at 1378.

 Even if analyzed under Rule 404(b), however, evidence of the Unindicted Schemes was admissible.[158] The Unindicted Schemes were acts of fraud and racketeering similar to those charged and were relevant to prove Bertoli's motive, intent and plan to engage in the racketeering activity charged in Counts One and Two. *See Scop,* 940 F.2d at 1008; *Traitz,* 871 F.2d at 389. As indicated at trial:

> In addition to demonstrating the background, it assists in understanding the overall intent and action that went on here, demonstrates the awareness of Mr. Bertoli that the conduct he engaged in was not otherwise innocent, it goes to proof of an essential element of the offense, demonstrating knowledge.
>
> It's clearly relevant to an issue other than Mr. Bertoli's character. It is clearly classified as a similar wrong. It fits in the same pattern with regard to [the] RICO counts and the conduct with regard to Monarch and as far as Mr. Bertoli's participation in that conduct, it's relevant to that.

> . . . . .

> Clearly based upon the information provided, the jury can find that these events did occur and as I indicate[d], these appear

---

158. The Government notified Bertoli of its intent to use evidence of his trading in Nature's Bounty and Solar Age by letter, dated 28 April 1993. This notice was given more than one month before trial. Accordingly, the Government fulfilled Rule 404(b)'s "reasonable notice" require-ment with respect to the Unindicted Schemes. *See Kern,* 12 F.3d at 124 (notice fourteen days prior to trial sufficient under Rule 404(b)); *Evangelista,* 813 F.Supp. at 302 (notice ten business days prior to trial sufficient under Rule 404(b)).

to be logically relevant to the essence of the indictment.

Trial Transcript at 917.

The probative value of the Unindicted Schemes far outweighed any possible undue prejudicial effect. Specifically, because the Unindicted Schemes were similar in nature to the indicted schemes, there was little possibility that the jury would believe the Unindicted Schemes constituted separate and distinct criminal acts for which Bertoli was on trial. *See Scop,* 940 F.2d at 1008 ("Though undoubtedly much evidence at trial concerned [the unnamed stocks], there was no shortage of evidence regarding [the defendants'] use of nominee accounts, for example, to buy [the named stocks].").

Finally, any potential for undue prejudice resulting from the admission of evidence of the Unindicted Schemes was minimized by limiting instructions given to the jury. *See Sampson,* 980 F.2d at 886. At trial it was stated:

> Ladies and gentlemen, with regard to this evidence on Nature's Bounty and Solar Age, I again remind you that defendant is not on trial for committing the acts concerning these two entities or involved with these two entities.

> He's not on trial for anything that's not included in the indictment. You may not consider that evidence that's referred to, either testimonially or in the documents themselves, as a substitute for proof that defendant committed the crimes charged in the indictment. Nor, as I indicated to you in the past, [are you] to consider this ... evidence as proof that the defendant has a criminal personality or a bad character.

> The evidence of these so-called other bad acts is admitted for a more limited purpose and can be used only for this limited purpose. That is, it may be considered for motive or intent, plan or knowledge, identity, absence of mistake as is related to the charges in the indictment.

You may not consider the evidence for any other purpose.

Trial Transcript at 1077.[159] Because the guidelines for admissibility under Rule 404(b) had been met, the evidence relating to the Unindicted Schemes was admitted. *See Sampson,* 980 F.2d at 886.

### ii. *The Government's Chart Evidence*

 As stated, the Government introduced various Demonstrative Charts and Summary Charts, outlining the transactions involved in the charged racketeering schemes, pursuant to Federal Rules of Evidence 611(a) and 1006. *See supra,* at 1050. As also stated, Bertoli objected to the introduction of these charts as inappropriate under the rules for admission of summary evidence.[160] *Id.* Bertoli also objected to certain of these charts on the ground that some of the documents upon which the charts were based violated Rule 404(b). Trial Transcript at 1248. Specifically, Bertoli contended those documents relating to the Nature's Bounty Scheme and the Solar Age Scheme were 'other act' evidence prohibited by Rule 404(b). *Id.* Bertoli, therefore, argued that the Demonstrative Charts and Summary Charts based on evidence of the Unindicted Schemes were similarly inadmissible.

As explained, evidence relating to the Nature's Bounty Scheme and the Solar Age Scheme was not 'other act' evidence excludable under Rule 404(b). *See supra,* at 1065. Moreover, also as explained, evidence of the Unindicted Schemes was admissible even as 'other act' evidence under Rule 404(b). *See supra,* at 1065. Because Rule 404(b) did not bar admission of evidence of the Unindicted Schemes, it did not bar admission of the Demonstrative Charts and Summary Charts which were based on evidence of the Unindicted Schemes. *See Pelullo,* 964 F.2d at 204 (Summary charts based on admissible evidence are admissible under Rule 1006.); *Paulino,* 935 F.2d at 753 (demonstrative charts describing evidence properly admitted

---

**159.** As stated, during the final charge to the jury, a substantially identical limiting instruction was given with respect to the use of all 'other act' evidence introduced by the Government. *See supra* note 155; Trial Transcript at 6719–20.

**160.** The admissibility of the Summary Charts and Demonstrative Charts under Rules 611(a) and 1006 is discussed *supra,* at 1050–1056.

during trial are admissible under Rule 611(a)).

### iii. *Berco Trust Financial Statements and Corporate Records*

■ At trial, the Government also sought to introduce certain financial statements and corporate records of Berco Trust, dated from about 1981 to about 1987 (the "Berco Trust Documents"). *See* Trial Transcript at 746–47. These documents were authenticated by the Government pursuant to 18 U.S.C. § 3505. *Id.* Bertoli objected to the admission of the Berco Trust Documents under Rule 404(b). *Id.* at 747.

The Berco Trust Documents were admitted over Bertoli's objection because they were not 'other act' evidence excludable under Rule 404(b). The Berco Trust Documents were direct and substantive evidence of the racketeering activity charged in Counts One and Two. Specifically, the Berco Trust Documents were offered by the Government on the ground that bank accounts in the name of Berco Trust contained, in part, the proceeds of Bertoli's manipulative trading schemes. *See supra* note 35. Because the Berco Trust Documents were direct evidence of indicted criminal activity, they were not 'other act' evidence, and as such were not within the scope of Rule 404(b).[161] *See Towne*, 870 F.2d at 886.

### iv. *The Swiss Bank Documents*

■ At trial, the Government sought to introduce certain documents showing cash disbursements from Bertoli's account at Swiss Bank to Euro Bank and to Bertoli himself (the "Swiss Bank Documents"). Trial Transcript at 747, 751. These documents were also authenticated pursuant to 18 U.S.C. § 3505. Bertoli objected to the intro-

duction of the Swiss Bank Documents on Rule 404(b) grounds. Trial Transcript at 747, 751.

The Swiss Bank Documents were admitted over Bertoli's objection because they did not constitute 'other act' evidence under Rule 404(b). Trial Transcript at 747, 751. The Swiss Bank Documents were direct and substantive evidence of transactions made in furtherance of the racketeering activity charged in Counts One and Two. As such, the Swiss Bank Documents did not constitute 'other act' evidence under Rule 404(b), and could not be excluded under that rule.[162] *See Towne*, 870 F.2d at 886.

### 11. *Objection to Special Verdict Sheet*

Prior to jury deliberations, Bertoli objected to the submission of special verdict interrogatories to the jury as part of the verdict sheet. *See* Trial Transcript at 6807, 6812–36. Bertoli argued that (1) special verdict interrogatories are disfavored in this Circuit, (2) such interrogatories were inappropriate because they would cause the jury "to focus on specific predicates as the most important issue in the case, to the exclusion of the court's other instructions" and (3) such interrogatories would be confusing. *Id.* at 6814.

■ Special interrogatories are disfavored in criminal cases. *United States v. Riccobene*, 709 F.2d 214, 228 n. 19 (3d Cir.), *cert. denied sub nom., Ciancaglini v. United States*, 464 U.S. 849, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983); *United States v. Palmeri*, 630 F.2d 192, 202 (3d Cir.1980), *cert. denied*, 450 U.S. 967, 101 S.Ct. 1484, 67 L.Ed.2d 616 (1981); *see also United States v. McNeese*, 901 F.2d 585, 605 (7th Cir.1990). This disfavor "results from interrogatories that lead the jury in a step-by-step progression to a verdict of guilty." *Palmeri*, 630

---

**161.** Bertoli also objected to the introduction of the Berco Trust Documents under Rule 403. Bertoli's Rule 403 objection was overruled. The Berco Trust Documents, as direct evidence of the racketeering activity charged in Counts One and Two, were highly probative. As such, they were necessarily prejudicial. However, there was no indication, either by Bertoli or in the record as a whole, that the introduction of the Berco Trust Documents would be or was unduly prejudicial.

**162.** Bertoli also objected to the introduction of the Swiss Bank Documents under Rule 403. Bertoli's Rule 403 objection was overruled because the Swiss Bank Documents were probative and were not unduly prejudicial. As substantive evidence of the acts charged in Counts One and Two, the Swiss Bank Documents were highly probative of the Government's case. Bertoli did not argue, and it does not appear, that the Swiss Bank Documents posed any danger of undue prejudice.

F.2d at 202 (citing *United States v. Frezzo Bros., Inc.,* 602 F.2d 1123, 1129 (3d Cir.1979), *cert. denied,* 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756 (1980); *United States v. Spock,* 416 F.2d 165, 182 (1st Cir.1969)); *see also Riccobene,* 709 F.2d at 228 n. 19 (fear of special interrogatories is that they "may unduly sway the jury in its decision regarding the defendant's guilt or innocence").

The Circuit, nevertheless, has not established a *per se* rule against special interrogatories. *Palmeri,* 630 F.2d at 202. When the concern that special interrogatories will be unduly suggestive and provide a roadmap to conviction is absent, courts have permitted special interrogatories to be submitted to the jury. *See, e.g., United States v. Pungitore,* 910 F.2d 1084, 1136 n. 1 (3d Cir.1990), *cert. denied sub nom., Scarfo v. United States,* 500 U.S. 915, 111 S.Ct. 2009, 114 L.Ed.2d 98 (1991); *Riccobene,* 709 F.2d at 228 n. 19; *Palmeri,* 630 F.2d at 202.

■ In this case, the special verdict sheet was presented to the jury as follows. The two-page verdict sheet (the "Verdict Sheet") listed Count One through Count Seven, with a space next to each for the jury to check "guilty" or "not guilty." In addition, sealed in a separate envelope, was a four page appendix (the "Verdict Sheet Appendix") which listed the predicate acts as alleged in the Redacted Second Superseding Indictment, with a space next to each for the jury to check "proved" or "not proved."

The jury was given the following instructions with regard to the Verdict Sheet and Verdict Sheet Appendix:

> The verdict sheet is in two parts, page one and two and then there is an appendix, pages one, two, three and four.

> You're not to use the appendix unless and until you've determined beyond a reasonable doubt to count one, [that] the defendant is guilty to count one. If you find the defendant not guilty as to count one, you leave the appendix in the envelop and you don't use it.

> If you find the defendant guilty as to count one, then you'll use the appendix and answer the inquiries that are on there.

> That's not to be used unless and until there is a finding as to count one.

> The entire verdict sheet ... [is] merely a physical vehicle to assist you in returning your verdict. There's no message there. It is not evidence. That's all it is to be used for.

> I again stress, before you go to what I'll call the appendix, you must answer question one. If you find the defendant guilty beyond a reasonable doubt, check off guilty and go to the appendix and respond to those questions. If you find him not guilty, you leave the appendix in the envelope and go on with deliberations....

> You only use the appendix when you resolve count one and only if you resolve it with a finding of guilty beyond a reasonable doubt.

Trial Transcript at 6838–39.

There was no danger that the special interrogatories submitted to the jury would be unduly suggestive and provide a roadmap to conviction. The jury was instructed three times that it could not look at or consider the Verdict Sheet Appendix, listing the alleged predicate acts, until it had reached a verdict of guilty beyond a reasonable doubt with regard to Count One. Accordingly, the Verdict Sheet Appendix could in no way influence the jury's verdict with regard to Count One. *See Palmeri,* 630 F.2d at 203; *see also Riccobene,* 709 F.2d at 228 (no danger where jury presented with special interrogatories after verdict returned). Any danger of undue suggestiveness was also quelled by placing the Verdict Sheet Appendix in a sealed envelope, which, in fact was never unsealed by the jury.

In addition, as pointed out in the Trial Transcript, the interrogatories used in the Verdict Sheet Appendix were not interrogatories as the term is ordinarily used. *See* Trial Transcript at 6815. "Usually interrogatories are sentences, asking certain things." *Id.* In contrast, the special interrogatories in this case contained neither descriptive nor extraneous language nor any reformulation of the jury charge. They merely listed the racketeering act, by name and number as described in the Redacted Second Superseding Indictment, and required the jury to

check "proven" or "not proven" in the space next to the racketeering act.[163] Use of such an unadorned list was not improperly suggestive. *Palmeri,* 630 F.2d at 203.

Finally, because this was a RICO case, use of the Verdict Sheet Appendix was necessary to indicate, for the purposes of a potential appeal, which predicate acts the jury had found to be proven so as to satisfy the RICO statute's pattern of racketeering requirement. *See Riccobene,* 709 F.2d at 214 n. 19 (citing Note, *RICO and the Predicate Offenses,* 58 Notre Dame L.Rev. 382, 407–08 (1982)); *see also* 18 U.S.C. § 1962(c).

Under Section 1962(c), a pattern of racketeering is established by proof that the defendant committed two or more predicate offenses. *See* 18 U.S.C. § 1962(c). However, under *United States v. Brown,* 583 F.2d 659 (3d Cir.1978), *cert. denied sub nom., Greenblatt v. United States,* 440 U.S. 909, 99 S.Ct. 1217, 59 L.Ed.2d 456 *reh'g denied,* 441 U.S. 917, 99 S.Ct. 2019, 60 L.Ed.2d 389 (1979), if a defendant is charged with multiple predicate offenses—as in this case—and the Circuit cannot determine which specific offenses the jury relied upon in reaching its verdict, the evidence must be sufficient to prove *all* of those offenses. *Id.* at 669–70; *see also Riccobene,* 709 F.2d at 227. In other words, if, on appeal, the Circuit finds insufficient evidence to support one of the predicate offenses and cannot determine which of the multiple predicate offenses the jury found to be proven, the RICO conviction must be reversed for failure to satisfy the RICO pattern requirement. *See Brown,* 583 F.2d at 669–70. This being the case, use of the Verdict Sheet Appendix and special predicate act interrogatories in this case were necessary, as well as appropriate.

### 12. Objection to Hard Copy of Jury Charges and Hard Copy of Trial Transcript Being Submitted to Deliberating Jury

 On numerous occasions during deliberations, the jury requested the testimony of certain witnesses. *See* Trial Transcript at 6844, 6885, 6887, 6899, 6913. Rather than re-read the testimony back to the jury, hard copies of the Trial Transcript were sent into the jury room. *See id.* at 6844–46, 6885–86, 6890, 6899, 6913. On each occasion, counsel for Bertoli objected to this practice on the ground that the Trial Transcript was not an exhibit.[164] *See id.* at 6845–46, 6885–86, 6889, 6899, 6913.

Similarly, on 12 August 1993, the jury requested a copy of the jury charge. *See id.* at 6856. Counsel for Bertoli objected to submission of a hard copy of the charges being submitted to the jury for the following reasons:

> My own view is that if the jury has specific questions about the law, they should get reinstructed, but I don't agree to sending the whole charge in.⋅ ... It's not an exhibit. Another thing, there is a danger that one juror's going to read it and tell the other jurors what's in it rather than every-

---

163. In *Palmeri,* the Circuit upheld the use of special interrogatories similar to those described here but which also re-stated the jury instruction that "[i]n reaching a verdict ... you must first decide whether or not each *defendant committed* two or more acts of racketeering." 630 F.2d at 203. Similarly, in *Pungitore,* the Circuit upheld special interrogatories which "summarized and collated the numerous charges against the defendants." 910 F.2d at 1136 n. 74. No such additional instruction or language was present on the Verdict Sheet submitted in this case. *See* Trial Transcript at 6835.

164. Bertoli's counsel did not object when it was first announced that transcripts requested by the jury would be supplied to them. During a break in the jury charges, the Government asked: "Are you contemplating sending the [jury the] entire truckload of evidence?" Trial Transcript at 6819. Bertoli's counsel responded: "My suggestion would be to tell the jury it's here and that if they want the whole thing, we'll give them the whole thing, if they want something specific, we'll give them something specific." *Id.* The parties were thereupon instructed: "[I]f they want ... all [the evidence], it can all go in. Now, if they ask for readbacks, we have the transcripts. I'm going to pull out any other sidebar conference and give them the transcripts of what they asked for." *Id.* at 6820.⋅

Bertoli's counsel did not object to this arrangement. Nor did Bertoli's counsel object when the jury was informed of the arrangement reached between the parties for the submission of transcripts. *Id.* at 6839. Bertoli's counsel objected only when the jury requested the testimony of a Government witness. *Id.* at 6844.

body hearing it and rereading it at the same time. *Id.* at 6856–57. A hard copy of the jury charge was given to the jury over the objection of Bertoli. *See id.* at 6857–59, 6874.

Both of Bertoli's objections were without merit. First, with regard to providing the jury with hard copies of Trial Transcripts, "the furnishing of transcripts to a jury is generally well within [a trial] court's discretion." *United States v. Betancourt,* 838 F.2d 168, 175 (6th Cir.), *cert. denied sub nom., Cubillos v. United States,* 486 U.S. 1013, 108 S.Ct. 1748, 100 L.Ed.2d 210 (1988); *see United States v. Lujan,* 936 F.2d 406, 411 (9th Cir.1991) (providing trial transcript to jury was not an abuse of discretion); *accord United States v. Nolan,* 700 F.2d 479, 486 (9th Cir.), *cert. denied,* 462 U.S. 1123, 103 S.Ct. 3095, 77 L.Ed.2d 1354 (1983); *United States v. Patterson,* 644 F.2d 890, 898 (1st Cir.1981); *United States v. Pollak,* 474 F.2d 828, 832 (2d Cir.1973); *see also United States v. Zarintash,* 736 F.2d 66, 69–70 (3d Cir.1984) ("trial court has broad discretion in deciding whether to accede to a jury's request for a reading of testimony"); *United States v. Wright–Barker,* 784 F.2d 161, 174 (3d Cir. 1986) (same); *United States v. Chrzanowski,* 502 F.2d 573, 577 (3d Cir.1974) (same); *United States v. Rabb,* 453 F.2d 1012, 1013–14 (3d Cir.1971) (same).

While some courts have stated that the re-reading of testimony during a jury's deliberations is generally "disfavored because of the emphasis it places on specific testimony and the delay it causes in the trial," *see Nolan,* 700 F.2d at 486; *accord Patterson,* 644 F.2d at 898, those same courts have indicated that the decision must consider "the particular facts and circumstances of the case." *United States v. Sacco,* 869 F.2d 499, 501 (9th Cir.

1989). Indeed, the Third Circuit has taken an even stronger position and has stated:

> Discretion is based upon a limited, twofold rationale: first, that requests to read testimony may slow the trial where the requested testimony is lengthy; second, that reading only a portion of the testimony may cause the jury to give that portion undue emphasis. *Thus ... a trial judge abuses his discretion where the refusal to read requested testimony is not supported by one of these reasons.*

*Zarintash,* 736 F.2d at 70 (citing *Rabb,* 453 F.2d at 1013–14) (emphasis added); *accord Wright–Barker,* 784 F.2d at 174.

In this case, as an initial matter, Bertoli did not object to the re-reading of testimony to the jury but, instead, merely objected to submission of a hard copy of the Trial Transcript to the jury. *See* Trial Transcript at 6845–46 (counsel for Bertoli stated "if the jury wants a read back, that's fine"); *see also id.* at 6885–86, 6889, 6899, 6913. As the Circuit has indicated, this distinction is irrelevant. *See Zarintash,* 736 F.2d at 70 (explaining that distinction between request by jury to "see" testimony and one to "rehear" testimony characterized as "a distinction of form, not substance").[165] Indeed, on appropriate occasions, the Circuit has required that a copy of the trial transcript be provided when requested by a jury. *See, e.g., id.* at 70–71.

The facts and circumstances of this case, moreover, indicate that the dangers of re-reading testimony to the jury were not present and that failure to provide the jury with the requested testimony would have constituted an abuse of discretion under *Zarintash.* Given that the jury requested and received the testimony of eleven separate

---

**165.** Bertoli argues submission of transcripts to the jury poses more danger of undue emphasis on particular testimony than does reading the transcript to the jury. Specifically, Bertoli contends that, in the jury room, testimony of a particular witness may be over-emphasized by repetition. *See* 19 Jan. 1994 Bertoli Brief at 30.

However, as was pointed out at trial, the same danger is posed by the re-reading of testimony to the jury in open court, for the jury "could ask for each of these transcripts to be read ten times." Trial Transcript at 6886. Moreover, reading tes-

timony to the jury does not guarantee that a particular portion of a witness' testimony will not be given undue emphasis. In each of these situations, the trial court has discretion to balance the dangers of undue emphasis with the necessity of providing the jury with sufficient information on which to decide the case. In the instant case, the interest in providing the jury with a complete factual framework with which to render a verdict outweighed the slight possibility of unduly emphasizing portions of the testimony.

witnesses, *see id.* at 6844–46 (one witness), 6885–86, 6890 (six witnesses), 6899 (one witness), 6913 (three witnesses), no undue emphasis was placed on the testimony of any single witness.[166] Because the jury was presented with the entire testimony of each witness, there was no danger that a specific portion of a witness' testimony would be inadvertently omitted or selectively emphasized in a read-back.[167] Finally, providing the jury with copies of the Trial Transcript conserved time in comparison to re-reading that testimony aloud to the jury.[168] Accordingly, presentation of the Trial Transcript to the jury was both appropriate and necessary.

■■■ With regard to submission to the jury of a written copy of the jury charges, here too "courts have wide discretion to submit the test of the charge to the jury." *United States v. Delano,* 825 F.Supp. 534, 546 (W.D.N.Y.1993); *see also United States v. Parent,* 954 F.2d 23, 24 n. 1 (1st Cir.1992); *United States v. Henry,* 878 F.2d 937, 940 (6th Cir.1989) (decision to send in written instructions was "proper exercise of the court's discretion") (citing *United States v. Acosta,* 763 F.2d 671, 677 (5th Cir.), *cert. denied,* 474 U.S. 863, 106 S.Ct. 179, 88 L.Ed.2d 148 (1985)).

As the *Delano* court recently observed:

As litigation grows increasingly complex, the jury often may be helped in their deliberations by having a copy of the instructions on a certain point be repeated. The trial judge has wide discretion as to whether he [or she] will submit a copy of his [or her] instructions to the jury.

825 F.Supp. at 546 (citing *United States v. Standard Oil Co.,* 316 F.2d 884, 896 (7th Cir.1963)); *see also United States v. Watson,* 669 F.2d 1374, 1386 (11th Cir.1982) ("[u]nder appropriate circumstances, the use of ... a written charge could well aid juror comprehension, as well as expedite the proceedings").

In *Delano,* moreover, the court recognized that four factors, virtually identical to the factors in this case, supported submission of a written copy of the jury charges to the deliberating jury. The *Delano* court explained: "[1] the trial lasted almost three months; [2] the jury charge lasted over three hours; [3] the over 300 pages of charge encompassed instructions on ten counts, including the complex law of RICO and RICO conspiracy; and [4] because some of the racketeering acts under RICO and RICO conspiracy involved the same charges as other counts in the indictment, the jury charge simply referenced instructions previously

---

**166.** Bertoli also argued submission of transcripts to the jury prevented the effective rendering of cautionary instructions regarding the testimony. *See* 19 Jan. 1994 Bertoli Brief at 31. The issue of the adequacy of cautionary instructions was addressed by the court in *Betancourt,* 838 F.2d 168, where the submission of transcripts to the jury was deemed proper. There, the court stated any possibility of improper emphasis was quelled by the trial judge's instruction, "in standard terms, that all of the evidence was to be weighed, and no undue credence was to be given any single part of it." *Id.* at 175; *see Lujan,* 936 F.2d at 412 (There was no prejudice from submission of transcripts to jury where "[t]he jury was admonished to weigh all the evidence and not to use the transcript to focus on any portion of the trial.")

In the instant case, as in *Betancourt* and in *Lujan,* the jury was adequately instructed regarding the proper weight to be given the evidence in the record. Specifically, the jury was instructed to determine the facts "with a fair and impartial consideration of all the evidence." Trial Transcript at 6732; *see id.* at 6736 (stating same). The jury was further instructed:

All of the evidence, regardless of whether I've referred to it, regardless of whether counsel referred to it in their summations, must be considered by you. It makes no difference whether the evidence was offered by the [Government] or by [Bertoli]. It was all evidence and all of it should be considered by you to the extent it helps you decide the issues in this case.

*Id.* at 6803. These cautionary instructions adequately guarded against the jury's placement of undue emphasis on any portion of the testimony offered at trial. *See Betancourt,* 838 F.2d at 175.

**167.** Bertoli concedes he "can allege no specific prejudice in this case" resulting from the submission of the portions of the Trial Transcript to the jury. 19 Jan. 1994 Bertoli Brief at 35. Indeed, submission of the requested testimony to the jury ostensibly aided Bertoli, who was acquitted of five of the seven counts of the Redacted Second Superseding Indictment.

**168.** Reading back the transcripts requested by the jury, which contained the testimony of eleven witnesses, would have extended the length of the trial by two to three weeks.

given, rather than repeating them." 825 F.Supp. at 547.

The *Delano* court also observed that the manner and form of presentation guarded against any potential prejudice to the defendant. *Id.* An unmarked copy of the jury charge was submitted to the jury and, prior to turning over the written copy, the jury was instructed that (1) they were to apply these instructions to the facts as they determined them and (2) they were to read the instructions as a whole and not single out any instruction as alone stating the law. *Id.*

In this case, not only was submission of a written copy of the jury charge to the deliberating jury within the court's discretion, but the facts and circumstances of this case made such submission particularly appropriate. Like *Delano*, this case lasted approximately three months and had a charge to the jury which lasted more than three hours and encompassed seven counts, including the complex law of RICO and RICO conspiracy. *See* Trial Transcript at 6718–806.

Also as in *Delano*, the presentation of the jury charge was done in a manner designed to eliminate any potential prejudice. The jury was presented with a plain unmarked copy of the portion of the Trial Transcript containing the jury charge. Moreover, the jury was instructed in the preface to the jury charge, as well as when the transcript was sent in to the jury room, that they were to "accept and apply the law for this case as it is given ... in this charge" and that they "shall take these instructions as a whole package ... [and] not pick out any particular instruction and place undue emphasis on it." Trial Transcript at 6718. Accordingly, submission of a written copy of the jury charge was neither improper nor objectionable.

### 13. Objection to Submission of Jury Books to Jury

 During deliberation, the jury also requested the jury books used at trial. Trial Transcript at 6854, 6869. These jury books contained documentary evidence used by the parties at trial. All of the documents in the Government's jury books (the "Government Jury Books") were admitted into evidence at trial.[169] *Id.* at 6856. The jury books used by Bertoli (the "Bertoli Jury Books") contained documents which were not introduced into evidence at trial (the "Non–Admitted Documents"). *Id.* at 6862.

It was determined that the documents in the jury books which were admitted into evidence at trial would be submitted to the jury, but the Non–Admitted Documents would be excised from the jury books before submission. *Id.* at 6874. Bertoli objected to the admission of the Government Jury Books and to the exclusion of the Non–Admitted Documents from the Bertoli Jury Books.[170] *Id.* at 6871.

Bertoli's objections were without merit. First, the Government Jury Books were properly submitted to the jury. "Once exhibits are properly admitted into evidence, it is within the sound discretion of the trial court to allow them to be sent into the jury room." *United States v. Foster,* 815 F.2d 1200, 1202 (8th Cir.1987); *see United States v. Aragon,* 983 F.2d 1306, 1309 (4th Cir.1993); *United States v. Scaife,* 749 F.2d 338, 347 (6th Cir.1984). Absent clear prejudice, "[j]urors are generally entitled to examine documents properly admitted in evidence." *United States v. De Coito,* 764 F.2d 690, 695 (9th Cir.1985); *see Aragon,* 983 F.2d at 1309 (Submission of properly admitted evidence to jury cannot be challenged "absent clear prejudice...."); *United States v. De Hernandez,* 745 F.2d 1305, 1308 (10th Cir.1984) ("The

---

**169.** Bertoli did not object to jury's use of the Government Jury Books during trial.

**170.** Initially, Bertoli's counsel stated: "When we handed out our jury books during summations, there were documents within those books which were in evidence, but there were documents which were not in evidence and I understand why those would not go to the jury." Trial Transcript at 6863. However, when Bertoli's counsel learned that the Government Jury Books

were to be submitted to the jury, he objected to the excision of the Non–Admitted Documents from the Bertoli Jury Books. *Id.* at 6871–72. Bertoli provided no case law in support of his objection.

Bertoli has again raised this issue in connection with his motion for bail pending appeal, but again has failed to provide legal authority for his contention of error.

trial court may send all or part of the exhibits admitted into evidence before or after it has begun deliberations."); *United States v. Gordon*, 685 F.Supp. 106, 107 (E.D.Pa.1988) (no error to submit to jury evidence admitted without objection of defendant).

As indicated, each document contained in the Government Jury Books was properly admitted into evidence at trial; Bertoli does not argue otherwise. Bertoli did not, in fact, object to the jury's use of the Government Jury Books during trial. The Government Jury Books were merely a compilation of properly admitted evidence. The jury was entitled, and in fact obligated, to view all the evidence introduced at trial. It was, therefore, proper to submit the Government Jury Books to the jury.[171] *See Pinto*, 850 F.2d at 927 ("[W]e find no error in the court's decision to allow the properly admitted summary charts into the jury room during deliberations."); *Scales*, 594 F.2d at 564 n. 3 (same).

Bertoli argues the Government Jury Books were "selective[ly] assembl[ed]" in an order meant to argue the Government's case, and therefore should not have been submitted to the jury. 19 January 1994 Bertoli Brief at 36; *see id.* at 37. Contrary to Bertoli's suggestion, however, the documents in the Government Jury Books were arranged in the order in which they were admitted into evidence. This order was the same order in which the documents were presented to the jury at trial; Bertoli did not object to the arrangement of the Government Jury Books during trial. Accordingly, the submission of the Government Jury Books to the jury in this order was not prejudicial to Bertoli. Absent a showing of clear prejudice, Bertoli cannot challenge the submission of the Government Jury Books to the jury. *See Aragon*, 983 F.2d at 1309.

**171.** It has been held that, where only a portion of the evidence is submitted to the jury, the trial court should give the jury a cautionary instruction to ensure "undue emphasis is not placed on that evidence." *De Hernandez*, 745 F.2d at 1308. In the instant case, as indicated, the jury was adequately charged regarding its duty to consider all the evidence in the record, and not to place undue weight on any particular evidence. *See supra* note 166; *Betancourt*, 838 F.2d at 175.

**172.** Contrary to Bertoli's suggestion, the principle that only evidence may be submitted to the

As stated, Bertoli further argues it was error to excise the Non–Admitted Documents from the Bertoli Jury Books before submitting the latter to the jury. *See* 19 Jan. 1994 Bertoli Brief at 36. This argument is also without merit. "A jury is bound to decide a case purely on the law and the evidence[;] it is therefore error for a jury to rely on items not admitted into evidence to reach its verdict." *United States v. Hans*, 738 F.2d 88, 92 (3d Cir.1984); *see Government of Virgin Islands v. Joseph*, 685 F.2d 857, 863–64 (3d Cir.1982). Therefore, evidence not properly admitted during trial may not be submitted to the jury during deliberations.[172] *See United States v. Casoni*, 950 F.2d 893, 914 (3d Cir.1991).

In the instant case, as stated, the Non–Admitted Documents were not in evidence. At most, these documents were argument. As such, the Non–Admitted Documents could not be submitted to the jury along with the Bertoli Jury Books. *See Casoni*, 950 F.2d at 914. The Non–Admitted documents were, therefore, properly excised from the Bertoli Jury Books.

### 14. *Objection to Subsequent Charges to Jury*

As already discussed, on two occasions during the deliberations, the jury indicated it was deadlocked and additional instructions were given. On the first occasion, the jury wrote: "Judge Lechner, after careful deliberation and consideration we have only reached a unanimous agreement on two counts of the indictment. At this point we are unable to reach agreements on any of the other counts remaining." *Id.* at 6906. In response, the following instruction was given:

jury does not preclude the submission of transcripts of testimony to the jury. *See* 19 Jan. 1994 Bertoli Brief at 33–34. The submission of transcripts to the jury is not the equivalent of permitting the consideration of non-evidentiary matter; the testimony set forth in the transcripts is evidence. As indicated, the Third Circuit, and other circuits, have expressly allowed for the submission of transcripts of testimony to a jury. *See supra*, at 1070.

COURT: .... As I pointed out in my charge to you, you have an obligation to deliberate with a view toward reaching an agreement in this case, and I also point out to you that you should not hesitate to reexamine your own views and your own positions *if you can do so without doing violence to your individual judgment.*

I'm going to recess for the evening and we'll begin tomorrow morning recommencing deliberations. Now I point out to you that, obviously, at this point your deliberations aren't to end. We'll pick them up tomorrow morning.

Remember the idea of a jury system. Its where twelve people sit down and deliberate and talk about whatever differences there may be and the evidence, viewpoints and discuss the case with a view towards reaching an agreement.

I again stress that you have that obligation and you have the option to change you opinion, whatever that opinion may be, but *I stress you should not do so merely for the purpose of returning a verdict.* Your purpose here is to be a judge of the facts, individually and collectively. That's your obligation.

Trial Transcript at 6907 (emphasis added). Counsel for Bertoli objected to this instruction on the grounds that (1) it was a modified *Allen* charge, *see Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896), and (2) the parties were not heard on what the supplemental charge would be prior to its presentation to the jury. *Id.* at 6908. A motion for a mistrial on these grounds was then denied. *Id.*

The following morning, prior to deliberations, the jury was again instructed as follows:

COURT: Ladies and gentlemen, we're going to recommence the deliberations this morning. I want to point out to you, as I indicated in the past, it's your duty as jurors to consult with one another, deliberate with a view toward reaching an agreement *if you can do so without doing violence to your individual judgment.*

Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence, all of the evidence in the case. Do so with the other members of the jury.

In the course of your deliberations, do not hesitate to reexamine your own views and change your own opinion if you're convinced its erroneous, *but do not, do not surrender your honest conviction because of the opinion of the other members of the jury or for the mere purpose of returning a verdict.*

As I've pointed out to you, you are not partisans, you are judges of the facts. As I've also pointed out to you, you are not to select any one or even a few of the jury charges I have given to you and place undue emphasis on it or them. You are to consider the jury charges as a whole package during your deliberations.

I'm going to ask that you return to the jury room and recommence your deliberations. Thank you.

*Id.* at 6910–11 (emphasis added). Counsel for Bertoli renewed the objection made on the prior day. *Id.* at 6911.

On the second occasion that the jury indicated it was deadlocked, the note read:

Judge Lechner, it is at this point that we ask for some guidance. We have reread your charge to us very carefully and have taken your additional advice very seriously.

However, after complet[ely] examining and taking notes on every act included in each count, we have concluded with an 11, one vote on the majority of them. This places us in a standstill as to how we can proceed from here to arrive at unanimous verdicts while still being fair and impartial.

We would like you to know that we have reached agreement on three counts of the indictment, but want to know if you can give us further instructions or suggestions on where to go from here.

Thank you for your patience and cooperation, the jury.

*Id.* at 6921.

In response to the second communication from the jury, essentially the same supplemental instruction was given:

COURT: .... You asked for further instruction and I will give it to you. I point out to you that you have to use your good, common sense and that fairness and impartiality is the hallmark of an American jury and that's what you have sworn [to uphold], fairness and impartiality.

As you've indicated in this note, you very carefully reviewed the charge I've given to you and you have the obligation to review all of the evidence and consider all of the evidence that was presented to you during the course of the trial.

As I mentioned, it is your duty as jurors to consult with one another and to deliberate with a view toward reaching an agreement *if you can do so without violence to your individual judgment.* Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence in the case with the other members of the jury.

In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion if you are convinced its erroneous, *but do not surrender your honest conviction as to the weight or effect of the evidence solely because of the opinion of the other members of the jury or for the mere purpose of returning a verdict.*

I stress to you that you are not partisans. You are judges, judges of the facts in the case. You are to use your good, common sense in being fair and impartial in this case.

As I also mentioned to you the other day, you are not to select any one or even a few of the instructions and place undue emphasis on that one or the few of the instructions. You are to take the instructions as a whole package and apply those instructions, that is the law to the facts as you find the facts to be.

Now, I ask that you retire to the jury room and recommence your deliberations. Thank you.

*Id.* at 6922–23 (emphasis added). There was no objection to this final instruction.

The objections of Bertoli to the supplemental charges were without merit. First, the charges given in no way resembled an *Allen*

charge. An *Allen* charge is a "device to generate verdicts, and thus eliminate hung juries." *United States v. Fioravanti,* 412 F.2d 407, 416 (3d Cir.), *cert. denied sub nom., Panaccione v. United States,* 396 U.S. 837, 90 S.Ct. 97, 24 L.Ed.2d 88 (1969). An *Allen* charge essentially instructs a juror "to distrust his own judgment if he [or she] finds a large majority of jurors taking a view different from his [or her]." *Id.* at 420. In the Third Circuit, the giving of an *Allen* charge is "normally reversible error." *Id.; accord United States v. Graham,* 758 F.2d 879, 883 (3d Cir.), *cert. denied,* 474 U.S. 901, 106 S.Ct. 226, 88 L.Ed.2d 226 (1985).

In lieu of an *Allen* charge, the Circuit has suggested that, "if there is any disposition to instruct jurors to consult with others in the deliberative process," trial judges should use the following charge:

It is your duty, as jurors, to consult with one another, and to deliberate with a view toward reaching an agreement if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence in the case with your fellow jurors. In the course of your deliberations, do not hesitate to re-examine your own views, and change your opinion, if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

*Fioravanti,* 412 F.2d at 420 n. 32 (quoting Mathes & Devitt, *Federal Jury Practice and Instructions* ¶ 79.01 (1965)).

The supplemental instructions in this case, unlike an *Allen* charge, in no way instructed the jurors to distrust their own judgment in the face of a disagreeing majority. In fact, as is evident from a reading of the supplemental instructions in this case, those instructions deliberately tracked the language suggested by the Circuit in *Fioravanti.* Jurors were instructed to deliberate with a view toward reaching an agreement, *only* if they "could do so without violence to [their] individual judgment." Trial Transcript at

6907, 6910–11, 6922–23; *see Fioravanti,* 412 F.2d at 420 n. 32. In addition, jurors were specifically cautioned *not* to surrender their individual judgments "solely because of the opinion of the other members of the jury or for the mere purpose of returning a verdict." *Id.* at 6907, 6910–11, 6922–23. Accordingly, Bertoli's characterization of the supplemental instruction as an *Allen* charge was erroneous.

With regard to the objection that the parties should have been heard on the contents of the supplemental instructions prior to the giving of those instructions to the jury, Bertoli provided no support for this position. Indeed, given that the supplemental instructions provided to the jury tracked an instruction already approved by the Circuit, this objection had no merit. *See United States v. United States Gypsum Co.,* 550 F.2d 115, 131 n. 4 (3d Cir.1977) (re-affirming that charge outlined in *Fioravanti* was proper supplemental charge to jury), *aff'd,* 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978).

E. *Pre–Trial and Trial Motions and Objections by Government*

1. *Motion to Preclude Bertoli From Presenting a Defense Based on Selective or Vindictive Prosecution or Governmental Misconduct*

■ On 21 May 1993, the Government moved to preclude Bertoli from presenting a defense based upon selective or vindictive prosecution or on Governmental misconduct.[173] *See* Government First Preclusion Brief at 3–6. According to the Government, these were not proper issues for the jury to consider and, moreover, the court had already ruled on these questions. *Id.*

Case law definitively establishes that questions of vindictive prosecution and Government misconduct are not proper questions for the jury to consider. With regard to

vindictive or selective prosecution, the Circuit stated twenty years ago in *United States v. Berrigan,* 482 F.2d 171 (3d Cir.1973):

Appellants sought to introduce evidence of discriminatory prosecution to the jury.... Appellants' argument misconceives the proper division of responsibility between judge and jury in a [F]ederal criminal proceeding. By both tradition and constitutional mandate the jury is given the responsibility of determining guilt or innocence according to instructions of law given by the court. The question of discriminatory prosecution relates not to the guilt or innocence of appellants, but rather addresses itself to a constitutional defect in the institution of the prosecution. [Fed. R.Crim.P.] 12(b)(2) provides: "Defenses and objections based on defects in the institution of the prosecution ... may be raised only by motion before trial." Rule 12(b)(4) provides: "An issue of fact shall be tried by the jury if a jury trial is required under the Constitution or an act of Congress. All other issues of fact shall be determined by the court...."

*Id.* at 174–75; *see United States v. Napper,* 553 F.Supp. 231, 232 (E.D.N.Y.1982) ("defendant does not have the right to present a selective prosecution claim to a jury").

Case law also establishes that the issue of whether the Government's misconduct is so outrageous as to require dismissal of an indictment is a question within the sole province of the court. The Circuit stated in *United States v. Engler,* 806 F.2d 425 (3d Cir.1986): "The question whether governmental conduct was so outrageous as to constitute a violation of due process is a question of law to be determined by the court, not the jury." *Id.* at 430 (citing *United States v. Salazar,* 720 F.2d 1482, 1488 (10th Cir.1983), *cert. denied,* 469 U.S. 1110, 105 S.Ct. 789, 83 L.Ed.2d 783 (1985); *United States v. Prairie,* 572 F.2d 1316, 1319 (9th Cir.1978); *United*

---

**173.** In connection with this motion, the Government submitted the following: Government's Memorandum of law in Support of Its Request that the Court Preclude Defendant Bertoli From Presenting a Defense Based on Selective or Vindictive Prosecution or Governmental Misconduct (the "Government First Preclusion Brief"); Letter to court, dated 1 July 1993.

In connection with this motion, Bertoli submitted the following: Letter Brief, dated 26 May 1993 (the "26 May 1993 Bertoli Preclusion Brief"); Letter, dated 28 June 1993 (renewing request to introduce evidence regarding Government motive).

*States v. Russell,* 411 U.S. 423, 441, 93 S.Ct. 1637, 1647, 36 L.Ed.2d 366 (1973) (Stewart, J. dissenting)), *cert. denied,* 481 U.S. 1019, 107 S.Ct. 1900, 95 L.Ed.2d 506 (1987).

In April 1992, prior to trial, Bertoli moved to dismiss the Second Superseding Indictment on a number of grounds, including prosecutorial misconduct, pre-indictment delay, selective prosecution and vindictive prosecution. *See Cannistraro,* 800 F.Supp. at 48–65. These arguments were considered at length and were rejected. *See id.*

Both the Supreme Court and the Third Circuit have indicated that trial courts have an obligation to prevent arguments regarding Government conduct or motives from "going 'out of bounds.'" *See United States v. Young,* 470 U.S. 1, 13, 105 S.Ct. 1038, 1045, 84 L.Ed.2d 1 (1985) (citation omitted); *see also Pungitore,* 910 F.2d at 1127 (urging close supervision by district court of defense claims of prosecutorial misconduct).

There was no reason to allow Bertoli to present evidence of selective or vindictive prosecution or of prosecutorial misconduct to the jury because such evidence, if it existed, could not properly be considered by the jury. *Engler,* 806 F.2d at 430; *Berrigan,* 482 F.2d at 174–75; *see also Salazar,* 720 F.2d at 1488; *Prairie,* 572 F.2d at 1319; *Napper,* 553 F.Supp. at 232. Moreover, Bertoli's arguments with regard to selective or vindictive prosecution and Government misconduct had already been considered and rejected, *see Cannistraro,* 800 F.Supp. at 48–51, 59–65, and, therefore, were properly excluded. *See Young,* 470 U.S. at 13, 105 S.Ct. at 1045; *Pungitore,* 910 F.2d at 1127.

Significantly, Bertoli offered no compelling authority to support the denial of the Government's motion to preclude. While Bertoli cited legal authority, *see* 26 May 1993 Bertoli Preclusion Brief at 1–2, that authority, at best, supported only Bertoli's right to pres-

ent a defense generally. *See id.* (citing *In re Oliver,* 333 U.S. 257, 273, 68 S.Ct. 499, 507–08, 92 L.Ed. 682 (1948); *Chambers v. Mississippi,* 410 U.S. 284, 294, 93 S.Ct. 1038, 1045, 35 L.Ed.2d 297 (1973); *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974)). Bertoli's authority did not specifically address his asserted right to present a defense based on vindictive or selective prosecution or on Government misconduct.[174]

Accordingly, the Government motion to preclude Bertoli from presenting a defense or any evidence based on selective or vindictive prosecution or on Government misconduct was granted on 28 May 1993. *See* 28 May 1993 Tr. at 21.

Bertoli appears to argue evidence of prosecutorial motive was admissible under Fed. R.Evid. 404(b). *See* Supplemental Memorandum of Law in Support of Motion for Bail Pending Appeal, dated 19 January 1994 (the "19 Jan. 1994 Bertoli Brief"), at 8. Rule 404(b) provides for the admissibility of 'prior bad act' evidence to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed.R.Evid. 404(b); *see Huddleston,* 485 U.S. at 691, 108 S.Ct. at 1502. However, in order to be admissible under Rule 404(b), evidence must be "relevant," as that term is defined by Fed.R.Evid. 401.[175] *See Huddleston,* 485 U.S. at 691, 108 S.Ct. at 1502; *Sampson,* 980 F.2d at 886.

Under Rule 401:

"Relevant evidence" means evidence having any tendency to make the existence of any fact *that is of consequence to the determination of the action* more probable or less probable than it would be without the evidence.

Fed.R.Evid. 401 (emphasis added). As stated, the issue of prosecutorial misconduct could not be submitted to the jury, and was

---

**174.** Bertoli argued granting the Government's preclusion motion would "emasculate" his defense because it would prevent him from inquiring as to whether the testimony of Government witnesses with cooperation agreements was false. *See* 26 May 1993 Bertoli Preclusion Brief at 2. This argument was without merit. Prohibiting Bertoli from presenting evidence of selective or vindictive prosecution or of Government miscon-

duct in *no way* prevented Bertoli from cross examining those witnesses, particularly with regard to credibility. Nor, for that matter, did such preclusion prohibit Bertoli from presenting other affirmative evidence.

**175.** Under Fed.R.Evid. 402, "[e]vidence which is not relevant is not admissible."

therefore properly resolved by the court before trial. *See supra,* at 237–38. Because the issue of prosecutorial motive was not proper for submission to the jury, evidence relating to prosecutorial motive was not "of consequence to the determination of the action." *Id.* Such evidence, being irrelevant under Rule 401, was not admissible under Rule 404(b). *See Huddleston,* 485 U.S. at 691, 108 S.Ct. at 1502.

■ Bertoli argues evidence of prosecutorial motive would have been relevant to the impeachment of Government witnesses as evidence of their motive to lie. Bertoli states he "intended to argue ... that the [G]overnment influenced unfairly the testimony of certain witnesses.[176] Anticipating the need to explain to the jurors *why* the [G]overnment would desire to so influence the witnesses, Bertoli intended to introduce evidence of [G]overnment motive...." 15 December 1993 Bertoli Letter at 3 (emphasis in original).

Contrary to Bertoli's assertion, any marginal relevance of prosecutorial motive to impeachment issues did not render evidence thereof admissible. Even if such evidence were "relevant" under Rule 401, it was excludable under Fed.R.Evid. 403. Rule 403 provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.[177]

Fed.R.Evid. 403.

In the instant case, evidence of prosecutorial motive was not indicative of the credibility of Government witnesses. At most, such evidence was indicative of the *Government's* motive to induce witnesses to lie while testifying. Even if Bertoli did establish improper prosecutorial motive, it would not necessarily follow that the Government's *witnesses* had lied. The probative value of evidence of

prosecutorial motive, even under the theory advanced by Bertoli, was slight at best.

Allowing Bertoli to introduce evidence of prosecutorial motive would, as the Government points out, have caused the case to devolve "into a mini-trial of the Government's alleged motives and misconduct." Government's Memorandum of Law in Opposition to Defendant Bertoli's Anticipated Motion for Bail Pending Appeal, dated 14 February 1994 (the "14 Feb. 1994 Government Brief"), at 6. The authenticity and probative value of each document submitted by Bertoli would have been open to attack by the Government, as would the credibility of any witnesses called by Bertoli. For these reasons, courts have exercised their discretion under Rule 403 to exclude evidence of prosecutorial motive where it was offered to attack the credibility of Government witnesses. *See United States v. Renfro,* 620 F.2d 497, 500–01 (5th Cir.) (evidence of FBI agent's bias properly excluded under Rule 403 where basis of relevance was allegation that agent had offered immunity to witnesses in exchange for testimony), *cert. denied,* 449 U.S. 921, 101 S.Ct. 321, 66 L.Ed.2d 149 (1980); *United States v. Johnson,* 605 F.2d 1025, 1030 (7th Cir.1979) (evidence indicating "indictment was a political instrument" properly excluded under Rule 403 because admission would have "permitted excursions into extraneous and collateral matters"), *cert. denied,* 444 U.S. 1033, 100 S.Ct. 706, 62 L.Ed.2d 670 (1980).

"When the trial court excludes evidence tending to impeach a witness, it has not abused its discretion as long as the jury has in its possession sufficient information to appraise the biases and motivations of the witness." *United States v. Parker,* 991 F.2d 1493, 1497 (9th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 121, 126 L.Ed.2d 86 (1993); *see United States v. Lopez,* 885 F.2d 1428, 1438 (9th Cir.1989) (same), *cert. denied,* 493 U.S. 1032, 110 S.Ct. 748, 107 L.Ed.2d 765 (1990); *Renfro,* 620 F.2d at 501 (exclusion of impeachment evidence proper where bias was established by other sources).

---

**176.** Specifically, Bertoli contends he intended to show the Government's influence over the testimony of Ernest Foster ("Foster"). 19 Jan. 1994 Bertoli Brief at 11.

**177.** Evidence submitted for admission under Rule 404(b) must meet the requirements of Rule 403. *See Huddleston,* 485 U.S. at 691, 108 S.Ct. at 1502; *Sampson,* 980 F.2d at 886.

In the instant case, Bertoli was able, during cross-examination of Eisenberg and Foster, to fully develop his theory that these witnesses were lying to please the Government.[178] Bertoli was able to introduce evidence of the plea agreements that existed between these witnesses and the Government, as well as evidence of inconsistencies in statements made by the witnesses. The jury, therefore, had adequate information regarding Bertoli's theory of witness bias. In light of this fact, and the scant probative value of evidence relating to prosecutorial motive, evidence regarding prosecutorial motive was properly excluded under Rule 403.

■ Bertoli further argues evidence of prosecutorial motive should have been admitted because the Government was permitted to present evidence concerning Bertoli's motive to commit the charged offenses.[179] 19 Jan. 1994 Bertoli Brief at 8–11. However, the admission of evidence regarding Bertoli's motive has no bearing on the admissibility of evidence regarding prosecutorial motive. Admission of evidence is not a reciprocal exercise. The admission of prior bad act evidence offered by the Government does not require that the defense be allowed to present evidence which is violative of the Federal Rules of Evidence. Rather, the admissibility of each offer of evidence is to be evaluated independently under the Federal Rules of Evidence and the relevant case law.

In the instant case, the 'other bad act' evidence offered by the Government was admissible to prove Bertoli's motive and intent under Rule 404(b). Because Bertoli's intent was a crucial element of the charges against him, evidence relating his motive, intent and absence of mistake were relevant under Rule 404. *See supra*, at 1058. Under the same principles, evidence relating to prosecutorial motive was irrelevant, and, if arguably relevant, so marginally relevant as to be inadmissible under Rule 403, if not Rule 402.[180]

---

**178.** Bertoli's cross-examination of Eisenberg spanned five days of trial and occupied 543 pages of the Trial Transcript. Bertoli's cross-examination of Foster spanned two days and occupied sixty-three pages of the Trial Transcript.

**179.** Bertoli states "the [G]overnment elicited testimony from ... Eisenberg that [Bertoli] told him, 'Leo, you know I hate the [G]overnment, I've never denied it....'" 19 Jan. 1994 Bertoli Brief at 9 n. 2 (quoting Trial Transcript at 2555). Contrary to Bertoli's assertion, the Government did not elicit this testimony regarding Bertoli's attitude toward the Government. Eisenberg's testimony was in response to the Government's question as to why Bertoli thought Cannistraro would not cooperate with the Government. *See* Trial Transcript at 2555. Eisenberg's answer was a spontaneous response to an open-ended question by the Government. Bertoli did not object to the question or the answer. *Id.*

**180.** Though he did not raise the issue at trial, Bertoli suggests it was error to permit the Government to offer evidence to support Foster's truthfulness. *See* 19 Jan. 1994 Bertoli Brief at 10–11. Specifically, Bertoli points to the Government's introduction, during the re-direct examination of Foster, of portions of the cooperation agreement between Foster and the Government (the "Foster Agreement"). These portions stated that Foster would "truthfully disclose all information concerning all matters about which the [Government] may inquire." Trial Transcript at 4797. The Foster Agreement further provided that, if Foster intentionally gave false or misleading information or testimony, the Foster Agreement would be "null and void." *Id.* at 4798.

Contrary to Bertoli's assertion, admission of the Foster Agreement was not improper. During his cross-examination of Foster, Bertoli vigorously attacked the truthfulness of Foster. *See, e.g., id.* at 4716 (Bertoli: "The first affidavit was truthful, the second one you fudged it, is that your testimony?"), 4752 (Bertoli: "But a number of [your clients] you lied to. Isn't that true?"). Also, during his opening, Bertoli attacked, in general terms, the credibility of all Government witnesses having cooperation agreements with the Government. *See id.* at 571, 586. Bertoli's attacks on the truthfulness of Foster made the issue of Foster's veracity relevant, and 'opened the door' to the Government's introduction of evidence in support of Foster's veracity. *See United States v. Smith*, 778 F.2d 925, 928 (2d Cir.1985) (prosecution permitted to introduce evidence of witness's agreement to testify truthfully where witness's credibility was attacked on cross-examination or during opening); *see also United States v. Kats*, 871 F.2d 105, 107 (9th Cir.1989) (same); *cf.* Fed.R.Evid. 608(a)(2) (Evidence of witness's character for truthfulness is admissible "after the character of the witness for truthfulness has been attacked...."). Therefore, the admission of the Foster Agreement as evidence of Foster's truthfulness was not error.

Nor did the admission of the Foster Agreement require the admission of Bertoli's proffered evidence of prosecutorial motive. As indicated, if relevant, evidence of prosecutorial motive was only marginally relevant to Foster's veracity, and was therefore excludable under Rule 403.

### 2. Motion to Quash Bertoli's Subpoena of Government's Case Agent

■ During trial, on 28 July 1993, the Government advised the court of Bertoli's intention to serve a subpoena on Special Agent Michael Cahill ("Special Agent Cahill"), the FBI's case agent in charge of the investigation of Bertoli (the "Cahill Subpoena").[181] Trial Transcript at 5388. Pursuant to 28 C.F.R. § 16.23(c), which governs the procedures to be followed in subpoenaing agents of the FBI, Bertoli was required to provide the Government with "an affidavit, or, if that is not feasible, a statement ... setting forth a summary of the testimony sought...." 28 C.F.R. § 16.23(c). Though Bertoli had not provided the Government with such an affidavit or statement, a proffer of relevance was invited. Trial Transcript at 5393.

Bertoli's counsel responded:

There are several areas I'll question [Special] Agent Cahill about, one of which concerns his interviewing of particular witnesses and whether or not those interviews concerned any undue suggestion to those witnesses.

*Id.*

Bertoli made additional proffers on 29 July 1993. Outside of the presence of the jury, Bertoli's counsel first stated he required the testimony of Special Agent Cahill "to show that he was present, either alone or with others, during many interviews with several of the cooperating witnesses who were called by the Government." *Id.* at 5511. Counsel for Bertoli explained:

It's the defense position that in those interviews, [Special Agent] Cahill influenced their testimony, thereby inducing, obviously by using the word "inducing," I'm not suggesting a monetary bribe or anything like that, but thereby inducing

those witnesses to testify in a way contrary to the facts...."

*Id.*

When Bertoli's counsel was asked to provide specifics concerning the type of 'inducement' to which he was alluding, he stated:

[T]here are ways to suggest to a witness that certain testimony is desired and it's not necessarily subornation of perjury or obstruction of justice, but an investigator, an FBI agent, even an attorney, who may not be intending to suborn perjury, who may not be intending to obstruct justice, by doing certain things or acting in a certain way, he telegraphs to a potential witness the answers he hopes to get.

*Id.* at 5512.

Bertoli's counsel was again informed that this was too vague a proffer as to what Special Agent Cahill did to induce Government witnesses to testify untruthfully. *Id.* at 5513. Bertoli's counsel then responded that it was his "belief" that "in either [Special Agent] Cahill's office or in an office adjacent to [Special Agent] Cahill's, where some of the interviews [with Government witnesses] were conducted, [there were] either two or three pictures on the wall of ... Bertoli ... and that there is a very suggestive sign on the wall as well that's connected to this case." *Id.* at 5515.

Bertoli's counsel later clarified that the pictures and signs he referred to were, he believed, in an office adjacent to Special Agent Cahill's office (the "Adjacent Office"). *Id.* Bertoli's counsel further stated he "believe[d]" certain interviews with Government witnesses were conducted in the Adjacent Office. *Id.* at 5516. Bertoli's attorney stated the "suggestive sign" to which he had referred was "not specifically concerning Bertoli."[182] *Id.* Bertoli's counsel then stated he did not know whether Special Agent Cahill had maneuvered any Government witnesses into the Adjacent Office, or whether Special

---

181. The Cahill Subpoena was served later on 28 July 1994. *See* Trial Transcript at 5394.

182. When asked the basis for his belief that the "suggestive sign" and pictures existed, Bertoli's counsel at first stated he had "spoken to people who have made that representation...." Trial

Transcript at 5516. When advised he would, at some point, have to substantiate the existence of the sign and the pictures, Bertoli's counsel recanted and stated only one person had advised him of the existence of the sign and pictures. *Id.* at 5517.

Agent Cahill placed the pictures or the sign in the Adjacent Office. *Id.* at 5518, 5522.

When asked if there was anything else he wished to proffer with regard to Special Agent Cahill's testimony, Bertoli's counsel stated:

I'd like to ask [Special Agent] Cahill about his conversations with and interviews with Mr. Foti,[183] the numbers of times he spoke with Mr. Foti, the subject matter of their conversations. I'd like to learn how it is that . . . Foti testified as he did and the history of his cooperation with the Government. . . . I'd like to know what was discussed with . . . Foti by either [Special] Agent Cahill or others who [Special Agent] Cahill may identify so that a witness like Foti might come in believing that if he implicates . . . Bertoli, it will help him at the time that he is sentenced. . . . If your Honor is suggesting that well, it's a fishing expedition, it is true. . . .

*Id.* at 5523.

Upon being informed this proffer was also vague, Bertoli's counsel stated: "I want to put [Special Agent] Cahill on to show how it is that Foti's testimony may have been influenced in a way that resulted in untruthful testimony." *Id.* at 5525. When asked to provide a proffer as to Special Agent Cahill's improper influence on Foti, Bertoli's attorney referred only to Foti's agreement to cooperate with the Government and his testimony against Bertoli. *Id.*

Bertoli's counsel then made a third proffer with regard to Special Agent Cahill's testi-mony. Bertoli's counsel stated he believed Special Agent Cahill had improperly influenced the testimony of Foster. As the basis for this belief, Bertoli's counsel pointed only to the fact that Foster "did not become an active cooperator against . . . Bertoli until long after his initial interviews with the Government and just prior to trial."[184] *Id.* at 5530. Bertoli's counsel stated he wished to "explore the genesis of . . . Foster's recollection concerning [his testimony against Bertoli]." *Id.*

Bertoli's counsel then argued that the vagueness of his proffers should be excused because he did not interview Special Agent Cahill. Bertoli's counsel stated:

There are times during the presentment of a defense case here, unfortunately, you have to call a witness based on certain other facts which may create a reasonable inference, but don't provide the kind of hard evidence that would have been provided had I been able to interview a [Special Agent] Cahill or other people.

*Id.* at 5531–32.

The Government argued the proffers of Bertoli's counsel did not establish a good faith basis on which to question Special Agent Cahill on the matters cited. *Id.* at 5531. The Government further argued that calling Special Agent Cahill for such purposes should be barred under Fed.R.Evid. 403 and 608(b). *Id.* at 5524, 5529. Upon consideration of the parties' arguments, the Cahill Subpoena was quashed. *Id.* at 5531.

**183.** Foti was a witness for the Government in its case against Bertoli. Foti was party to a cooperation agreement with the Government. During trial, Foti testified he had cooperation agreements with the United States Attorney's Office for the Southern District of New York (the "New York U.S. Attorney") and the United States Attorney's Office for the District of Utah (the "Utah U.S. Attorney"). Trial Transcript at 1574. The Government represented Foti did not have an agreement with the United States Attorney's Office for the District of New Jersey (the "New Jersey U.S. Attorney"). *Id.* at 5529. Bertoli has not disputed this representation.

**184.** It appears Bertoli's attorney was referring to Foster's late disclosure of the fact that Ebanks had destroyed records for Bertoli. During cross-examination, Foster testified he had been asked by Agent Cahill, in February 1993, whether Ebanks had destroyed records for Bertoli. Trial Transcript at 4763. Foster stated he did not answer at that time, but told Agent Cahill in early July 1993 that Ebanks had, in fact, destroyed records for Bertoli. *Id.* at 4764.

Asked to explain his delay in disclosing this information, Foster stated:

The reason is very simple. I have been holding out until the very last. This was, I know, a key piece of information that they required. I was always hesitant about calling [Ebanks'] name because I thought it would get him in trouble.

And there is also some self-interest in it, that if I had this piece of information . . . I would have a better chance of reducing [my] time [of incarceration].

*Id.*

In connection with his motion for bail pending appeal, Bertoli argues the quashal of the Cahill Subpoena constituted a violation of his right to compulsory process and, therefore, of his right to present a defense. *See* 19 Jan. 1994 Bertoli Brief at 20.

The Sixth Amendment provides, in relevant part: "In all criminal prosecutions, the accused shall enjoy the right ... to have compulsory process for obtaining witnesses in his favor." U.S. Const. Amend. 6. "The Supreme Court has extended the Compulsory Process [C]lause to cover a criminal defendant's right to present witnesses or evidence in his defense, 'even though [such a right] is not expressly described in so many words.'"[185] *Mills,* 956 F.2d at 445 (quoting *Taylor v. Illinois,* 484 U.S. 400, 409, 108 S.Ct. 646, 653, 98 L.Ed.2d 798 *reh'g denied,* 485 U.S. 983, 108 S.Ct. 1283, 99 L.Ed.2d 494 (1988)).

"Like many other constitutional rights, the right to call witnesses is not absolute." *Roussell v. Jeane,* 842 F.2d 1512, 1517 (5th Cir.1988); *see United States v. Valenzuela–Bernal,* 458 U.S. 858, 867, 102 S.Ct. 3440, 3446, 73 L.Ed.2d 1193 (1982); *Mills,* 956 F.2d at 446. "[T]he right to present relevant testimony ... 'may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.'" *Rock v. Arkansas,* 483 U.S. 44, 55, 107 S.Ct. 2704, 2711, 97 L.Ed.2d 37 (1987) (quoting *Chambers,* 410 U.S. at 295, 93 S.Ct. at 1045–46); *see Buie v. Sullivan,* 923 F.2d 10, 11 (2d Cir.1990) ("The right to present a defense, and its concomitant right to compulsory process, are not unqualified; they are subject to 'countervailing public interests,' such as the state's responsibility for arresting and prosecuting suspected criminals.").

For example, "[a] defendant's right to call witnesses ... must comply with established rules of evidence." *Person v. Meachum,* 772 F.Supp. 69, 75 (D.Conn.1991), *aff'd mem.,* 962 F.2d 1 (2d Cir.), *cert. denied,* — U.S. —,

113 S.Ct. 69, 121 L.Ed.2d 35 (1992); *see Taylor,* 484 U.S. at 410, 108 S.Ct. at 653–54 ("The accused does not have an unfettered right to offer testimony that is incompetent, privileged or otherwise inadmissible under standard rules of evidence."); *Chambers,* 410 U.S. at 302, 93 S.Ct. at 1049; *United States v. Davis,* 772 F.2d 1339, 1348 (7th Cir.) ("The Sixth Amendment does not make otherwise irrelevant evidence admissible."), *cert. denied,* 474 U.S. 1036, 106 S.Ct. 603, 88 L.Ed.2d 581 (1985). The right to compulsory process is also limited by the "legitimate interest in efficient trials." *Kaltenbach v. Breaux,* 690 F.Supp. 1551, 1555 (W.D.La.), *cert. denied sub nom., Kaltenbach v. Stalder,* 488 U.S. 930, 109 S.Ct. 318, 102 L.Ed.2d 336 (1988); *see Taylor,* 484 U.S. at 411, 108 S.Ct. at 654 ("The State's interest in the orderly conduct of a criminal trial is sufficient to justify the imposition and enforcement of firm ... rules relating to the ... presentation of evidence."); *Jordan v. Ducharme,* 983 F.2d 933, 938 (9th Cir.), *cert. denied,* — U.S. —, 114 S.Ct. 216, 126 L.Ed.2d 172 (1993).

"A mere showing by the accused that some relevant evidence was excluded is insufficient [to establish a violation of the right to compulsory process]; the accused must demonstrate that the testimony would have been both material and favorable to his defense." *United States v. Cruz–Jiminez,* 977 F.2d 95, 100 (3d Cir.1992) (citation omitted); *see Valenzuela–Bernal,* 458 U.S. at 867, 102 S.Ct. at 3446; *Mills,* 956 F.2d at 446. "Evidence is material only if there is a reasonable likelihood that the testimony could have affected the judgment of the trier of fact." *Cruz–Jiminez,* 977 F.2d at 100; *see Valenzuela–Bernal,* 458 U.S. at 867, 102 S.Ct. at 3446; *Mills,* 956 F.2d at 446. The accused must further demonstrate "the deprivation was arbitrary or disproportionate to any legitimate evidentiary or procedural purposes." *Cruz–*

---

**185.** As the Third Circuit has noted: "Some courts ... have analyzed the issue [of the accused's right to present a defense] under the [D]ue [P]rocess [C]lause rather than the [C]ompulsory [P]rocess [C]lause. There is apparently little, if any, difference in the analysis." *Government of Virgin Islands v. Mills,* 956 F.2d 443, 445

n. 4 (3d Cir.1992); *see Cikora v. Dugger,* 840 F.2d 893, 897 n. 4 (11th Cir.1988) ("[W]e believe that the standards for assessing the sixth amendment violation and a violation of due process itself are identical in context—a challenge to a trial court ruling excluding evidence or testimony.").

*Jiminez,* 977 F.2d at 100; *see Mills,* 956 F.2d at 446.

The right of compulsory process does not, therefore, entitle a defendant to subpoena witnesses whose testimony would be "collateral, rather than material, to the issues in the case." *United States v. Scopo,* 861 F.2d 339, 345 (2d Cir.1988) ("If the court could properly have excluded proffered testimony on the ground that the evidence was collateral, its refusal to subpoena witnesses who were to give that testimony cannot be deemed error."), *cert. denied,* 490 U.S. 1048, 109 S.Ct. 1957, 104 L.Ed.2d 426 (1989); *see United States v. North,* 910 F.2d 843, 890–91 (subpoena properly quashed where testimony sought would have been "unhelpful" to defense), *modified in part on other grounds,* 920 F.2d 940 (D.C.Cir.1990), *cert. denied,* 500 U.S. 941, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991); *United States v. Campbell,* 874 F.2d 838, 850–51 (1st Cir.1989) (no error in quashal of subpoena of Government informant where "his testimony could add nothing relevant and material to [the] defense"); *United States ex rel. Ashford v. Director, Illinois Dep't of Corrections,* 871 F.2d 680, 687 (7th Cir.1989) (trial court's refusal to allow defense to call prosecutor as witness was not error where "excluded testimony was not exculpatory"); *cf. Gay v. Petsock,* 917 F.2d 768, 772–73 (3d Cir.1990) (holding, in civil context, that subpoena may properly be denied where the proffered testimony would be inadmissible under Fed.R.Evid. 403).

Accordingly, "a defendant may compel the attendance of a witness only if he can 'make some plausible showing of how their testimony would [be] both material and favorable to his defense.'" *Campbell,* 874 F.2d at 851 (quoting *Valenzuela–Bernal,* 458 U.S. at 867, 102 S.Ct. at 3446). "When the record is devoid of such factual proof, a court is within its discretion in denying defense requests for the presentation of [that witness]." *United States v. Tanner,* 941 F.2d 574, 586 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1190, 117 L.Ed.2d 432 (1992). "Determinations of relevance and materiality [in this context] are entrusted to the sound discretion of the trial judge." *United States v. Caming,* 968 F.2d 232, 238 (2d Cir.), *cert.*

*denied,* —— U.S. ——, 113 S.Ct. 416, 121 L.Ed.2d 339 (1992); *see United States v. Weisman,* 858 F.2d 389, 392, *reh'g denied en banc,* 1988 U.S.App. LEXIS 15,951 (8th Cir. 1988), *cert. denied,* 489 U.S. 1071, 109 S.Ct. 1353, 103 L.Ed.2d 820 (1989); *United States v. Ebner,* 782 F.2d 1120, 1126 (2d Cir.1986).

A defendant does not establish the materiality of a witness's testimony by a proffer which raises "only speculation concerning the possible testimony" of the witness. *Tanner,* 941 F.2d at 585. "Moreover, that a defendant may not be able to detail the lost testimony because he was unable to interview witnesses does not relieve him of the duty to make some showing of materiality." *Campbell v. Klevenhagen,* 760 F.Supp. 1206, 1214 (S.D.Tex.1991); *see Valenzuela–Bernal,* 458 U.S. at 873, 102 S.Ct. at 3449–50 (deportation of witness by Government, so that defendant was deprived of opportunity to interview witnesses, does not relieve defendant of requirement of showing materiality of witnesses' testimony). The right to compulsory process "does not conceive the right to grant investigative services or to enforce interviews with defense counsel under the guise of a trial subpoena...." *Campbell,* 760 F.Supp. at 1214.

■ A witness's testimony will not be material where the witness has no personal knowledge of the facts to which he or she is intended to testify. *See Caming,* 968 F.2d at 238 (subpoena properly quashed where witness "'kn[e]w nothing about the underlying transactions' [and] had 'no personal knowledge of any of the underlying facts'"); *Tanner,* 941 F.2d at 585 (no violation of right to compulsory process where "the potential witness could not have provided personal observations concerning relevant and material evidence").

■ A witness's testimony, moreover, will not be material where it would merely be cumulative or repetitive of other evidence in the case. *See Weisman,* 858 F.2d at 392 ("The record sufficiently supports the District Court's denial of [defendant's] request for subpoenaing the two witnesses, because their testimony would have been repetitive and cumulative."); *Roussell,* 842 F.2d at 1516 ("[A] defendant is not entitled [by his right of

compulsory process] to burden the proceedings with cumulative testimony."); *see also Valenzuela–Bernal,* 458 U.S. at 873, 102 S.Ct. at 3449–50 ("Sanctions may be imposed on the Government for deporting witnesses only if the criminal defendant makes a plausible showing that the testimony of the deported witnesses would have been material ... in ways not merely cumulative to the testimony of available witnesses."); *Perry v. Lockhart,* 871 F.2d 1384, 1388 (8th Cir.) (trial court's refusal to subpoena witness did not violate right to compulsory process where witness's testimony was weaker repetition of other testimony in case), *cert. denied,* 493 U.S. 959, 110 S.Ct. 378, 107 L.Ed.2d 363 (1989).

Similarly, testimony is not material where it would not "materially differ from that which [the defendant] had the opportunity to elicit" at trial. *Claudio v. Scully,* 982 F.2d 798, 806 (2d Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2347, 124 L.Ed.2d 256 (1993); *see Buie,* 923 F.2d at 11 (Compulsory Process Clause not violated unless excluded evidence was "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means").

■ Applying these principles to the facts at bar, it is apparent the quashal of the Cahill Subpoena was proper and did not violate Bertoli's right to compulsory process or to present a defense. Bertoli's counsel himself stated the Cahill Subpoena was "a fishing expedition." Trial Transcript at 5523. As stated, the right of compulsory process is not to be used as a guise for a discovery device. *See Campbell,* 760 F.Supp. at 1214.

Bertoli's counsel stated he sought to subpoena Special Agent Cahill to prove he induced Government witnesses to testify "in a way contrary to the facts." Trial Transcript at 5511. Bertoli's counsel did little, however, to substantiate these vague allegations. Bertoli's counsel stated he "believed" certain pictures of Bertoli and a "suggestive sign" were placed in the Adjacent Office. *Id.* at 5515. However, Bertoli's counsel himself conceded the sign was "not specifically concerning Ber-

toli." *Id.* at 5516. There was significant doubt, therefore, that Special Agent Cahill's testimony regarding the pictures and the sign would have been material to Bertoli's case. *See Scopo,* 861 F.2d at 345.

Any indication that such testimony would have been material was rank speculation on the part of Bertoli's counsel. Bertoli's counsel was unable to detail the substance of the sign or the way in which it was "suggestive." Bertoli's counsel was able to offer no more than his "belie[f]" that interviews with Government witnesses had even taken place in the Adjacent Office; he offered no facts regarding the way in which any witnesses were biased by the pictures or the sign. Trial Transcript at 5516. Moreover, Bertoli's counsel could not state whether Special Agent Cahill had any personal knowledge regarding the existence or substance of the pictures or sign. *Id.* at 5518, 5522 (Bertoli's counsel stated he did not know whether Special Agent Cahill had maneuvered any Government witnesses into the Adjacent Office or whether he had placed the pictures or sign in the office). Bertoli's attorney could not, therefore, make the required showing that Special Agent Cahill could have "provided personal observations concerning relevant and material evidence." *Tanner,* 941 F.2d at 585. Because Bertoli's proffer regarding the pictures and sign involved "only speculation concerning the possible testimony" of Special Agent Cahill, that proffer did not establish the materiality of Special Agent Cahill's testimony. *Id.*

Bertoli had adequate opportunity to develop his 'inducement' theory during his cross-examination of the Government's witnesses. During his proffer, Bertoli's counsel identified three Government witnesses whom he "believe[d]" Special Agent Cahill had improperly influenced during interviews. These were Bynum Vickory ("Vickory"), Norman L. Vance ("Vance") and John Kevorkian ("Kevorkian"). Trial Transcript at 5512. Bertoli was given considerable leeway in his cross-examination of these witnesses and was able to do so extensively and thoroughly.[186]

---

**186.** Bertoli's cross- and recross-examination of the Government's witnesses totalled 1406 pages of the Trial Transcript.

During Bertoli's cross-examination of Vickory, he questioned Vickory extensively concerning his interviews with the Government. Vickory was, in fact, asked whether the Government showed him any photographs of Bertoli. *Id.* at 3288. Vickory answered: "No, they did not." *Id.*

Bertoli also thoroughly questioned Vance on the subject of his meetings with Special Agent Cahill. *Id.* at 4012–15. During his cross-examination of Vance, Bertoli was able to explore in depth the issues of the conversations between Special Agent Cahill and Vance and the documents shown to Vance by Special Agent Cahill and other Government agents. *Id.* at 4012. Vance did not indicate any inducement of the type referred to by Bertoli's attorney in his proffer.

Bertoli's cross-examination of Kevorkian was equally thorough. Bertoli questioned Kevorkian extensively regarding the length and content of his interviews with the Government. *Id.* at 4101. Bertoli obtained an admission from Kevorkian that the Government "went over the questions and answers that [Kevorkian] testified to." *Id.* Kevorkian, like Vickory and Vance, gave no indication that an agent of the Government had induced false testimony.

Ostensibly, these witnesses' impressions regarding the Government's influence over their testimony were far more relevant and material than those of Special Agent Cahill; it is the state of mind of the Government's witnesses that was material to Bertoli's defense and not that of Special Agent Cahill. Because the information sought from Special Agent Cahill was obtainable from these other witnesses, the Cahill Subpoena was not necessary to preserve Bertoli's right of compulsory process. *See Buie,* 923 F.2d at 11.

It appears Bertoli sought the testimony of Special Agent Cahill for the purposes of putting the Government's conduct on trial and diverting attention from his own conduct. As stated, the issue of prosecutorial motive or misconduct was an improper one for the jury to consider. *See supra,* at 237. Because Special Agent Cahill's testimony regarding the pictures and sign would have been of slight, if any, probative value and would have caused substantial "confusion of the issues, ... undue delay [and] waste of time," it was inadmissible pursuant to Fed. R.Evid. 403.

Bertoli argues Special Agent Cahill's testimony was relevant to prove the "bias" of certain witnesses. 19 Jan. 1994 Bertoli Brief at 22, 24. "The district court, however, retains discretion to impose reasonable limits on defense counsel's inquiry into the potential bias of a [G]overnment witness where there is a concern about the harassment, prejudice, confusion of the issue, the witnesses' safety, or interrogation that is repetitive or only marginally relevant." *United States v. Beros,* 833 F.2d 455, 465 (3d Cir.1987). In the instant circumstances, this discretion was properly exercised.

During his proffer, as stated, Bertoli's attorney also asserted Special Agent Cahill's testimony was necessary to show the testimony of Foti was improperly influenced by Special Agent Cahill. As with his first proffer, the assertions of Bertoli's attorney regarding Special Agent Cahill's influence over Foti were vague and speculative. Bertoli's counsel was unable to state or suggest the manner in which Special Agent Cahill had influenced Foti's testimony. Rather, Bertoli's counsel stated he would "like to learn" how Foti was influenced and would "like to know what was discussed with ... Foti" by Special Agent Cahill. Trial Transcript at 5523. The right of compulsory process is not the proper vehicle for an inquiry which was conceded by Bertoli's attorney to be a "fishing expedition." *Id.* at 5523; *see Tanner,* 941 F.2d at 585; *Campbell,* 760 F.Supp. at 1214.

Bertoli's counsel stated he wished to question Special Agent Cahill concerning the details of the Government's cooperation agreement with Foti. *See* Trial Transcript at 5525. However, Bertoli's counsel could only speculate as to whether Special Agent Cahill had personal knowledge regarding this agreement and whether such knowledge would be helpful to Bertoli. *Id.* at 5523. It appears, in fact, that any information regarding the agreements between Foti and the Government was collateral, and not material, to Bertoli's case. As indicated, Foti's cooper-

ation agreements were with the New York U.S. Attorney and the Utah U.S. Attorney, not with the New Jersey U.S. Attorney. *See id.* at 5529. Foti did not have an agreement with the office prosecuting Bertoli. *Id.* Therefore, Foti's cooperation agreements had little, if any, bearing on the veracity of his testimony in the instant proceedings.

Foti, moreover, was extensively cross-examined regarding his cooperation agreements with the Government. Bertoli's cross-examination of Foti spanned most of a day of trial and filled 98 pages of the Trial Transcript. During this time, Foti testified in great detail concerning his cooperation agreements and discussions with the Government. *See* Trial Transcript at 1573–1605. Foti's two plea agreements with the New York U.S. Attorney were introduced and received into evidence. *Id.* at 1597–98. Bertoli's counsel offered no basis to believe Special Agent Cahill's testimony would have varied from this evidence. In light of the extensive evidence in the record concerning Foti's agreements and discussions with the Government, any testimony by Special Agent Cahill regarding such agreements and discussions would have been cumulative and repetitive. *See Weisman,* 858 F.2d at 392.

Because Special Agent Cahill's testimony regarding the Government's cooperation agreements with Foti would have been of marginal probative value and would have caused "undue delay, waste of time [and] needless presentation of cumulative evidence," such testimony was inadmissible under Fed.R.Evid. 403. This is so even though Bertoli argues such testimony was offered in support of proving "bias" on the part of Foti. *See Beros,* 833 F.2d at 455.

Bertoli's counsel also argued Special Agent Cahill's testimony was necessary to prove Special Agent Cahill had improperly influenced the testimony of Foster. Trial Transcript at 5530. However, as support for this argument, Bertoli's counsel could offer only baseless speculation that Special Agent Cahill had influenced Foster's testimony. Specifically, Bertoli's counsel based his belief

that Special Agent Cahill had influenced Foster solely on the late date upon which Foster "became an active cooperator against ... Bertoli...." Trial Transcript at 5530.

The mere fact that Foster decided to cooperate with the Government "just prior to trial" clearly does not establish a good faith basis for asserting Special Agent Cahill had improperly influenced Foster to testify. *Id.* Bertoli's attorney in effect conceded he was using the Cahill Subpoena as a discovery device when he stated he wished to "explore" the issue of Special Agent Cahill's influence over Foster. *Id.* As indicated, the right of compulsory process is not properly used as an "investigative service[ ] or to enforce interviews with defense counsel...." *Campbell,* 760 F.Supp. at 1214.

Foster, moreover, was extensively cross-examined regarding his arrangement with the Government and his discussions with Special Agent Cahill. Foster admitted his cooperation with the Government in Bertoli's case would entitle him to a reduction in his sentence pursuant to Fed.R.Crim.P. 35(b).[187] Trial Transcript at 4757. Foster further testified in depth regarding the contents of his conversations with Special Agent Cahill; no improper influence was even suggested. *Id.* at 4758–68. It was, in fact, revealed that most of Foster's requests for incentives to cooperate were rejected by Special Agent Cahill. *Id.* at 4761 (Foster: "Subsequent to that first meeting, I discussed certain things with [Agent] Cahill and most of the things I asked was [*sic*] refused.").

Foster also fully explained why he had refrained from disclosing Ebanks' destruction of records until July 1993. Foster stated he withheld the information to protect Ebanks and to ensure he would obtain a reduced sentence from the disclosure of this information. *Id.* at 4764. In spite of extensive cross-examination on the subject by Bertoli, including some highly suggestive questions, Foster's testimony did not contain the slightest indication that Special Agent Cahill had improperly influenced him to testify. *Id.* at 4764–68. During his proffer, Bertoli's

---

**187.** Rule 35(b) provides that, "upon a motion of the Government," the court "may reduce a sentence to reflect a defendant's subsequent, substantial assistance in the investigation or prosecution of another person who has committed an offense...." Fed.R.Crim.P. 35(b).

counsel offered no reason to suggest Special Agent Cahill's testimony regarding his conversations with Foster would differ from Foster's extensive testimony on the subject.

As stated, there was no indication Special Agent Cahill's testimony concerning his discussions with Foster would be probative of Foster's asserted "bias" or of any other issue relevant to Bertoli's defense. In light of this fact, and because such testimony would be cumulative and repetitive, Special Agent Cahill's testimony on this subject was inadmissible. *See* Fed.R.Evid. 403; *Beros*, 833 F.2d at 465.

The testimony of Special Agent Cahill would not have been material to Bertoli's case. *See Campbell*, 874 F.2d at 851. Any suggestions to the contrary made by Bertoli's counsel consisted purely of speculation.[188] *See Tanner*, 941 F.2d at 585. Finally, Special Agent Cahill's testimony, as proferred by Bertoli's attorney, would have been inadmissible under Fed.R.Evid. 403. Under these circumstances, Bertoli was not entitled by his right of compulsory process to subpoena Special Agent Cahill; the Cahill Subpoena was properly quashed.

3. *Motion to Preclude Bertoli From Presenting Any Evidence That Charges Were Dismissed in This Case*

■ On 24 March 1993, the Government moved to preclude Bertoli from presenting any evidence that charges were dismissed in this case.[189] Government Second Preclusion Brief at 1–3. According to the Government, "such evidence [was] not relevant to the charges for which Bertoli [stood] trial" and was inadmissible under Fed.R.Evid. 401. Government Second Preclusion Brief at 1–2.

Fed.R.Evid. 402 provides that "[e]vidence which is not relevant is inadmissible." *Id.* Relevant evidence is defined by Fed.R.Evid. 401 as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." *Id.*

As the Government argued, and as Bertoli failed to contradict, the only relevant evidence in this case was that evidence which related to the charges for which Bertoli was tried. The fact that the Government chose to dismiss certain charges against Bertoli was of *no consequence* because it did not make the existence of any relevant fact more or less probable.

The Government argued that there appeared to be no case law dealing with this particular situation. *See* Government Second Preclusion Brief at 2. Nevertheless, as the Government pointed out, the standard practice during a jury charge is to instruct the jury to disregard any dismissed charges and evidence pertaining to those charges. *See id.* at 2–3 (citing Sand, Siffert, *Modern Federal Jury Instructions* ¶ 2.01, at 2–41). Accordingly, there was no reason to allow Bertoli to submit evidence on this issue.

The motion to preclude Bertoli from submitting evidence that charges were dismissed in this case was granted on 28 May 1993. *See* 28 May 1993 Tr. at 21.

4. *Motion to Preclude Bertoli From Introducing Evidence That Certain Government Witnesses Used Narcotics or Alcohol*

■ On 13 July 1993, the Government sought to preclude Bertoli from questioning witness Kevorkian about prior narcotics and alcohol use.[190] *See* Trial Transcript at 3875–

---

**188.** As indicated, the failure of Bertoli's counsel to interview Special Agent Cahill does not excuse the vague and speculative nature of his proffers. *See Campbell*, 760 F.Supp. at 1214. The right of compulsory process is not a vehicle for the conducting of witness interviews. *Id.*

**189.** In support of this motion, the Government submitted the following: Government's Memorandum of Law in Support of its Motion to Preclude Defendant Bertoli From Presenting Any Evidence That Charges Were Dismissed in This

Case (the "Government Second Preclusion Brief").

Bertoli made no submissions in connection with this motion.

**190.** In connection with this motion, the Government submitted the following: Letter, dated 14 June 1993 (the "14 June 1993 Government Letter"); Letter, dated 12 July 1993 Letter (the "12 July 1993 Government Letter").

Bertoli apparently made no written submission with regard to this motion.

77. In the 12 July 1993 Government Letter, the Government indicated Kevorkian had been involved in the following instances of drug and alcohol use:

(1) On 22 May 1984, Kevorkian pleaded guilty in Suffolk County, New York to operating a vehicle while impaired by alcohol and operating a vehicle while impaired by drugs; Kevorkian was fined $250.00 on the first charge and sentenced to three years probation on the second charge;

(2) On 19 December 1984, Kevorkian pleaded guilty in Nassau County, New York to operating a motor vehicle under the influence of drugs, operating a vehicle while his driver's license was suspended and operating a motor vehicle under the influence of drugs; Kevorkian was fined a total of $900.00 and was incarcerated for eight months;

(3) From the early 1980s to 1986 or 1987, Kevorkian used cocaine four to five times monthly, but never while working at the trading desk at G.K. Scott;

(4) From 1980 to 1984, Kevorkian used prescription quaaludes (not illegally) three to four times weekly, but never while working on the trading desk of G.K. Scott.

12 July 1993 Government Letter at 1–2.

Fed.R.Evid. 608(b) provides in pertinent part:

Specific instances of conduct of a witness, for the purpose of attacking ... the witness' credibility, other than conviction of a crime as provided in rule 609, may *not* be proved by extrinsic evidence.

*Id.*

The Third Circuit has construed Rule 608(b) "as requiring the exclusion of extrinsic impeachment evidence concerning a witness' prior instances of conduct." *United States v. McNeill*, 887 F.2d 448, 453 (3d Cir.1989), *cert. denied*, 493 U.S. 1087, 110 S.Ct. 1152, 107 L.Ed.2d 1055 (1990); *see also United States v. Agnes*, 753 F.2d 293, 304–05 (3d Cir.1985); *United States v. Herman*, 589 F.2d 1191, 1196–97 (3d Cir.1978), *cert. de-*

*nied*, 441 U.S. 913, 99 S.Ct. 2014, 60 L.Ed.2d 386 (1979).

Rule 608(b) has its exceptions:

[Specific instances of conduct] may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness. . . .

Fed.R.Evid. 608(b). As the Circuit has cautioned, however, "there may be cross-examination *only* if the trial court determines that the conduct is probative of a witness's truthfulness or untruthfulness." *McNeill*, 887 F.2d at 453. Such a determination is within the discretion of the trial court. *Id.*

■ As a general rule, prior drug use is not probative of a witness's truthfulness or untruthfulness. *See United States v. Sellers*, 906 F.2d 597, 602 (11th Cir.1990); *United States v. McDonald*, 905 F.2d 871, 875 (5th Cir.), *cert. denied*, 498 U.S. 1002, 111 S.Ct. 566, 112 L.Ed.2d 572 (1990); *United States v. Rubin*, 733 F.2d 837, 841–42 (11th Cir.1984). Exceptions to this rule exist under two circumstances.

First, an exception exists when the drug use occurred while the witness was in a cooperative relationship with the Government *and* the Government was contemplating prosecution for that use or at least was aware of the drug use. *See United States v. Atherton*, 936 F.2d 728, 733 (2d Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1187, 117 L.Ed.2d 429 (1992); *United States v. Capozzi*, 883 F.2d 608, 616, *reh'g denied en banc*, 1989 U.S.App. LEXIS 15,565 (8th Cir. 1989), *cert. denied*, 495 U.S. 918, 110 S.Ct. 1947, 109 L.Ed.2d 310 (1990); *United States v. Noti*, 731 F.2d 610, 612–23 (9th Cir.1984).

Second, an exception exists when the drug use occurred during "relevant periods of trial and the transaction charged in the indictment," thereby affecting the witness' ability to perceive the underlying events and to testify lucidly at trial. *See Sellers*, 906 F.2d at 602; *see also Jarrett v. United States*, 822 F.2d 1438, 1446 (7th Cir.1987).

Nothing in the record in this case supported allowing Bertoli to inquire into the former drug and alcohol use of Kevorkian.

For instance, at trial, Bertoli conceded that the alcohol-related incidents involving Kevorkian were not relevant to the issues in the case. *See* Trial Transcript at 3875–76. Bertoli also conceded that, because Kevorkian's drug-related offenses resulted in misdemeanor convictions, evidence thereof was not admissible pursuant to Fed.R.Evid. 609.[191] *See* Trial Transcript at 3876.

With regard to Kevorkian's use of cocaine and quaaludes, Bertoli was permitted to *voir dire* Kevorkian, outside of the presence of the jury, prior to his testimony. *See id.* at 4040–41. The Trial Transcript reveals the following *voir dire:*

> BERTOLI: I'm going to ask you a few preliminary questions. It's been represented to me that on the average you used cocaine four to five times a month in the early 80s, ending approximately 1987.... Is that correct?
>
> KEVORKIAN: That's correct.
>
> BERTOLI: It's also been represented to me that you never used it while working on the trading desk of G.K. Scott. Is that correct?
>
> KEVORKIAN: That is correct.
>
> BERTOLI: Have you used any sort of drug within the past week?
>
> KEVORKIAN: No.
>
> BERTOLI: And with regard to quaaludes, from approximately 1980 to 1984, it's been represented that you used those three to four times a week. Is that correct?
>
> KEVORKIAN: Yes.
>
> BERTOLI: Is it correct that you did not use those while at the trading desk at G.K. Scott?
>
> KEVORKIAN: That's correct.
>
> COURT: Anything further, Mr. Bertoli?

> BERTOLI: No.
>
> *Id.*

The *voir dire* of Kevorkian confirmed that which had already been represented by the Government—specifically, Kevorkian had not used cocaine or quaaludes while on the job at G.K. Scott or within his recent history. *See* 14 June 1993 Government Letter at 4; 12 July 1993 Government Letter at 2–3. Accordingly, there was nothing to indicate impairment of Kevorkian's ability to perceive underlying events or to testify lucidly at trial. Based upon this *voir dire,* as well as on the case law discussed above, it was concluded that cross examination regarding Kevorkian's drug use was prohibited. *See* Trial Transcript at 4041. Bertoli eventually concurred in this ruling. *See id.*

### F. Post–Trial Proceedings

#### 1. Bertoli's Motions for a New Trial Based on Allegations of Juror Misconduct During Trial

Bertoli twice moved for a new trial on the basis of alleged juror misconduct during trial. The first motion was made during the trial, *see* Trial Transcript at 6765, and the second was a post-trial motion based on purported new evidence.[192] Both motions were based on the following incident.

On 10 August 1993, after a ten-week trial, Bertoli and the Government completed their closing arguments. At the close of summations, court recessed for the day with the following instruction to the jury:

> As I cautioned you yesterday, I indicated you should not discuss or deliberate [on] this matter. Although you heard the summations of the attorneys, you've not had the benefit of my charge and I direct that you should not begin deliberations in any

---

**191.** Fed.R.Evid. 609(a) provides:

For the purpose of attacking the credibility of a witness, (1) evidence that a witness other than an accused has been convicted of a crime shall be admitted, subject to Rule 403, if the crime was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted....

Fed.R.Evid. 609(a). Because, by definition, a misdemeanor is a crime punishable by less than one year, Rule 609(a) was not applicable to the convictions of Kevorkian.

**192.** In support of this motion, Bertoli submitted: Memorandum of Law in Support of Motion for a New Trial, dated 19 January 1994 (the "Bertoli New Trial Brief").

In opposition to the motion, the Government submitted: Government's Memorandum of Law in Opposition to Defendant Bertoli's Motion for a New Trial, dated 11 February 1994 (the "Government Brief in Opposition to a New Trial").

way until you've had the benefit of my charge and you're all together in the jury-room.

Trial Transcript at 6704–05.

The next day, 11 August 1993, the charge was given to the jury. Part way through the jury charge, a fifteen minute recess was taken. *Id.* at 6759. Before recessing the jury, the jury was instructed: "You are not, and I underscore, you are not to begin any deliberations. I've not completed my charge." *Id.* During the recess, one of the jurors ("Juror Six")[193] communicated to the court that an alternate juror, in apparent disregard of repeated instructions to the contrary, had mentioned something to her about the case. *Id.* at 6760. So as not to elicit a discussion of jury deliberations,[194] Juror Six was immediately instructed not to relate the substance of what was said by the alternate and told to wait in the juryroom. *Id.*

Outside the presence of the jury, counsel for both sides were told what had happened. *Id.*

> THE COURT: As I was walking out, one of the jurors mentioned to me that an alternate mentioned something to her about the case. I said I don't want to know about it.
>
> I asked her whether it affected her in any way and she said no.
>
> She said that a few of the other jurors have mentioned something about the case and she did not want to know about it.
>
> I'll call her out here. I'm going to ask her not to go into the substance of it, but ask her if more than one person mentioned something to her [and] if it affected her ability to be fair and impartial. And I'm going to find out who mentioned something to her, if they expressed any opinion one way or another, without her revealing what the opinions were. If they did, I'm going to excuse those jurors.

*Id.* There was no objection to this proposed course of action.

Juror Six was called into the courtroom and asked whether what she had been told by the alternate had affected her ability to be fair and impartial. *Id.* at 6760–61. Juror Six responded: "I do not think so. In fact, I'm sure it has not." *Id.* at 6761. The court, again making clear Juror Six was not to relate the substance of what she had been told, asked Juror Six to name the alternate who had made the statement. *Id.* Juror Six answered, "Number 13." *Id.* When asked whether anyone else had mentioned the case, Juror Six answered that alternate jurors numbers fourteen and fifteen had also made statements to her. *Id.* Juror Six was then instructed to "go back in the juryroom and do not mention ... this to anybody." *Id.*

After Juror Six had returned to the juryroom, alternate jurors numbers thirteen, fourteen and fifteen (collectively, the "Alternate Jurors")[195] were called into the courtroom one at a time and individually questioned about what had happened. Each Alternate Juror was asked whether he or she had spoken to anyone other than Juror Six about the case. *Id.* at 6762–65. The Alternate Jurors answered that they had not made statements about the case to anyone other than Juror Six. At the conclusion of questioning, each of the Alternate Jurors was excused from the case. *Id.* at 6763–65.

After the Alternate Jurors had been excused, counsel for Bertoli stated: "[B]ased on all this, we would make a mistrial motion and also ask alternatively that other jurors be asked similar questions and alternatively, that [Juror Six] be excused." *Id.* at 6765. The court denied the motions, stating:

> [Juror Six] has expressed to me her ability to be fair and impartial and I'm satisfied she can be ... that.

---

193. Because this opinion is intended for publication, Juror Six's name is withheld in the interest of her privacy.

194. Pursuant to Federal Rule of Evidence 606(b), no inquiry is allowed into the jury's process of arriving at a verdict. *See* Advisory Committee Notes to Rule 606(b); *Tanner v. United States*, 483 U.S. 107, 120, 107 S.Ct. 2739, 2747–48, 97

L.Ed.2d 90 (1987); *United States v. Gilsenan*, 949 F.2d 90, 95–96 (3d Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 2971, 119 L.Ed.2d 590 (1992).

195. Because this opinion is intended for publication, the name of the Alternate Jurors are withheld in the interest of their privacy.

Th[ere] is no outside influence that occurred here.... I'm doing this in an abundance of caution....

I've instructed her, as you heard, not to reveal what the comments were [and] I've instructed [the Alternate J]urors to be excused as alternates. They're not even deliberating jurors at this point because nobody's become disabled or sick.

*Id.*

Counsel for Bertoli then stated he wanted additional questioning of the Alternate Jurors and Juror Six so as to be better able to "assess whether or not the[ ] comments could have an influence on Juror Six...." *Id.* at 6816. In response, the court stated it would "*in camera* ask each of them what they said and seal it, so the Circuit has it." *Id.* at 6817. Significantly, neither Bertoli nor his counsel objected to the course of action proposed by the court. Nor did Bertoli or his counsel request to be present during the *in camera* questioning of the jurors.

During the next recess, Juror Six and the Alternate Jurors were called into chambers individually to again discuss what had happened. Counsel were not present during this discussion, but the interviews were transcribed. *See* Trial Transcript at 6821–33. The transcript of those discussions was set aside.[196]

First, alternate juror number thirteen ("Alternate Juror Thirteen") was called into chambers. Alternate Juror Thirteen was asked whether he had expressed an opinion of guilt or innocence to Juror Six. *Id.* at 6821. He denied he had made any statement about the case to Juror Six or anyone else. *Id.* Alternate Juror Thirteen was visibly upset and expressed his concern about being excused from the case.[197] *See id.* at 6921–22, 6824–25. Alternate Juror Thirteen contended it was Juror Six who had made a statement to him about the case rather than the other way around. *Id.* at 6823.

The two remaining Alternate Jurors were then called into chambers one at a time and questioned again about the incident. *Id.* at 6826. When asked whether anyone had made any statements to them about guilt or innocence in this case, they each responded, "No." *Id.*

Next, Juror Six was called into chambers and questioned. She again assured the court she remained fair and impartial. *Id.* at 6826–27. Juror Six also stated none of the jury members had begun deliberations. *Id.* She was then sent back to the jury room.

After questioning all four jurors for the second time, the following findings were made:

I'm satisfied at this point that [the Alternate Jurors] don't have any feeling of guilt or innocence.

I'm satisfied that [Juror Six] has not prejudged the case, has not deliberated, ha[s] not done anything improper....

I'm further satisfied that at best, if there's been any comment, it may have been sporadic comments on individual witnesses or individual presentation of the evidence....

I'm satisfied beyond [any] doubt the jury has not begun deliberations.

I'm satisfied beyond any doubt no one in that juryroom ha[s] made any determination as to guilt or innocence.

*Id.* at 6827–28.

It was determined the accusation by Alternate Juror Thirteen that Juror Six had formed a premature opinion and made a comment about the case was not credible. The determination was based on the evaluation of the demeanor and credibility of all four jurors upon questioning and from general observation of the jury throughout the ten-week trial. The fact that Alternate Juror Thirteen appeared visibly upset about being excused and blamed Juror Six for what had

---

**196.** During a telephone conference on 17 December 1993, counsel for Bertoli requested a copy of the transcript of the *in camera* discussion with the jurors. That request was granted.

**197.** In fact, Alternate Juror 13 was so upset about being excused from the case, courtroom security officers, without the court's knowledge, posted themselves outside of chambers during the questioning of that juror. Trial Transcript at 6830.

happened was also taken into consideration.[198]

> THE COURT: [Alternate Juror Thirteen] was clearly upset this morning and it seemed ... that he was venting his anger because he assumed that [Juror Six] was accusing him of doing something wrong....
>
> \* \* \* \* \* \*
>
> I'm ... satisfied that [Alternate Juror Thirteen] was really upset with [Juror Six], ... and I'm satisfied that the comments he attributed to [Juror Six] are [in]accurate. I think [his] comments [are] more out of pique than out of accuracy.

*Id.* at 6831, 6827–28. Juror Six, on the other hand, "was cool, calm and deliberate in her response...." *Id.* at 6830. In addition, Juror Six's version of what had happened was corroborated by the other two Alternate Jurors who "were very strong in their statement that [Juror Six] did not say anything to them." [199] *Id.* at 6832; *see also id.* at 6831–33.

It was determined, based on the observation of Juror Six throughout the ten-week trial, that the statement Alternate Juror Thirteen sought to attribute to Juror Six was wholly out of character for her.

> THE COURT: [T]he language [Alternate Juror Thirteen] attributes to [Juror Six] just does not fit. I have had the opportunity to conduct a jury selection in which she was involved and I've had the opportunity to see her on a daily basis for the last two months.... [A]lthough I've not had any discussion with her, I am satisfied she is not the type of person who would use the language [Alternate Juror Thirteen] quotes her as using. It just does not fit.

*Id.* at 6833.

It was also noted that, given the dedication demonstrated by the jury throughout the case, if Juror Six had made any statements about guilt or innocence, one of the other jurors certainly would have reported it. *Id.* at 6831–32; *see also id.* at 6829–30. Accordingly, it was determined there was no need to excuse Juror Six despite the fact that excusing her would be an "easy answer" because there were "plenty of [alternate] jurors to replace her," even after excusing the three Alternate Jurors. *Id.* at 6830.

> THE COURT: I am ... satisfied beyond any doubt that [Juror Six] is a fair, impar-

198. The Bertoli New Trial Brief twice states that the apparent source of concern for Alternate Juror Thirteen was the fact that he and the other two alternate jurors are African–American while Juror Six is white. *Id.* at 7, 17. This proffered explanation as to why Alternate Juror Thirteen was upset is wholly unsupported by the record and directly inconsistent with the specific finding that Alternate Juror Thirteen was upset about being excused from his duties as a juror. The statements are an unsupported and baseless attempt to complicate the case by unreasonably suggesting the existence of a racial element.

The attempt to inject a racial element into this case is but one example of the baseless contentions in the Bertoli New Trial Brief. Counsel also suggests the court engaged in numerous "undisclosed substantive communications [with] the jurors." *Id.* at 8 n. 2. The allegation is purportedly based on the following statement by the court:

> I'm not sure what happened between [Juror Six] and the [Alternate Jurors], but it is clear that [Alternate Juror Thirteen] was visibly upset with [Juror Six] this morning. In point of fact, my courtroom deputy, told me that one of the courtroom security officers came [and

stood] outside [of chambers], I didn't know he was here, because it was so obvious [Alternate Juror Thirteen] was upset. Apparently there was some other disagreement, which I'm satisfied had nothing to do with this case.

Trial Transcript at 6830. The suggestion that the court engaged in undisclosed *ex parte* communications with the jury is baseless and plainly wrong. This is particularly clear in light of the scrupulous care with which the court conveyed all of the communications addressed to it from the jury, including the report from Juror Six. *See, e.g., id.* at 6906–07, 6921–23.

Counsel for Bertoli also accused the court of being unwilling to completely air the facts in an attempt to "insulate the proceedings from appellate scrutiny." *Id.* at 18. The facts are to the contrary. As discussed *infra*, the actions taken were well within the appropriate discretion of the court and supported by the case law. The accusation is baseless and inappropriate.

199. Furthermore, it was Juror Six, not Alternate Juror Thirteen, who brought the incident to the attention of the court. It is unlikely Juror Six would have reported the premature discussions of other jurors if she herself were engaging in the same inappropriate conduct.

tial juror. There would be no reason ... to replace her.

*Id.*

After the recess, the court discussed with counsel matters *generally concerning* the instruction to the jury. *See* Trial Transcript at 6832–37. At no time during that discussion did either Bertoli or his counsel object to the *in camera* interview of the jurors during the recess. In fact, there was no objection raised with regard to the *in camera* proceedings until Bertoli filed his post-trial motion for a new trial.

Upon concluding the discussion with counsel, the court resumed charging the jury, first informing them the Alternate Jurors had been excused and instructing that the jury was "not to speculate as to the reason [that] occurred." *Id.* at 6768. Jury deliberations began that same day, 11 August 1993.

On 24 August 1993, after ten days of deliberations, as mentioned, the jury acquitted Bertoli on five of the seven counts on which he was indicted and found him guilty of one count of conspiracy to obstruct justice in violation of 18 U.S.C. § 371 and one count of obstruction of justice in violation of 18 U.S.C. §§ 1503 and 1502.

During a telephone conference on 17 December 1993, counsel for Bertoli requested that the Trial Transcript be released to him for purposes of appeal. The request was granted.

The motion by Bertoli for a new trial is brought pursuant to Fed.R.Crim.P. 33 and based on newly discovered evidence. Rule 33 provides:

The court on motion of defendant may grant a new trial to that defendant if required in the interest of justice.... A motion for a new trial based on the ground of newly discovered evidence may be made only before or within two years after final judgment.... A motion for a new trial based on any other grounds shall be made within 7 days after verdict or finding of guilty or within such further time as the court may fix during the 7–day period.

Fed.R.Crim.P. 33.

■■■ " 'A motion for a new trial is addressed to the trial judge's discretion....' "

*United States v. Console,* 13 F.3d 641, 665 (3d Cir.1993) (quoting *Government of the Virgin Islands v. Lima,* 774 F.2d 1245, 1250 (3d Cir.1985)). The power to grant a new trial should be exercised sparingly. *United States v. Clemons,* 658 F.Supp. 1116, 1119 (W.D.Pa.1987), *aff'd,* 843 F.2d 741 (3d Cir.), *cert. denied,* 488 U.S. 835, 109 S.Ct. 97, 102 L.Ed.2d 73 (1988).

■■■ In considering a motion for a new trial, in addition to determining whether there was error, a court must determine whether the defendant suffered "substantial prejudice" from the alleged error. *See Gilsenan,* 949 F.2d at 95; *Government of the Virgin Islands v. Dowling,* 814 F.2d 134, 139 (3d Cir.1987); *United States v. Jones,* 542 F.2d 186, 211 (4th Cir.), *cert. denied,* 426 U.S. 922, 96 S.Ct. 2629, 49 L.Ed.2d 375 (1976); *United States v. Armocida,* 515 F.2d 29, 49 (3d Cir.), *cert. denied,* 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975); *United States D'Andrea,* 495 F.2d 1170, 1172–73 (3d Cir.), *cert. denied,* 419 U.S. 855, 95 S.Ct. 101, 42 L.Ed.2d 88 (1974). Only where there is a reasonable probability that trial error could have had a substantial impact on the jury's decision must a court grant a new trial. *Government of Virgin Islands v. Bedford,* 671 F.2d 758, 762 (3d Cir.1982); *United States v. Bevans,* 728 F.Supp. 340, 343 (E.D.Pa.), *aff'd,* 914 F.2d 244 (3d Cir.1990); *United States v. Clark,* 617 F.Supp. 693, 694 (E.D.Pa.1985), *aff'd,* 791 F.2d 922 (3d Cir. 1986).

■■■ Where a motion for a new trial is based on "newly discovered evidence, great caution should be used by the trial court. *United States v. Persinger,* 587 F.Supp. 899, 901 (W.D.Pa.1984). In determining whether a new trial should be granted on the basis of newly discovered evidence, a movant must establish the following five factors:

(1) The evidence was discovered since the trial;

(2) The late emergence of the evidence is not due to a lack of diligence on the part of defendants;

(3) The evidence is not merely cumulative or impeaching;

(4) The evidence is material to the issues involved at trial; and

(5) The evidence is of such a nature that it would probably produce an acquittal upon retrial.

*United States v. Adams,* 759 F.2d 1099, 1108 (3d Cir.1985), *cert. denied sub nom. Alongi v. United States,* 474 U.S. 906, 106 S.Ct. 275, 88 L.Ed.2d 236 (1986); *United States v. Messerlian,* 633 F.Supp. 1493, 1504 (D.N.J.1986). Failure to establish any one of the five elements is "fatal" to a Rule 33 motion. *Messerlian,* 633 F.Supp. at 1504 n. 16.

The new evidence offered by Bertoli in the instant case is the portion of the Trial Transcript which includes the *in camera* interview of the Alternate Jurors and Juror Six. It must be determined whether this "new evidence" satisfies all five elements set forth above.

Although the parties knew, at the time, the proceedings were being transcribed, Bertoli received a copy of the transcript only after his counsel requested it during a telephone conference with the court on 17 December 1993. However, as discussed *infra,* Bertoli has not established that the events transcribed therein are "of such a nature that it would probably produce an acquittal upon retrial." *See Messerlian,* 633 F.Supp. at 1504. Therefore, Bertoli has failed to establish one of the necessary elements for a new trial based on new evidence. Nevertheless, for purposes of this portion of the opinion, the transcript of the in-chambers interview will be regarded as "new evidence."

a. *Jury Misconduct as a Basis for Granting a New Trial*

■■■ Bertoli argues: "Th[e Trial Transcript], read together with the other facts surrounding the allegations that one or more jurors violated their oaths by expressing opinions regarding the case prior to the commencement of deliberations, demonstrates that Mr. Bertoli's constitutional and statutory rights have been violated." Bertoli New Trial Brief at 1–2. It is further argued that the actions taken by the court in response to learning that an alternate juror may have expressed an opinion as to guilt or innocence

was "insufficient to assess the nature and extent of the misconduct." *Id.* at 2.

Bertoli further argues the inquiry conducted of the Alternate Jurors and Juror Six was inadequate. *Id.* at 9–14. His argument depends entirely on *United States v. Resko,* 3 F.3d 684 (3d Cir.1993), a case which was decided on 24 August 1993, approximately two weeks after the incident in the instant case. *See* Bertoli New Trial Brief at 9–14. As discussed below, the handling of the incident in this case fully comported with the requirements in *Resko.*

■■■ It is a generally accepted principle of trial administration that jurors must not engage in discussions of a case before they have heard both the evidence and the instruction by the court as to the law and have begun deliberating as a collective body. *Id.* at 688. Accordingly, trial judges traditionally admonish juries not to discuss the case with other members of the jury before the conclusion of the trial. *Id.* at 689.

The Third Circuit has articulated several reasons for the general rule against premature deliberations. First, because the prosecution presents its case first, any discussions which occur early in the case are more likely to be unfavorable to the defendant. *Id.* Second, the Circuit observed that once a juror expresses his or her view in the presence of the other jurors, "he or she is likely to continue to adhere to that opinion and to pay greater attention to evidence presented that comports with that opinion." *Id.* Third, premature deliberations thwart the goal of the jury system as a collective, deliberative process. *Id.* Fourth, opinions resulting from premature deliberations are formed without the benefit of the court's legal instruction. *Id.* at 689–90.

■■■ Despite the possibility of prejudice, not every instance of premature deliberations requires a new trial. "[T]he Constitution 'does not require a new trial every time a juror has been placed in a potentially compromising situation ... [because] it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote.'" *Rushen v. Spain,* 464 U.S. 114, 118, 104 S.Ct. 453, 455, 78 L.Ed.2d

267 (1983) (quoting *Smith v. Phillips*, 455 U.S. 209, 217, 102 S.Ct. 940, 946, 71 L.Ed.2d 78 (1982)); *see United States v. Caldwell*, 776 F.2d 989, 996 (11th Cir.1985); *United States v. Aiello*, 771 F.2d 621, 629 (2d Cir.1985); *United States v. Watchmaker*, 761 F.2d 1459, 1466, *reh'g denied*, 766 F.2d 1493 (11th Cir. 1985). Rather "[t]he test is whether or not the misconduct has prejudiced the defendant to the extent that he has not received a fair trial." *United States v. Klee*, 494 F.2d 394, 396 (9th Cir.), *cert. denied*, 419 U.S. 835, 95 S.Ct. 62, 42 L.Ed.2d 61 (1974); *see United States v. Clapps*, 732 F.2d 1148, 1152 (3d Cir.), *cert. denied*, 469 U.S. 1085, 105 S.Ct. 589, 83 L.Ed.2d 699 (1984); *United States v. Provenzano*, 620 F.2d 985, 997 (3d Cir.), *cert. denied*, 449 U.S. 899, 101 S.Ct. 267, 66 L.Ed.2d 129 (1980).

In guarding against prejudice to the defendant, the Third Circuit has described the following obligations of a trial court which has discovered possible jury misconduct:

[W]hen jury misconduct (including improper intra-jury influences) has been alleged, the district court should: ascertain whether the misconduct actually occurred; if it did, determine whether it was prejudicial; and if there are no grounds for a new trial, specify the reasons it decided that misconduct did not occur, or occurred but was not prejudicial.

*Resko*, 3 F.3d at 691. In meeting those obligations, however, trial courts have broad discretion in choosing what measures to take. *Id.* at 690; *Dowling*, 814 F.2d at 137–38; *see Console*, 13 F.3d at 667, 669; *Waldorf v. Shuta*, 3 F.3d 705, 710 (3d Cir.1993). "[T]hat discretion extends even to the initial decision of whether to interrogate the jurors." *United States v. Yonn*, 702 F.2d 1341, 1345 (11th Cir.), *cert. denied sub nom. Weeks v. United*

*States*, 464 U.S. 917, 104 S.Ct. 283, 78 L.Ed.2d 261 (1983).

The degree of discretion is especially broad when " 'the alleged prejudice results from statements made by the jurors themselves, and not from media publicity or other outside influences.' " [200] *United States v. Thornton*, 1 F.3d 149, 155 (3d Cir.) (citation omitted), *cert. denied*, —— U.S. ——, 114 S.Ct. 483, 126 L.Ed.2d 433 (1993). Such broad discretion is permitted because

"[t]he trial court is obviously in a better position (than the appellate court) to observe the impact of premature jury discussions of guilt, and to make a considered judgment as to the effectiveness of a cautionary instruction." Moreover, the trial court is in a superior position to observe the "mood at trial and the predilections of the jury."

*Resko*, 3 F.3d at 690 (quoting *United States v. Pantone*, 609 F.2d 675, 679 (3d Cir.1979); *Chiantese*, 582 F.2d at 980); *see Thornton*, 1 F.3d at 155; *Klee*, 494 F.2d at 396.

"[E]xperience teaches that trial judges typically, and quite properly, act independently, at least initially, to investigate and address alleged juror bias or misconduct." *United States v. Santiago*, 977 F.2d 517, 522 (10th Cir.1992). Accordingly, the trial court must "decide upon the appropriate course to take in view of [its] personal observations of the jurors and parties." *Aiello*, 771 F.2d at 629; *see United States v. Phillips*, 664 F.2d 971, 998–999 (5th Cir.1981), *cert. denied*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982); *United States v. Bufalino*, 576 F.2d 446, 451–52 (2d Cir.), *cert. denied*, 439 U.S. 928, 99 S.Ct. 314, 58 L.Ed.2d 321 (1978).

In *Resko*, the Third Circuit was faced with the problem of intra-jury influence. In that

---

**200.** In *Resko*, the Third Circuit recognized that intra-jury influence is a less serious problem than extra-jury influence.

It has long been recognized that when jurors are influenced by the media and other publicity, or when they engage in communications with third parties, these extra-record influences pose a substantial threat to the fairness of the criminal proceeding because the extraneous information completely evades the safeguards of the judicial process. In contrast, when there are premature deliberations among

jurors with no allegations of external influence on the jury, the proper *process* for jury decisionmaking has been violated, but there is no reason to doubt that the jury based its ultimate decision only on evidence formally presented at trial.

*Id.* at 690 (emphasis in original); *see also Console*, 13 F.3d at 666; *United States v. Chiantese*, 582 F.2d 974, 979 (5th Cir.1978), *cert. denied sub nom. Cerrella v. United States*, 441 U.S. 922, 99 S.Ct. 2030, 60 L.Ed.2d 395 (1979).

case, the trial court learned, on the seventh day of a nine day trial, that the jurors, in disregard of the court's admonition, had been discussing the case amongst themselves. The court responded by distributing a two-part questionnaire asking each juror (1) whether he or she had discussed the case with other jurors and, if so, (2) whether those discussions had resulted in the juror forming an opinion as to the guilt or innocence of the defendant. After the questionnaire was distributed, the jury was left alone in the courtroom to fill in their answers. All of the jurors admitted they had discussed the case but denied they had formed any opinion as a result.

In light of the jury's positive answers to question number one, the defendants requested that each juror be questioned individually in more detail as to precisely what had occurred and the extent of any prejudice. The court denied the defendants' request. The court then concluded, solely on the basis of the jury's written answers to the questionnaire, that the defendants had suffered no prejudice as a result of the jury's misconduct. The trial was resumed and the defendant was convicted.

On appeal, the Circuit found the trial court had erred by refusing to conduct a more detailed inquiry into the jury's misconduct. The Circuit found that by relying exclusively on the written statements of the jurors that they had not been influenced by the discussions, the court "effectively ceded to the jury its responsibility for determining whether or not the defendants would be prejudiced by the juror's misconduct." *Id.* at 691. The Circuit further questioned the reliability of the questionnaire because of the way it had been administered. "The jurors were together when filling out the questionnaires and no court personnel were present at that time. Consequently, there was a potential for collaboration among the jurors...." *Id.*

It was held that the trial court did not have enough information upon which to deny the defendants' motion for a mistrial and should have individually questioned each of the jurors about what had happened. Moreover, the absence of any information in the record concerning the discussions left the Circuit unable to evaluate the discussions with regard to their prejudice to the defendants. *Id.*

In remanding the case to the district court for a new trial, the Circuit expressly limited its holding to the particular circumstances of that case. *Id.* at 695.

In the instant case, it was learned, after the close of all the evidence, after completion of summations and after the court had begun instructing the jury as to the applicable law, that *certain* jurors *may* have engaged in a premature discussion of the case. Immediately upon learning of the problem, each of the jurors involved in the incident was individually questioned. The actions taken complied with the obligations set forth in *Resko*, 3 F.3d at 691.

The court first questioned Juror Six, in the presence of Bertoli and counsel, to determine whether any misconduct occurred. Juror Six stated she had heard remarks made by the Alternate Jurors regarding the case. Juror Six was then questioned regarding her ability to continue as a fair and impartial juror in the case; Juror Six assured the court she remained impartial. Next, the Alternate Jurors were questioned in the presence of Bertoli and counsel to determine whether any other members of the jury had been exposed to any remarks about the case. The Alternate Jurors responded they had not made statements about the case to any jurors other than Juror Six. Accordingly, the court and the parties learned the nature and extent of the problem and the identity of the jurors involved.

From the information gathered through the in-court questioning, it was determined that only the four jurors were involved. It was further determined there was no need to declare a mistrial because the only deliberating juror involved in the incident satisfactorily assured the court her impartiality was not affected. Therefore, the extent of the problem was ascertained, it was determined no prejudice to the defendant had occurred and reasons were given for that determination. The court thus complied with the three obligations set forth in *Resko*.

In addition, upon the request of Bertoli's counsel to develop the record more fully, the court conducted further questioning of the jurors in chambers. The jurors who were questioned in chambers were told their statements, although they were being transcribed, would not be made part of the public record, thus encouraging the jurors to speak openly about what had occurred.

Therefore, unlike the situation in *Resko*, the decision in this case not to declare a mistrial was based on complete information obtained through questioning the jurors involved both in the courtroom and in chambers. There was no need in the instant case to question all of the jurors because, unlike *Resko*, there was no evidence any other jury member had been exposed to any inappropriate statements.

Bertoli criticizes the actions taken by the court and asserts alternative courses of actions should have been taken. *See* Bertoli New Trial Brief at 11–14; Trial Transcript at 6765. Specifically, it is argued that (1) the entire jury panel should have been questioned regarding the incident, (2) Juror Six should have been confronted with the accusation of Alternate Juror Thirteen that she made remarks about the case and (3) Juror Six should have been excused. *Id.* None of those proposed courses of action was required or appropriate in the instant case.

■ There is no requirement that a trial court interview every member of the jury upon learning of possible jury misconduct. If the court knows which jurors are involved in the misconduct, questioning only those jurors is sufficient. *See Caldwell*, 776 F.2d at 997–98; *see, e.g., United States v. Gagnon*, 470 U.S. 522, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985); *United States v. Brantley*, 733 F.2d 1429 (11th Cir.1984), *cert. denied*, 470 U.S. 1006, 105 S.Ct. 1362, 84 L.Ed.2d 383 (1985); *United States v. Kelly*, 749 F.2d 1541, 1551–52 (11th Cir.), *cert. denied*, 472 U.S. 1029, 105 S.Ct. 3506, 87 L.Ed.2d 636 (1985); *United States v. Sedigh*, 658 F.2d 1010, 1013–14 (5th Cir.1981), *cert. denied*, 455 U.S. 921, 102 S.Ct. 1279, 71 L.Ed.2d 462 (1982); *United States v. Brown*, 571 F.2d 980, 990–91 (6th Cir.1978).

The extensiveness of the court's investigation depends upon the nature and credibility of the allegations.

> At one end of the spectrum the cases focus on the certainty some impropriety has occurred. The more speculative or unsubstantiated the allegation of misconduct, the less the burden to investigate. At the other end of the continuum lies the seriousness of the potential jury contamination, especially where alleged extrinsic influence is involved, the heavier the burden to investigate.

*Caldwell*, 776 F.2d at 998 (citations omitted); *see Aiello*, 771 F.2d at 629; *Sedigh*, 658 F.2d at 1014 ("trial court's duty in deciding a motion for a new trial when jury misconduct is alleged must be judged on the peculiar facts and circumstances of each case").

An additional concern, in determining whether it is necessary to question the entire jury, is the possibility such questioning will place undue emphasis on the incident.

> "[T]he court must balance the probable harm resulting from the emphasis such action would place upon the misconduct and the disruption involved in conducting a hearing against the likely extent and gravity of the prejudice generated by that misconduct."

*Thornton*, 1 F.3d at 156 (quoting *Chiantese*, 582 F.2d at 980); *see Brown*, 571 F.2d at 990–91 (where court's interrogation of entire jury regarding one juror's exposure to outside communication could prejudice the jury, it was held: "A district judge must have the discretion to decline to interrogate the jurors in this situation.").

A further problem which may result from questioning the entire jury is that such questioning

> has a great potential to pollute the jury as a deliberative body through the introduction of bias and the alienation of sitting jurors. The questioning and defending that takes place in such a proceeding can lead jurors to come to dislike counsel for one side, and sometimes to dislike each other.

*United States v. Simone*, 14 F.3d 833, 839 (3d Cir.1994); *see United States v. Edwards,*

823 F.2d 111, 116–17, *reh'g denied,* 828 F.2d 772 (5th Cir.1987), *cert. denied,* 485 U.S. 934, 108 S.Ct. 1109, 99 L.Ed.2d 270 (1988).

There is nothing in the record in the instant case which supported the need for questioning the entire jury. Upon questioning Juror Six and the Alternate Jurors, it was learned that the incident was confined to those four. There was no indication or basis to infer any other members of the jury were involved or even aware of what had happened. The limited extent of the incident when weighed against the possible disruption of the jury and undue emphasis on the incident by questioning every member, weighed in favor of the action taken. *See Thornton,* 1 F.3d at 156; *see also Simone,* 14 F.3d at 839; *Edwards,* 823 F.2d at 116–17.

The assertion that Juror Six should have been "confront[ed]" with Alternate Juror Thirteen's accusation that she had made statements regarding Bertoli's guilt or innocence, Bertoli New Trial Brief at 12, is without merit. Such a confrontation was unnecessary given the determination by the court that the accusation by Alternate Juror Thirteen was not credible. *See Kelly,* 749 F.2d at 1551–52; *see also Caldwell,* 776 F.2d at 998.

In *Kelly,* the defendants contended on appeal that the trial court had erred by refusing to question the jury regarding an allegation of bias. 749 F.2d at 1551. Toward the end of the trial, there was a report that several of the jurors were possibly biased. After questioning the person who reported the bias, the court refused to interrogate the jury because it found the report to be "incredible" and not worthy of belief. *Id.* at 1551–52. On appeal, the refusal of the trial court to question the entire panel on the basis of a report it found incredible was

upheld. The Eleventh Circuit determined that because the trial court found the statements of the reporting juror to be incredible, the court had not abused its discretion in refusing to question the other jury members. *Id.* at 1552.

In addition, confronting Juror Six with the accusations of Alternate Juror Thirteen would have placed in her head a statement of Bertoli's guilt. That could have been prejudicial to Bertoli.

It is further asserted Juror Six should have been excused from deliberations.[201] Bertoli New Trial Brief at 27–28. Excusing Juror Six, however, was unnecessary because it was determined, based on the responses to direct questioning and observations of the jurors, that Juror Six had not made any statement regarding guilt or innocence and continued to be fair and impartial. Trial Transcript at 6827–28, 6830. The determination of a trial court as to whether a juror should be disqualified is entitled to a "high measure of deference." *Rushen,* 464 U.S. at 128, 104 S.Ct. at 460–61; *see Patton v. Yount,* 467 U.S. 1025, 1037 n. 12, 104 S.Ct. 2885, 2891 n. 12, 81 L.Ed.2d 847 (1984); *Clapps,* 732 F.2d at 1152; *Aiello,* 771 F.2d at 630; *Bufalino,* 576 F.2d at 451. Bertoli has offered nothing to overcome the deference accorded to the decision not to excuse Juror Six.

The exposure of Juror Six to any premature opinions did not automatically warrant excusing her from the jury. So long as it is determined that the juror can render a verdict based on the evidence presented in court and is in fact fair and impartial, a defendant is not prejudiced by the inclusion of that juror. *See Dobbert v. Florida,* 432 U.S. 282, 302, 97 S.Ct. 2290, 2302–03, 53

---

**201.** The Bertoli New Trial Brief argues that the disqualification of Juror Six "certainly might have altered the outcome of the case...." *Id.* at 28. The argument goes on to state: "The court will recall that, on August 19, 1993, the jury reported that, "after completely examining and taking notes on every act included in each count, we have concluded with an 11 one vote on the majority of them." *Id.* at n. 7 (citing Trial Transcript at 6918).

There is no indication that the eleven-to-one vote was to acquit Bertoli. An earlier communi-

cation from the jury had in fact stated they had "reached a unanimous agreement on two counts of the indictment." Trial Transcript at 6909. As indicated, Bertoli was convicted on two counts of the Redacted Second Superseding Indictment. Moreover, there is absolutely no evidence Juror Six cast the one contrary vote to which the jury referred.

This statement, viewed in light the total record, does not establish the necessary showing of "substantial prejudice" warranting a new trial. *See Clapps,* 732 F.2d at 1152; *Provenzano,* 620 F.2d at 997; *Klee,* 494 F.2d at 396.

L.Ed.2d 344 (1977); *Murphy*, 421 U.S. at 800, 95 S.Ct. at 2036; *Irvin*, 366 U.S. at 722–23, 81 S.Ct. at 1642–43.

> One may not know or altogether understand the imponderables which cause one to think what he [or she] thinks, but surely one who is trying as an honest man [or woman] to live up to the sanctity of his [or her] oath [as a juror] is well qualified to say whether he [or she] has an unbiased mind in a certain matter.

*Dennis v. United States*, 339 U.S. 162, 171, 70 S.Ct. 519, 523, 94 L.Ed. 734 (1950); *see Smith v. Phillips*, 455 U.S. 209, 217 n. 7, 102 S.Ct. 940, 946 n. 7, 71 L.Ed.2d 78 (1982); *Aiello*, 771 F.2d at 630.

In this case, Juror Six did more than merely state her ability to be fair and impartial. The observation of the conduct and demeanor of the Juror during questioning regarding this incident and throughout the ten-week trial, led to the conclusion that she was credible and her statements were in fact accurate.

In *Clapps*,[202] after the presentation of evidence but before closing arguments, a juror reported that some of the other jurors had been discussing the case. *See* 732 F.2d at 1152. The court, upon learning of this and upon the defendant's motion for a mistrial, conducted a *voir dire* examination of the jury. *Id.* As a result of the *voir dire*, the court excused the two jurors who were identified as the persons who had made the remarks and replaced them with alternates. *Id.* The court, however, did not excuse the jurors who heard the remarks because it was satisfied by their statements that their impartiality had not been affected by the remarks they had heard. Accordingly, the court denied the defendant's motion for a mistrial.

The Circuit affirmed the decision of the district court because the defendant failed to show the "likelihood of actual prejudice" arising from the incident. *Id.* Although the defendant argued the entire jury had been tainted and biased by the remarks, there was no evidence that was the case; particularly in light of the statements by the remaining jury members that they remained impartial. *Id.*

To prevail on his motion for a mistrial in the instant case, Bertoli has the burden of showing the " 'likelihood of actual prejudice.' " *Clapps*, 732 F.2d at 1152 (citation omitted).

The actions taken in this case adequately dealt with any potential prejudice arising from the comments made by the Alternate Jurors. Juror Six, who heard the remarks, was questioned about the affect of those remarks on her ability to fairly deliberate; her response and the observation of her demeanor and credibility during the investigation established that she had not been influenced by what she had heard. Each of the Alternate Jurors who were identified as making the remarks was individually questioned. It was determined they had not discussed the case with any of the other jurors. It was also determined that the Alternate Jurors had not formed any opinion as to guilt or innocence. Nevertheless, as an additional precaution against any potential prejudice, the Alternate Jurors were then excused.[203]

None of the factors recognized by the Third Circuit in *Resko* as creating a likelihood of prejudice is present in the instant case. The incident occurred after the close of all the evidence, after the summations and after the instruction to the jury had begun. *See* Trial Transcript at 6729. Accordingly, there was no likelihood any prematurely formed opinions were violative of the rationale in *Resko*. *Resko*, 3 F.3d at 689–90. There was also no danger any of the deliberating jurors would feel bound to adhere to any "publicly expressed viewpoint," *see id.* at 689, because the Alternate Jurors who were

---

**202.** As mentioned, at the time the incident occurred, the court did not have the benefit of the Third Circuit's opinion in *Resko*, 3 F.3d 684. Instead, the opinion in *Clapps*, 732 F.2d 1148, provided guidance for handling the situation. Nevertheless, as discussed, the rationale of and requirements of *Resko* were in fact satisfied in the handling of the jury problem in this trial.

**203.** The excusal of the Alternate Jurors, was of no significance because, as alternates, they, along with alternate jurors sixteen and twenty, would have been dismissed in any event. All of the deliberating jurors were present and able to deliberate so there was no need to use any of the alternate jurors.

identified as making remarks about the case explained they had not made comments to anyone other than Juror Six. Trial Transcript at 6762–65. As well, the Alternate Jurors were excused from further participation in the case without ever engaging in deliberations. Juror Six who reported the misconduct was found to be fair and impartial and not affected by the incident and was further found not to have expressed any viewpoint to the jury. Moreover, she was instructed not to repeat the remarks she had heard. Trial Transcript at 6761.

The fact the jury deliberated for ten days and delivered a verdict which acquitted Bertoli of the most significant charges, indicates the jury's deliberations were careful, serious and fair. In *Aiello*, the Second Circuit took note of the following in affirming the finding by the trial court that the defendant had not been prejudiced by jury misconduct.

> The accuracy of the district judge's finding about the ability of the jury to render an impartial verdict is confirmed by the care which the jury took in its deliberations; over a period of four days it requested multiple readbacks of testimony and then determined that some defendants should be acquitted altogether, that others should be acquitted on some charges, and that others were guilty of all crimes charged.

771 F.2d at 631; *see United States v. Piccarreto*, 718 F.Supp. 1088, 1093 (W.D.N.Y.1989) (no prejudice where defendant was acquitted of most serious RICO charges).

### b. *Right of Defendants to Be Present During Court's Interview of Juror for Misconduct*

It is argued that the *ex parte* interview of the Alternate Jurors and Juror Six violated Bertoli's Fifth Amendment right to be present at a critical stage of the trial, his Sixth Amendment right to effective assistance of counsel and his right to be present at every stage of trial pursuant to Fed.R.Crim.P. 43. Bertoli New Trial Brief at 14–28.

#### i. *Fifth Amendment Right to be Present*

 In *Gagnon*, 470 U.S. 522, 105 S.Ct. 1482, 84 L.Ed.2d 486 the Supreme Court rejected the argument that defendants had a constitutional right to be present during an *in camera* interview of jurors by the trial court.[204]

> "[T]he mere occurrence of an *ex parte* conversation between a trial judge and a juror does not constitute a deprivation of any constitutional right. The defense has no constitutional right to be present at every interaction between a judge and a juror...."

*Id.* at 526, 105 S.Ct. at 1484 (citing *Rushen*, 464 U.S. at 125–26, 104 S.Ct. at 459–60 (Stevens, J., concurring)). As the Tenth Circuit stated in *Santiago*, 977 F.2d 517: "While it is crucial in any trial to assure that jurors will render unbiased verdicts, a judge's *in camera* examination of a juror for possible bias is not so critical a trial function that a defendant's presence to exert a psychological influence is constitutionally mandated." *Id.* at 523 n. 6.

In *Gagnon*, the bailiff informed the trial court that one of the jurors had expressed concern after he noticed one of the four defendants making sketches of the jury during the trial. 470 U.S. at 523, 105 S.Ct. at 1482–83. The bailiff conveyed this information to the court in the presence of counsel for the defendants and the Government. *Id.* Counsel for the defendant who had made the sketches suggested that the court question the juror who had expressed concern to ascertain whether the juror had been prejudiced against his client. *Id.* The court stated it would question the juror in chambers and determine whether there was any prejudice. No objection was made by the counsel for any of the defendants and none of the defendants requested to be present during questioning. *Id.* Counsel for the defendant who made the sketches was present during the questioning. *Id.* at 523–24, 105 S.Ct. at 1482–83.

The juror who expressed concern stated during questioning that another juror had

---

**204.** While counsel for Bertoli correctly cites *Gagnon* for the Court's recognition that the "constitutional right to presence" extends beyond con-

fronting witnesses, Bertoli New Trial Brief at 20, he apparently ignores the holding in that case.

noticed the sketching and had made a comment to him but none of the other jurors seemed to have noticed. *Id.* at 523, 105 S.Ct. at 1482–83. The juror then stated his willingness to continue as an impartial juror. *Id.* The defense counsel asked two questions of the juror and stated he was satisfied there was no prejudice. A transcript of the *in camera* proceedings was later provided to all the parties. *Id.* No objections were made as to the *in camera* proceedings.

After the jury returned guilty verdicts, all four defendants filed motions for a new trial on the ground their right to an impartial jury and their rights under Rule 43 and the Due Process Clause of the Fifth Amendment had been violated by the court's *in camera* discussion with the juror. *Id.* at 524–25, 105 S.Ct. at 1483–84. The Ninth Circuit reversed all four convictions, holding that all four defendants had a right to be present during the *in camera* questioning of the juror. *Id.* at 525, 105 S.Ct. at 1484. The Ninth Circuit further found the harmless-error-rule could not excuse the error. The Supreme Court reversed the Circuit, stating:

> The encounter between the judge, the juror, and [one of the defendant's] lawyer was a short interlude in a complex trial; the conference was not the sort of event which every defendant had a right to personally attend under the Fifth Amendment.

*Id.* at 527, 105 S.Ct. at 1484; *see Aiello,* 771 F.2d at 621.

In the instant case, the *in camera* interview of the jurors was similarly a "short interlude in a complex trial" and, therefore, "was not the sort of event which" Bertoli had any constitutional right to attend. And, significantly, there was neither an objection to the procedure nor a request to be present on the part of Bertoli.

ii. *Right to be Present Pursuant to Rule 43*

■■■ Rule 43 of the Fed.R.Crim.P. provides:

> (a) The defendant shall be present at the arraignment, at the time of the plea, at every stage of the trial including the impanelling of the jury and the return of the

verdict, and at the imposition of sentence, except as otherwise provided by this rule.

Fed.R.Crim.P. 43(a).

An in-chambers conference with a juror is not expressly exempted from Rule 43. *See* Fed.R.Crim.P. 43(b) and (c); *Brown,* 571 F.2d at 985–86. "Although Rule 43(a) does have its constitutional underpinning, the right of presence stated in the Rule is more far-reaching than the right of presence protected by the Constitution." *Brown,* 571 F.2d at 986.

It is within the court's discretion to proceed with *in camera* interviews of jurors without the presence of defendants and their counsel. *Santiago,* 977 F.2d at 522; *see Gagnon,* 470 U.S. at 527, 105 S.Ct. at 1484–85; *Aiello,* 771 F.2d at 630; *United States v. Williams,* 737 F.2d 594, 612 (7th Cir.1984), *cert. denied,* 470 U.S. 1003, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985); *United States v. Buchanan,* 633 F.2d 423, 427 (5th Cir.1980), *cert. denied,* 451 U.S. 912, 101 S.Ct. 1984, 68 L.Ed.2d 301 (1981); *Jones,* 542 F.2d at 211. "[T]he trial judge, aided by his personal observation and appraisal of all persons concerned, may choose a private inquiry in the more relaxed atmosphere of [chambers]." *Aiello,* 771 F.2d at 629.

Such discretion is necessary given the nature of trial proceedings. As stated by the Supreme Court:

> There is scarcely a lengthy trial in which one or more jurors does not have occasion to speak to the trial judge about something, whether it relates to a matter of personal comfort or to some aspect of the trial. The lower [F]ederal court's conclusion that an unrecorded *ex parte* communication between trial judge and juror can never be harmless error ignores these day-to-day realities of courtroom life and undermines society's interest in the administration of criminal justice.

*Rushen,* 464 U.S. at 118–19, 104 S.Ct. at 455–56.

In *United States v. Marrero,* 904 F.2d 251 (5th Cir.), *cert. denied,* 498 U.S. 1000, 111 S.Ct. 561, 112 L.Ed.2d 567 (1990), the defendant moved for a new trial on the ground of

jury misconduct and requested a hearing on the issue. *Id.* at 261. After the verdict had been entered, the defendant obtained the affidavits of two jurors which stated that (1) a juror had made a statement in the presence of the other jurors that the·defendant was guilty and (2) a juror had said during the deliberations that the "majority rule" controlled their verdict such that they had to vote with the majority. *Id.* On the basis of the two affidavits, the defendant moved for a new trial. The Government submitted the affidavits of two other jurors which refuted the jurors' statements contained in the affidavits submitted by the defendant. *Id.* In response, the trial court conducted an *ex parte in camera* interview of the four jurors who had signed the affidavits; the court then sealed the record of the interview. *Id.* The defendant's motion to open the sealed record for purposes of her appeal was denied. *Id.*

The Fifth Circuit rejected the defendant's claims of jury bias after reviewing the record of the court's interview with the jurors and the affidavits of the jurors. The court stated:

The record reveals that the district court was essentially faced with making a credibility determination based on the conflicting testimony given by the jurors, the district court concluded that the allegations of juror bias were incredible. Since the district court is best suited to make this type of credibility determination, we are constrained to leave undisturbed the district court's conclusions.

*Id.* at 261–62. In affirming the district court denial of the defendant's motion for a new trial, the Fifth Circuit had no criticism of the *ex parte* questioning of the jurors. *See id.*

The failure of either Bertoli or his counsel to request that Bertoli be present during the *in camera* interview of the jurors, moreover, constituted a waiver of any right Bertoli had under Rule 43. *See Gagnon,* 470 U.S. at 527–29, 105 S.Ct. at 1484–86; *Brown,* 571 F.2d at 987. At no time did Bertoli or his counsel suggest that Bertoli or counsel should be present during the *in camera*

questioning which was conducted at the request of Bertoli's counsel.

In *Gagnon,*[205] the Supreme Court determined the defendants had waived any right they had to be present during the *in camera* questioning of a juror.

The record shows ... the District Judge, in open court, announced her intention to speak to the juror in chambers, and then called a recess. The *in camera* discussion took place during the recess, and trial resumed shortly thereafter.... [The defendants] neither then nor later in the course of the trial asserted any Rule 43 rights they could have had to attend this conference. [The defendants] did not request to attend the conference at any time. No objections of any sort were lodged, either before or after the conference.

470 U.S. at 527–28, 105 S.Ct. at 1485. The Court found that this behavior was enough to constitute a waiver of any right the defendants had pursuant to Rule 43 to be present during the *in camera* questioning of a juror.

[F]ailure by a criminal defendant to invoke his right to be present under Federal Rule of Criminal Procedure 43 at a conference which he knows is taking place between the judge and a juror in chambers constitutes a valid waiver of that right.

*Id.* at 529, 105 S.Ct. at 1486.

"The district court need not get an express 'on the record' waiver from the defendant from every trial conference which a defendant may have a right to attend." *Id.; see, e.g., United States v. Washington,* 705 F.2d 489, 496–98 (D.C.Cir.1983); *United States v. Provenzano,* 620 F.2d 985, 997–98 (3d Cir.), *cert. denied,* 449 U.S. 899, 101 S.Ct. 267, 66 L.Ed.2d 129 (1980); *Bufalino,* 576 F.2d at 450–51.

In *Jones,* 542 F.2d 186, the defendants moved for a new trial, alleging the trial court had erred in its handling of allegations of juror misconduct. When the allegations of jury misconduct were brought to the attention of the trial court, counsel for defendants suggested that the trial court "either [conduct] an *in camera* conference ... or that

---

**205.** For purposes of that opinion, the Court assumed the defendants had a right under Rule 43 to be present in chambers during questioning of a juror. *Id.* at 527, 105 S.Ct. at 1484–85.

[the juror] be brought to the bench, or in [the judge's] chambers, something of that nature, and questioned by all counsel and the Court." *Id.* Despite counsel's request to be present during questioning, the court conducted *ex parte in camera* interviews of each of the jurors. Before questioning the jurors, the trial court informed counsel of its intended course of action; there were no objections. *Id.* Upon the conclusion of its *in camera* questioning, the trial court determined a new trial was not necessary.

In affirming the decision and procedure of the trial court, the Fourth Circuit stated:

> Even had counsel for the defendants not suggested and, by implication at least, agreed to the procedure followed by the trial court, the very fact that counsel for the defendants knew of the procedure, and neither before nor after the examinations were completed, objected would amount under the authorities to a waiver of any claim of error in regard to the *in camera* examination in the absence of a showing of prejudice.

*Id.* at 213; *see United States v. Larkin,* 417 F.2d 617, 619 (1st Cir.1969), *cert. denied,* 397 U.S. 1027, 90 S.Ct. 1271, 25 L.Ed.2d 536 (1970); *United States v. Doe,* 513 F.2d 709, 710 n. 1 (1st Cir.1975); *United States v. Jorgenson,* 451 F.2d 516, 521 (10th Cir.1971), *cert. denied,* 405 U.S. 922, 92 S.Ct. 959, 30 L.Ed.2d 793 (1972).

In the instant case, counsel for Bertoli requested that further questioning of the Alternate Jurors and Juror Six be conducted to determine the nature of the discussions. Trial Transcript at 6816. In response to the request of counsel, the court stated to the parties its intention to question those jurors in chambers and that the record of that interview would be sealed. *Id.* As in *Gagnon* and *Jones,* neither the defendant nor defendant's counsel objected or asked to be present during the *in camera* interview. *See* Trial Transcript at 6816. Accordingly, Bertoli waived any right he had under Rule 43 to be present. *See Larkin,* 417 F.2d at 619; *Doe,* 513 F.2d at 710 n. 1; *Jorgenson,* 451 F.2d at 521.

▇ Even if Bertoli had a right under Rule 43 to be present during the *in camera*

interviews of the jurors, his absence is not a basis for a new trial without a demonstration of prejudice.

> An alleged deprivation of a defendant's right under Fed.R.Crim.P. 43 to be present during trial proceedings ordinarily is subject to the harmless error rule and will not constitute reversible error absent a showing of clear prejudice to the absent defendant.

*Santiago,* 977 F.2d at 521 n. 5. A defendant must show actual prejudice resulting from an *ex parte* contact to receive a new trial. *See Rushen,* 464 U.S. at 130 n. 8, 104 S.Ct. at 461 n. 8 (Stevens, J., concurring); *Smith,* 455 U.S. at 217, 102 S.Ct. at 946; *United States v. Birges,* 723 F.2d 666, 671 (9th Cir), *cert. denied,* 466 U.S. 943, 104 S.Ct. 1926, 80 L.Ed.2d 472 (1984); *see also United States v. Madrid,* 842 F.2d 1090, 1093 (9th Cir.), *cert. denied sub nom. Madamba v. United States,* 488 U.S. 912, 109 S.Ct. 269, 102 L.Ed.2d 256 (1988).

Furthermore, a defendant's absence during questioning of a juror by a court can be more advantageous than prejudicial to the defendant. As stated by the Eleventh Circuit in *Caldwell:*

> [There is] perhaps ... some benefit, to be gained by the defendants absence during the questioning of [the] juror.... Had the [defendant] actually been present and had counsel taken an active role in the questioning, it would have put the juror and the defendant in an adversarial posture, which could have an adverse affect on the juror.

776 F.2d at 997; *see Gagnon,* 470 U.S. at 527, 105 S.Ct. at 1484–85; *Santiago,* 977 F.2d at 522–23; *Yonn,* 702 F.2d at 1345–46; *see also Simone,* 14 F.3d at 839.

In *Yonn,* the Eleventh Circuit did not find the defendant had been prejudiced by the *ex parte* interviews by the court of the jury based on the following description of the interview.

> [The trial judge] began by assuring the jurors that the inquiry was merely a necessary precaution and did not result from any impropriety on their part. The judge scrupulously refrained from intimating any

opinion on the comment; he merely observed that the remark was a possible violation of his instructions. He obtained the pledges of those jurors how had overheard the remarks that the comment had not interfered with their ability to render a fair and impartial verdict.... There is no suggestion that the judge's communications with, or his questions of the jurors ... prejudiced the defendants. Moreover, when the trial resumed, the court instructed the jury to disregard their earlier conversation, and again reminded them of their duty to base the verdict only on the evidence, the arguments, and the court's instructions.

702 F.2d at 1345.

As in *Yonn*, there was nothing which occurred in the instant case during the *in camera* interview of the jurors that could have prejudiced Bertoli. In the instant case, there was nothing Bertoli could have accomplished through his presence during the *in camera* interviews of the jurors. The investigation of juror misconduct lies wholly within the discretion of the trial court. *See Caldwell*, 776 F.2d at 997; *see also Console*, 13 F.3d at 667, 669; *Resko*, 3 F.3d at 690. As discussed, the trial court, "[g]iven [its] superior vantage position," must determine whether the jurors are credible and whether anything that occurred resulted in prejudice to the defendant. *See Santiago*, 977 F.2d at 522; *Caldwell*, 776 F.2d at 999–1000.

### iii. *Right to Have Counsel Present*

 There is no right of defendants to have their counsel present during a court's questioning of a juror to determine bias. *See, e.g., Marrero*, 904 F.2d at 261–62.

Even courts which have stated a preference for having counsel present during *in camera* interviews of jurors have found that *ex parte* interviews do not create a basis for ordering a new trial in the absence of prejudice, particularly where a record was made of the conference. *See Aiello*, 771 F.2d at 629–30; *Yonn*, 702 F.2d at 1345; *United States v.*

*Dumas*, 658 F.2d 411, 414 (5th Cir.1981), *cert. denied*, 455 U.S. 990, 102 S.Ct. 1615, 71 L.Ed.2d 850 (1982); *United States v. Dominguez*, 615 F.2d 1093, 1096 n. 5 (5th Cir.1980). "Transcribing the *in camera* interview for the record helps to minimize the possibility of prejudice." *Yonn*, 702 F.2d at 1345.

In the instant case, Bertoli was not prejudiced by the absence of his counsel. Counsel were given the opportunity to offer input as to how to proceed with regard to the information learned from Juror Six. *See* Trial Transcript at 6760. Also, the initial questioning was conducted in open court in the presence of counsel. *See id.* at 6760–65. Once the initial questioning was concluded, counsel had a second opportunity to make suggestions as to how to proceed. *Id.* at 6765. In fact, the *in camera* interview was conducted at the request of counsel for Bertoli. *Id.* at 6816. In response to counsel's request, the court stated its intention to conduct further questioning of the jurors in chambers. *Id.* at 6817. There was no objection by Bertoli or his counsel to that proposed course of action.

There was nothing counsel could have accomplished through his presence during the *in camera* interview. As discussed, it was the sole duty of the court to decide the credibility of the jurors and make a determination as to whether the incident resulted in any prejudice to Bertoli. *See supra*, at 288–90. Accordingly, Bertoli was not prejudiced by the absence of his counsel during the interview. The possibility of prejudice was further minimized by the record of the proceedings contained in the Trial Transcript. *See Aiello*, 771 F.2d at 629–30; *Yonn*, 702 F.2d at 1345; *Dumas*, 658 F.2d at 414; *Dominguez*, 615 F.2d at 1096 n. 5.

### c. *The Riepe Letter*

 On 7 March 1994, Bertoli submitted new evidence which he contends warrants a further hearing on the issue of Juror Six's asserted misconduct.[206] This new evidence

---

**206.** In support of his argument in this regard, Bertoli submitted: Supplemental Brief in Support of Motion for a New Trial, dated 7 March 1994 (the "7 March 1994 Bertoli Brief"); Affir-

mation of Levitt, dated 7 March 1994 (the "Levitt Aff."); letter, dated 18 March 1994 (the "18 March 1994 Bertoli Letter").

consists of a letter from John Riepe ("Riepe") to Levitt, dated 4 March 1994 (the "Riepe Letter"). In the Riepe Letter, Riepe purports to be "engaged in a literary project focusing on the emotional impact courtroom proceedings have on jurors, and the way in which they reach decisions or verdicts." Riepe Letter, attached to Levitt Aff. as Exhibit E, at 1.

Riepe states that, in connection with this "literary project," he pursued and interviewed at least one juror in Bertoli's case ("Juror Two").[207] Attached to the Riepe Letter are notes of an interview between Riepe and Juror Two, held 1 February 1994 (the "Riepe Notes").[208] It is the Riepe Notes which Bertoli relies upon in requesting a further hearing into Juror Six's asserted misconduct. *See* 7 March 1994 Bertoli Brief at 8, 16.

According to the Riepe Notes, Juror Two disclosed to Riepe several details concerning the private deliberations of the jury in this case. Bertoli makes specific reference to the following passages:

> In opposition to Bertoli's request, the Government submitted: Government's Memorandum of Law in Opposition to Bertoli's Supplemental Memorandum of Law in Support of a Motion for a New Trial, dated 16 March 1994 (the "16 March 1994 Government Brief"); Affidavit of Agent Cahill, dated 16 March 1994 (the "16 March 1994 Cahill Aff.").

**207.** Both Riepe and Levitt have identified Juror Two by name. However, because this opinion is intended for publication, Juror Two's name is withheld in the interest of her privacy.

**208.** In introducing the Riepe Letter, Levitt certified that Riepe is "an independent writer...." Levitt Aff., ¶ 1. Levitt further certified the Riepe Notes reflect "interviews and related interviews independently conducted by Riepe with jurors...." *Id.*

Evidence submitted by the Government, however, casts significant doubt on the representations of Levitt in this regard. Specifically, it appears Riepe has had significant prior contact with Bertoli. An investigation by the Government has revealed Riepe as the former press secretary to Wally Lindsley ("Lindsley"), mayor of Weehawken, New Jersey from 1980 through 1982. 16 Mar. 1994 Cahill Aff., ¶ 1. Riepe has also been identified as Lindsley's "spokesman." *Id.*, Ex. 2. Lindsley was convicted of a violation of the Hobbs Act in this district in 1983 (the "Lindsley Prosecution"). *Id.*

In the beginning, we all felt that Bertoli was clean. After a while, I (and others) felt that Bertoli had to be a little dirty to be involved in all this, but not to the extent that the [G]overnment had proved in their case. There was one woman ( [Juror Six] ) who insisted that he was dirty and guilty from the very beginning. I don't know why the [G]overnment was so intent on putting this guy away when the witnesses for the [G]overnment seemed to be far guiltier than he was. But this woman ( [Juror Six] ) didn't like him from the beginning. And there were times during the trial when I felt that [Juror Six] wasn't even listening. On occasion, there were multiple jurors sleeping. [Juror Six] was one of the ones who slept.

I got upset with [Juror Six]. We were repeatedly voting without conclusion and I thought the judge would think that we were brain-dead because we couldn't reach a decision. ...

[Juror Six] had three people thrown off the jury because she said they tried to influence the rest of us. She went to the

Lindsley and Bertoli have an extensive and well-documented relationship. In 1984, Lindsley testified on Bertoli's behalf in connection with the SEC Investigation. During this testimony, Lindsley stated that, as of 1984, he had known Bertoli for five years. 16 Mar. 1994 Cahill Aff., Ex. 3 at 23. Lindsley further testified he "admire[d]" Bertoli, and considered him a "God-fearing scholar." *Id.* at 24. Lindsley also testified he borrowed $10,000 from Bertoli to finance his defense in the Lindsley Prosecution. *Id.* at 52. During the Lindsley Prosecution, Lindsley confirmed on cross-examination that Bertoli "was a family friend." *Id.*, Ex. 4.

Bertoli has continued to demonstrate his close relationship with Lindsley in the instant proceedings. In connection with his continuing efforts to introduce evidence of vindictive prosecution to the jury, Bertoli has made repeated reference to this relationship. For example, in the 19 January 1994 Bertoli Brief, Bertoli stated that, if permitted, he "would have introduced evidence that the [G]overnment targeted Bertoli because he ... provided assistance to former Weehawken Mayor ... Lindsley when Lindsley was prosecuted...." *Id.* at 7; *see* Affidavit of Bertoli, dated 13 March 1992, in Support of Motion to Dismiss Indictment on Grounds of Vindictive and Selective Prosecution, ¶ 12A ("The affiant caused substantial family funds to be loaned to Lindsley to retain his counsel....").

judge to tell him that these jurors were saying that this man was innocent, and were prejudicial [*sic* ], while she herself had been saying he was guilty from the beginning. She was pretty much guilty of all the things she said they were guilty of—but she went to the judge first. The judge said he believed the statements of the accused jurors but released them for the sake of the court. The other jurors in the courtroom didn't even know what was going on. If the judge was going to disqualify these jurors, he should have disqualified [Juror Six] as well.

[Juror Six] was a very dramatic person. She had to be the center of attention. She claimed she was taking medication for sugar and made a big production of everything. Some or us were under the impression that she was dragging out the trial for the $40 per day, and because she probably had nothing else to do.

Riepe Notes at 2–3.

Bertoli argues the comments of Juror Two, as described in the Riepe Notes, indicate misconduct on the part of Juror Six in that she "repeatedly expressed opinions regarding ... Bertoli's guilt to other jurors during the trial." 7 March 1994 Bertoli Brief at 16. Bertoli argues, therefore, that the Riepe Notes warrant a new trial or, in the alternative, "a hearing at which all knowledgeable persons should be called upon to testify." 7 March 1994 Bertoli Brief at 16.

*Impeachment of the Verdict: Rule 606(b)*

Federal Rule of Evidence 606(b) provides, in full:

Inquiry into validity of verdict or indictment. Upon an inquiry into the validity of a verdict or indictment, *a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or the effect of anything upon that or any other juror's mind or emotions* as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental pro-

cesses in connection therewith, except that a juror may testify on the question whether *extraneous prejudicial information* was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

Fed.R.Evid. 606(b) (emphasis added).

As the Supreme Court has noted, Rule 606(b) "is grounded in the common-law rule against admission of jury testimony to impeach a verdict and the exception for juror testimony relating to extraneous influences." *Tanner*, 483 U.S. at 121, 107 S.Ct. at 2748. The rule recognizes that a jury's verdict may not be impeached by a juror's testimony as to " 'internal' rather than 'external' matters." *Id.* at 118, 107 S.Ct. at 2746.

Elaborating on this distinction, the Court has explained that, under Rule 606(b), a juror can

testify as to the influence of extraneous prejudicial information brought to the jury's attention (e.g. a radio newscast or a newspaper account) or an outside influence which improperly had been brought to bear upon a juror (e.g. a threat to the safety of a member of his family), *but he [can]not testify as to other irregularities which occurred in the jury room.*[209]

*Id.* at 123, 107 S.Ct. at 2749 (quoting H.R.Rep. No. 93–6450 at 9–10 (1973)) (emphasis added); *see United States v. Black*, 843 F.2d 1456, 1464 n. 7 (D.C.Cir.1988) (Under rationale of *Tanner* and Rule 606(b), a juror's affidavit or testimony "is incompetent to impeach the verdict for internal error; juror affidavits [or testimony] may only be used for the narrow purpose of showing 'extraneous influence,' such as prejudicial publicity."); *Government of the Virgin Islands v. Nicholas*, 759 F.2d 1073, 1080 (3d Cir.1985) (adopting identical reading of Rule 606(b) on

---

**209.** An irregularity need not occur inside the jury room, in the physical sense, in order to be considered 'internal.' Rather, the distinction focuses on whether the irregularity or influence involves jurors alone, or other non-jury influences as well. Thus, in *Tanner*, the Supreme Court determined that "juror intoxication is not an 'outside influence' about which jurors may testify to impeach the verdict." 483 U.S. at 125, 107 S.Ct. at 2750.

rationale that "[i]t is obvious that the drafters of the rule were primarily concerned with jury tampering or improper communications to the jury ...").

■ Where allegations of juror misconduct are based solely on juror testimony as to 'internal' matters, which testimony would be inadmissible under Rule 606(b), a post-verdict evidentiary hearing is not required with respect to such allegations. *See Tanner,* 483 U.S. at 127, 107 S.Ct. at 2751; *Gilsenan,* 949 F.2d at 97; *Nicholas,* 759 F.2d at 1081; *see also United States v. O'Brien,* 972 F.2d 12, 14 (1st Cir.1992) ("Only communications between jurors and others which concern the case require further inquiry.").

■ It has consistently been held that premature deliberations or improper jury discussions do not constitute "extraneous" irregularities, and testimony regarding such deliberations or discussions may not be received from jurors. *See United States v. Cuthel,* 903 F.2d 1381, 1382–83 (11th Cir. 1990) ("evidence of premature deliberation" could not be the subject of post-verdict inquiry because "there was no allegation of extraneous prejudicial information being brought to the jury's attention; nor was there evidence of improper outside influence sufficient to warrant an inquiry"); *Chiantese,* 582 F.2d at 979 (juror's remark during trial that defense attorney was "stupid" and "a pain in the ____ [*sic*]" did not require evidentiary hearing because "there was no outside influence"); *United States v. Williams–Davis,* 821 F.Supp. 727, 741 (D.D.C.1993) (juror discussions of case prior to deliberations did not require a hearing because such discussions were not extraneous influence under Rule 606(b)); *United States v. Oshatz,* 715 F.Supp. 74, 76 (S.D.N.Y.1989) (Juror's testimony that other jurors "had made up their minds" after testimony of Government's chief witness was inadmissible as internal matter under Rule 606(b)); *see also United States v. Casamayor,* 837 F.2d 1509, 1515 (11th Cir.1988) ("[T]he alleged harassment or intimidation of one juror by another would not be competent evidence to impeach the verdict under Rule 606(b). . . ."), *cert. denied sub nom. Barker v. United States,* 488 U.S. 1017, 109 S.Ct. 813, 102 L.Ed.2d 803 (1989).

Applying these principles to the facts at bar, none of the facts alleged in the Riepe Letter or the Riepe Notes would be admissible to impeach Bertoli's guilty verdict. Every allegation supposedly made by Juror Two in the Riepe Notes concerns internal matters about which jurors would be incompetent to testify pursuant to Rule 606(b). As stated, Bertoli relies solely on Juror Two's allegations as to comments made, and views held, by Juror Six prior to deliberations. *See* Riepe Notes at 2–3; 7 March 1994 Bertoli Brief at 16. Such comments and views do not constitute external influences under Rule 606(b). *See Oshatz,* 715 F.Supp. at 76. The testimony of Juror Two, or of any other juror, regarding such statements by Juror Six would be inadmissible to impeach the verdict. *Id.* Accordingly, neither a new trial nor an evidentiary hearing is warranted by Juror Two's allegations as set forth in the Riepe Notes.

Bertoli does not appear to argue a hearing is warranted by Juror Two's allegations that other jurors were sleeping and otherwise inattentive during trial. Riepe Notes at 2. To the extent he does, his argument fails on both factual and legal grounds. As a factual matter, any assertion that jurors were sleeping during testimony in Bertoli's trial is simply inaccurate. All parts of the jury box are in plain view of the court and the parties; any juror sleeping while testimony was being taken would have been conspicuous and noticed immediately. The court observed no jurors sleeping, either while testimony was being taken or at any other time during trial. Nor did the parties bring any such occurrence to the court's attention. Throughout trial, in fact, the jurors and alternates were observed to be alert and attentive. Any assertion to the contrary lacks credibility. *See United States v. Hernandez,* 921 F.2d 1569, 1577–78 (11th Cir.) (where trial judge found, in response to defense assertions of juror inattentiveness, that "no jurors had been asleep at trial," refusal to investigate issue further was well within discretion of trial court), *cert. denied sub nom. Tape v. United States,* 500 U.S. 958, 111 S.Ct. 2271, 114 L.Ed.2d 722 (1991); *see United States v.*

*Key,* 717 F.2d 1206, 1209 (8th Cir.1983) (same).

Any testimony, moreover, by Juror Two regarding sleeping jurors would be incompetent to impeach the verdict. A juror's testimony that other jurors were sleeping or inattentive during trial does not concern "extraneous" influences and is therefore inadmissible under Rule 606(b). *See Tanner,* 483 U.S. at 121, 107 S.Ct. at 2748 ("[U]nder Rule 606(b), 'proof to the following effects is excludable . . .: that one or more jurors was inattentive during trial or deliberations, sleeping or thinking about other matters.' ") (quoting 3 D. Lousell & C. Mueller, Federal Evidence § 287 at 121–25 (1979)); *see also Nicholas,* 759 F.2d at 1078 ("[Q]uestions concerning the competency of a jury ordinarily are not entertained once the jury has rendered its verdict.").

Only jurors could testify, based on personal knowledge, regarding the issues raised by Juror Two in the Riepe Letter and Riepe Notes. As stated, none of these issues concern "extraneous" influences within the meaning of Rule 606(b). Therefore, any testimony regarding the issues raised in the Riepe Letter and Riepe Notes would be inadmissible to impeach the verdict in this case.[210] *See Tanner,* 483 U.S. at 123, 107 S.Ct. at 2749. Under these facts, neither a new trial nor an evidentiary hearing is warranted by the Riepe Letter and Riepe Notes. *Id.*

### 2. Bertoli's Motion for New Trial Based on Allegations of Juror Misconduct During Voir Dire

By notice of motion, dated 7 March 1994, Bertoli again moved for a new trial based on allegations of juror misconduct (the "7 March 1994 Motion for New Trial"). The 7 March 1994 Motion for New Trial relies on Bertoli's allegations of misconduct during jury *voir dire.*[211]

### a. Voir Dire

As an introduction to the conducting of *voir dire* in this case, it was explained to prospective jurors that they would be asked a series of questions by the court. Trial Transcript at 2. It was stressed that "during this selection process, there [were] only two things [they would] have to be concerned with: fairness and impartiality." *Id.* at 3. No objections were made to this instruction. Following the reading of the Redacted Second Superseding Indictment, prospective jurors were asked forty-three questions meant to insure fairness and impartiality in an empaneled juror. Jurors were also questioned individually on their background. Each prospective juror responded in a manner consistent with the court's direction, bringing to the court's attention only issues which the

---

**210.** The Riepe Letter and Riepe Notes themselves lack credibility. As indicated, Bertoli and Riepe have a substantial relationship through their close friendships with Lindsley. *See supra* note 208. It appears Bertoli, through Levitt, sought to conceal this relationship by representing that Riepe is "an independent writer" who conducted juror interviews on his own initiative. Levitt Aff., ¶ 1. In light of Bertoli's extensive relationship with Riepe, it is highly unlikely that Riepe's decision to interview jurors in Bertoli's case was pure coincidence. Because it appears the Riepe Letter and Riepe Notes were the result of collusion between Bertoli and Riepe, these documents cannot be deemed credible. Accordingly, the Riepe Letter and Riepe Notes cannot provide a basis for a new trial or evidentiary hearing. *See Kelly,* 749 F.2d at 1551–52 (where court found allegations of juror bias to lack credibility, it was within its discretion to deny request for evidentiary hearing to examine juror bias); *see also Caldwell,* 776 F.2d at 998 ("The more

speculative or unsubstantiated the allegation of misconduct, the less the burden to investigate.").

Levitt's actions in concealing the relationship between Riepe and Bertoli from the court raise potential concerns of a different nature. Rule 19B of the General Rules for the District of New Jersey prohibits an attorney or party, either "personally or through any investigator or other person acting for such attorney or party," from interviewing, examining or questioning any juror during the pendency of the trial without leave of the court. Though the issue need not be decided at this juncture, the facts before the court suggest this Rule may have been violated.

**211.** In support of the 7 March 1994 Motion for New Trial, Bertoli submitted: the 7 March 1994 Bertoli Brief; the Levitt Aff.; the 18 March 1994 Bertoli Letter.

In opposition to the 7 March 1994 Motion for New Trial, the Government submitted: the 16 March 1994 Government Brief; the 16 March 1994 Cahill Aff.

juror believed were relevant to his or her ability to serve as a fair, impartial and effective juror.

Bertoli contends Juror Six "made false and misleading statements to the court during *voir dire ....*" Levitt Aff., ¶ 1. Bertoli makes specific reference to four questions asked prospective jurors on *voir dire:*

> [Question] number two [ ("Question 2") ]: do any of you know the defendant, his standby counsel, the Assistant United States Attorneys, anyone in the United States Attorney's Office, any prospective witnesses or members of their families, or have you had any dealings with these people or entities on that list of prospective witnesses.[212]

> . . . . .

> [Question] number thirteen [ ("Question 13") ]: do you have any opinions of accountants or auditors or individuals or entities involved in the securities business, the brokerage business or in the field of finance or investments which would prevent you from being fair and impartial in this case?

> . . . . .

> [Question] number fourteen [ ("Question 14") ]: have you or has any member of your family ever had difficulty in obtaining credit, obtaining a loan or [been] threatened with default on a loan and, if so, is there anything about that which would prevent you from being fair and impartial in this case?

> . . . . .

> [Question] number twenty-seven [ ("Question 27") ]: have you or has a family member ever assisted in the formation of a corporation and, if so, is there anything about [that] which would prevent you from being fair and impartial in this case?

Trial Transcript at 78, 80, 82. Juror Six did not give affirmative answers to any of these questions. Juror Six did, however, indicate during direct questioning by the court that her husband "owns his own business." *Id.* at 115. Bertoli did not question Juror Six further upon gaining this information. Nor did Bertoli object to the form of any of the questions or ask for any follow-up questions.

b. *The Lawsuit against Juror Six*

Bertoli asserts Juror Six, in failing to give affirmative responses to these questions, answered the questions untruthfully. Bertoli bases this assertion on his "investigation" of Juror Six made after his conviction.[213] Levitt Aff., ¶ 5. During this investigation, Bertoli learned Juror Six was party to a lawsuit (the "MLBFS Suit") involving her husband ("WW")[214] and a company known as Merrill Lynch Business Financial Services ("Merrill Lynch Financial"), which is located in Chicago Illinois. The facts of that suit follow.

On 15 August 1991, Merrill Lynch Financial filed a complaint (the "MLBFS Complaint") in the Supreme Court of the State of New York, New York County, naming as defendants Shorlane–Benet Co., Inc. ("Shorlane"), WW and Juror Six. *See* MLBFS Complaint, attached as Exhibit A to the Levitt Aff., at 1. According to the MLBFS

---

**212.** The list of prospective witnesses referred to in Question 2 (the "Witness List") consisted of six pages of names of prospective witnesses for the Government and Bertoli. Listed among these prospective witnesses was the name "Merrill Lynch." Persons related to "Merrill Lynch" were intended to testify on behalf of the Government. The Government has represented that the "Merrill Lynch" named on the witness list denoted Merrill, Lynch, Pierce, Fenner & Smith ("Merrill Lynch Securities"), the New York securities brokerage firm. *See* 16 March 1994 Government Brief at 11.

No employee of Merrill Lynch Securities, or of any other company named "Merrill Lynch," ultimately testified in Bertoli's case. The only witnesses related to Merrill Lynch Securities were two employees of Broadcort Capital, Inc. ("Broadcort"), a subsidiary of Merrill Lynch Se-

curities (the "Broadcort Witnesses"). The Broadcort Witnesses did not provide substantive testimony, but rather testified as records custodians for the purpose of authenticating documents for the Government. *See* Trial Transcript at 863–75 (testimony of Lynda Reynolds); *id.* at 3428–38 (testimony of Robert McGee).

**213.** During a telephone conference on 22 February 1994, Levitt was directed to provide the court with details concerning Bertoli's investigation of Juror Six. To date, the requested data have not been received.

**214.** Because this opinion is intended for publication, the name of Juror Six's husband is withheld in the interest of his privacy.

Complaint, Shorlane was a New York corporation and WW was its president. *Id.*, ¶¶ 2–3.

The MLBFS Complaint alleged that, commencing in March 1988, Shorlane opened a "Working Capital Management Account" with Merrill Lynch Financial "and was granted a line of credit, maturing on February 28, 1989, in the amount of $75,000." *Id.*, ¶ 5. In order to obtain this line of credit, Shorlane executed a Note and Security Agreement (the "MLBFS Note"), dated 2 March 1988. *Id.*, ¶ 6 and Ex. A. Pursuant to the MLBFS Note, Shorlane agreed to repay the line of credit by 28 February 1989, with interest at a per annum rate of two percent over the prime interest rate. *Id.*, Ex. A. Shorlane's obligations under the MLBFS Note were personally guaranteed by WW (the "WW Guaranty"). *Id.*, Ex. B.

By a "Spouse's Certificate," dated 2 March 1988 (the "Spouse's Certificate"), Juror Six consented to the WW Guaranty. *Id.*, Ex. C. Pursuant to the Spouse's Certificate, Juror Six agreed that "all community property and property held with [WW] either as joint tenants or as tenants by the entirety shall be bound by and subject to [the WW Guaranty]." *Id.*

According to the MLBFS Complaint, the MLBFS Note was renewed twice, through 28 February 1991. *Id.*, ¶ 9. The MLBFS Complaint alleged that, during February 1991, Shorlane went out of business, resulting in its default on the MLBFS Note. *Id.*, ¶ 10. The MLBFS Complaint further alleged WW was in breach of the WW Guaranty since 28 February 1991. *Id.*, ¶ 12. The MLBFS Complaint demanded damages in the amount of the unpaid portion of the MLBFS Note from Shorlane and WW, jointly and severally. *Id.*, ¶ 17(a). The MLBFS Complaint further sought a declaration that "any property held by WW as joint tenant or tenant by the entiret[y] with his wife [Juror Six] be subjected to the judgment." *Id.* The MLBFS Complaint demanded no damages from Juror Six.

By order, dated 15 May 1992, summary judgment was granted to Merrill Lynch Financial. *See* Levitt Aff., Ex. B. Subsequently, on 24 September 1992, judgment was entered against Shorlane and WW, jointly and severally, in the amount of $48,014.51 (the "MLBFS Judgment"). No judgment was entered against Juror Six. *See* MLBFS Judgment, attached as Exhibit C to the Levitt Aff., at 2. It appears Merrill Lynch Financial filed suit against WW in the Superior Court of New Jersey to collect the MLBFS Judgment (the "MLBFS New Jersey Suit"). *See* Levitt Aff., Ex. D. Juror Six was not named in the MLBFS New Jersey Suit. *Id.* By order, dated 10 May 1993, final judgment by default was entered against WW in the MLBFS New Jersey Suit. *Id.*

Bertoli asserts Juror Six was required to disclose the existence of the MLBFS Suit in response to Question 2, Question 13 and Question 14. 7 March 1994 Bertoli Brief at 5–6. Bertoli further asserts Juror Six was required by Question 27 to disclose her husband's relationship with Shorlane. *Id.* at 7. Based on Juror Six's failure to answer affirmatively any of these questions, Bertoli argues a new trial is warranted pursuant to Fed.R.Crim.P. 33.

### c. Motion for a New Trial Based on Answers to Jury Voir Dire

As indicated, the decision whether to grant a new trial is committed to the sound discretion of the district court. *See Console,* 13 F.3d at 665. A new trial should be granted only where there is a reasonable probability of substantial prejudice to the defendant. *See Bedford,* 671 F.2d at 762.

The Supreme Court has established that in order to obtain a new trial based on a juror's answers at *voir dire,*

> a party must first demonstrate that a juror failed to answer honestly a material question on *voir dire,* and then further show that a correct response would have provided a valid basis for a challenge for cause.

*McDonough Power Equipment, Inc. v. Greenwood,* 464 U.S. 548, 556, 104 S.Ct. 845, 850, 78 L.Ed.2d 663 (1984);[215] *see Langford,*

---

**215.** Though the standard articulated in *McDonough* was reached in the civil context, it has consistently been applied to motions for a new trial by criminal defendants. *See, e.g., United*

990 F.2d at 68; *North,* 910 F.2d at 904; *United States v. Aquon,* 851 F.2d 1158, 1170 (9th Cir.1988); *Casamayor,* 837 F.2d at 1515.

 Under this standard, an honest, though mistaken, answer is insufficient to require a new trial. *See McDonough,* 464 U.S. at 555, 104 S.Ct. at 849–50 ("To invalidate the result of a 3–week trial because of a juror's mistaken, though honest, response to a question, is to insist on something closer to perfection than our judicial system can be expected to give."); *United States v. Colombo,* 909 F.2d 711, 713 (2d Cir.1990) ("Because the juror had no intention to withhold information or to be unresponsive to the Magistrate's *voir dire,* reversal of [the defendant's] conviction on this claim is unwarranted."); *United States v. Fryar,* 867 F.2d 850, 855 (5th Cir.1989) (no new trial required where juror did not disclose prior crime because of good faith belief it constituted a traffic violation), *cert. denied,* 499 U.S. 981, 111 S.Ct. 1635, 113 L.Ed.2d 730 (1991); *Casamayor,* 837 F.2d at 1515 (new trial not warranted where nondisclosures were attributed to "inattentiveness").

"[A] 'valid basis for a challenge for cause,' absent a showing of actual bias, is insufficient justification" for a new trial. *North,* 910 F.2d at 904; *see Langford,* 990 F.2d at 68 ("[T]he proper focus when ruling on a motion for a new trial in this situation should be on the bias of the juror and the resulting prejudice to the litigant." (quoting *McDonough,* 464 U.S. at 557, 104 S.Ct. at 851 (Brennan, J., concurring)); *United States v. Patrick,* 965 F.2d 1390, 1399 (6th Cir.) ("A prospective juror's failure to disclose material information is grounds for a new trial [only] if it demonstrates actual bias."), *cert. denied sub nom. Gross v. United States,* — U.S. —, 113 S.Ct. 376, 121 L.Ed.2d 287 (1992); *Unit-*

*ed States v. Aponte–Suarez,* 905 F.2d 483, 492 (1st Cir.) ("A defendant seeking a new trial because of nondisclosure by a juror must demonstrate actual bias."), *cert. denied,* 498 U.S. 990, 111 S.Ct. 531, 112 L.Ed.2d 541 (1990); *Casamayor,* 837 F.2d at 1515 (second prong of *McDonough* standard not met because inaccurate answer "did not constitute actual bias").

### Failure to Answer Questions Honestly

 Bertoli argues, first, that Juror Six answered Question 2 falsely. Bertoli points specifically to that part of Question 2 which asked whether a prospective juror knew or "had any dealings with" any people or entities on the Witness List. Trial Transcript at 78. Bertoli argues that, because "Merrill Lynch" was included on the Witness List, Juror Six should have disclosed the existence of the MLBFS Suit in response to Question 2. 7 March 1994 Bertoli Brief at 6.

Bertoli's argument in this regard is unavailing. This case was dominated by the issue of securities fraud. Bertoli was indicted, largely, for actions taken while working behind the scenes at a securities brokerage firm.[216] In light of these facts, the "Merrill Lynch" named on the Witness List was Merrill Lynch Securities, the New York securities brokerage firm.[217] Merrill Lynch Financial, the entity which filed suit against Juror Six, is not a brokerage firm, but a credit and loan corporation. Merrill Lynch Financial was not even peripherally involved in this case. In light of these circumstances, it was not inaccurate, much more dishonest, for Juror Six to fail to discuss the MLBFS Suit in response to Question 2.

In addition, the MLBFS Suit was not the *type* of "dealing" to which Question 2 referred.[218] As indicated, the MLBFS Suit

---

States v. Langford, 990 F.2d 65, 68 (2d Cir.1993); United States v. Calabrese, 942 F.2d 218, 230 n. 6 (3d Cir.1991); North, 910 F.2d at 904.

**216.** As indicated, the Redacted Second Superseding Indictment was read to the jury prior to the conducting of *voir dire.* Trial Transcript at 5–75.

**217.** As stated, the Government has represented that the "Merrill Lynch" named in the Witness List was, in fact, intended to designate Merrill

Lynch Securities. 16 March 1994 Government Brief at 11.

**218.** Question 2 did not specifically ask for the disclosure of lawsuits, but only of "dealings" with prospective witnesses. Trial Transcript at 78. Juror Six's involvement in the MLBFS Suit was, in fact, so peripheral that it might not be considered a "dealing" within the meaning of Question 2. As indicated, it was Shorlane that was involved with Merrill Lynch Financial in the MLBFS Note. *See* MLBFS Complaint, Ex. A. It

involved a note and guaranty. *See* MLBFS Complaint. That suit had no relation to securities or to the trading thereof. Because it was clear the instant suit involved securities, and did not involve a note or mortgage, it was equally clear the MLBFS Suit could have no bearing on a juror's ability to decide the instant case fairly. As indicated, jurors were informed, prior to the conducting of *voir dire*, that the *voir dire* questions were concerned solely with fairness and impartiality. Trial Transcript at 3. Bertoli did not object to this statement or to the form of *voir dire* or ask for any follow-up inquiry. Under these circumstances, Juror Six was not required by Question 2 to reveal the existence of the MLBFS Suit. *See Aponte–Suarez*, 905 F.2d at 492 ("Jurors cannot be faulted for failing to disclose their previous service since they were never asked during the course of *voir dire* to make such a disclosure.").

A decision instructive on this point is *United States v. Nickell*, 883 F.2d 824 (9th Cir. 1989). There, the defendant was tried and convicted of tampering with a consumer product. After his conviction, the defendant moved for a new trial based on a juror's allegedly false response to a *voir dire* question. The question at issue asked: "Have you ... or anyone you know, been the victim of a product tampering incident?" *Id.* at 826. The juror answered: "No." *Id.*

After the verdict, it was discovered the juror "had been involved in a lawsuit against Pepperidge Farms concerning a contaminated product."

The lawsuit arose out of an incident that occurred more than a year and a half before this trial began, when [the juror] bit into a cracker and swallowed a foreign object in the cracker. In her deposition

for that lawsuit, about ten months before trial in this case began, she testified that at the time she bit into the cracker, she "figured I was dead," and noted, "this was right after the cyanide poisonings in Auburn," the same poisonings involved in this case.

*Id.*

Notwithstanding the obvious relationship between the prior suit and the prosecution at bar, the Circuit held the juror's answer was not grounds for a new trial:

The district court correctly ruled that the juror's response in this case did not meet the first requirement of the *McDonough* test. We see no basis for a finding that the juror deliberately concealed information.... There is ... a significant difference between a product contamination case, such as the suit [the juror] had been involved in earlier, and a product tampering case. [The juror] was asked only if she ... had been involved in a product tampering case. It is difficult to understand what response by the juror would have been more appropriate than her denial.

*Id.* at 827.

The MLBFS Suit and the instant prosecution are far more divergent than the proceedings at issue in *Nickell.* The relevance of the MLBFS Suit was so far removed from the instant proceedings that its disclosure in response to Question 2 was not required. Juror Six's answer to Question 2 did not, therefore, constitute a dishonest answer to a *voir dire* question, so as to warrant a new trial. *See Nickell,* 883 F.2d at 827.

As stated, Bertoli also argues Juror Six's failure to disclose the existence of the MLBFS Suit constituted a false answer to Question 13. This contention is also unper-

was WW, Juror Six's husband, who was president of Shorlane and who executed the WW Guaranty with Merrill Lynch Financial. *Id.,* Ex. B. Juror Six was not an officer of Shorlane or a party to the transactions underlying the MLBFS Suit; her only relation to the suit was her execution of the Spouse's Certificate. That instrument merely indicated her agreement that marital property jointly owned by her and WW would be subject to the WW Guaranty. *Id.,* Ex. C. Indeed, no judgment was entered against Juror Six in the MLBFS Suit, and Juror Six was not even

named in the MLBFS New Jersey Suit. *See* MLBFS Judgment; Levitt Aff., Ex. D.

Involvement as peripheral as that of Juror Six in the MLBFS Suit did not constitute the type of "dealings" which Question 2 sought to reveal. To conclude otherwise would require the disclosure of scores of facts manifestly irrelevant to the case at bar. Such a result would be unduly burdensome to the court and parties, and would make the impaneling of a jury exceptionally difficult.

suasive. Question 13, as stated, merely asked whether the prospective jurors had "any *opinions* of accountants or auditors or individuals or entities involved in the securities business, the brokerage business or in the field of finance or investments which would prevent [them] from being fair and impartial in this case." Trial Transcript at 80.

Nowhere in Question 13 is the disclosure of events or relationships required. The question merely requires the disclosure of opinions which the jurors might have. The MLBFS Suit does not constitute an "opinion," but an event. It would, therefore, have been inappropriate for Juror Six to disclose the existence of the MLBFS Suit in response to Question 13. *See Nickell,* 883 F.2d at 827.

Question 13, moreover, asks only for opinions regarding accountants, auditors, "or individuals or entities involved in the securities business, the brokerage business or in the field of finance or investments...." Trial Transcript at 80. As stated, Merrill Lynch Financial is a credit and loan company; it is not an auditing, accounting, securities brokerage or investment firm. Because the MLBFS Suit did not involve an entity described in Question 13, it could not evidence an "opinion" disclosable in response to that question.

In addition, Question 13 asks only for opinions "which would prevent [a juror] from being fair and impartial in this case." *Id.* The facts adduced by Bertoli establish that Juror Six was only peripherally involved in the MLBFS Suit. *See supra* note 218. In light of her slight involvement, it is highly unlikely the MLBFS Suit affected Juror Six's opinion in a way which would prevent her from being fair and impartial. This conclusion is further supported by the complete

lack of similarity between the parties and issues involved in the MLBFS Suit and those involved in the instant case. Juror Six's answer to Question 13 was not, therefore, dishonest and does not warrant a new trial. *See McDonough,* 464 U.S. at 556, 104 S.Ct. at 850.

■ Bertoli's argument with respect to Question 14 also fails. As stated, that question asked, in relevant part, whether a prospective juror "ever had difficulty in obtaining credit, obtaining a loan or [been] threatened with default on a loan and, if so, is there anything about that which would prevent you from being fair and impartial in this case." Trial Transcript at 80. Bertoli argues the MLBFS Suit should have been disclosed in response to this question. 7 March 1994 Bertoli Brief at 6.

There is no indication Juror Six answered this question falsely. Specifically, there is no indication, either in the MLBFS Suit or elsewhere, that Juror Six or WW themselves were ever threatened with default on a loan. The MLBFS Suit evidences only that Shorlane, a corporation, was in default on the MLBFS Note; neither Juror Six nor WW was a party to that note. *See* MLBFS Complaint, ¶ 10, Ex. A. WW was a guarantor of the MLBFS Note and was not himself in default on that note. *Id.,* Ex. B. Juror Six, having merely executed the Spouse's Certificate, was even farther removed from Shorlane's default. *Id.,* Ex. C. There is, therefore, no indication Juror Six or any of her family members were ever threatened with default on a note. Correspondingly, there is no indication Juror Six submitted a dishonest, or even inaccurate, answer to Question 14.[219] *See McDonough,* 464 U.S. at 556, 104 S.Ct. at 850.

---

**219.** Question 14, by its terms, requires disclosure only of information "which would prevent [a juror] from being fair and impartial in this case." Trial Transcript at 80. As stated, Juror Six's peripheral involvement in the MLBFS Suit provides no basis on which to conclude she could not have been impartial in Bertoli's case. Therefore, Juror Six's failure to render an affirmative response to Question 14 did not constitute a dishonest answer. *See McDonough,* 464 U.S. at 556, 104 S.Ct. at 850.

Bertoli argues such a reading of Question 14 would render the question no more useful in

determining bias than the general question: "Is there any reason you cannot be fair and impartial." 18 March 1994 Bertoli Letter at 2. Bertoli ignores, however, that a question phrased so generally would give the prospective juror no indication of the opinions or predispositions which could render the juror partial in this particular case. Question 14, on the other hand, points the prospective juror toward the issues he or she should consider in determining whether he or she can be impartial. A two-part question, such as Question 14, enables the juror to make

 Finally, Bertoli argues Juror Six should have disclosed her husband's relationship with Shorlane in response to Question 27. *See* 7 March 1994 Bertoli Brief at 7. The relevant portion of that question asks whether the prospective juror or a family member has "ever assisted in the formation of a corporation and, if so, is there anything about [that] which would prevent [the juror] from being fair and impartial in this case?" Trial Transcript at 82.

Contrary to Bertoli's suggestion, there is no indication Juror Six should have responded affirmatively to Question 27. At most, the facts adduced by Bertoli regarding the MLBFS Suit evidence that WW, Juror Six's husband, was president of a corporation. *See* MLBFS Complaint, ¶ 3. These facts in no way suggest that WW, or Juror Six, ever assisted in the formation of a corporation or, more importantly, that Juror Six was not or could not be fair and impartial. Bertoli has not established, therefore, that Juror Six answered Question 27 dishonestly, or even inaccurately.[220]

Juror Six, moreover, made no attempt to hide her husband's involvement with Shorlane. On direct questioning by the court, Juror Six stated her husband "owns his own business." Trial Transcript at 115. Bertoli's failure to pursue this issue, despite every opportunity to do so, cannot be equated with dishonesty on the part of Juror Six.

Each of the questions cited by Bertoli in support of his 7 March 1994 Motion for New Trial was answered accurately and honestly by Juror Six. Bertoli has, therefore, failed to demonstrate that Juror Six "failed to answer honestly a material question on *voir dire* . . . ." *McDonough*, 464 U.S. at 556, 104 S.Ct. at 850. The 7 March Motion for New Trial must be denied on this basis alone.

*Valid Basis for Challenge for Cause*

 As stated, in order to obtain a new trial based on Juror Six's responses to questions on *voir dire*, Bertoli must "further show that a correct response would have provided a valid basis for a challenge for cause." *Id.* Moreover, as indicated, the touchstone for this inquiry is whether the defendant has demonstrated "actual bias" on the part of the juror. *Patrick*, 965 F.2d at 1399; *see Langford*, 990 F.2d at 68; *Aponte–Suarez*, 905 F.2d at 492.

In the instant case, Bertoli has not demonstrated that disclosure of the MLBFS Suit and the surrounding facts would have established Juror Six's bias or otherwise provided a valid basis for a challenge for cause. Nor could he make such a showing. As indicated, the impartiality *vel non* of Juror Six was extensively explored by the court during the proceedings in this case. During this inquiry, Juror Six affirmed she was able to decide the case in a fair and impartial manner. The court's inquiry, as well as Juror Six's conduct during trial, resulted in the finding that Juror Six's affirmations of impartiality were credible and accurate. Trial Transcript at 6830 ("I am . . . satisfied beyond any doubt that [Juror Six] is a fair, impartial juror."). This finding may only be revisited upon "solid evidence of distinct bias." *United States v. Angiulo*, 897 F.2d 1169, 1183 (1st Cir.), *cert. denied sub nom. Granito v. United States*, 498 U.S. 845, 111 S.Ct. 130, 112 L.Ed.2d 98 (1990).

Bertoli has presented no evidence of actual bias in connection with his 7 March 1994 Motion for New Trial. The existence of the MLBFS Suit and the facts surrounding it, had they been disclosed during *voir dire*, would not have evidenced bias on the part of Juror Six. As indicated, Juror Six was only

---

an informed decision regarding whether he or she can be impartial. It does not, however, require the disclosure of extraneous material which has no impact on the case or the juror's ability to decide it and which would unnecessarily burden the jury selection process.

**220.** Like Question 14, Question 27 solicited disclosure only of information which would prevent the juror from being fair and impartial. Trial Transcript at 82. Juror Six's involvement with Shorlane was too peripheral to have resulted in

any bias or partiality on her part. As indicated, Juror Six was not an officer of Shorlane. Indeed, there is no indication Juror Six had any involvement in the business of Shorlane beyond her execution of the Spouse's Certificate in connection with the MLBFS Note. *See generally,* Levitt Aff. Because there is nothing in the record to suggest Juror Six was rendered partial by any involvement in Shorlane, her answer to Question 27 was not inaccurate or dishonest.

peripherally involved in the MLBFS Suit. She was not a party to the MLBFS Note or the WW Guaranty, the transactions constituting the focus of the MLBFS Suit. *See* MLBFS Complaint, Exs. A, B. Juror Six was not an officer of Shorlane, the principal defendant in the MLBFS Suit. Indeed, no judgment was entered against Juror Six in the MLBFS Suit, and Juror Six was not even named in the MLBFS New Jersey Suit. *See* MLBFS Judgment; Levitt Aff., Ex. D. Under these circumstances, it is highly unlikely the MLBFS Suit impacted significantly on Juror Six's opinions.

As the Government points out, any opinions held by Juror Six as a result of the MLBFS Suit would have inured to the benefit of Bertoli. Any predispositions held by Juror Six as a result of the MLBFS Suit would have been adverse to Merrill Lynch Financial and not in its favor. Similarly, any confusion between Merrill Lynch Financial and Merrill Lynch Securities on the part of Juror Six would have resulted in her unfavorable opinion toward Merrill Lynch Securities. As stated, employees of Merrill Lynch Securities were expected to testify on behalf of the Government and not on behalf of Bertoli. Accordingly, the MLBFS Suit would, at most, have caused Juror Six to doubt the testimony of the Government's witnesses and could in no way have prejudiced Bertoli. It is highly unlikely, in fact, that either party was prejudiced by the empaneling of Juror Six, for the only persons related to Merrill Lynch Securities who ultimately testified, the Broadcort Witnesses, did so only to authenticate documents and did not offer substantive testimony.

WW's relationship with Shorlane, which Bertoli argues should have been disclosed in response to Question 27, similarly provides no basis for a finding of bias on the part of Juror Six. As stated, there is no indication in the record that Juror Six maintained any relationship with Shorlane beyond her execution of the Spouse's Certificate. In any event, Bertoli has failed to explain how Juror Six's mere relationship with Shorlane would exhibit bias on her part or otherwise have caused her excusal for cause. It does not, in fact, appear Juror Six's limited relationship

with Shorlane adversely impacted on her ability to render a fair and impartial verdict. She would not, therefore, have been excused for cause had she revealed this relationship during *voir dire.*

As indicated, moreover, Juror Six did refer to her husband's relationship with Shorlane during *voir dire.* Responding to direct questioning by the court, Juror Six stated: "My husband ... owns his own business." Trial Transcript at 115. In spite of the disclosure of this information, Bertoli failed to challenge Juror Six or even ask to explore more fully issues related to WW's ownership of the business. Instead, Bertoli sat through the *voir dire* of over thirty other prospective jurors without once revisiting Juror Six. Indeed, Bertoli sat through the entire trial without raising this issue and only now claims he was prejudiced by Juror Six's failure to disclose her husband's role in Shorlane. Bertoli had knowledge and opportunity sufficient to explore this issue nearly one year ago, and chose not to do so until after he was found guilty.

"A sentient defendant, knowledgeable of a possible claim of juror bias, waives the claim if he elects not to raise it promptly." *Aponte–Suarez,* 905 F.2d at 492; *see United States v. Uribe,* 890 F.2d 554, 560 (1st Cir. 1989); *United States v. Ramsey,* 726 F.2d 601, 604 (10th Cir.1984); *United States v. Dean,* 667 F.2d 729, 730 (8th Cir.), *cert. denied,* 456 U.S. 1006, 102 S.Ct. 2296, 73 L.Ed.2d 1300 (1982).

> Any other rule would allow defendants to sandbag the court by remaining silent and gambling on a favorable verdict, knowing that if the verdict went against them, they could always obtain a new trial by later raising the issue of juror misconduct.

*United States v. Costa,* 890 F.2d 480, 482 (1st Cir.1989); *see United States v. Breit,* 712 F.2d 81, 83 (4th Cir.1983) ("A defendant who remains silent about known juror misconduct—who, in effect, takes out an insurance policy against an unfavorable verdict—is toying with the court.").

Juror Six's statements during *voir dire* placed Bertoli on notice with respect to WW's relationship with his business. Because he failed to raise, or sought to explore,

the issue of WW's relationship with Shorlane until after the verdict, Bertoli cannot now argue Juror Six was biased because of this relationship. *See Aponte–Suarez*, 905 F.2d at 492.

Bertoli has demonstrated no bias, actual or potential, on the part of Juror Six as a result of the MLBFS Suit or its surrounding facts. He has similarly failed to demonstrate that, had these facts been known during *voir dire*, there would have been a valid basis to challenge Juror Six for cause. Bertoli's failure to make these showings precludes the grant of his 7 March 1994 Motion for New Trial.[221] *See McDonough*, 464 U.S. at 556, 104 S.Ct. at 850.

### 3. *Bertoli's Motion to Recuse Court from Sentencing*

#### a. *Background*

By letter, dated 6 October 1993 (the "6 October 1993 Letter"), Bertoli again moved that the court recuse itself from sentencing in this matter (the "Sentencing Recusal Motion"). The Sentencing Recusal Motion is the most recent in a series of recusal motions made by Bertoli in this case:

On 2 November 1989, Bertoli filed a motion seeking the recusal of the court from presiding over his case (the "2 November 1989 Recusal Motion"). The 2 November 1989 Recusal Motion relied on two letters written by Bertoli which concerned the court.

On 2 November 1987, following the sentencing of Cannistraro in connection with the 1987 Cannistraro Indictment and prior to Bertoli's indictment, Bertoli addressed a letter to the court expressing dissatisfaction with the court's handling of Cannistraro's sentencing. Amended Brief in Support of 2 November 1989 Recusal Motion, Ex. A (the "2 November 1987 Bertoli Letter"). In the 2 November 1987 Bertoli Letter, Bertoli attacked the integrity of the court and cast aspersions on the court's "mannerism[s]" and views. *Id.* at 1. The 2 November 1987 Bertoli Letter concluded: "If you do not resign from the bench within thirty days, I will refer this matter to the Judiciary committee and bar association for action." *Id.* at 3.

On 3 November 1987, Bertoli addressed a letter to then Justice Thurgood Marshall of the United States Supreme Court. Amended Brief in Support of 2 November 1989 Recusal Motion, Ex. B (the "3 November 1987 Bertoli Letter") (collectively with the 2 November 1987 Bertoli Letter, the "November 1987

---

**221.** No evidentiary hearing was required to render a decision on the 7 March 1994 Motion for New Trial. The decision as to whether to grant an evidentiary hearing on a motion for a new trial is addressed to the sound discretion of the trial court. *See United States v. Begnaud*, 848 F.2d 111, 113 (8th Cir.1988); *United States v. Berry*, 627 F.2d 193, 197 (9th Cir.1980), *cert. denied*, 449 U.S. 1113, 101 S.Ct. 925, 66 L.Ed.2d 843 (1981); *United States v. Cardarella*, 588 F.2d 1204, 1205 (8th Cir.1978). "A district court, when entertaining a motion for a new trial, may rely on knowledge gained while presiding over trial...." *United States v. Tucker*, 836 F.2d 334, 337 (7th Cir.), *cert. denied*, 488 U.S. 855, 109 S.Ct. 143, 102 L.Ed.2d 115 (1988). Even where there are disputed issues of fact, such issues "can ordinarily be decided on the basis of affidavits without an evidentiary hearing." *United States v. Kelly*, 790 F.2d 130, 134 (D.C.Cir.1986); *see United States v. Sensi*, 879 F.2d 888, 900 n. 12 (D.C.Cir.1989); *United States v. Abou–Saada*, 785 F.2d 1, 6 (1st Cir.), *cert. denied*, 477 U.S. 908, 106 S.Ct. 3283, 91 L.Ed.2d 572 (1986); *United States v. Hamilton*, 559 F.2d 1370, 1373 (5th Cir.1977). Moreover, an evidentiary hearing will not be required where the arguments advanced in support of a new trial are baseless or frivolous. *See United States v. Salerno*, 868 F.2d 524,

541 (2d Cir.), *cert. denied*, 491 U.S. 907, 109 S.Ct. 3192, 105 L.Ed.2d 700 (1989); *Tucker*, 836 F.2d at 337; *United States v. Kimberlin*, 805 F.2d 210, 251 (7th Cir.1986), *cert. denied*, 483 U.S. 1023, 107 S.Ct. 3270, 97 L.Ed.2d 768 (1987); *Kelly*, 749 F.2d at 1551 (where trial court did not find allegations of juror bias credible, it was within court's discretion to refuse to "hold a separate hearing in which it would interrogate jurors as to their bias").

In the instant case, the record, combined with the affidavits of the parties, provided an adequate factual basis on which to decide the 7 March 1994 Motion for New Trial. The court had the opportunity to observe the conduct of Juror Six over ten weeks of trial and deliberations. During this period, and during the court's inquiry into Juror Six's fitness, it was determined "beyond any doubt" that Juror Six was able to serve fairly and impartially. Trial Transcript at 6830. Bertoli's new submissions did nothing to bring that determination into question. Because the record established conclusively that Bertoli's 7 March 1994 Motion for New Trial was meritless, no evidentiary hearing was required to rule on the motion.

Letters"). The 3 November 1987 Bertoli Letter purported to be a "formal complaint and request to reprimand and take such other action including impeachment.... " *Id.* at 1. In the 3 November 1987 Bertoli Letter, Bertoli again expressed dissatisfaction with this court's handling of the 1987 Cannistraro Indictment.

By opinion, dated 22 March 1990, the 2 November 1989 Recusal Motion was denied. *See Eisenberg,* 734 F.Supp. 1137. Bertoli moved for reconsideration on 2 April 1990; this motion was denied by opinion dated 12 April 1990. *See United States v. Eisenberg,* 734 F.Supp. 1168 (D.N.J.1990). Bertoli subsequently petitioned the Third Circuit for a writ of mandamus ordering recusal. On 18 May 1990, the Circuit filed an order denying Bertoli's petition for mandamus without requiring a response from the Government.

On 24 July 1990, Cannistraro moved for recusal of the court (the "24 July 1990 Recusal Motion"). By letter, dated 26 July 1990, Bertoli joined in the 24 July 1990 Recusal Motion. By letter opinion, dated 16 August 1990, the 24 July 1990 Recusal Motion was denied. *See United States v. Eisenberg,* No. 89–218, slip op. (D.N.J. 16 Aug. 1990). The Third Circuit dismissed Bertoli's subsequent appeal.

On 12 March 1991, Bertoli and Cannistraro again moved for the recusal of the court (the "12 March 1991 Recusal Motion"). The 12 March 1991 Recusal Motion was based on a purported "public opinion survey [which] was commissioned to ascertain what a citizen of New Jersey would feel concerning the [c]ourt's impartiality knowing the background of this case." *United States v. Eisenberg,* 773 F.Supp. 662, 733 (D.N.J.1991) (citing Brief of Cannistraro in Support of 12 March 1991 Recusal Motion at 14). By opinion, dated 26 July 1991, the 12 March 1991 Recusal Motion was denied. *See Eisenberg,* 773 F.Supp. at 734.

---

**222.** A statute parallel to section 455, 28 U.S.C. § 144, provides for disqualification where actual bias exists. Section 144 requires a party to move for disqualification and to "file a timely and sufficient affidavit" in support of recusal. *Id.*

By letter, dated 17 December 1992, Bertoli requested, for a fourth time, the recusal of the court (the "17 December 1992 Recusal Motion"). The 17 December 1992 Recusal Motion was based on the court's 7 December 1992 letter to the parties, directing Defendants to enclose a cover letter when serving trial subpoenas *duces tecum.* At a pretrial hearing on 12 January 1993, the 17 December 1992 Recusal Motion was denied. Bertoli thereafter petitioned the Third Circuit for a writ of mandamus recusing the court. By order, dated 21 April 1993, the Third Circuit once again refused to grant Bertoli the requested writ of mandamus. On 27 May 1993, Bertoli petitioned the Supreme Court for *certiorari* on the recusal issue. On 4 October 1993, the Supreme Court denied *certiorari. See Bertoli v. United States District Court for the District of New Jersey,* —— U.S. ——, 114 S.Ct. 77, 126 L.Ed.2d 45 (1993). As stated, the Sentencing Recusal Motion followed on 6 October 1993.

**b. *28 U.S.C. § 455(a)***

■ Section 455(a) of title 28 provides: "Any justice, judge or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). Under section 455(a), a court must consider *sua sponte* whether disqualification is warranted; no onus is placed on the parties to submit affidavits in support of disqualification, or even to move for disqualification.[222] *See United States v. Schreiber,* 599 F.2d 534, 539 (3d Cir.), *cert. denied,* 444 U.S. 843, 100 S.Ct. 86, 62 L.Ed.2d 56 (1979).

"In determining whether recusal is required under this provision, [the court] must apply an objective standard." *Edelstein v. Wilentz,* 812 F.2d 128, 131 (3d Cir.1987). More specifically, "a judge must consider whether a reasonable person knowing all the circumstances would harbor doubts concerning the Judge's impartiality." *Jones v. Pittsburgh National Corp.,* 899 F.2d 1350, 1356

---

The 6 October 1993 Letter does not specify the statute under which the Sentencing Recusal Motion is made. However, because Bertoli has not filed an affidavit in support of recusal, as required by section 144, the Sentencing Recusal Motion will be considered under section 455.

(3d Cir.1990); *see Edelstein,* 812 F.2d at 131; *United States v. Dalfonso,* 707 F.2d 757, 760 (3d Cir.1983).

Recusal under section 455(a) "must rest on the kind of objective facts that a reasonable person would use to evaluate whether an appearance of impropriety had been created, not on 'possibilities' and unsubstantiated allegations." *United States v. Martorano,* 866 F.2d 62, 68 (3d Cir.1989), *cert. denied,* 493 U.S. 1077, 110 S.Ct. 1128, 107 L.Ed.2d 1034 (1990). "Disagreement with a judge's determinations certainly cannot be equated with the showing required to so reflect on his [or her] impartiality as to dictate recusal." *Jones,* 899 F.2d at 1356.

Generally, "only extrajudicial bias requires disqualification" under section 455(a). *United States v. Sciarra,* 851 F.2d 621, 635 (3d Cir.1988); *see Liteky v. United States,* ── U.S. ──, ── ── ──, 114 S.Ct. 1147, 1156–57, 127 L.Ed.2d 474 (7 Mar. 1994) (Bias not derived from extrajudicial source will "rarely" require recusal under section 455(a), and whether bias is extrajudicial is "often determinative" of recusal inquiry.); *Johnson v. Trueblood,* 629 F.2d 287, 291 (3d Cir.1980), *cert. denied,* 450 U.S. 999, 101 S.Ct. 1704, 68 L.Ed.2d 200 (1981). " 'Extrajudicial bias' refers to a bias that is not derived from the evidence or conduct of the parties that the judge observes in the course of the proceedings." [223] *Sciarra,* 851 F.2d at 634 n. 28; *see United States v. Grinnell Corp.,* 384 U.S. 563, 583, 86 S.Ct. 1698, 1710, 16 L.Ed.2d 778 (1966) ("The alleged bias and prejudice to be disqualifying must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case."); *Johnson,* 629 F.2d at 291.

Where a "trial judge's . . . comments [are] linked to his [or her] evaluation of the case based on the pleadings and other materials outlining the nature of the case," such comments will not constitute extrajudicial bias. *Johnson,* 629 F.2d at 291. "Also not subject

to deprecatory characterization as 'bias' or 'prejudice' are opinions held by judges as a result of what they learned in earlier proceedings [with the same defendant]. It has long been regarded as normal and proper for a judge to sit in the same case upon its remand, and to sit in successive trials involving the same defendant." *Liteky,* ── U.S. at ──, 114 S.Ct. at 1155; *see United States v. Sinclair,* 424 F.Supp. 715, 718 (D.Del.1976) ("[I]t is equally clear that a claim of prejudice based on judicial knowledge gained from prior hearings or other cases is not sufficient grounds for disqualification of a judge whether it be from prior judicial exposure to the defendant or prior judicial rulings adverse to the defendant in same or similar cases.").

As a consequence of the "extrajudicial source factor," "judicial rulings alone almost never constitute valid basis for a bias or partiality motion [under section 455(a)]. In and of themselves . . . , they cannot possibly show reliance upon an extrajudicial source, and can only in the rarest circumstances evidence the degree of favoritism or antagonism required . . . when no extrajudicial source is involved." *Liteky,* ── U.S. at ──, 114 S.Ct. at 1157; *see Johnson,* 629 F.2d at 291 ("[T]he judge's rulings at trial do not constitute grounds for recusal because they can be corrected by reversal on appeal.").

"[J]udicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." *Liteky,* ── U.S. at ──, 114 S.Ct. at 1157. The Supreme Court has explained that judicial remarks during the course of trial may require recusal:

> if they reveal an opinion that derives from an extrajudicial source, and they will do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible. . . . *Not establishing bias or partiality, however,* are expressions of impatience, dissatisfaction, annoy-

─────────

**223.** The Supreme Court has elaborated:

[O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a

bias or partiality motion [under section 455(a)] unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible.

*Liteky,* ── U.S. at ──, 114 S.Ct. at 1157.

ance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as [F]ederal judges, sometimes display. A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune.

*Id.* (emphasis added).

█ A criminal defendant's public allegations of misconduct on the part of the court will not support recusal from sentencing without some other "evidence from which it could be inferred that [the court] harbored ill will against [the defendant]...." *Martorano,* 866 F.2d at 69. "By training and inclination, judges meet media criticism of their actions with robust insensitivity." *Id.; see In re Martin–Trigona,* 573 F.Supp. 1237, 1243 (D.Conn.1983) ("[I]t is clear that a judge is not disqualified under 28 U.S.C. § 455 (or under 28 U.S.C. § 144 for that matter) merely because a litigant sues or threatens to sue him.... Neither is a litigant's scurrilous attack on a presiding judge a valid ground for recusal...."); *United States v. Garrison,* 340 F.Supp. 952, 957 (E.D.La.1972) ("To allow prior derogatory remarks about a judge to cause the latter's compulsory recusal would enable any defendant to cause the recusal of any judge merely by making disparaging statements about him.").

### c. *Bertoli's Plan to Force Recusal*

█ In support of the Sentencing Recusal Motion, Bertoli argues: "That the earlier, critical [November 1987 L]etter[s] stuck in the proverbial craw of the court is apparent." 6 October 1993 Letter at 2. As indicated in response to the 2 November 1989 Recusal Motion, the November 1987 Letters do not constitute a basis for the court's recusal. *See generally Eisenberg,* 734 F.Supp. 1137.

It appears that the November 1987 Letters, the four other recusal motions, and indeed the Sentencing Recusal Motion itself, as the Government argues, are a part of a "plan to force the court's recusal" which was initiated before Bertoli's indictment. *See* Government's Memorandum in Response to Bertoli's 6 October 1993 Letter, dated 15

October 1993 (the "15 Oct. 1993 Government Brief") at 8–14.

As stated in the opinion denying the 2 November 1989 Recusal Motion: "At least by the time of the 1987 Cannistraro Indictment, it appears Bertoli was aware that he was a subject of a grand jury investigation which also concerned Eisenberg." *Eisenberg,* 734 F.Supp. at 1145. According to interviews of Eisenberg conducted in September 1991 and on 13 October 1993 (the "Eisenberg Interviews"), "after [the 1987 Cannistraro Indictment], ... Bertoli told Eisenberg that Bertoli expected that he and Eisenberg would be the next to be indicted. Bertoli also told Eisenberg that he expected that the Honorable Alfred J. Lechner, Jr., who was presiding over the Cannistraro case, would also be assigned to hear their case." Affidavit of Michael J. Cahill, Special Agent of Federal Bureau of Investigation (the "Cahill Recusal Aff."), ¶ 2.

According to the Eisenberg Interviews:

Bertoli told Eisenberg that he considered Judge Lechner to be a tough sentencer, that he had a plan to ensure that Judge Lechner could not preside over their case, and that he would cause problems for Judge Lechner with his tactics.

After Cannistraro was sentenced on [2 November] 1987, Bertoli told Eisenberg that he had sent [the November 1987 L]etters to Judge Lechner and to Washington and other places. Moreover, he told Eisenberg that these letters were highly critical of Judge Lechner, that they would antagonize him, and that they would ensure that Judge Lechner could not preside over their expected prosecution[s]. Bertoli also told Eisenberg that, after their expected indictment, Bertoli planned to say that as a result of these letters they could not receive a fair trial in front of Judge Lechner.

Cahill Recusal Aff., ¶¶ 2–3.

The information obtained in the Eisenberg Interviews is consistent with that obtained in a Government tape recording of a telephone conversation between Cannistraro and Berto-

li during Cannistraro's incarceration on the 1987 Cannistraro Indictment:[224]

> BERTOLI: ... my letter complaint on Lechner is in the mail today.
>
> CANNISTRARO: Okay.
>
> BERTOLI: Ahh ... the second the second paragraph I'll use (unintelligible). The second paragraph says Mr. [sic] Lechner has displayed lack of judicial temperament and truly needs psychiatric help and analysis. He should love me for that.

Government's Brief in Opposition to the 2 November 1989 Recusal Motion, dated 17 November 1989 (the "17 Nov. 1989 Government Brief"), Ex. 1 (tape recording at approximately counter number 184).

The existence of Bertoli's plan is also shown by evidence of Bertoli's attempts to judge-shop on other occasions. In 1975, the SEC filed the 1975 SEC Proceeding against Bertoli in connection with his New York City brokerage firm, Executive Securities. *See Eisenberg,* 734 F.Supp. at 1146. The matter was assigned to Administrative Law Judge Ralph Tracy ("Judge Tracy"). By letter and affidavit, both dated 7 April 1976, Bertoli demanded Judge Tracy's recusal "based on bias and prejudice of said Judge." 17 Nov. 1989 Government Brief, Ex. 5. Bertoli warned Judge Tracy: "In the event of your failure to respond with[in] ten days, I will have no choice but to move in the United States District Court for your removal." *Id.* By order, dated 16 April 1976, Judge Tracy denied Bertoli's motion for recusal. *Id.* The SEC found Bertoli's claims of bias against Judge Tracy to be "without substance." 18 SEC Docket 486, 491, Release No. 34–16220, 1979 WL 17048 at *4 (25 Sept. 1979).

Bertoli's proclivity for judge-shopping resurfaced during a 1976 to 1977 Federal grand jury investigation of Bertoli's role in the collapse of Executive Securities. *Eisenberg,* 734 F.Supp. at 1145. As appears from a series of letters between Bertoli and the

United States Attorney's Office in 1976 and 1977, Bertoli was aware of the then pending grand jury investigation. *See Eisenberg,* 734 F.Supp. at 1145–46; 17 Nov. 1989 Government Brief, Ex. 3.

On 23 April 1977, Bertoli addressed a letter to then United States Attorney General Griffin Bell, President Jimmy Carter and other officials of the Government, "demand[ing] that United States District Court Judges Fredrick Lacey [("Judge Lacey")] and Lawrence [(sic)] Stern [("Judge Stern"), both of the District of New Jersey,] be indicted." 17 Nov. 1989 Government Brief, Ex. 4. Bertoli made outrageous unsupported allegations about Judge Lacey and Judge Stern. *Id.* It turned out, however, that when Bertoli was indicted on 20 June 1977, as a result of a 'blind assignment,' neither Judge Lacey nor Judge Stern was assigned to Bertoli's case. *See Eisenberg,* 734 F.Supp. at 1147.

It appears Bertoli's actions in this case are another such attempt at judge-shopping. His transparent attempts to cause recusal through the November 1987 Letters were unsuccessful, and cannot constitute a basis for the court's recusal under section 455(a).[225] *See Martorano,* 866 F.2d at 69; *In re Martin–Trigona,* 573 F.Supp. at 1243; *cf. Dalfonso,* 707 F.2d at 761 ("This potential judge shopping problem was not lost upon the framers of the [F]ederal recusal statute."). Accordingly, to the extent the Sentencing Recusal Motion is predicated on the November 1987 Letters, the motion is without merit.

### d. *Statements and Rulings of the Court*

■ The Sentencing Recusal Motion is predicated primarily on several statements and rulings made prior to and during Bertoli's trial. Bertoli first points to the proceedings of 2 July 1993, and to the court's statement:

---

**224.** It appears all non-privileged prisoner communications made from or received at the prison were recorded. Prisoners were apprised of this practice.

**225.** As stated, the 2 November 1989 Recusal Motion, which was based upon the November

1987 Letters, was denied in an opinion dated 22 March 1990. *See Eisenberg,* 734 F.Supp. 1137. The reasons the November 1987 Letters cannot constitute a basis for recusal are discussed in greater detail in that opinion.

From day one in this case either you or your attorneys have been taunting me. You have been making up straw men and trying to knock them down. You've written bogus letters and say that's the reason I should recuse myself.

6 October 1993 Letter at 2 (quoting Trial Transcript at 2945). Bertoli argues that the court's "spontaneous exhumation" of the November 1987 Letters "demonstrates—or at least creates the appearance of—the court's continuing hostility toward Bertoli." 6 October Letter at 2.

These comments neither demonstrate a disposition of the court toward Bertoli nor compel recusal. *Johnson*, 629 F.2d at 291. As indicated, Bertoli wrote the November 1987 Letters in response to the court's 2 November 1989 sentencing of Cannistraro, and in anticipation of his trial before this court on a related indictment. Bertoli relied on the November 1987 Letters in his 2 November 1989 Recusal Motion. *See supra* at 1116. Comments of the court referring to the November 1987 Letters, and to Bertoli's reliance thereon in the 2 November 1989 Recusal motion, were based upon "prior judicial exposure" to Bertoli, and do not evidence extrajudicial bias. *Sinclair*, 424 F.Supp. at 718; *see Liteky*, —— U.S. ——, —— – ——, 114 S.Ct. 1147, 1156–57.

Perhaps more importantly, these comments do not in the least evidence "hostility toward Bertoli." 6 October 1993 Letter at 2. The comments to which Bertoli refers were not "spontaneous"; a cursory review of the record reveals Bertoli has removed these comments from their context in order to serve his argument for recusal. These comments were made during a conversation, outside the presence of the jury, concerning a 2 July 1993 letter from Bertoli objecting that the court had cut Bertoli off during his cross-examination of Eisenberg.

Bertoli was asked to point out the page and line in the trial transcript where the court had denied Bertoli the opportunity to cross-examine Eisenberg. When Bertoli was unable to produce the requested information, the court commented on his state of preparedness for trial:

I put this on the record a number of times. You are not prepared. You don't even have your questions ready, and you can't even give me the page and line with regard to this letter that you've written to me this morning.

Mr. Bertoli, I have bent over backwards to try to accommodate you. From day one in this case either you or your attorneys have been taunting me. You have been making up straw men and trying to knock them down. You've written bogus letters and say that's the reason I should recuse myself.

During the course of the trial you have been doing the same thing and you're doing it right now. You don't like something, you roll your eyes, you look at the floor and you won't respond to me.

The Government will move a document into evidence, another example. I'll look at you. You will affirmatively look away, I'll wait, you won't respond and I finally have to say "Mr. Bertoli." Then you'll respond to me.

The Government will make an objection, I'll look at you, you'll say nothing. We go to sidebar, more often than not the Government will say something, I'll look at you, you won't respond. You show displeasure.

I understand you're not happy being on trial here. I can't do anything about that, Mr. Bertoli, but I do need your cooperation.

Trial Transcript at 2945–46.

Taken in context, the remarks referred to by Bertoli were not, as Bertoli characterizes them, a "spontaneous exhumation of what [the court] perceived as a personal affront." 6 October 1993 Letter at 2. Rather, they were part of an assessment of Bertoli's conduct and preparedness during trial; the comments were based upon observations of such conduct and preparedness during the proceedings prior to and during the trial.

As is apparent, the comments were made as part of a request that Bertoli cease his contentious conduct and cooperate. The comments were not an expression of a disposition toward Bertoli; a reasonable person

could not conclude otherwise. *See Jones,* 899 F.2d at 1356; *see also Liteky,* — U.S. —, —, 114 S.Ct. 1147, 1157 ("[O]rdinary efforts at courtroom administration," even those containing "expressions of impatience [or] dissatisfaction" do not require recusal.).

Bertoli next points to several comments, made at various stages of the proceedings, which Bertoli contends evidence "animosity toward Bertoli and his counsel:"

> Certain of these statements took the form of the court's sharp and unfair criticism of Bertoli's examination of witnesses (i.e. Trial Transcript 2916: "You've done everything possible to confuse and obstruct."). Others took the form of expressing opinions regarding issues central to the case (e.g. Trial Transcript 4975, referring to transfers of funds from Caymans to Andorra: "That was brought up by Mr. Sachs, that sharp dealing in the Caymans."). Others reflected the court's belief that any application for [*sic*] Bertoli for a mistrial was somehow false and contrived (e.g., the court's dismissive rejection of Bertoli's stated concern that jurors could hear the court's challenge to Bertoli during a bench conference to testify in his own behalf (Trial Transcript 3154–57.)).

6 October 1993 Letter at 2.

 Each of the statements referred to by Bertoli was based upon observations of the conduct of Bertoli and his attorneys at various stages of the proceedings. Because these statements were based on the court's exposure, in its judicial capacity, to the conduct of Bertoli and his attorneys during the proceedings, they do not evidence extrajudicial bias, and do not constitute a basis for recusal. *See Liteky,* — U.S. —, — — —, 114 S.Ct. 1147, 1156–57; *Sciarra,* 851 F.2d at 634 n. 28.

The statements referred to by Bertoli do not, moreover, evidence any animosity to-

ward Bertoli. The first statement referred to by Bertoli, "You've done everything possible to obstruct," was made in reference to the Government's objection to Bertoli's lengthy, unfocused and often irrelevant cross-examination of Eisenberg. After an extensive discussion on the issue at sidebar, the Government's objection was sustained. It was stated:

> Mr. Bertoli, your cross-examination for the past three days has done anything but get to the issues. You've gone all over the block. You've done everything you can to confuse and obstruct. You've gone over the same area four or five times. I'm telling you under [Rules] 611 and 403, I'm on the verge of shutting you down.
>
> The objection of the Government is sustained. You better start honing in with regard to your cross-examination.

Trial Transcript at 2916.

Viewed in context, these comments were a description of Bertoli's cross-examination tactics, and a warning that such tactics were in violation of the Federal Rules of Evidence and would not be tolerated. *See Liteky,* — U.S. —, — — —, 114 S.Ct. 1147, 1156–57 (efforts at courtroom administration do not constitute grounds for recusal).

Bertoli's characterization of the court's reference to "sharp dealing in the Caymans" as "expressing opinions regarding issues central to the case" is simply inaccurate.[226] 6 October 1993 Letter at 2. A review of the record reveals the comment about "sharp dealing" was not, as Bertoli suggests, a reference "to transfers of funds from [the] Caymans to Andorra." *Id.* The statement was made outside the presence of the jury, during a hearing on 22 July 1993. The Government informed the court that its motion for a letter rogatory had been delayed by Bertoli's Cayman Islands *Ex Parte* Injunction.[227] The

---

**226.** Bertoli has cited no authority indicating that commenting on an issue in the case is grounds for recusal. Quite to the contrary, the Third Circuit has stated that where a "trial judge's ... comments [are] linked to his [or her] evaluation of the case based on the pleadings and other materials outlining the nature of the case," such comments will not constitute extrajudicial bias. *Johnson,* 629 F.2d at 291. In any event, as

discussed below, the comment referred to by Bertoli was not in fact a comment on a central issue of his case.

**227.** As indicated, Bertoli, through Sachs, filed opposition to the Government's Cayman Islands Discovery Motion on 17 November 1989. Bertoli then filed a series of additional motions in this court. While these motions were pending, and

court stated: "That was brought up by Mr. Sachs, that sharp dealing down in the Caymans." Trial Transcript at 4975. In context, the court's statement regarding "sharp dealing" did not refer to the alleged transfers of funds from the Caymans to Andorra. It referred to the *ex parte* injunction obtained by Bertoli without notice to either the court or the Government, after Sachs requested a stay in deciding certain motions.

The third instance of "animosity" cited by Bertoli is the denial of Bertoli's 6 July Motion for Mistrial based on his contention that the jury could hear sidebar comments. *See* 6 October 1993 Letter at 2; Trial Transcript at 3156–57. The court's denial of Bertoli's 6 July Motion for Mistrial, constituting as it does a ruling of the court, does not provide a basis for recusal. *See Liteky,* —— U.S. at ——––——, 114 S.Ct. at 1156–57; *Johnson,* 629 F.2d at 291 ("[T]he judge's rulings at trial do not constitute grounds for recusal because they can be corrected by reversal on appeal."). Bertoli's disagreement with this ruling "certainly cannot be equated with the showing required *to so reflect on* [the court's] impartiality as to dictate recusal." *Jones,* 899 F.2d at 1356. Moreover, as indicated, Bertoli's 6 July Motion for Mistrial was in fact meritless, and was properly denied. *See supra,* at 1048.

Bertoli next refers to an admonishment for addressing the court with a pejorative term. 6 October 1993 Letter at 3. The court stated:

> Mr. Bertoli, I don't like your wise comments. You're out of place. You're totally out of place, you're unprofessional. Now, please give me an estimate and don't give me another wisecrack like that again. Answer me please.

Trial Transcript at 2096–97. There was neither "a tirade," nor was there a "bl[o]w up at Bertoli," as Bertoli suggests. *See* 6 October 1993 Letter at 2, 3. On the contrary, there was a measured response to a wholly inappropriate, sarcastic comment from Bertoli.

Bertoli was simply directed to answer the question posed to him. There was no further discussion on the subject. The comment, based on the court's observations of Bertoli at the moment, including the tone of voice, sarcasm and physical expression surrounding the comment, do not evidence extrajudicial bias. *See Liteky,* —— U.S. at ——––——, 114 S.Ct. at 1156–57. This response to Bertoli's sarcasm does not provide a basis for recusal. *See Sciarra,* 851 F.2d at 634 n. 28.

Bertoli next refers to another reference to the actions of Bertoli and his attorneys in obtaining an *ex parte* injunction in the Cayman Islands. The court stated:

> Because you and your client snuck down there after you misled me, an affirmative misleading of the court by your attorney[,] [t]hat's how all this arose. It was sneaky and underhanded and this case still may be referred to the Ethics Committee for Mr. Sachs.

Trial Transcript at 4977. Again, Bertoli does not explain the manner in which these comments evidence, or could be perceived to evidence, partiality. These comments simply referred to unsavory and highly questionable tactics by Sachs. No reasonable person knowing the sharp and misleading tactics employed by Sachs would be led to the position taken by Bertoli.

The comment concerning the "underhanded" tactics was, moreover, based upon observations of the conduct of Bertoli and his attorneys during the course of the proceedings. *See Sciarra,* 851 F.2d at 634 n. 28. Accordingly, this comment does not evidence extrajudicial bias and does not form the basis for recusal. *See Liteky,* —— U.S. at ——–——, 114 S.Ct. at 1156–57.

Bertoli next relies on the request, prior to charging the jury, that Bertoli's attorney justify certain comments made during summation the previous day. 6 October 1993 Letter at 3–4. Bertoli and his attorneys may disagree with the request, but such disagreement does not require recusal of the court.

after Sachs requested a delay of the decision on the Government's Cayman Islands Discovery Motion, Bertoli applied for and obtained, on an *ex parte* basis, an injunction from the Grand Court of the Cayman Islands which directly impacted

on and delayed this case. The court was unaware of the application for and issuance of the Cayman Islands *Ex Parte* Injunction until a copy thereof was forwarded to it by the Government.

Bertoli cannot use the Federal recusal statute as a means to oppose every ruling or request of the court with which he does not agree; that sort of opposition is properly expressed on appeal.[228] *See Liteky,* — U.S. at — — —, 114 S.Ct. at 1156–57; *Jones,* 899 F.2d at 1356.

█ Finally, Bertoli argues the "hostility by the court toward the defense was further evidenced by the court's determination to remand Bertoli following the jury's verdict. . . ." 6 October 1993 Letter at 4. This determination fails to provide a basis for recusal for several reasons. First, the determination to remand Bertoli (the "Remand Order") was a ruling of the court, and as such does not provide a basis for recusal.[229] *See Liteky,* — U.S. at — — —, 114 S.Ct. at 1156–57; *Johnson,* 629 F.2d at 291. Bertoli's reliance on the Remand Order in requesting recusal is yet another example of his continued attempts to misuse the recusal statute to oppose every ruling of the court with which he does not agree. As stated, a motion for recusal is not the proper avenue by which to express such disagreement. *See Jones,* 899 F.2d at 1356.

The Remand Order, moreover, was based on evidence and conduct observed by the court during the proceedings in Bertoli's case. As further detailed below, such evidence and conduct was what led the court to believe Bertoli posed a substantial risk of flight, and accordingly to issue the Remand Order. The Remand Order therefore does not evidence extrajudicial bias, and does not provide a basis for recusal. *See Sciarra,* 851 F.2d at 634 & n. 28.

No reasonable person viewing the facts of Bertoli's case would be led by the Remand Order to question the impartiality of the court. The court had the opportunity to view for four years the conduct of Bertoli and the evidence concerning the likelihood of his fleeing custody. The court observed that Bertoli was "thoroughly familiar and experienced in international monetary transactions." Trial Transcript at 6942. It was further observed Bertoli "has contacts in various countries." *Id.* Bertoli's weak roots in the community and previous convictions were also noted. *Id.* Furthermore, Bertoli had been convicted of engaging in criminal conduct while released on bail in this case. *See* Count Three, ¶ 27; *see also infra* at 1162. Based on this analysis of the evidence in the record and the conduct of Bertoli as observed during trial, it was determined that Bertoli was likely to flee custody; accordingly, the Remand Order was issued.[230]

---

**228.** It appears, moreover, that the request for justification of statements made by counsel during summation was within the supervisory power of the court. Bertoli's attorney had made comments concerning the good faith of the Government which were unsupported by the record. In fact counsel unequivocally charged the Government with having induced perjury. *See* Trial Transcript at 6642 ("We know that on at least certain occasions they [the Government] actively . . . induced witnesses not to tell the truth on the witness stand.").

**229.** The Remand Order is discussed in greater detail *infra* at Discussion § F.5.

**230.** The Government pointed out the risk that Bertoli would flee in its motion to restrict Bertoli's bail conditions, filed in January 1992. The Government stated:

In light of Bertoli's control of more than $4 million in foreign bank accounts, the United States believes that Bertoli's current bail of $1 million bond secured by the house in which

[he] lives is insufficient to ensure that he will not flee to avoid prosecution.

 • • *,* • •

Apparently, Bertoli's closest ties in life are to his money.

 • • • •

An examination of Bertoli's stock manipulation schemes also reveals that his family ties are questionable.

 • • • •

[A]s long as Bertoli has access to and control over $4 million beyond the reach of the Government, there is a good likelihood that Bertoli will disappear if he perceives that things are looking bad for him.

Memorandum of Law in Support of the Government's Motion for a Modification of Defendant Bertoli's Conditions of Release, dated 29 January 1992 (the "29 Jan. 1992 Bail Memo") at 22–25. The Government's January 1992 motion to modify bail conditions is discussed in greater detail *infra* at Discussion § F.3.

By order, dated 8 April 1992, the Government's motion was denied. At that time, before Bertoli's conviction, it was determined that the bail conditions then existing adequately guarded

The fact that the Third Circuit reversed the Remand Order in part, and placed Bertoli under strict supervised release with electronic monitoring, does not show partiality on the part of the court. *See Bertoli v. United States,* No. 93–5511, slip order (3d Cir. 27 Aug. 1993) (the "27 Aug. 1993 Circuit Order"). The determination with respect to the Remand Order was made, as it must have been made, on the facts before the court at the time of sentencing. The fact that the Circuit did not agree entirely with this determination in no way leads to the conclusion that the Remand Order was motivated by prejudice. To conclude otherwise would require the recusal of a trial judge every time an order of that judge was not upheld on appeal.

None of the statements or rulings referenced in the 6 October 1993 Letter provide a basis for the recusal of the court under section 455(a). Quite to the contrary, over the four years during which Bertoli has been before this court, he has been treated with unfailing patience, professionalism and courtesy.

Bertoli's effort to recuse this court has been before this court four other times and before the Third Circuit three times. In every such instance, this court and the Circuit refused to order recusal. All parties have relied on and operated under the Circuit's consistent refusal to order recusal. Nothing submitted by Bertoli in connection with the Sentencing Recusal Motion sheds doubt on the prior refusals of this court and the Circuit to grant recusal. Accordingly, the Sentencing Recusal Motion is denied.[231]

### 4. Sentencing [232]

On 24 August 1993, after ten days of deliberations, the jury returned a verdict finding Bertoli guilty on Count Three, which charged a violation of 18 U.S.C. § 317 (conspiracy), and Count Six, which charged a violation of 18 U.S.C. § 1503 (obstruction of justice). Count Three charged Bertoli with conspiracy to obstruct justice in a total of five proceedings beginning as early as 8 March 1983 and continuing through 17 January 1992. Count Six charged that Bertoli and Eisenberg knowingly obstructed the investigation and prosecution of the present criminal action against Bertoli by causing the transfer of racketeering proceeds and related documents from the Cayman Islands to the Principality of Andorra in Europe.

Each of sections 317 and 1503 carries a maximum sentence of five years. In addition, Bertoli committed the offense described in Count Three and Count Six while on pretrial release in the instant case. Accordingly, Bertoli is subject to an additional ten-year period of incarceration pursuant to 18 U.S.C. § 3147, which provides in pertinent part:

> A person convicted of an offense committed while on [pretrial release] *shall be sentenced* in addition to the sentence prescribed for by the offense to (1) a term of

against the risk of flight. However, after Bertoli's conviction, when it appeared certain he would be incarcerated, the risk of flight was greatly intensified and warranted Bertoli's remand pending sentencing. *See* Trial Transcript at 6943 (noting in support of Remand Order that Bertoli "now faces a very significant sentence").

**231.** In the Bertoli Pre–Sentence Brief, Bertoli asks that the court consider the Sentencing Recusal Motion in light of the Third Circuit's recent opinion in *Alexander v. Primerica Holdings, Inc.,* 10 F.3d 155 (3d Cir.1993). The decision in *Alexander* has been considered, and is inapposite on the law and facts. The recent Supreme Court decision in *Liteky,* —— U.S. ——, 114 S.Ct. 1147, is controlling.

**232.** In connection with sentencing, a Presentence Investigation Report (the "Presentence Report") was submitted by the United States Probation Office.

The Government submitted: Letter, dated 7 December 1993, commenting on a draft of the Presentence Report (the "7 Dec. 1993 Government Letter"); Government's Sentencing Memorandum Concerning Richard O. Bertoli (the "Government Sentencing Memo"); Government's Response to Defendant Bertoli's Sentencing Memorandum (the "Government Reply Sentencing Memo"); Exhibits to the Government's Sentencing Memorandum Concerning Richard O. Bertoli (the "Government Sentencing Ex(s). ——").

Bertoli submitted: Letter, dated 1 December 1993, stating his objections to a draft of the Presentence Report (the "Bertoli 1 Dec. 1993 Letter"); Pre–Sentence Memorandum of Richard O. Bertoli (the "Bertoli Sentencing Memo"); Letter, dated 4 February 1994, in reply to the Government Reply Sentencing Memo (the "Bertoli 4 Feb. 1994 Letter"); miscellaneous letters from family members, friends and acquaintances.

imprisonment of not more than ten years if the offense is a felony.

18 U.S.C. § 3147 (emphasis added); *see United States v. Di Pasquale*, 864 F.2d 271, 279–80 (3d Cir.1988), *cert. denied sub nom., Di Norscio v. United States*, 492 U.S. 906, 109 S.Ct. 3216, 106 L.Ed.2d 566 (1989).

On 28 March 1994, Bertoli was sentenced to two one-hundred-month sentences to run concurrently. *See* Transcript of Proceedings, dated 28 March 1994 (the "Sentencing Hearing Transcript"), at 12. Specifically, on Count Three, Bertoli was sentenced to sixty months for his violation of 18 U.S.C. § 371 and forty months, to run consecutively, for the violation of 18 U.S.C. § 3147 in connection with that count. On Count Six, he was sentenced sixty months for the violation of 18 U.S.C. § 1503 and forty months, to run consecutively, for an additional violation of 18 U.S.C. § 3147 in connection with that count. Upon his release from prison, Bertoli is subject to three years of supervised release. Bertoli was also assessed a $7,000,000 fine.

### a. *Facts* [233]

The following facts, which provide the basis for sentencing, have been established at trial and during sentencing, by at least a preponderance of the evidence.[234]

### i. *Bertoli's Activities at Executive Securities*

Prior to 1977, Bertoli was president and chief executive officer of Executive Securities. On 14 February 1975, the SEC filed an action against Bertoli and Executive Securities in the United States District Court for the Southern District of New York, seeking preliminary and permanent injunctive relief (the "1975 SEC Action"). *See SEC v. Executive Securities Corp.*, 75 Civ. 733, Final Judgment of Permanent Injunction by Consent, dated 17 March 1975 (the "1975 Injunction"), Government Sentencing Ex. 1, at 1. The action alleged Bertoli and others at Executive Securities had engaged in fraudulent securities trading and bookkeeping activities. Upon the joint application by the SIPC and the SEC, Executive Securities "was placed in liquidation" and a trustee was appointed by the United States District Court for the Southern District of New York. Trial Transcript at 676–677.

The Cahill Sentencing Aff. and the 1993 Cannistraro Plea Allocution have more than a "minimal indicium of reliability"; they are strongly reliable sources. Moreover, the evidence contained therein is corroborated by the facts established at trial.

**233.** Some of the facts set forth in this portion of the Opinion are substantiated with citations to testimony or documentary evidence or a combination of such authority; such citations are not meant to be extensive or exhaustive as to each point. Some of the facts are based upon the record or inferences from the record which are not cited.

Included among the facts considered for sentencing purposes were two submissions from the Government—the Affidavit of Michael J. Cahill, dated 10 December 1993 (the "Cahill Sentencing Aff."), Government Sentencing Ex. 14, ¶ 2; Cahill Sentencing Aff. and the Cannistraro Plea Allocution, dated 24 March 1993 (the "1993 Cannistraro Plea Allocution"), Government Sentencing Ex. 12—which constitute hearsay.

For purposes of making findings under the Guidelines for sentencing, the Circuit has expressly held that a court may rely on hearsay statements as long as the statements are determined to be reliable. *United States v. Sciarrino*, 884 F.2d 95, 97, 98 (3d Cir.), *cert. denied*, 493 U.S. 997, 110 S.Ct. 553, 107 L.Ed.2d 549 (1989). " '[A]s a matter of due process, factual matters may be considered as a basis for sentence ... if they have some minimal indicium of reliability beyond mere allegation.' " *United States v. Kikumura*, 918 F.2d 1084, 1102 (3d Cir.1990) (quoting *United States v. Baylin*, 696 F.2d 1030, 1040 (3d Cir.1982)).

**234.** The evidence relied upon for purposes of sentencing is comprised of facts established during the trial, the facts given in the Presentence Report and the evidence submitted by the Government for sentencing. Neither party sought to present evidence at the hearing held on 28 March 1994 (the "Sentencing Hearing"). In fact, when counsel for both parties were asked whether they wanted to submit evidence during the Sentencing Hearing, both parties indicated their willingness to have sentencing determined on the basis of their submissions. *See* Sentencing Hearing Transcript at 4–5.

The parties had a full opportunity to contest the contents of the forty-eight page Presentence Report. As is apparent, this was not the usual case where sentencing occurs within forty-five days of the conviction. In this case, there was approximately seven months from when Bertoli was convicted and the Sentencing Hearing. In that time, Bertoli and the Government presented 611 pages of submissions regarding sentencing.

On 17 March 1975, by final consent judgment, the district court ordered that Bertoli and his "agents, servants, employees, attorneys and assigns"

> be and hereby are permanently enjoined from directly or indirectly failing to make, keep and preserve accurate and current such accounts, ledgers, papers, books and other records as required by section 17(a) of the Securities Exchange Act ... and [Rules 17a–3 and 17a–4] thereunder.

SEC Bar at 2. The district court further ordered that Bertoli was "permanently enjoined from aiding and abetting violations of section 17(a) ... and Rules [17a–3 and 17a–4] with respect to Executive Securities ... or any other broker-dealer with respect to which ... Bertoli may become a principal or controlling person." *Id.* Bertoli consented to the entry of the 1975 Injunction but did not admit or deny any of the substantive allegations of the 1975 SEC Action. *Id.* at 3.

In July 1975, also in connection with Bertoli's fraudulent activities at Executive Securities, the SEC brought the 1975 SEC Proceedings against Bertoli. During the 1975 SEC Proceedings, the SEC found, by clear and convincing evidence, that, during the period from October 1975 to February 1975, Bertoli had "engaged in a scheme to defraud by failing to deliver stock of Centronics Data Computer Corp. to customers who had paid for the stock." *In the Matter of Richard O. Bertoli and Arnold L. Freilich,* 18 SEC Docket 486, 487 (25 Sept. 1979). The 1975 SEC Proceedings resulted in the SEC Bar on 25 September 1979. *Id.* at 492. Pursuant to the SEC Bar, Bertoli was "barred from association with any broker or dealer." *Id.* Specifically, the order entered stated:

> ORDERED, that Richard O. Bertoli and Arnold L. Freilich be, and they hereby are barred from associating with any broker or dealer.

SEC Bar, Government Sentencing Ex. 2.

In a related action in 1977, Bertoli was named in a seventy-seven count indictment charging him with conspiracy, mail fraud, securities fraud, maintenance of false records and submission of false records to the SEC—the 1977 Indictment. *See* Government Sentencing Exs. 4, 5. Bertoli pleaded *nolo con-*

*tendere* to the 1977 Indictment. Government Sentencing Ex. 4. By judgment order, dated 27 July 1978, Bertoli was sentenced to probation for a period of five years from that date (the "1977 Probation Order"). *Id.* Bertoli was also fined $10,000 and required to perform six hours of community service per week during the period of his probation. *Id.*

In 1977, in yet another related action, Executive Securities, by its trustee in liquidation, instituted the SIPC Suit against Bertoli, *Executive Securities Corp. v. Bertoli,* 77 Civ. 714 (S.D.N.Y.), claiming approximately $2.9 million in damages. *See* Trial Transcript at 675. The $2.9 million represented money that Executive Securities and its customers had lost as a result of Bertoli's fraudulent trading activities at Executive Securities. The SIPC joined the SIPC Suit as a plaintiff in 1982. *Id.* at 679. The SIPC Suit has been stayed by Bertoli's filing of the Bankruptcy Petition on or about 11 October 1983.

As a result of the action being stayed, the SIPC, which insures customers of brokerage houses, was required to pay out more than $2 million to the customers of Executive Securities who had been defrauded by Bertoli and others at Executive Securities. *Id.* at 677. The brokerage firms which had been defrauded sustained unreimbursed losses of about $1,000,000.

At some point after the legal troubles at Executive Securities began in the mid 1970's, Bertoli attempted to convey to his brother John Bertoli ("John Bertoli") and his own minor children, personal and corporate assets. This was an attempt by Bertoli to remove those assets from the reach of his Executive Securities creditors. In an action (the "Rutherford Suit") filed in the Superior Court of New Jersey (the "Superior Court"), the appointed trustee of Executive Securities sought to have the transfers declared fraudulent. *See Executive Securities Corp. v. Richard O. Bertoli,* No. C–5–88–79, slip op. (Ch. Div. 23 Feb. 1983) (the "Rutherford Opinion"), Government Sentencing Ex. 8.

As the Superior Court found in the Rutherford Suit, Bertoli, with the knowledge he was being accused of fraud at Executive Se-

**1128**

curities and that he faced substantial liability if the fraud charges were proven, had fraudulently created Rutherford Construction Co. ("Rutherford"). *See id.* Rutherford was a partnership comprised of John Bertoli, as the general partner, and Bertoli's three minor children, as limited partners. *Id.* at 4–5. After forming Rutherford, Bertoli conveyed to the partnership personal and corporate assets. *Id.*

As a result of the Rutherford Suit, the Superior Court appointed a trustee to take over Rutherford's assets and entered a judgment barring Bertoli and John Bertoli from disposing of the assets and interfering with the operations of the trustee. *Id.* at 17. As stated by the Superior Court:

> None of the transfers consisted of a directed property transfer which would have been easily detected. Instead, defendants systematically stripped a number of entities in which [Bertoli] had a substantial direct or indirect interest of all their valuable assets.
>
> When the divestitures were completed, [Bertoli's] stock holdings had not been outwardly altered. In actuality, however, they had been rendered worthless.

. . . . .

> From the totality of the proof, therefore, I find that the transfers to [Rutherford] were made with the intent of defrauding the unmatured claims of shareholders and creditors of [Executive Securities]. They were fraudulent transfers.... Bertoli and John Bertoli together were perpetrators of the fraud and are equally culpable. John [Bertoli] is a mere figurehead for [Bertoli] in [Rutherford].

*Id.* at 4, 17.

ii. *The Stock Manipulation Schemes*

In or about 1982 or 1983, Bertoli began working behind the scenes at Monarch. *See* 1993 Cannistraro Plea Allocution 22. From November 1982 to June 1983, Eisenberg permitted Bertoli to use Monarch's offices to "promote" and "arrange" securities transactions. Trial Transcript at 2256. As Eisenberg explained at trial: "He [Bertoli] used to come to my office, we used to talk. We were involved with various securities.... He in-

troduced me to a few underwritings." *Id.* at 2268.

In addition, Bertoli "used to sit in [Monarch's] office ... when LCI, Toxic [Waste] and High Tech were trading." *Id.* In fact, Bertoli "introduced" Monarch to LCI, Toxic Waste and High Tech securities, whereupon Monarch came to underwrite IPOs for these securities. Bertoli hired the lawyer who represented Monarch in the LCI IPO, the Toxic Waste IPO and the High Tech IPO.

Bertoli was the orchestrator of the LCI Scheme, the Toxic Waste Scheme and the High Tech Scheme (collectively, the "Stock Manipulation Schemes") at Monarch. Bertoli brought LCI, Toxic Waste and High Tech to Monarch, he directed how the IPOs for each of those companies were going to be structured and he was the person ultimately responsible for directing the Stock Manipulation Schemes.

Bertoli introduced LCI to Monarch by representing to Eisenberg that he "was working as a consultant for some outfit in Washington, D.C., ... some kind of liaison." *Id.* at 2270. Bertoli told Eisenberg he could introduce Eisenberg to an underwriter for LCI in the expectation that Monarch could underwrite the LCI IPO. *Id.* Bertoli "said that whatever [LCI] wanted him to do, he could set it up for them. He knew the company, he knew the underwriter, there would be no problem for him to get [Eisenberg] to do the deal." *Id.* Bertoli later introduced Monarch to Toxic Waste and High Tech.

Bertoli determined that LCI securities would be sold in the form of units, and that the units would consist of one share of common stock and two warrants. Bertoli further determined each unit of LCI stock would be priced at $0.25 and that the warrants could be converted to a share of common stock at a price of $0.375 per share. Neither Eisenberg nor any other employee of Monarch took part in these decisions.

As with the LCI IPO, Bertoli orchestrated the Toxic Waste IPO and the High Tech IPO. Bertoli determined the Toxic Waste IPO would be structured in a manner identical to the LCI IPO. *Id.* at 2275. Neither Eisenberg nor any other employee of Mon-

arch participated in the structuring of the Toxic Waste IPO.

Bertoli maintained similar control over the structuring of the High Tech IPO. Bertoli determined that each unit of High Tech stock would be priced at $0.50 and that a unit would consist of one share of common stock and four warrants. *Id.* at 2276–77. Bertoli further determined each warrant would be convertible to a share of common stock at a price of $0.75 per share. Eisenberg was not involved in the structuring of the High Tech IPO.[235]

While involved with Monarch and before the IPOs, Bertoli conceived a plan to manipulate the prices of the securities of LCI, Toxic Waste and High Tech. The LCI Scheme, the Toxic Waste Scheme and the High Tech Scheme were "almost identical," each consisting of "boxing the stock and manipulating the price, [and] creating demand." *Id.* at 2338.

Boxing the IPOs consisted of Bertoli and his partners allocating the units of the IPOs to a small number to "players that [Eisenberg and Bertoli] kn[e]w [they could] control." *Id.* at 2280. This meant those "players" agreed to help restrict the purchase and sale of the stocks in accordance with Bertoli's and Eisenberg's instructions, thus creating demand and ensuring the price of the stock would rise.

The stock manipulations by Bertoli, Cannistraro, Eisenberg and their co-conspirators, for example, led to the price of LCI stock rising from $.25 to $1.625, the price of High Tech stock rising from $.50 to $3.25 and the price of Toxic Waste stock rising from $.50 to $4.50 in a matter of months following

the IPO's of each company. After the price had risen, Bertoli and his co-conspirators sold their shares at a profit. After the insiders had sold their shares, however, the stock prices dropped dramatically. As a result, the public investors who bought the stocks at the artificially increased prices and then held them for investment purposes lost significant amounts of money.

After the price of the stock had risen to a certain level, outside buyers were brought in to purchase the stock. Cannistraro, who was an analyst at Wood Gundy, helped bring in outside buyers by writing favorable reports about the IPOs. *Id.* at 2281; *see* 1993 Cannistraro Plea Allocution at 25.

Bertoli also performed as a "player"[236] for several accounts held in the names of his family members, but did not have accounts in his own name at Monarch. Bertoli stated to Eisenberg that he engaged in this practice to conceal his violation of the SEC Bar and to hide his assets from his bankruptcy proceedings.[237] Bertoli personally controlled trading in several Monarch accounts, comprising more than 253,000 units of LCI stock, more than 272,000 units of Toxic Waste stock and more than 300,000 units of High Tech stock.

Bertoli also exercised control over the consummation of the Stock Manipulation Schemes. Bertoli determined, before trading began, that the price of the stocks would be $1.00 to $1.25 per share soon after the IPOs. Bertoli gradually but deliberately raised the prices of the stock through a series of fraudulent "up-tick" trades. By this technique, Bertoli was able to raise the prices of the stocks to $1.25 per share within the first few days of aftermarket trading

---

235. Eisenberg indicated he was involved only in the sale of the LCI IPO, Toxic Waste IPO and High Tech IPO. Trial Transcript at 2278. Eisenberg indicated Bertoli was "handling things ... from Monarch's end of [these IPOs]." *Id.*

236. Other "players" included Tommy Quinn, Joe Lugo ("Lugo"), Frank Coppa, Erick Wynn, Robert Cooper, ("Cooper"), Bertoli, Eisenberg, Cannistraro and others. Trial Transcript at 2282–83, 2287–88.

237. During the 1993 Cannistraro Plea Allocution, it was established that Bertoli's beneficial ownership of over 400,000 shares of LCI stock was not disclosed in the registration statements and prospectus issued in connection with the

LCI IPO. *See* 1993 Cannistraro Plea Allocution at 24.

It was further established that, prior to the close of the High Tech IPO, Bertoli requested that Cannistraro arrange for Carl Alan Key ("Key") to become an "inside shareholder" of High Tech. *Id.* at 29–30. Bertoli told Cannistraro that Key would be holding shares for the benefit of Cannistraro, or, if Cannistraro did not become involved in High Tech, for Bertoli's benefit. *Id.* at 30. This arrangement was not disclosed in the prospectus and registration statements filed and issued in connection with the High Tech IPO. *Id.*

without invoking the suspicion of securities regulators or law enforcement authorities.

Bertoli made "the major decision" regarding the allocation of stocks to players. Eisenberg and Bertoli "talked to the players about their responsibilities" in the stock manipulation schemes. *Id.* at 2302, 2321. Bertoli alone, however, discussed the schemes with Cannistraro, Cooper and Lugo, and had similar discussions with Quinn and Coppa. In fact, Eisenberg, had to seek approval of major trades from Bertoli.

*Profits from the Stock Manipulation Schemes*

Both at trial and from the evidence submitted by the Government for purposes of sentencing, it was established that Bertoli, Eisenberg and Cannistraro profited in excess of $6,000,000 from the Stock Manipulation Schemes. Bertoli and his co-conspirators gained $462,820.00 from the LCI Scheme, $4,235,180.00 from the Toxic Waste Scheme and $1,768,727.50 from the High Tech Scheme. *See* Government Sentencing Exs. 9, 10 and 11. The profits from the Stock Manipulation Schemes were to be divided equally among Bertoli, Eisenberg and Cannistraro.

*The Cayman Accounts*

Bertoli, Cannistraro and Eisenberg each held accounts in various Cayman Islands banks (the "Cayman Accounts") in which they deposited profits generated from the Stock Manipulation Schemes. In addition, Bertoli, Cannistraro and Eisenberg had companies created in the Cayman Islands to which they transferred profits from the Stock Manipulation Schemes and through which they purchased stock. In particular, there were three sets of Cayman Islands companies (the "Paget Brown Companies") formed by Coleman of Paget Brown and owned by Bertoli, Cannistraro and Eisenberg: (1) Amersham Holdings Ltd. (owned by Bertoli), Galteco Ltd. (owned by Cannistraro) and Ochec Ltd. (owned by Eisenberg) (collectively, the "First set of Paget Brown Companies"); (2) Midco Ltd. (owned by Bertoli), Coastco Ltd. (owned by Cannistraro) and Whiteco Ltd. (owned by Eisenberg) (collectively, the "Second Set of Paget Brown Companies"); and (3) Beecham International

Corp. ("Beecham") (owned by Bertoli), Centurion (owned by Cannistraro) and Eastern Funds Corp. ("Eastern") (owned by Eisenberg) (collectively, the "Third Set of Paget Brown Companies"). Until early 1990, Coleman managed the records and money of the Paget Brown Companies.

### iii. *Obstruction of Justice*

The Government's investigation into the Stock Manipulation Schemes began approximately in 1982 and continued through 1992. It started with an administrative investigation by the SEC in 1982 which eventually led to the SEC Action in 1985. The SEC Action led to the Grand Jury Investigation which resulted in the criminal prosecutions of Cannistraro in 1987 and Bertoli in 1989.

In total, Bertoli and his co-conspirators attempted to obstruct five separate proceedings: (1) the SEC Investigation; (2) the SEC Action; (3) the criminal investigation by the grand jury (the "Grand Jury Investigation"); (4) the 1987 Cannistraro Prosecution; and (5) the criminal prosecution of Bertoli (the "Bertoli Prosecution"), the instant case.

### (1) *The SEC Investigation*

In approximately January 1983, the SEC began an investigation into, among other things, fraudulent or manipulative trading in LCI securities. In about March 1983, the investigation was expanded to include trading in Toxic Waste securities. During the summer of 1983, the SEC began subpoenaing documents and taking sworn testimony from individuals; this continued until about 1985.

### (2) *The SEC Action*

As a result of its investigation, the SEC, in or about 1985, filed a civil lawsuit in the United States District Court for the Southern District of New York against Bertoli, Cannistraro, Eisenberg, Monarch and former Monarch broker, Cloyes. The complaint in the SEC Action alleged, *inter alia*, that Bertoli, along with the other defendants, had engaged in fraudulent activity in connection with trading in LCI and Toxic Waste securities and that Bertoli and Eisenberg had used various Cayman Islands banks to carry out

illegal trading activities. The SEC Action is still pending; it was stayed.

### (3) *The Grand Jury Investigation*

Beginning in April 1985, various United States grand juries (the "Grand Jury") began the Grand Jury Investigation into the trading of the securities of Astrosystems, Nature's Bounty, LCI, Toxic Waste, High Tech and Solar Age. The Grand Jury was pending between April 1985 and September 1989.

### (4) *The 1987 Cannistraro Prosecution*

On or about 28 May 1987, the New Jersey grand jury returned a nine-count indictment against Cannistraro. The nine-count indictment charged Cannistraro with securities fraud, conspiracy, interstate transportation of money taken by fraud and obstruction of justice in relation to the LCI and Toxic Waste securities transactions. On 21 September 1987, Cannistraro pleaded guilty to all nine counts.

### (5) *The Bertoli Prosecution*

As has been discussed, the current criminal action against Bertoli, Cannistraro and Eisenberg originated on 16 June 1989 when the Indictment was returned. On 29 September 1989,[238] the grand jury returned the six-count Superseding Indictment which charged that Bertoli, Cannistraro, Eisenberg and others conspired to and did conduct the affairs of Monarch through a pattern of racketeering activity consisting of acts of mail fraud, wire fraud and obstruction of justice. The conduct was in connection to the Stock Manipulation Schemes. The Superseding Indictment also sought forfeiture of the proceeds obtained by Bertoli, Cannistraro and Eisenberg as a result of the Stock Manipulation Schemes and deposited in the Cayman Accounts.

*The Overt Acts of the Conspiracy to Obstruct*

The conspiracies described in Count Three of the Redacted Second Superseding Indictment contain several overt acts of obstruction including lying, causing others to lie, destroying evidence, hiding evidence, hiding the proceeds of the Stock Manipulation Schemes, submitting fraudulent affidavits and inducing a potential witness to evade possible service of process. In general, it was charged the goal of the conspiracies was to avoid civil and criminal liability for the Stock Manipulation Schemes. During those investigations and prosecutions, Bertoli, Eisenberg and Cannistraro engaged in continuous, concerted conspiracies to obstruct those investigations and prosecutions.

*The Cooper Perjury*

At the direction of Bertoli and Eisenberg, G.K. Scott broker Cooper perjured himself during the SEC Investigation. Sometime in the early part of 1983, Cooper was contacted by the SEC about being interviewed in connection with its investigation of the Stock Manipulation Schemes. Prior to being interviewed, Cooper met with Bertoli and Eisenberg to discuss the SEC interview. In particular, the three discussed the LCI Report that was put out on G.K. Scott letterhead but written by Cannistraro. Bertoli and Eisenberg told Cooper to lie to the SEC and tell them Cooper had written the LCI Report. Cooper expressed his concern that he did not know everything about the report, but Bertoli and Eisenberg assured him that if he needed back-up for the report they would provide it to him.

When Cooper was informally interviewed by the SEC in March 1983, he represented the following falsehoods to the SEC: (1) he wrote the LCI Report; (2) he first heard about LCI when he read about it in the *Corporate Financing Week* newsletter, and he took the projections in the LCI Report from that article and from discussions with an LCI officer; and (3) he met Bertoli at the race track, but had never done business with him and had not discussed LCI or the LCI Report with Bertoli. Cahill Sentencing Aff., ¶ 2; *see* Handwritten Notes of Amato of the Informal Interview with Cooper, Government Sentencing Ex. 15; Trial Transcript at 4152–54.

---

**238.** On 21 January 1992, the grand jury returned the eight-count Second Superseding Indictment. On 15 April 1993, the Second Superseded Indictment was redacted to, among other changes, delete count eight and take into account Cannistraro's guilty plea.

In mid-June 1983, Cooper received a subpoena from the SEC for documents and sworn testimony. Cooper immediately called Bertoli and Eisenberg. Cahill Sentencing Aff., ¶ 3. Bertoli and Eisenberg met with Cooper several times to go over Cooper's testimony to the SEC. Bertoli told Cooper to stick with the story he had given to the SEC during the March meeting. Bertoli then went over, in great detail, the testimony Cooper was to give the SEC, reminding Cooper of the importance of being consistent with the statements made during the March meeting.

At one of the meetings, Bertoli supplied Cooper with a worksheet containing the calculations for the projections in the LCI Report. Bertoli then reviewed those calculations with Cooper several times in preparation for Cooper's testimony. Cooper travelled to London, England in early August 1983 to go over his SEC testimony with Bertoli. On 29 August 1993, the day before Cooper was to testify, Cooper called Bertoli in Paris, France to discuss Cooper's testimony one last time.

On 30 August 1983, Cooper gave sworn testimony to the SEC. Cooper again lied, this time under oath, about writing the LCI Report and about how he had met Bertoli. *See* Trial Transcript at 4154; Cahill Sentencing Aff., ¶ 5. At the time of his sworn testimony, Cooper provided the SEC with the handwritten worksheet of calculations and testified he had created it and used it in preparing the LCI Report. The worksheet, however, had not been shown or discussed by Cooper during his March 1983 meeting with the SEC, despite the fact Cooper had been asked by the SEC to turn over all of his files relating to the preparation of the LCI Report. Trial Transcript at 4156; Cahill Sentencing Aff., ¶ 5.

The day after Cooper testified before the SEC, Bertoli called Cooper from London to find out how the testimony had gone. Cooper described to Bertoli the testimony he had given the SEC and Bertoli responded that it sounded good. Cahill Sentencing Aff., ¶ 5. After Bertoli returned to the United States from London, he reviewed the transcript of

the SEC proceedings and told Cooper he had done a good job. *Id.*

### Eisenberg Perjury

With Bertoli's assistance and direction, Eisenberg also perjured himself during the SEC Investigation. Eisenberg was deposed by the SEC in March and August 1984. In preparation for his deposition, Eisenberg discussed his testimony with Bertoli. Bertoli had gathered the transcripts of the earlier SEC testimony of various witnesses for Eisenberg's review; the purpose was to prevent any inconsistencies between Eisenberg's story and the earlier testimony of other witnesses. Bertoli instructed Eisenberg to do whatever he had to do to "protect" Bertoli and Eisenberg. Accordingly, Eisenberg lied in his sworn testimony to the SEC. Specifically, he lied about the agreements with the players, the trading activity at Monarch in LCI and Toxic Waste securities and about his account at Butterfield in the Cayman Islands.

### Beyer Perjury

Harold Beyer ("Beyer"), the nominee for Vickory, was also contacted by the SEC during the SEC Investigation. Vickory contacted Cannistraro and told him Beyer had been called by the SEC; Cannistraro told Vickory to make up a good story and stick to it. Trial Transcript at 3269–71; *see* 1993 Cannistraro Plea Allocution at 28–29. Cannistraro wanted Beyer to lie to the SEC and deny the existence of the nominee relationship. Cannistraro's instructions were carried out; Beyer lied during his sworn testimony to the SEC in June 1984.

### The Bakery Obstruction

In 1983 and 1984, Monarch received subpoenas from a Federal grand jury in Chicago and the United States Justice Department requesting a limited number of Monarch records in connection with a proceeding unrelated to this case and unrelated to the trading in LCI, Toxic Waste and High Tech securities. In 1985, the Chicago Strike Force complained that Monarch had not submitted to it all the records responsive to the subpoenas. Eisenberg conveyed this information to Bertoli who told Eisenberg to pack up all of Monarch's records, including unresponsive

documents concerning LCI, Toxic Waste and High Tech, and send them to Chicago. The intended purpose was the dual effect of confusing the authorities in Chicago and, if another agency or grand jury requested those records, Eisenberg could simply say all of Monarch's records were in Chicago. Eisenberg did as Bertoli told him and sent twenty boxes of unresponsive Monarch records to Chicago. At the time, Eisenberg believed he had sent all of the Monarch records from the late 1970's to early 1984 to Chicago.

In August 1985, a New Jersey grand jury subpoenaed Monarch for its records concerning LCI and Toxic Waste trading (the "August 1985 Subpoena"). Upon receiving the subpoena, Eisenberg spoke to Bertoli. Bertoli told Eisenberg to respond to the subpoena by saying all of the records were in Chicago. At Eisenberg's instruction, the attorney representing Monarch wrote a letter stating all the Monarch records were in Chicago.

The New Jersey U.S. Attorney complained to Eisenberg, however, that some of the records were not in Chicago. Eisenberg then discovered Monarch still had possession of eight to ten boxes of records that were responsive to the August 1985 Subpoena. Eisenberg called Bertoli and told him about finding boxes of records at Monarch. Bertoli told Eisenberg to get the records out of Monarch because the Government might come there with a search warrant. Eisenberg told Bertoli he was taking the records out of Monarch and storing them at his house on Long Island. Eisenberg did not inform the New Jersey U.S. Attorney or the New Jersey grand jury he had found boxes of responsive records at Monarch.

The boxes of records remained at Eisenberg's house on Long Island when another subpoena was served on Monarch. During the 1987 Cannistraro Prosecution, Cannistraro stated he would object at trial to the introduction into evidence of numerous Monarch records on chain of custody and authenticity grounds. As a result, the New Jersey U.S. Attorney served a trial subpoena on Monarch for various original records concerning trading in LCI and Toxic Waste securities.

When Eisenberg received the subpoena he spoke again to Bertoli who told him to remove the documents from his house. Eisenberg took the records to a bakery in Brooklyn which was owned by George Shapiro. Eisenberg then told the New Jersey U.S. Attorney the documents they wanted were in Chicago.

The boxes of Monarch records were kept at the bakery for about one year. In August 1988, the grand jury issued another subpoena. In response, Eisenberg again stated the records were in Chicago. Thereafter, however, the FBI found the Monarch records at the bakery. When Eisenberg called Bertoli and told him the FBI had discovered the Monarch records, Bertoli said: "[W]ell, Leo [Eisenberg], that's obstruction." *Id.* at 2512.

### The Key Perjury

Key acted as Cannistraro's nominee on numerous occasions. In early 1983, Key was subpoenaed to appear before the Federal grand jury in New Jersey and to be interviewed by the Government. 1993 Cannistraro Plea Allocution at 30; *see* Trial Transcript at 3533. As Key testified at trial, he contacted Cannistraro who dictated the false story Key was to tell the authorities and the grand jury concerning Key's trading in the securities of Toxic Waste and High Tech. *See* Government Trial Exhibit 707(a)(1) (handwritten script of story Key should tell authorities). Key was told that if he lied, the investigation would go away.

Key did as he was told and lied to the Government. Subsequently, Cannistraro paid Key's legal fees totalling $4,000.

### The Cannistraro Perjury

Cannistraro met with Bertoli before Cannistraro's plea allocution in the 1987 Cannistraro Prosecution. 1993 Cannistraro Plea Allocution at 33. At that time, Bertoli told him to lie about particular subjects at the plea allocution. Bertoli also provided him with false answers to give in response to certain questions. Cannistraro followed Bertoli's directions and lied in his plea allocution in 1987. In part, the lies were intended to conceal the secret Cayman Accounts of Bertoli, Eisenberg and Cannistraro.

In addition, in October 1987, Cannistraro filed a financial disclosure form that was to be used by the Probation Office to prepare Cannistraro's presentence report. On that form, Cannistraro failed to list the several million dollars he held in the Cayman Accounts at the time. Bertoli had told Cannistraro not to list those assets. The purpose of concealing that information was to keep secret the Cayman Accounts.

### Attempts to Conceal the Cayman Accounts

After commencement of the SEC Action, Bertoli anticipated the SEC might be able to force him, Eisenberg and Cannistraro to consent to disclosure of records regarding the Cayman Accounts. In February 1986, Bertoli, Eisenberg and Cannistraro travelled to the Cayman Islands to seek legal advice from a Cayman Islands law firm as to how to prevent Cayman Islands banks from providing information to United States authorities. As a result of the meeting, the Cayman Islands attorneys sent letters to Euro Bank and Butterfield seeking the cooperation of the banks in blocking any attempts by the Government to obtain evidence of the Cayman Accounts.

In mid–1986, in connection with the Grand Jury Investigation, the United States Department of Justice, by means of a Gentleman's Agreement request (the "Gentleman's Agreement Request"),[239] sought various documents from Euro Bank, Butterfield and Greenshields concerning the Cayman Accounts. In early January 1987, the Cayman Islands government granted the Gentleman's Agreement Request and advised Euro Bank, Butterfield and Greenshields they could turn over the documents sought by the Government.

Immediately after the Gentleman's Agreement Request, Bertoli and Cannistraro travelled to the Cayman Islands. Bertoli told Eisenberg he and Cannistraro were going to the Cayman Islands to set up another block. When Bertoli returned, he informed Eisenberg everything had been "taken care of." Trial Transcript at 2528. Subsequent to the trip by Bertoli and Cannistraro, Euro Bank, Butterfield and Greenshields advised the Cayman Islands police they would not turn over the documents absent an order from a Cayman Islands court compelling them to do so. When it appeared these attempts were not enough to prevent the Government from obtaining evidence of the Cayman Accounts, Bertoli participated in and directed the following illegal acts.

### The Euro Bank Shreddings

In 1986, the MLA Treaty between the United States and the Cayman Islands was signed by the Cayman Islands government and was expected to be signed by the United States. Foster, a Cayman Islands money manager, testified at trial that he had had discussions with Bertoli about the impending ratification of the MLA Treaty. Bertoli expressed concern that once the MLA Treaty was effective, the United States would be able to obtain records of the Cayman Accounts.

In addition, Bertoli expected the 1987 Cannistraro Prosecution to lead to an action against himself. Bertoli told Eisenberg it was only a matter of time before the Government indicted Bertoli and Eisenberg. Bertoli, therefore, sought to prevent the Government from obtaining records of the Cayman Accounts.

In order to prevent the Government from obtaining the records of the Cayman Accounts, Bertoli spoke to Ebanks at Euro Bank and arranged for Ebanks to provide Bertoli and Eisenberg with the records concerning their Euro Bank accounts. Bertoli explained to Eisenberg: " 'George is a good friend of mine. He'll do anything I ask him because I take pretty good care of him.' " *Id.* at 2551. Bertoli and Eisenberg then travelled to the Cayman Islands and met

---

**239.** In general, the Gentleman's Agreement was an informal agreement between the governments of the Cayman Islands and the United States which provided that, if the United States Department of Justice made an appropriate request for financial records, the Cayman Islands financial institution could turn over the records without violating the strict secrecy laws of the Cayman Islands. The procedure, however, was a voluntary one, and the financial institution could refuse to turn over documents.

Ebanks at Euro Bank.[240] Ebanks brought them to a file room, retrieved the records Bertoli requested (the "Euro Bank Records") and handed them to Bertoli and Eisenberg. When Eisenberg asked Ebanks whether the folders contained all of the records, Ebanks replied he had given them everything Euro Bank had.

Bertoli and Eisenberg took the Euro Bank Records to another location in the Cayman Islands and shredded them. As Eisenberg testified at trial, after they had finished shredding the Euro Bank Records, Bertoli said: " 'Now they'll never find the records. Let them come down, let them do what they want, they'll never have any records.' He used a famous expression that he always used to me. He said 'good show, Leo.' " *Id.* at 2553–54.

On 9 June 1987, the date the Euro Bank Records were shredded, Ebanks received a $20,000 check from Foster. *See id.* at 4671. Bertoli directed that Foster make the payment to Ebanks. The check was issued as payment for Ebanks' assistance in destroying the Euro Bank Records.

### The Paget–Brown Shreddings

In February 1987, about the time of the Gentleman's Agreement Request, and again in November 1987, Bertoli travelled to the Cayman Islands to obtain the records of some of the Paget Brown Companies so as to prevent the Government from getting them. In February 1987, Bertoli obtained the records of the First Set of Paget Brown Companies. Accordingly, when the Government later sought those records pursuant to the MLA Treaty Request, the records were not produced because Bertoli had them.

In November 1987, Bertoli obtained the records of the Second Set of Paget Brown Companies and shredded them. Again, when the Government later sought those records pursuant to a MLA Treaty Request, the request was denied because Bertoli had destroyed the records.

### Hiding the Cayman Accounts and the Records of the Paget Brown Companies

On 6 November 1989, the Government requested the issuance of a letter rogatory (the "1989 Proposed Letter Rogatory") from the Grand Court of the Cayman Islands. The 1989 Proposed Letter Rogatory requested documents and evidence concerning the Cayman Accounts for use at trial in the Bertoli Prosecution. In addition, the 1989 Proposed Letter Rogatory requested that both Coleman and Foster be deposed.

After the Government requested the 1989 Proposed Letter Rogatory, Bertoli arranged to have the money in the Third Set of Paget Brown Companies transferred from the management of Coleman at Paget Brown to that of Foster. Bertoli then caused Foster to move the money from the Cayman Islands to Andorra. In addition, Bertoli had transferred to Foster most of the original documents showing Bertoli, Cannistraro and Eisenberg as the owners of the Third Set of Paget Brown Companies.

In November 1989, Foster met with Bertoli to discuss moving the money and documents concerning the Third Set of Paget Brown Companies out of the Cayman Islands. Soon after that meeting, Foster received a call from Bertoli who wanted Foster to go to Andorra and open a bank account to which the money from the Third Set of Paget Brown Companies would be moved. Accordingly, in December 1989, Foster, Lugo and Jose Camprubi travelled to Andorra. There, they opened an account named Fosca, S.A. (the "Fosca Account") at the Banc Agricoli in Andorra. Foster confirmed with the Andorran bankers that Andorra had no treaties similar to the MLA Treaty and later relayed the substance of those discussions to Bertoli.

Bertoli then met with Eisenberg to discuss moving the documents concerning the Third Set of Paget Brown Companies. Bertoli stated he felt more comfortable having Foster in possession of the documents because Foster was someone he trusted. Eisenberg agreed with Bertoli's advice.

**240.** At trial, the Government introduced into evidence, Cayman Islands immigration records which showed Bertoli and Eisenberg travelled to the Cayman Islands approximately two weeks after Cannistraro was indicted in the 1987 Cannistraro Prosecution.

In 1990, the administration of the Third Set of Paget Brown Companies was transferred from Coleman at Paget Brown to Foster. When Foster obtained control of the money from the Third Set of Paget Brown Companies, which totalled approximately $8,700,000, he arranged to have the sum transferred by wire to the Fosca Account in Andorra.

After the MLA Treaty became effective in March 1990, the Government withdrew its request for the 1989 Proposed Letter Rogatory and issued the MLA Treaty Request directly to the government of the Cayman Islands for the same evidence.

In the fall of 1991, Bertoli met with Foster to discuss moving the records of the Third Set of Paget Brown Companies. Bertoli instructed Foster to take the documents to Andorra and leave them with an attorney there. The attorney was nominally representing Foster in a dispute over the handling of the Fosca Account and the attorney wanted the records documenting ownership to the money transferred to the Fosca Account from the Cayman Islands. Foster did as he was directed.

Subsequently, Foster was served with a notice from the Cayman Islands police to produce the records of the Third Set of Paget Brown Companies. In response, Foster informed the police he did not have the documents. He subsequently told Bertoli of his response.

### Inducing Foster to Evade Possible Service of Process

When Foster met with Bertoli in March 1991 to discuss moving the documents concerning the Third Set of Paget Brown Companies, the two also discussed the depositions that were going to be conducted by the Government pursuant to the April 1990 MLA Treaty Request (the "Government Cayman Depositions"). Bertoli told Foster that Government prosecutors were travelling to the Cayman Islands in May 1991 to take depositions. Bertoli then offered Foster $50,000 to leave the Cayman Islands for three months so that Foster would not be available at the

time the Government Cayman Depositions were being taken. Foster asked for $75,000.

In August 1991, the Government notified Bertoli, Cannistraro and Eisenberg of the individuals it wanted to depose during the depositions it planned to conduct in the Cayman Islands in September 1991. At the end of August, Foster left the Cayman Islands; he returned on 9 September 1991. When he returned, he had an urgent phone message awaiting him that he should contact Bertoli immediately at a location in the Cayman Islands. Foster phoned Bertoli who told him the Government was still conducting the Government Cayman Depositions and Foster was to leave the Cayman Islands at once.

As instructed by Bertoli, Foster left the Cayman Islands that night and went to Jamaica.[241] Later, Foster received a note at his Jamaica hotel informing him the Government Cayman Depositions were completed. On 20 September 1991, Foster returned to the Cayman Islands, three days after the Government had completed its depositions.

### The Isaacson Affidavits

After commencement of the Bertoli Prosecution in 1989, Bertoli, Cannistraro and Eisenberg continued their attempts to conceal their illegal activities.

In December 1991, Bertoli filed a motion to dismiss the Superseding Indictment for pre-indictment delay. Bertoli argued he had been prejudiced by the delay because his friend and partner, Isaacson, had died on 15 January 1988. Bertoli was the executor of Isaacson's estate. Bertoli contended Isaacson would have been an exculpatory witness who would have aided in his defense. In support of his motion to dismiss, Bertoli submitted the three Isaacson Affidavits. *See* Appendix B to the Affidavit of Richard Bertoli In Support of the Motion to Dismiss for Pre–Indictment Delay, filed 9 December 1991.

In the Isaacson Affidavits, it was stated that Isaacson and another individual were the owners of the Cayman Accounts, not Bertoli, Cannistraro and Eisenberg. The contents of the Isaacson Affidavits are false.

---

**241.** At trial, Foster's Cayman Islands' immigration records were introduced which showed that

he came into the Cayman Islands on 9 September 1991 and left again that very night.

Bertoli also submitted the Isaacson Affidavits in support of his motion for leave to take the Cayman Islands Depositions, his motion for the issuance of a letter rogatory and in support of his brief in opposition to a motion by the Government.

At trial, Eisenberg testified he and Bertoli had the following conversation after Bertoli had presented two of the Isaacson Affidavits to Eisenberg:

A: The conversation was, I said to him "gee, according to this it looks like Jack [Isaacson] is taking the blame for all the accounts." He says, "that's correct." He says, "you know, they got to believe a man whose affidavit is in contemplation of his death. They have no other choice."

Q: How did you feel about ... Isaacson [sic] taking the blame for you?

A: .... I felt pretty good.

Q: Why did you feel pretty good?

A: Because I was guilty of various crimes in this case and it would—I felt if he's going to take the blame for everything ... had got me and Richard [Bertoli], all of us, off the hook.

Trial Transcript at 2567.

b. *Sentencing Computation*

As stated, Bertoli was convicted on Count Three and Count Six, which charged him with violations of 18 U.S.C. §§ 371 and 1503. Bertoli's violations of sections 371 and 1503 each carry a statutory maximum penalty of five years imprisonment. Because Bertoli committed each offense while on pretrial release, he is subject to an additional term of imprisonment of up to ten years on each count pursuant to 18 U.S.C. § 3147.[242] Accordingly, Bertoli faced a maximum of fifteen years on each count.

i. *Applicable Guidelines*

 The United States Sentencing Guidelines (the "Guidelines") govern sentenc-

ing on all Federal crimes committed after 1 November 1987. The Guidelines govern sentencing for both Count Three and Count Six. The obstruction of justice charge described in Count Six occurred in or about March or April 1990, after the adoption of the Guidelines. The Guidelines also apply to Count Three which involves several conspiracies to obstruct justice, the first of which originated in 1983, and the last of which continued until at least as late as January 1992; there is no indication Bertoli ever withdrew from any of the conspiracies. *See United States v. Seligsohn,* 981 F.2d 1418, 1425 (3d Cir.1992) (where conspiracy charge straddles period before and after Guidelines were adopted, Guidelines apply); *United States v. Moscony,* 927 F.2d 742, 754 (3d Cir.) (same), *cert. denied,* 501 U.S. 1211, 111 S.Ct. 2812, 115 L.Ed.2d 984 (1991); *United States v. Rosa,* 891 F.2d 1063, 1068–69 (3d Cir.1989) (same).

In the instant case, sentencing is properly pursuant to the Sentencing Guidelines Manual of 1 November 1993 (the "1993 Manual") because sentencing took place on 28 March 1994. *Seligsohn,* 981 F.2d at 1424; *United States v. Cianscewski,* 894 F.2d 74, 77 n. 6 (3d Cir.1990). Section 1B1.11 of the Guidelines states:

(a) The court shall use the Guidelines Manual in effect on the date that the defendant is sentenced.

(b)(1) If the court determines that use of the Guidelines Manual in effect on the date that the defendant is sentenced would violate the *ex post facto* clause of the United States Constitution, the court shall use the Guidelines Manual in effect on the date that the *offense of conviction was committed.*

(b)(2) The Guidelines Manual in effect on a particular date shall be applied in its entirety. The court shall not apply, for example, one guideline section from one edition of the Guidelines Manual and another

---

**242.** Section 3147 provides:
A person convicted of an offense committed while [on pre-trial release] shall be sentenced, in addition to the sentence prescribed for the offense to—
(1) a term of imprisonment of not more than ten years if the offense is a felony; ....

A term or imprisonment imposed under this section shall be consecutive to any other sentence of imprisonment.
18 U.S.C. § 3147.

guideline section from a different edition of the Guidelines Manual.

U.S.S.G. § 1B1.11.

 Accordingly, the 1993 Manual must be used to calculate Bertoli's sentence unless the use of that manual would violate the *ex post facto* clause of the Constitution. An *ex post facto* violation occurs only if the law on the date of sentencing is more detrimental to the defendant than it was at the time the offense is committed. *See Seligsohn,* 981 F.2d at 1424; *United States v. Kopp,* 951 F.2d 521, 526 (3d Cir.1991), *reh'g denied en banc,* 1992 U.S.App.LEXIS 2334 (3d Cir. Feb. 18, 1992); *Cianscewski,* 894 F.2d at 77 n. 6; *see also United States v. Pollen,* 978 F.2d 78, 90, *reh'g denied en banc,* 1992 U.S.App.LEXIS 29,864 (3d Cir.1992), *cert. denied,* — U.S. ——, 113 S.Ct. 2332, 124 L.Ed.2d 244 (1993). If such is the case, the court must apply the more lenient sentencing law that was in effect at the time of the offense. *Id.*

In the instant case, the only other Guidelines Manual that could be used is the 1 November 1991 Manual (the "1991 Manual"), which was the manual in effect on the date the Second Superseding Indictment was returned and the conspiracies to obstruct justice described in Count Three ceased.[243] Because there are no material differences between the 1991 Manual and the 1993 Manual as the Guidelines contained therein apply to Bertoli, the 1993 Manual applies in this case. *See Seligsohn,* 981 F.2d at 1424; *Kopp,* 951 F.2d at 526.

### ii. *Grouping the Offenses*

*Multiple Offenses*

 Under section 1B1.2, "conviction on a count charging conspiracy to commit more than one offense shall be treated as if the defendant had been convicted on a separate count of conspiracy for each offense that the defendant conspired to commit." U.S.S.G. § 1B1.2(d).

For example, where a conviction on a single count of conspiracy establishes that the defendant conspired to commit three robberies, the guidelines are to be applied as if the defendant had been convicted on one count of conspiracy to commit the first robbery, one count of conspiracy to commit the second robbery, and one count of conspiracy to commit the third robbery.

U.S.S.G. § 1B1.2, Application Note 4; *see United States v. Kimmons,* 965 F.2d 1001, 1005–07 (11th Cir.1992); *see also United States v. Golden,* 954 F.2d 1413, 1418 (7th Cir.1992).

In determining whether a conspiracy count gives rise to multiple offenses

[p]articular care must be taken ... because there are cases in which the verdict or plea does not establish which offense(s) was the object of the conspiracy. In such cases, subsection (d) should only be applied with respect to an object offense alleged in the conspiracy count if the court, were it sitting as a trier of fact, would convict the defendant of conspiracy to commit that object offense.

U.S.S.G. § 1B1.2, Application Note 5. Accordingly, it is the determination of the court whether the defendant should be sentenced for multiple conspiracies.

Bertoli was convicted on Count Three and Count Six. Count Three charges Bertoli with engaging in conspiracies to obstruct five different proceedings—the SEC Investigation, the SEC Action, the Grand Jury Investigation, the 1987 Cannistraro Prosecution and the Bertoli Prosecution. Accordingly, Count Three comprises five different offenses within the meaning of section 1B1.2(d). *See Kimmons,* 965 F.2d at 1005–07; *Golden,* 954 F.2d at 1418. Count Six charges Bertoli with obstructing the Bertoli Prosecution by moving money and documents concerning the Cayman Accounts to Andorra.

Bertoli argues, as he does throughout the Bertoli Sentencing Memo, there was insufficient evidence produced at trial to demonstrate obstruction of five proceedings. Specifically, Bertoli contends (1) there is no

---

**243.** Although the substantive offense for obstruction of the Bertoli Prosecution described in Count Six occurred in 1990, as discussed *infra,* it is grouped with the conspiracy to obstruct the Bertoli Prosecution described in Count Three for sentencing purposes.

proof the jury convicted him on every overt act described in Count Three and (2) the fact the jury acquitted him on Count Four, Count Five and Count Seven demonstrates there was inadequate proof of the conduct described in those counts. Bertoli Sentencing Memo at 24–26.

An " '[a]cquittal does not have the effect of conclusively establishing the untruth of all the evidence introduced against the defendants.' " *United States v. Gonzalez*, 733 F.Supp. 29, 31 (D.N.J.1990). As stated by the Circuit in *United States v. Pollard*, 986 F.2d 44 (3d Cir.), *cert. denied*, ––– U.S. –––, 113 S.Ct. 2457, 124 L.Ed.2d 671 (1993):

> There is no statutory or constitutional requirement that a defendant be convicted of conduct that may be considered in sentencing. Indeed, the conduct need not even be shown beyond a reasonable doubt, but only be a preponderance of the evidence.... The Due Process Clause sets no limits on the relevant, proven *conduct* that a sentencing judge may consider when imposing sentence, and sentencing court possesses great discretion in the conduct it may consider. This is true even if the conduct was not proved at trial but came from a presentence report.

*Id.* at 46–47 (emphasis in original) (citations omitted).

As discussed, it has been established by at least a preponderance of the evidence that Bertoli was involved in obstructing all five proceedings described in Count Three. On the basis of the facts established at trial, this court, if sitting as the trier of fact, would have convicted Bertoli of conspiracy to commit each of the five offenses described in Count Three.

*Grouping*

■■■ Once it has been determined there are multiple offenses, it must then be determined whether to group those offenses and treat them as a single count or treat them separately as distinct offenses. Chapter Three, Part D of the Guidelines governs the treatment of multiple offenses. The Guidelines contained therein are a means of balancing two competing objectives. One objective is to ensure "incremental punishment for significant additional criminal conduct."

U.S.S.G. Chapter 3, Part D, Introductory Comment. The competing objective is "to limit the significance of the formal charging decision ... to prevent multiple punishment for substantial identical offense conduct." *Id.* Therefore,

> [c]onvictions on multiple counts do not result in a sentence enhancement unless they represent additional conduct that is not otherwise accounted for by the [G]uidelines. In essence, counts that are grouped together are treated as constituting a single offense for purposes of the [G]uidelines.

*Id.*

Section 3D1.1 sets forth the procedure for determining the offense level for multiple counts of conviction.

> When a defendant has been convicted of more than one count, the court shall:
>
> (1) Group the counts resulting in conviction into distinct Groups of Closely Related Counts ("Groups") by applying the rules specified in § 3D1.2.
>
> (2) Determine the offense level applicable to each Group by applying the rules specified in § 3D1.3.
>
> (3) Determine the combined offense level applicable to all Groups taken together by applying the rules specified in § 3D1.4.

U.S.S.G. § 3D1.1(a).

The first step in the instant case, therefore, is to determine whether the five conspiracy offenses in Count Three and the obstruction offense in Count Six should be considered as a "distinct [g]roup[ ] of [c]losely [r]elated [c]ounts." *See* U.S.S.G. § 3D1.1(a)(1). The pertinent section of the Guidelines, section 3D1.2, provides: "All counts involving substantially the same harm should be grouped together into a single Group." U.S.S.G. § 3D1.2. The guideline describes when counts are considered to "involve substantially the same harm":

> (a) When counts involve the same victim and the same act or transaction.
>
> (b) When counts involve the same victim and two or more acts or transactions connected by a common criminal objec-

tive or constituting part of a common scheme or plan.

(c) When one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts.

(d) When the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior.[244]

U.S.S.G. § 3D1.2.

An application note for section 3D1.2 gives the following example of how to group conspiracy counts which describe several conspiracies:

> *Example:* The defendant is convicted of two counts: conspiring to commit offenses A, B, and C, and committing offense A. Treat this as if the defendant was convicted of (1) committing offense A; (2) conspiracy to commit offense A; (3) conspiracy to commit offense B; and (4) conspiracy to commit offense C. Count (1) and count (2) are grouped together under § 3D1.2(b).

Group the remaining counts, including the various acts cited by the conspiracy count that would constitute behavior of a substantive nature, according to the rules in this section.

U.S.S.G. § 3D1.2, Application Note 8.

 The grouping analysis in the instant case must begin with a determination as to the number of groups of offenses that exist. *See* U.S.S.G. § 3D1.1(a)(1). A "group" consists of one or more offenses which should be lumped together pursuant to section 3D1.2. The question of whether to group particular offenses turns primarily on whether the acts of misconduct arose from the same transaction and affected the same victim. In this case, Bertoli was convicted of one count of conspiracy to obstruct justice in five separate proceedings and one count of obstructing justice.

The Government argues

the five separate conspiracies to obstruct justice resulting from Bertoli's conviction on Count [Three], as well as his obstruction of justice conviction on Count [Six], should be separated into three different Groups. This is so because these obstructions of justice invaded three distinct societal interests—the societal interests in the

---

**244.** Bertoli also argues that section 3D1.2(d) precludes treating the five conspiracy offenses other than as a single offense and, therefore, that the five conspiracies and the obstruction count must be treated as a single group of closely related offenses.

An application note provides the following example of a case where section 3D1.2(d) requires grouping:

> The defendant is convicted of two counts of distributing a controlled substance, each count involving a separate sale of 10 grams of cocaine that is part of a common scheme or plan. In addition, a finding is made that there are two other sales, also part of the common scheme or plan, each involving 10 grams of cocaine. The total amount of all four sales (40 grams of cocaine) will be used to determine the offense level for each count under § 1B1.3(a)(2). The two counts will then be grouped together under either this subsection or subsection (d) to avoid double counting. *But:* ... The defendant is convicted of two counts of rape for raping the same person on different days. The counts are not grouped together.

U.S.S.G. § 3D1.2, Application Note 4. From the above example, it is clear that the concern addressed in section 3D1.2(d) is that the offense will be grouped for purposes of determining harm or loss as well as treated separately for purposes of increasing the level for multiple offenses.

Bertoli argues that because the offense level is increased in the instant case, pursuant to section 2F1.1(b)(1)(O), for the amount of loss resulting from the Stock Manipulation Schemes, section 3D1.2(d) requires that the five conspiracies and the substantive obstruction count be treated as a single offense. Bertoli 4 Feb. 1994 Letter at 7.

Bertoli's reasoning is incorrect. The offense level in the instant case is not determined "largely on the basis of the *total* amount of harm of loss." The total loss calculated for purposes of section 2F1.1(b)(1)(O) is not determined by totalling the loss from the five conspiracy offenses. *See infra* at 1146–1148. Rather, each group of conspiracy offenses on its own provides the level of loss required to apply the fourteen level increase pursuant to section 2F1.1(b)(1)(O). *See id.* Because there is no need to group the offenses to determine the amount of the loss, the concern at issue in section 3D1.2(d) is not raised in the instant case.

proper conduct of (1) the [F]ederal district courts (the SEC [Action], [the 1987 Cannistraro Prosecution], and the [Bertoli Prosecution]) ["Group One"], (2) [F]ederal grand juries (the [G]rand [J]ury [I]nvestigation in this case) ["Group Two"] and (3) [F]ederal administrative agencies (the SEC [I]nvestigation) ["Group Three"]. Thus Group [One] would consist of the three conspiracies to obstruct [F]ederal court proceedings as well as Count [Six]. Group [Two] would consist of the conspiracy to obstruct the [G]rand [J]ury [I]nvestigation.... Group [Three] would consist of the conspiracy to obstruct the SEC [I]nvestigation.

Government Sentencing Memo at 77. In response, Bertoli argues all of the offenses should be grouped together and treated as one offense because "[t]here is only one 'victim': society." Bertoli Sentencing Memo at 28.

In resolving the issue of whether criminal conduct involves the same victim, there are two passages from the commentary to section 3D1.2 which provide some guidance. Application Note 2 states:

> For offenses in which there are no identifiable victims ..., the *"victim"* for purposes of subsection (a) and (b) *is the societal interest harmed.* In such cases, the counts are grouped together when the societal interests that are harmed are closely related....

U.S.S.G. § 3D1.2, Application Note 2 (emphasis added). The second passage is contained in the Background section and states:

> A primary consideration in this section is whether the offenses involve different victims. For example, a defendant may stab three prison guards in a single escape attempt. Some would argue that all counts arising out of a single transaction or occurrence should be grouped together even when there are distinct victims. Although such a proposal would require departure in many cases in order to capture adequately the criminal behavior. Cases involving injury to distinct victims are sufficiently comparable, whether the injuries are inflicted in distinct transactions, so that each such count should be treated

separately rather than grouped together. Counts involving different victims (or societal harms in the case of "victimless" crimes) are grouped together only as provided in subsection (c) or (d).

U.S.S.G. § 3D1.2, Background.

Numerous courts have recognized that even where the Government or society is the only apparent victim of a crime, the interests represented by those entities may be so distinct as to constitute multiple victims. As explained by the court in *United States v. Alter*, 825 F.Supp. 550 (S.D.N.Y.1993): "Even if the Court were find to that the Government is the sole victim, [where] different interests [are at issue] ... grouping the offenses may be improper." *Id.* at 553; *see, e.g., United States v. Gallo*, 927 F.2d 815, 823–24 (5th Cir.1991) (separate grouping for drug offense and money laundering counts because distinct societal interests invaded); *United States v. Odofin*, 929 F.2d 56, 61 (2d Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 154, 116 L.Ed.2d 120 (1991) (separate grouping for heroin importation and false passport counts); *United States v. Egson*, 897 F.2d 353, 354 (8th Cir.1990) (separate grouping for drug count and food stamp abuse count); *United States v. Kim*, 896 F.2d 678, 687 (2d Cir.1990) ("[t]he interests protected by the immigration laws and the currency laws are so distinct that it is not realistic to consider both offenses to have as a common 'victim' the United States"); *United States v. Pope*, 871 F.2d 506, 510 (5th Cir.1989) (possession of unregistered silencer and unlawful possession of a pistol by a felon "involve two distinct harms and different societal interests"); *see also United States v. Riviere*, 924 F.2d 1289, 1304 (3d Cir.1991) ("[f]or victimless crimes in which society at large is the victim, 'the grouping decision must be based primarily upon the nature of the interest invaded by each offense' ").

Although it is well-established that different societal interests may be involved in victimless crimes, there appears to be only one case which specifically discusses whether different interests are affected by separate ob-

struction of justice offenses.[245] In *United States v. Beard*, 960 F.2d 965 (11th Cir.1992), the defendant, a car dealer, was convicted of, among other things, two counts of obstruction of justice. The first obstruction occurred when the IRS began investigating a phony rebate scheme involving the defendant. *Id.* at 966. The defendant instructed his employee to lie to the IRS about the scheme. *Id.* The employee did as he was told but was himself later charged with income tax evasion. *Id.* The employee pleaded guilty to the charge but did not disclose the defendant's involvement in the scheme. *Id.*

The second obstruction occurred two years later when the IRS served another of defendant's employees with a grand jury subpoena. *Id.* The defendant also told this other employee to lie to the grand jury about the defendant's participation in the phony rebate scheme. *Id.* That employee, however, did not lie to the grand jury but entered into an immunity agreement with the Government. *Id.* The defendant was convicted and the district court refused to group together the two obstruction counts. *Id.* The defendant appealed his sentence.

On appeal, the Eleventh Circuit acknowledged that because the obstruction of justice counts "involve[d] a "victimless" crime, . . . the harm to the societal interest must be considered." *Id.* at 968. The Circuit then held: "The defendant's conduct invades two distinct societal interests: the proper conduct of the district court and the [F]ederal grand jury." *Id.* As an additional reason for not grouping together the two obstruction counts, the Circuit stated:

> "Counts should not be grouped together where they "represent additional conduct that is not otherwise accounted for by the guidelines." The [second] obstruction constitutes significant additional criminal conduct directed toward the grand jury which is sufficient to preclude grouping."

*Id.* (citation omitted).

Under the reasoning in *Beard*, Group One, Group Two and Group Three in the instant case should be viewed as distinct offenses which should not be grouped together for sentencing purposes. The three groups, which involve "victimless" crimes, do not affect the same governmental or societal interests. As in *Beard*, distinct societal interests were affected by the conspiracy to obstruct justice as described in Group One—the SEC

---

**245.** The only other case which has discussed grouping in the context of obstruction of justice is *United States v. Bradach*, 949 F.2d 1461 (7th Cir.1991). In that case, the defendant, who owned an insurance agency, had an arrangement to periodically issue checks to four individuals who were not employed by him. *Id.* at 1462. The four individuals reported the payments as income on their tax returns. *Id.* The defendant and the four individuals each agreed to provide a false explanation for the payments if they were ever questioned by law enforcement officials or at legal proceedings. *Id.*

Eventually, three of the four individuals were indicted. *Id.* All three provided the agreed upon false story to the grand jury. *Id.* Two of the three were subsequently tried for their false statements to the grand jury. *Id.* at 1462–63. At each of their trials, the defendant gave the false explanation under oath. *Id.* at 1463.

The defendant was later charged with (1) subornation of perjury, (2) conspiracy to commit subornation of perjury and (3) making false statements under oath; in total, the defendant was charged with eleven counts pertaining to false declarations. *Id.* at 1462. The district court grouped all of the offenses together for sentencing purposes. *Id.* On appeal, the Government objected to the grouping. *Id.*

The Seventh Circuit affirmed the decision of the district court, explaining:

> In [this] case, the [G]overnment concedes that "the counts do involve the same victim." The [G]overnment also concedes that the counts against [the defendant] "involve acts constituting part of a common scheme or plan." Nevertheless, the [G]overnment claims that the harm to the United States was not the same for each false declaration and therefore should not be grouped for sentencing purposes.... *Where the [G]overnment has conceded that all conditions of § 3D1.2(b) have been satisfied, the explicit dictates of that guideline may not be ignored.*

*Id.* at 1464–65 (citation & footnote omitted) (emphasis added).

The Seventh Circuit never addressed the issue of whether the obstruction of justice counts based on perjurious statements in different proceedings affected different societal interests. Because the Government, in that case, conceded the elements of section 3D1.2(b), the Seventh Circuit applied the grouping rules contained therein. The Seventh Circuit gave no indication of what its decision would have been in the absence of the Government's stipulations.

Action, the 1987 Cannistraro Prosecution, the Bertoli Prosecution and the substantive obstruction in Count Six, Group Two—the SEC Investigation and Group Three—the Grand Jury Investigation.

Bertoli relies on two cases to counter the holding in *Beard*. *See* Bertoli Sentencing Memo at 29–33. First, he cites *United States v. Berkowitz*, 712 F.Supp. 707 (N.D.Ill. 1989), *rev'd on other grounds*, 927 F.2d 1376 (7th Cir.1991). In *Berkowitz*, the defendant was convicted of (1) obstructing justice by stealing documents from the office of the United States Attorney, (2) obstructing justice by destroying those stolen documents and (3) stealing Government property. *Id.* at 708. The Government argued during sentencing in *Berkowitz* that the third count should not be grouped together with counts one and two because different interests were involved. *Id.* at 710. Specifically, the Government contended counts two and three affected "society at large" and the court system, while the U.S. Attorney was the victim of count three. *Id.* The sentencing court disagreed and grouped all three offenses together, stating:

> With respect to all counts, the victim is society. The U.S. Attorney's Office, as a representative of society, cannot reasonably be construed as a victim separate from society with respect to any offense committed by [the defendant].

*Id.*

There are two factors distinguishing the instant case from *Berkowitz*. First, in *Berkowitz*, the defendant attempted to obstruct the same criminal proceeding. 712 F.Supp. at 708. Second, the Government in *Berkowitz* did not attempt to argue that different interests were involved in the two obstruction of justice charges. Rather it argued both obstruction charges harmed "society." The only distinction drawn by the Government in that case was between itself and society for purposes of distinguishing the obstruction counts from the theft count; that is the distinction rejected by the court.

Therefore, the court never addressed the issue of whether obstruction of justice can harm different societal or governmental interests.

The second case upon which Bertoli relies is *Riviere*. *See* Bertoli Sentencing Memo at 30–33. In *Riviere*, the defendant pleaded guilty to (1) possession of a firearm by a felon, (2) delivery of firearms to common/contract carrier and (3) possession of an altered firearm. 924 F.2d at 1292 & n. 3. Because there was no individual victim for the firearms offenses, the Circuit considered whether different societal interests were impacted. *Id.* at 1305. The Government argued that the three offenses should not be grouped because each offense required proof of different elements and because the Guidelines did not specifically list firearms offenses as offenses to be grouped. *Id.* at 1305–06. The Circuit rejected both arguments. *Id.*

The holding in *Riviere* is not helpful to Bertoli. First, the case did not involve obstruction of justice counts. Second, the Government in that case did not argue that different societal interests were at stake for the different offenses.[246]

Under the holding in *Beard*, the offense conduct in this case is appropriately grouped into Group One, Group Two and Group Three. Furthermore, such grouping is appropriate under the Guidelines. Bertoli conspired to obstruct five separate legal proceedings which affected three distinct legal interests. That conduct, together with the substantive obstruction offense, cannot be "treated as constituting a single offense for purposes of the Guidelines." To the contrary, treating all five conspiracy offenses together with the obstruction of justice in Count Six as a single offense would fail to enhance Bertoli's sentence for additional conduct that is not otherwise accounted for in the Guidelines. *See* U.S.S.G. Ch. 3, Part D, Introductory Commentary.

Otherwise, if the societal interests affected by the obstructions of justice in the different legal proceedings are not taken into consid-

---

**246.** Bertoli incorrectly states that the Third Circuit in *Riviere* "approved the holding of" *Berkowitz*. Bertoli Sentencing Memo at 31. The Circuit in *Riviere* refers to the fact that the defendant in that case based his argument on *Berkowitz*, but does not further comment as to the holding in that case. *See Riviere*, 924 F.2d at 1305.

eration, it would make no difference whether a defendant obstructed one proceeding or one hundred different proceedings because all of the counts would be grouped together and the defendant would be sentenced on the basis of a single offense.

### iii. *Calculating the Offense Level*

Once the offenses have been grouped, the second step is to "[d]etermine the offense level applicable to each Group by applying the rules specified in § 3D1.3." U.S.S.G. § 3D1.1(a)(2). Section 3D1.3 provides in pertinent part:

> Determine the offense level applicable to each of the Groups as follows:
>
> (a) In the case of counts grouped together pursuant to § 3D1.2(a)-(c), the offense level applicable to a Group is the offense level, determined in accordance with Chapter Two and Parts A, B, and C of Chapter Three, for the most serious of the counts comprising the Group, *i.e.*, the highest offense level of the counts in the Group.

U.S.S.G. § 3D.1.3(a). Accordingly, the Guidelines must be applied to Group One, Group Two and Group Three.

### *Group One*

The Guidelines generally instruct that sentences be calculated in the following manner:

> (1) Determine the applicable offense guideline from Chapter Two....
>
> (2) Determine the base offense level and apply an appropriate specific offense characteristics contained in the particular guideline in Chapter Two in the order listed.
>
> (3) Apply the adjustments as appropriate related to the victim, role and obstruction of justice from Parts A, B and C of Chapter 3.

*United States v. Wong*, 3 F.3d 667, 670 (3d Cir.1993) (citing U.S.S.G. § 1B1.1); *see McNeill*, 887 F.2d at 455.

### *Sections 2J1.2 and 2X3.1*

The Guideline for obstruction of justice is section 2J1.2, which provides a base level of twelve. U.S.S.G. § 2J1.2(a). Section 2J1.2 further provides:

> (b) Specific Offense Characteristics
>
> (1) If the offense involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice, increase by 8 levels.
>
> (2) If the offense level resulted in substantial interference with the administration of justice, increase by 3 levels.
>
> (c) Cross Reference
>
> (1) If the offense involved obstructing the investigation or prosecution of a criminal offense, apply § 2X3.1 (Accessory After the Fact) in respect to that criminal offense, if the resulting offense level is greater than that determined above.

U.S.S.G. § 2J1.2. In turn, section 2X3.1 reads:

> Base Offense Level: 6 levels lower than the offense level for the underlying offense but in no event less than 4, or more than 30....

U.S.S.G. § 2X3.1(a).

Section 2J1.2 requires several steps to be taken in calculating the offense level for obstruction of justice. First, the offense level must be calculated using subsections (a) and (b) (the "First Method"). Then, if the defendant was convicted of obstructing the investigation or prosecution of a criminal offense, it must be determined whether the cross-reference to section 2X3.1 should be used. To make that determination, the offense level must be calculated pursuant to section 2X3.1 (the "Second Method"). Finally, it must be determined whether the First Method or the Second Method generates the greater offense level; the method which results in the higher offense level is the one used. U.S.S.G. § 2J1.2(c).

Under the First Method, which references subsections (a) and (b) of section 2J1.2, the offense level is fifteen. That number is achieved by using the base offense level of twelve and making a three point adjustment, pursuant to section 2J1.2(b)(2), for Bertoli's substantial interference with the administration of justice.

A greater offense level is achieved using the Second Method which incorporates the

cross-reference to section 2X3.1. Section 2X3.1 provides that the offense level may be calculated on the basis of the criminal offense underlying the investigation or prosecution that was obstructed by the offense of conviction. The use of the cross-reference section does not require that the defendant be convicted of the underlying offense. *See United States v. Salinas,* 956 F.2d 80, 83 (5th Cir. 1992); *see also United States v. Nelson,* 919 F.2d 1381, 1382–83 (9th Cir.1990). Nor does it require that the defendant have been charged and convicted as an accessory after the fact. *Id.*

Because use of the Second Method and the cross-reference section requires that the underlying conduct be the basis for calculating the sentence, it must be determined which Guidelines apply to the underlying conduct in the instant case. The criminal conduct Bertoli attempted to conceal with his acts of obstruction involved racketeering and racketeering conspiracy, the predicate offenses of which were premised on the Stock Manipulation Schemes. The Guideline applicable to the underlying Stock Manipulation Schemes is section 2F1.1 which applies to offenses involving fraud.[247]

The Second Method, pursuant to section 2X3.1, requires that the offense level be calculated under section 2F1.1 and compared to the offense level achieved using the First Method. Using the Second Method, an offense level of twenty-four is calculated. Accordingly, the Second Method is to be used

as it yields a higher offense level than the First Method. *See* U.S.S.G. § 2J1.2(c).

 Bertoli, however, argues section 2X3.1 cannot be applied in the instant case because section 2X3.1 is applicable only where the defendant who is convicted of obstructing justice is convicted of obstructing proceedings in which he or she is not the principal offender. *See* Bertoli Sentencing Memo at 2–5.[248] Bertoli relies primarily on the holdings in *United States v. Huppert,* 917 F.2d 507, 510–11 (11th Cir.1990) and *United States v. Pierson,* 946 F.2d 1044, 1047–49 (4th Cir.1991).

In *Huppert,* the defendant was convicted of two counts of obstructing justice in connection with the investigation of a money-laundering scheme in which the defendant was engaged. 917 F.2d 507. The defendant was sentenced pursuant to section 2J1.2(c) and its cross-reference to section 2X3.1. The Eleventh Circuit concluded the defendant could not be sentenced as an accessory after the fact because he was protecting himself, not others, and it was clear he was a principal in the money laundering scheme. *Id.* at 510–11.

The holding in *Huppert* looked to the background commentary for section 2J1.2 in the then applicable Guidelines which provided:

Because the conduct covered by this guideline is frequently part of an effort to assist another person to escape punishment for a crime he has committed, an alternative

247. Although the underlying charges in this case were RICO offenses, the RICO Guideline, U.S.S.G. § 2E1.1, is not applicable. Section 2E1.1 states that the base offense level is the greater of nineteen or "the offense level applicable to the underlying racketeering activity." U.S.S.G. § 2E1.1(a)(1); *see Moscony,* 927 F.2d at 755 n. 18. In this case, the underlying racketeering activities are the Stock Manipulation Schemes. As discussed below, the application of the fraud guidelines are appropriate because they result in an offense level of twenty-four.

248. As the Government argued:
Accepting Bertoli's argument would yield illogical results. For example, assume that a defendant is charged and convicted of obstructing an investigation of mail fraud. Further assume that the mail fraud was not prosecuted because the statute of limitations had run, but that if it had been prosecuted, the Guidelines

offense level for the mail fraud would have been level 30. Finally, assume that the obstruction of justice substantially interfered with the administration of justice. Using Bertoli's analysis, the offense level for a defendant convicted of obstruction would depend on whether or not he was protecting himself by obstructing the mail fraud investigation. If the defendant was not protecting himself, but only protecting another, his offense level (without adjustments) would be 24 (30 minus 6) pursuant to section 2J1.2(c) and the cross-reference to section 2X3.1). If, on the other hand, the defendant was involved in the mail fraud and was protecting himself as well as others, Bertoli's analysis would yield an offense level (without adjustments) of only 15 (12 plus 3 pursuant to section 2J1.2(a) and (b)).
Government Sentencing Memo at 84–85.

reference to the guideline for accessory after the fact is made.

U.S.S.G. § 2J1.2, Background (1 November 1989 Manual). This language was interpreted to preclude the application of the cross-reference provision to individuals who were participants in the underlying offense and obstructed justice to protect themselves, as opposed to protecting others. *See Huppert,* 917 F.2d at 510–11; *see also Pierson,* 946 F.2d at 1047–49.

In the 1 November 1991 Manual, however, the background commentary was amended to clarify the use of the cross-reference section. As amended, the background commentary reads:

> Because the conduct covered by the guideline is frequently part of an effort to avoid punishment for an offense that the defendant has committed or to assist another person to escape punishment for an offense, a cross reference to § 2X3.1 (Accessory After the Fact) is provided. Use of this cross reference will provide an enhanced offense level when the obstruction is in respect to a particularly serious offense, whether such offense was committed by the defendant or another person.

U.S.S.G. § 2J1.2, Background (1 November 1991 Manual); *see United States v. Jamison,* 996 F.2d 698, 701 n. 3 (4th Cir.1993) ("In 1991, the Guidelines Commission amended the commentary on which both the *Pierson* and *Huppert* courts relied in a manner which casts doubt upon the continued validity of those decisions."). This amended commentary remained unchanged in the subsequent editions of the Guidelines, including the 1993 Manual, which applies in this case.

Bertoli argues that the holdings in *Huppert* and *Pierson* apply to him because, until the amendment of the background commentary in the 1991 Guidelines, section 2X3.1 would not have applied where a defendant obstructed justice in a proceeding against himself. Bertoli Sentencing Memo at 2–3.

It is not necessary to reach the question of whether the 1991 amendment to the background commentary was a clarifying amendment because, as discussed, to the extent the 1993 Guidelines are not applicable to this case, the 1991 Manual is the only other Guidelines Manual which could apply. The conspiracies alleged in Count Three continued until 29 January 1992, at which time the 1991 Guidelines were in effect.

> When a conspiracy begins during a period where the application of certain Guidelines would be controlling and extends into a period when another Guideline would be appropriate, there is no violation of the *ex post facto* clause in applying the Guidelines in effect at the time of the last act of the conspiracy.

*United States v. Stanberry,* 963 F.2d 1323, 1326–27 (10th Cir.1992); *see also Seligsohn,* 981 F.2d at 1425; *Moscony,* 927 F.2d at 754; *Rosa,* 891 F.2d at 1068–69.

Accordingly, the cross-reference to section 2X3.1 is applicable in this case.

*Section 2F1.1*

Section 2F1.1(a) provides a base level of six. Subsection (b) then provides various specific offense characteristics which may enhance the base level.

*Amount of Loss*

■ The first relevant offense characteristic is in section 2F1.1(b)(1), which provides for an increase in the base offense level depending on the loss resulting from the fraudulent conduct. Both the Presentence Report and the Government Sentencing Memo conclude that a fourteen level increase under section 2F1.1(b)(1)(O) is warranted because the loss involved as a result of the Stock Manipulation Schemes was greater than $5,000,000. *See* Presentence Report at 32; Government Sentencing Memo at 88. The loss was measured by taking into consideration the gain to Bertoli and his co-conspirators as a result of the Stock Manipulation Schemes, which has been calculated at more than $6,000,000. *See id.*

Bertoli argues that the adjustment is improper because (1) "there was no victim and there was no loss" as a result of the Stock Manipulation Schemes, *see* Bertoli 1 Dec. 1993 Letter at 3–5, and (2) Bertoli neither knew nor reasonably should have known the amount of the fraud. *See* Bertoli Sentencing Memo at 10–12.

The Application Notes to section 2F1.1, however, states:

> For the purposes of subsection (b)(1), the loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information. This estimate, for example, may be based on the approximate number of victims and an estimate of the average loss to each victim, or on more general factors, such as the nature and duration of the fraud and the revenues generated by similar operations. The *offender's gain from committing the fraud is an alternative estimate* that ordinarily will underestimate the loss.

U.S.S.G. § 2F1.1, Application Note 8 (emphasis added).

 "Loss" for purposes of section 2F1.1 is to be determined on a case by case basis. *See United States v. Badaracco*, 954 F.2d 928, 937, *reh'g denied en banc*, 1992 U.S.App.LEXIS 2332 (3d Cir.1992). As the Circuit stated in *Badaracco*: "Although section 2F1.1 is applicable to a wide variety of fraud schemes, the sentencing judge is entitled, probably compelled, to evaluate the size of the loss based on the particular offense." *Id.*

 "[F]raud 'loss' is, in the first instance, the amount of money the victims have actually lost (estimated at the time of sentencing)." *Kopp*, 951 F.2d at 536; *see United States v. Katora*, 981 F.2d 1398, 1406 (3d Cir.1992); *Badaracco*, 954 F.2d at 936–37. An adjustment for loss, however, is not precluded where that measurement is difficult or impossible. In that situation, the alternative measure of the offender's gain is appropriate. *See* U.S.S.G. § 2F1.1, Application Note 8; *Badaracco*, 954 F.2d at 937; *United States v. Cherif*, 943 F.2d 692 (7th Cir.1991), *cert. denied*, ── U.S. ──, 112 S.Ct. 1564, 118 L.Ed.2d 211 (1992).

In *Cherif*, the district court's decision to increase the offense level by reference to the gain realized from the offenders was affirmed. 943 F.2d at 702. The Seventh Circuit stated:

> [E]ven though the loss here might only have been to the bank and its customers, it was appropriate to use [the defendant's] gain as a measure for that loss. There was a loss to the bank and its customers but that loss is difficult to quantify. The whole point of § 2F1.2 is to allow the court to place a monetary value on losses that are hard to identify. [The defendant's] scheme was designed to make money (for himself and his friends) trading stocks. To disregard the gains [the defendant] made from his scheme would be to disregard an essential part of his scheme and understate the seriousness of [the defendant's] crime.

*Id.* at 702–03.

Measuring loss by reference to the offender's gain is a measure which has been used in the Third Circuit. In *Badaracco*, a bank president pleaded guilty to bank fraud. 954 F.2d 928. At sentencing, the loss was calculated for purposes of section 2F1.1(b)(1) by referring to the amount of contracts awarded to the defendant's companies by the developers. *See id.* at 930–33. The sentence was affirmed by the Circuit on appeal, which in so doing, limited the scope of its previous opinion in *Kopp*. *Badaracco*, 954 F.2d at 933.

Contrary to Bertoli's argument, the Stock Manipulation Schemes in the instant case had victims. When legitimate investors purchased stock in LCI, Toxic Waste and High Tech in 1983, they did so without knowing the trading activity was not "real" and the stock prices were not reflective of the unimpeded interaction of real supply and demand. Accordingly, the victims of the Stock Manipulation Schemes were the investors who purchased the stock on the public market, as well as the entire marketplace.

As discussed, the stock manipulations by Bertoli, Cannistraro, Eisenberg and their co-conspirators led to the price of the stock rising dramatically as a result of the restrictions Bertoli placed on the market through the players. Once the price had risen significantly, Bertoli and the other insiders sold their shares at a profit. Soon thereafter, the stock prices tumbled dramatically. As a result, the public investors who bought the stocks at the artificially increased prices and then held them for investment purposes lost significant amounts of money.

The Government states it has identified forty brokers and investors throughout the United States and Canada who bought the stocks at the artificially high prices and later sold the stock at a substantial loss. Government Sentencing Memo at 94. The Government believes those forty brokers and investors are "just the tip of the iceberg." *Id.* It appears, however, that it would be impossible to precisely quantify the total loss to the investing public resulting from the Stock Manipulation Schemes.

The instant case, therefore, is not one controlled by the holding in *Kopp* where the actual loss could be measured. Rather, it is more akin to *Badaracco* and *Cherif* were it was difficult or impossible to measure the loss.

Bertoli's argument there is no evidence he was aware or should have been aware of any loss to investors is without merit. The evidence demonstrates by at least a preponderance of the evidence that Bertoli orchestrated the Stock Manipulation Schemes. Bertoli introduced LCI, Toxic Waste and High Tech to Monarch, he came up with the idea of the IPOs, he directed the actions of the players and he controlled the accounts set up to hold the profits of himself, Cannistraro and Eisenberg resulting from the Stock Manipulation Schemes. The contention that Bertoli did not know and could not have known the amount of the loss because he was unaware of the fraud or profits generated by the fraud is not credible.[249]

The amount of the gain in excess of $6,000,000 achieved by Bertoli, Cannistraro and Eisenberg as a result of the Stock Manipulation Schemes, has been established by a preponderance of the evidence.

*Amount of Planning*

■■■ Section 2F1.1(b)(2) provides for a two level increase where the "offense involved ... more than minimal planning." U.S.S.G. § 2F1.1(b)(2). "More than minimal

planning" is defined in the application notes to section 1B1.1 as:

> [M]ore planning than is typical for commission of the offense in a simple form. "More than minimal planning" also exists if significant affirmative steps were taken to conceal the offense, other than conduct to which § 3C1.1 (Obstructing or Impeding the Administration of Justice) applies.

U.S.S.G. § 1B1.1, Application Note 1(f).

The Guidelines explain the purpose of the increase as follows:

> The extent to which an offense is planned or sophisticated is important in assessing its potential harmfulness of the offender, independent of the actual harm. A complex scheme or repeated incidents of fraud are indicative of an intention and potential to do considerable harm....

U.S.S.G. 2F1.1, Background Notes; *see United States v. Astorri,* 923 F.2d 1052, 1057–58 (3d Cir.1991); *Cianscewski,* 894 F.2d at 81–83.

The Stock Manipulation Schemes clearly involved more than minimal planning. They consisted of manipulating the market for the stock of three different companies, eliciting the participation of numerous "players," juggling the profits from the fraudulent trading among different international accounts and the trading schemes continued for several months. Bertoli, moreover, does not oppose the application of the adjustment in section 2F1.1(b)(2).

*Violation of Judicial or Administrative Order*

■■■ Section 2F1.1 also provides for a two level increase if the fraudulent conduct involved

> violation of any judicial or administrative order, injunction or decree, or process not addressed elsewhere in the guidelines....

U.S.S.G. § 2F1.1(b)(3)(B). As discussed, on 25 September 1975, the SEC issued an order

---

**249.** Bertoli further argues that because the jury "acquitted him of participating" in the securities fraud, the jury found he could not have known about any losses to investors. *See* Bertoli 1 Dec. 1993 Letter at 5. The jury, however, did not acquit Bertoli of participating in securities fraud, rather the jury found Bertoli not guilty of the RICO charges (Count One and Count Two). The RICO charges involved different elements of proof from that required for securities fraud. Accordingly, the jury's verdict on the RICO charges are in no way proof that the Stock Manipulation Schemes did not occur or that Bertoli did not participate in them.

barring Bertoli from associating with any broker or dealer. This bar resulted from Bertoli's fraudulent activities at Executive.

Bertoli argues the adjustment pursuant to section 2F1.1(b)(3)(B) should not be made (1) because "it had nothing to do with the offense of conviction—obstruction of justice" and (2) it has not been proven Bertoli violated the SEC Bar. Bertoli Sentencing Memo at 13–14. Both arguments are without merit.

As discussed, the cross-reference to section 2X3.1 provides that a sentence shall be calculated on the basis of the criminal offense the convicted offense was meant to obstruct. In the instant case, Bertoli intended to obstruct proceedings with regard to the Stock Manipulation Schemes. Bertoli, in orchestrating and directing the Stock Manipulation Schemes at Monarch, violated the SEC Bar. Clearly, the SEC Bar is related to the Stock Manipulation Schemes.

As explained at trial by the Assistant Director of the SEC's Division of Market Regulation, when someone is "barred from associating with a broker or dealer" that person

> can't be an employee of the broker-dealer, he [or she] can't sell securities for the broker-dealer, he [or she] can't trade securities for the broker-dealer, he [or she] can't be an officer, director, owner of a broker-dealer.

Trial Transcript at 610.

It has been established that Bertoli (1) directed the trading of securities in the Monarch trading account, (2) brought business to Monarch, (3) acted, essentially, as a Monarch broker when he traded the securities in the brokerage accounts of his wife, three children and others at Monarch, (4) used Monarch's offices to conduct his business of

bringing companies public, (5) determined the accounts to which Monarch would sell various securities and (6) directed the activities of Monarch employees. Each of those activities violated the SEC Bar.[250]

The foregoing calculations result in a subtotal of twenty-four. A downward adjustment of six levels is required pursuant to section 2X3.1. This results in a base offense level of eighteen.

*Sections 2J1.7 and 3B1.1* [251]

*Section 2J1.7*

■ On 6 November 1989, Bertoli was arraigned on the Superseding Indictment and released on bail. As discussed, in or about April 1990, while he was on pre-trial release, Bertoli engaged in the obstruction of justice conduct described in Count Six and that portion of Count Three which describes a conspiracy to obstruct justice in Bertoli's Prosecution. Because Bertoli committed the crimes described in Count Three and Count Six while he was on pretrial release, his sentence is subject to a three point enhancement under section 2J1.7, which provides:

> If an enhancement under 18 U.S.C. § 3147 applies, add 3 levels to the offense level for the offense committed while on release as if this section were a specific offense characteristic contained in the offense guideline for the offense committed while on release.

U.S.S.G. § 2J1.7; *see Di Pasquale,* 864 F.2d at 279–80.

Section 3147 does not establish a criminal offense but "was intended only to enhance the punishments for other offenses." *Di Pasquale,* 864 F.2d at 279–80. The purpose of the provision is to

250. In a one-sentence statement and without supporting legal citation, Bertoli contends: "To the extent the [c]ourt would interpret the [SEC Bar] as precluding Bertoli's actions [at Monarch], we would assert that such an interpretation would render the order unconstitutionally vague, in violation of due process of law." Bertoli Sentencing Memo at 14. The terms of the SEC Bar are not vague; they clearly prohibited Bertoli's conduct at Monarch. Moreover, Bertoli recognized that his activities at Monarch were in violation of the SEC Bar. As mentioned, both Eisenberg and Cannistraro stated Bertoli took care to conceal his trading activities at Monarch

so as to hide his violation of the SEC Bar. *See* Trial Transcript at 2285; 1993 Cannistraro Plea Allocution at 24–30.

251. The cross-reference to the underlying securities fraud is only necessary for purposes of calculating the base offense level under section 2F1.1. For purposes of determining the additional adjustments to the offense level, reference is to the offense of conviction—obstruction of justice. Accordingly, Bertoli's arguments that the adjustments must be made based on the offense of conviction are misplaced.

"deter those who would pose a risk to community safety by committing another offense when released under the provisions of this title. . . . This section enforces the self-evident requirement that any release ordered by the courts include a condition that the defendant not commit another crime while on release. Given the problem of crime committed by those on pretrial release this requirement needs enforcement. Accordingly, *this section prescribes a penalty in addition to any sentence ordered for the offense* for which the defendant was on release. . . ."

*Id.* at 280 (quoting S.Rep. No. 225 at 25, 98th Cong., 2d Sess., *reprinted in* 1984 U.S.Code Cong. & Admin.News 3182, 3217) (emphasis in original).

The Third Circuit has expressly refused to require that [notice to the person released on bail of the penalties applicable to a violation of the conditions] be a prerequisite to punishment for violation of the statute. Moreover, we fail to see how such a reading could be consistent with Congress' intent. . . . In statements concerning the effect of § 3142(h)'s notice requirement on other provisions of the Bail Act, the Senate Report noted that "failure to render such advice is not a bar or defense to prosecution for bail jumping under § 3146 . . . [or] to a prosecution under the[ ] sections of title 18 designed to protect witnesses, victims and informants." Rather, "[t]he purpose of such advice *is solely to impress upon the person the seriousness of failing to appear when required.*"[252]

*Di Pasquale,* 864 F.2d at 281 (quoting S.Rep. No. 225 at 25) (emphasis in original).

Because Bertoli committed crimes in both Count Three and Count Six while he was on pretrial release, he is subject to the three level adjustment pursuant to section 2J1.7.

*Section 3B1.1*

 Pursuant to section 3B1.1, a court may increase the offense level for the defen-

dant's aggravating role in the offense conduct. Section 3B1.1 provides:

Based on the defendant's role in the offense, increase the offense level as follows:

(a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.

U.S.S.G. § 3B1.1(a); *see Katora,* 981 F.2d at 1402; *United States v. Fuentes,* 954 F.2d 151, 153 (3d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 2950, 119 L.Ed.2d 573 (1992); *United States v. Bierley,* 922 F.2d 1061, 1065 (3d Cir.1990).

Adjustments authorized by section 3B1.1 " 'are directed to the relative culpability of participants in group conduct.' " *Fuentes,* 954 F.2d at 153. Section 3B1.1 "increases the sentence for the more culpable participants in a criminal conspiracy in proportion to the participants' role and the extensiveness of the crime." *Katora,* 981 F.2d at 1405 n. 10. The Application Notes define the term "participant" as "a person who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1(a), Application Note 1.

The Third Circuit has set forth the following factors to be considered in determining whether the adjustment in section 3B1.1 should be applied:

[T]he exercise of decisionmaking authority, the nature of the participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

*United States v. Ortiz,* 878 F.2d 125, 127 (3d Cir.1989); *see United States v. Phillips,* 959 F.2d 1187, 1191, *reh'g denied en banc,* 1992 U.S.App. LEXIS 10,402 (3d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 497, 121 L.Ed.2d 434 (1992).

---

**252.** Bertoli acknowledges that the Third Circuit does not require notice to be given in order for the penalties under § 3147 to apply. Bertoli Sentencing Memo at 17–18. However, he cites conflicting cases from other circuits and argues

this court should apply the holdings from the Fifth Circuit and the Seventh Circuit. *Id.* The decisions of the Third Circuit control in this matter.

Bertoli argues there is inadequate proof of his aggravating role in the scheme to conceal the Stock Manipulation Schemes from the authorities.[253] Bertoli Sentencing Memo at 20–21. As discussed, it has been established by at least a preponderance of the evidence that Bertoli was the organizer and leader of the transfer of illegally obtained funds from the Cayman Accounts to Andorra and that he controlled and supervised the obstructionist activities of at least Eisenberg, Cannistraro, Foster, Ebanks, Lugo and himself in conspiring to obstruct the proceedings in Group One.[254]

*Second Step in Grouping Analysis*

The second step in the grouping analysis is to determine the offense level for the conspiracy to obstruct the Grand Jury Investigation in Group Two and the offense level for the conspiracy to obstruct the SEC Investigation in Group Three.

*Group Two*

The offenses that were investigated by the grand jury were the Stock Manipulation Schemes underlying the Redacted Second Superseding Indictment in this case, as well as the obstruction of justice charges con-

tained therein. The base offense level calculations for the conspiracy to obstruct the Grand Jury Investigation are the same as the calculations for Group One, discussed above, which resulted in a base offense level of eighteen.[255]

The base level would then be increased by four levels because Bertoli organized and led the scheme to obstruct justice and the scheme to obstruct the Grand Jury Investigation involved five or more participants (Bertoli, Eisenberg, Cannistraro, Ebanks and Foster). Accordingly, the total offense level for Group Two is twenty two. Because the conspiracy to obstruct the Grand Jury Investigation did not occur while Bertoli was on pre-trial release, the three level adjustment pursuant to section 2J1.7 is not applicable.

*Group Three*

The offenses investigated by the SEC were the Stock Manipulation Schemes involving LCI and Toxic Waste securities. The base offense level calculations for the conspiracy to obstruct the SEC Investigation in Group Three would be the same as the calculations for Group One and Group Two.[256] Because

---

253. In addition, Bertoli argues section 3B1.1(a) is inapplicable because an adjustment for an aggravating role is inappropriate when section 2X3.1 is used. Bertoli Sentencing Memo at 16–17. The argument is based on an application note to section 3B1.2, which provides a downward adjustment where the defendant played a mitigating role in the offense. The application note states: "The adjustment from § 3B1.2 (Mitigating Role) normally would not apply because an adjustment for reduced culpability is incorporated in the base offense level." Bertoli Sentencing Memo at 19 (quoting U.S.S.G. § 3B1.2, Application Note 2). Bertoli then uses the application note to argue: "Having ... determined *not* to recognize a reduction for *mitigating* role, no adjustment for an *aggravating* role should be made. Any other result would permit the inconsistent, irrational and unfair application of the Guidelines." Bertoli Sentencing Memo at 20 (emphasis in original).

The argument is unpersuasive. As Bertoli notes, *id.* at 19–20, the reason for "normally" not considering a mitigating role adjustment when applying section 2X3.1 is that section 2X3.1 already provides that the offense level calculated by reference to that section shall be decreased by six levels for a mitigating role. Significantly, there is no indication in the application notes to section 3B1.1 that the adjustment is inappropriate in cases where section 2X3.1 is used. Furthermore, it is entirely inconsistent to construe

section 2X3.1, which provides for a six-level *decrease*, as precluding an upward adjustment for an aggravating role in the underlying conduct.

254. Bertoli himself may be counted as a participant for purposes of section 3B1.1(a). *See United States v. Fells*, 920 F.2d 1179, 1182 (4th Cir.1990), *cert. denied*, 501 U.S. 1219, 111 S.Ct. 2831, 115 L.Ed.2d 1000 (1991); *United States v. Preakos*, 907 F.2d 7, 10 (1st Cir.1990); *cf. United States v. Inigo*, 925 F.2d 641, 660 (3d Cir.1991) (without discussion, including the defendant as one of the five participants).

255. Because the Grand Jury Investigation looked into all three Stock Manipulation Schemes, Group Two warrants the same fourteen level increase under section 2F1.1(b)(1)(O) for the same amount of the loss.

256. The "loss" within the meaning of section 2F1.1(b)(1) must be calculated by reference only to the LCI and Toxic Waste Manipulations for Group Three. The fourteen-level adjustment, however, would apply to Group Three. The profits of Bertoli, Eisenberg and Cannistraro from the LCI and Toxic Waste manipulations were approximately $4,700,000. When the profits of the other participants in the schemes are added, the total profits exceed $5,000,000, placing it within the range of section 2F1.1(b)(1)(O).

Bertoli organized and led the scheme to obstruct the SEC Investigation and the scheme involved five or more participants (Bertoli, Eisenberg, Cannistraro, Cooper and Foster), an upward adjustment of four levels is warranted under section 3B1.1(a). However, because the conspiracy to obstruct the SEC Investigation did not occur while Bertoli was on pre-trial release, the three level increase under section 2J1.7 is not applicable. Accordingly, the offense level for Group Three is twenty-two.

*The Combined Offense Level*

Section 3D1.4 states:

The combined offense level is determined by taking the offense level applicable to the Group with the highest level and increasing that offense level by the amount indicated in the following table:

| Number of Units | Increase in Offense Level |
|---|---|
| 1 | none |
| 1½ | add 1 level |
| 2 | add 2 levels |
| 2½–3 | add 3 levels |
| 3½–5 | add 4 levels |
| more than 5 | add 5 levels |

In determining the number of Units for purposes of this section:

(a) Count as one Unit the Group with the highest offense level. Count one additional Unit for each Group that is equally serious or from 1 to 4 levels less serious.

U.S.S.G. § 3D1.4(a).

In the instant case, Group One, with an offense level of twenty-five, is the group with the highest offense level; it is counted as one unit. Because Group Two and Group Three are only three levels less serious than Group One, under the grouping rules they count as two additional units. Because there are a total of three units, section 3D1.4 provides that three levels be added to the group with the highest offense level—Group One. When three levels are added to Group One, it yields a total offense level of twenty-eight.

*Total Offense Level*

The total offense level of 28 is calculated as follows:

(1) Base Offense Level
— Applicable Guideline: § 2J1.2(c), which by cross-reference to § 2X3.1, requires the offense level to be calculated as if Bertoli was an accessory after the fact to the offenses being prosecuted in the Redacted Second Superseding Indictment because he conspired to obstruct the investigations and prosecutions of those offenses. This requires the use of § 2F1.1
— Base Level § 2F1.1(a) 6
— Upward adjustment pursuant to § 2F1.1(b)(1)(O) for loss between $5 and $10 million 14
— Upward adjustment pursuant to § 2F1.1.(b)(2) for more than minimal planning 2
— Upward adjustment pursuant to § 2F1.1(b)(3)(B) for violation of a judicial or administrative order 2
 SUBTOTAL 24
— Downward adjustment pursuant to § 2X3.1 6
 BASE OFFENSE LEVEL 18
(2) Upward adjustment pursuant to § 2J1.7 for committing an offense while on pretrial release 3
(3) Upward adjustment pursuant to § 3B1.1(a) for having an aggravating role in the offense 4
GROUP ONE OFFENSE LEVEL 25
(4) Upward adjustment pursuant to § 3D1.4 for multiple offenses 3
TOTAL OFFENSE LEVEL 28

---

iv. *Criminal History Category*

 The Presentence Report indicates that Bertoli's criminal history should be categorized as Category II. This was calculated by allotting (1) one point for Bertoli's conviction under the 1977 Indictment, *see* U.S.S.G. § 4A1.1(c), and

(2) two points for his committing offenses in the instant case while on probation from that conviction. *See* U.S.S.G. § 4A1.1(d).

Bertoli argues this conclusion is erroneous. Specifically, he contends:

> It appears that the Probation Department made the adjustment based on the claim within the conspiracy count [Count Three] that Bertoli told ... Cooper to lie to the SEC in a conversation which allegedly occurred prior to June 27, 1983. *See* Second Superseding Indictment, Count Three, Overt Acts, ¶¶ 1–2. This overt act, however, was not separately charged as a substantive count. We dispute this claim as factually unsupportable [sic] and assert that the [G]overnment cannot sustain its burden of proving that this conduct was a basis upon which the jury convicted Bertoli of the Count Three conspiracy.

Bertoli 1 Dec. 1993 Letter at 7.

As discussed, it has been established by a preponderance of the evidence that, in the early spring to 1983, Bertoli instructed Cooper to lie to the SEC during the SEC Investigation. The initial meeting among Bertoli, Eisenberg and Cooper, at which Cooper was instructed to lie and told the specific falsehoods to relay to the SEC, occurred in March 1983, months before his five-year probation came to an end. Both Eisenberg and Amato, an SEC staff attorney, testified about Cooper lying to the SEC in March of 1983. In addition, the Cahill Sentencing Aff., submitted in support of the Government Sentencing Memo, relayed the contents of a conversation between Cooper and Special Agent Cahill. In that conversation, Cooper told Special Agent Cahill that he had lied to the SEC at the direction of Bertoli in March 1983 during the informal interview. Cahill Sentencing Aff., ¶ 4.

With a total offense level of twenty-eight and a criminal history II, the sentencing range under the Guidelines is 87 to 108 months.[257]

### v. *Monetary Penalties*

The provisions of the United States Code concerning fines are set forth at 18 U.S.C. §§ 3571, *et seq.* Section 3571 provides in pertinent part:

> (b) Fines for Individuals—[A]n individual who has been found guilty of an offense may be fined not more than the greatest of—
>
> > (1) the amount specified in the law setting forth the offense;[258]

---

257. If it were determined that treating the obstruction offenses as three separate groups of offenses was inappropriate in this case, there are sufficient reasons presented in this case for an upward departure pursuant to the holding in *Kikumura*, 918 F.2d at 1098 and its progeny.

The Guidelines provide that the district court should impose a sentence within the Guidelines' imprisonment range "unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." 18 U.S.C. § 3553(b); *see Williams v. United States,* — U.S. —, —, 112 S.Ct. 1112, 1119, 117 L.Ed.2d 341 (1992); *Kikumura,* 918 F.2d at 1098; *see also United States v. Cherry,* 10 F.3d 1003, 1009 (3d Cir.1993).

In the introduction to the Guidelines, however, it is explained that the Guidelines

> carv[e] out a "heartland," a set of typical cases embodying the conduct that each guideline describes. When a court finds an atypical case, one to which a particular guideline from the norm, the court may consider whether a departure is warranted.

U.S.S.G., Ch. 1, Pt. A, Intro. 4(b); *see United States v. Kikumura,* 918 F.2d at 1098; *United States v. Ryan,* 866 F.2d 604, 606–07 (3d Cir. 1989); *see United States v. Lieberman,* 971 F.2d 989, 995 (3d Cir.1992) ("a court may depart in the face of an aggravating or mitigating circumstance 'of a kind' not considered by the Commission").

If the five conspiracy offenses were treated as a single offense, under the Guidelines, the offense level for a single offense would be twenty-five. *See* calculations for Group One. Therefore, if grouping were unavailable, the Guidelines will not have adequately considered Bertoli's criminal offense conduct. He would be sentenced on the basis of only one obstruction of justice offense when he has been determined to be guilty of six—five obstructions under the conspiracy count and the substantive conviction. Accordingly, an upward departure in the absence of grouping would be necessary.

258. In the instant case, Bertoli was convicted of Count Three, which charged him with conspiracy to obstruct justice in violation of 18 U.S.C. § 371, and Count Six, which charged him with obstruction of justice in violation of 18 U.S.C. § 1503. Section 371 provides that an individual may be fined not more than $10,000 for each offense. Section 1503 provides that an individu-

(2) the applicable amount under subsection (d) of this section; [or]

(3) for a felony, not more than $250,000. . . .

(d) Alternative Fine Based on Gain or Loss—

—If any person derives pecuniary gain from the offense, or if the offense results in pecuniary loss to a person other than defendant, the defendant may be fined not more than the greater of twice the gross gain or twice the gross loss, unless imposition of the fine under this subsection would unduly complicate or prolong the sentencing process.

18 U.S.C. § 3571(b) and (d).

The factors to be considered in imposing a fine are set forth in section 3572, which provides in pertinent part:

In determining whether to impose a fine, and the amount, time for payment, and method of payment of a fine, the court shall consider, in addition to the factors set forth in section 3553(a)—

(1) the defendant's income, earning capacity, and financial resources;

(2) the burden that the fine will impose upon the defendant, or any other person who is financially dependent on the defendant, or any other person . . . that would be responsible for the welfare of any person financially dependent on the defendant, relative to the burden that alternative punishment would impose;

(3) any pecuniary loss inflicted upon others as a result of the offense;

(4) whether restitution is ordered or made and the amount of such restitution;

(5) the need to deprive the defendant of illegally obtained gains from the offense. . . .

18 U.S.C. § 3572(a).

■■■ The fine provisions of the Guidelines are set forth in section 5E1.2, which provides in pertinent part:

(a) The court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine.

al may be fined not more than $5,000 for each

(b) [T]he fine imposed shall be within the range specified in subsection (c) below. . . .

U.S.S.G. § 5E1.2(a) and (b). Subsection (c) thus provides that the maximum fine for Bertoli's offense level twenty-eight is $125,000. U.S.S.G. § 5E1.2(c)(3).

The Guidelines have recognized, however, that, under certain circumstances, an upward departure from the fine guideline range is warranted. Specifically, one of the application notes indicates an upward departure from the Guidelines to ensure the fine is punitive and to prevent the defendant from profiting from his crimes. U.S.S.G. § 5E1.2(c)(3), Application Note 4; *see United States v. Wilder*, 15 F.3d 1292, 1300 (5th Cir.1994). Application Note 4 further provides that an upward departure may be warranted "[w]here . . . two times . . . the amount of gain to the defendant . . . exceeds the maximum of the fine guideline" or "where a sentence within the applicable fine guideline range would not be sufficient to ensure both the disgorgement of any gain from the offense that otherwise would not be disgorged . . . and an adequate punitive fine." *Id.*

In *Wilder*, the Circuit affirmed the decision by the district court to upwardly depart from the Guidelines with respect to the fine assessed the defendant. 15 F.3d at 1300. In that case,

[t]he district court based its decision to upwardly depart on two grounds: first that the enhanced fine was necessary to ensure that [the defendant] disgorged any gain from his criminal activities and, second, that the enhanced fine was permitted by [section] 3571(d) because [the defendant's] criminal acts resulted in pecuniary losses to other persons exceeding five million dollars. The district court's findings that [the defendant] derived at least two million dollars in gross gains and caused at least two million dollars in gross losses is not clearly erroneous. For example, the parties stipulated to the fact that the losses caused by [the defendant's] scheme exceeded five million dollars.

offense.

*Id.* at 1300. The Circuit affirmed the decision, finding the district court had not abused its discretion in departing from the Guidelines.

In the instant case, Count Three and Count Six charge, *inter alia,* that Bertoli moved the illicit proceeds of the Stock Manipulation Schemes to Andorra in an effort to obstruct justice. It was established that approximately $8,700,000 was moved and that Bertoli moved the funds so the Government could not reach it. It was further established that the $8,700,00 included (1) $5,086,-593.94 from Centurion (Cannistraro's company), (2) $3,132,956.09 from Eastern (Eisenberg's company) and (3) $471,580.61 from Beecham (Bertoli's company).

Although the documentary evidence produced at trial indicates the portion of the $8,700,000 attributable to Bertoli is less than $500,000, it has been established Bertoli controlled all of the money once it reached Andorra.

As part of their plea agreements in this case, Eisenberg and Cannistraro forfeited to the Government their interest in the funds held by Eastern and Centurion. The Government, however, has been able to recover only $789,083.89 of that money.

For Bertoli, with an offense level of twenty-eight, the maximum fine under the Guidelines is $125,000. An upward departure is necessary in calculating the appropriate fine for Bertoli because the fine indicated by the Guidelines is inadequate to "disgorge" the gain of Bertoli's criminal activities. Moreover, as demonstrated by the Government, Bertoli retains control of the millions of dollars, forfeited to it by Eisenberg and Cannistraro, but removed by Bertoli to Andorra beyond its reach. Bertoli does not deny he has access to several million dollars in foreign bank accounts. In fact, Bertoli has indicated he "take[s] no position" regarding the Government's claim that "Bertoli has ac-

cess to millions of dollars in foreign bank accounts." *See* Bertoli 1 Dec. 1993 Letter at 1.

Accordingly, at the Sentencing Hearing, a fine of $7,000,000 plus interest was assessed.

*Ability to Pay*

Bertoli contends he is financially destitute. He filed for personal bankruptcy in 1983; the case is still pending.[259] Bertoli has not filed a tax return for several years, claiming he has no tax owing. Presentence Report at 37. Bertoli further contends he receives no income and meets family expenses through a combination of his pension and financial support from other family members. *Id.* Probation asked Bertoli to submit a financial questionnaire, but Bertoli has yet to provide that document. *Id.* Bertoli has stated to Probation that his house is owned by a trust company in the name of his wife and children; the home is conservatively valued in excess of $1,000,000. *Id.*

Bertoli is not destitute; he can afford the fine of $7,000,000. As established at trial, in October 1983, Bertoli stashed millions of dollars in secret bank accounts in the Cayman Islands and other off-shore accounts. In addition, in 1990, Bertoli was able to successfully move millions of dollars out of the Cayman Accounts into the accounts in Andorra which are beyond the reach of the Government. In fact, the jury convicted Bertoli for obstructing justice by transferring funds from the Cayman Islands to Andorra. The evidence further demonstrates Bertoli is in control of those funds in the accounts in Andorra. Bertoli is, therefore, not destitute and is able to pay the fine.

**5. *Bertoli's Motion for Bail Pending Appeal***

At the Sentencing Hearing, Bertoli moved to continue his release on bail pending his appeal of his conviction.[260]

---

**259.** As discussed, *supra,* at 198–204, the Government introduced at trial evidence that the Bankruptcy Petition as well as the supporting financial statements were fraudulent in that they failed to disclose the money Bertoli had hidden in Cayman Islands accounts.

**260.** In support of his application for bail pending appeal, Bertoli submitted: Letter–Brief, dated 15 December 1993 (the "15 December 1993 Bertoli Brief"); 19 January 1994 Bertoli Brief; Reply Memorandum in Support of Bail Pending Appeal, dated 1 March 1994 (the "1 March 1994 Bertoli Brief").

### a. *Background*

On 6 November 1989, Bertoli was arraigned on the Superseding Indictment. At that time, Bertoli was ordered to surrender his passport and to report to Pretrial Services according to a schedule set by Pretrial Services. Bertoli was also ordered to post a one million dollar bond secured by the house in which he lived, which, in November 1989, had a fair market value of between $1,850,000 and $1,900,000. A subsequent order modified the release conditions to allow Bertoli to travel, upon notice to Pretrial Services, anywhere within the continental United States for purposes of pretrial preparation.

In January 1992, the Government made a motion to modify Bertoli's release conditions pursuant to 18 U.S.C. § 3148. *See* 29 Jan. 1992 Bail Memo. Specifically, the Government sought to increase the amount of bail from $1,000,000 to $4,000,000 and to have Bertoli confined to his home subject to twenty-four hour electronic monitoring under the supervision of Pretrial Services. *Id.* at 2. The Government contended these modifications were necessary because it had recently learned of Bertoli's continuing efforts to conceal his illegal racketeering activities, which activities constituted the bases for Counts Three through Seven of the Second Superseding Indictment. *Id.* at 1. The Government further stated that "although Bertoli has been in personal bankruptcy proceedings since October 1983, he beneficially owns in excess of $4 million in accounts outside the United States—money that represents the proceeds of his illegal racketeering activities." *Id.* at 1–2. By order, dated 8 April 1992, the Government's motion to modify Bertoli's bail conditions was denied.

As stated, Bertoli was convicted of Counts Three and Six of the Redacted Second Superseding Indictment on 24 August 1993. At that time, Bertoli requested that he "remain at liberty pending sentencing on the [then-existing] bail conditions." Trial Transcript at 6938. The Government argued that "there [was] a presumption of flight," and accordingly asked that Bertoli's bail condi-

tions be restricted. Specifically, the Government asked that Bertoli be required to post further security as bond, and that he "be confined to his home ..., and be subject to 24–hour electronic monitoring under the supervision of Pretrial Services at ... Bertoli's cost, and upon notification to and approval by Pretrial Services, he be permitted to leave his home only to attend religious services, visit and consult with counsel, receive medical treatment and attend court proceedings." Trial Transcript at 6941.

Bertoli's request to continue his release conditions was denied, and Bertoli was remanded to custody pending sentencing. The basis for the Remand Order was the determination that there was "a certainty that [Bertoli would] flee...." Trial Transcript at 6945. It was explained:

> [Bertoli] is thoroughly familiar and experienced in international monetary transactions. He has had and still has foreign bank accounts worth millions of dollars. He is an experienced international traveler. He obviously has contacts in various countries. He has friends in other countries.
>
> He has previously been convicted of 77 counts of either securities fraud or mail and wire fraud. To my understanding he has not had a job for a long[ ] period of time. He owns no real estate. All [domestic] assets that he [owns] are in his wife's name. He has no viable roots to hold him. His children are grown. It is his second major conviction. He has taken extensive steps to cover up his prior activity. He now faces a very significant sentence.
>
> . . . . .
>
> As indicated by his extensive years of experience internationally, he does have the ability to flee, [and] I believe he will flee. I do not believe he is reliable. I do not believe he is truthful.
>
> . . . . .

February 1994 Government Brief.

In opposition to Bertoli's application for bail pending appeal, the Government submitted: 14

I have had an opportunity to see [Bertoli] every day for the past three and a half months. I am satisfied he will flee. He will be out of the country. He has no reason to stay here. ... I again stress he is not employed, he owns no real estate, he has no assets. He has no viable roots.

Trial Transcript at 6942–43, 6944.

As stated, the Circuit reversed the Remand Order on 27 August 1993, and reinstated the bail conditions which existed prior to the Remand Order. *See* 27 Aug. 1993 Circuit Order. However, the Circuit also added to the conditions of Bertoli's release the establishment of a regime of 24–hour electronic monitoring. *See id.*

The Government subsequently moved before the Circuit to increase the amount of security to $4,000,000.00 and to require that Bertoli bear the costs of electronic monitoring. The Circuit granted the Government's motion only in so far as it sought to impose the costs of monitoring on Bertoli. *See* Order of the Circuit, dated 15 September 1993 (the "15 Sept. 1993 Circuit Order"). The Circuit further clarified the 27 August 1993 Circuit order by stating:

> [Bertoli] shall be permitted to leave home for [six specifically requested] purposes,[261] provided that he shall give 48 hours notice of the time and place of each trip and provide an address and telephone number at which he can be reached at all times during such trips.

15 Sept. 1993 Circuit Order. The instant motion to continue bail pending appeal followed at the Sentencing Hearing.

b. *18 U.S.C. § 3143(b)*

The Bail Reform Act of 1984 (the "1984 Act") provides, in relevant part:

> [T]he judicial officer shall order that a person who has been found guilty of an offense and sentenced to a term of impris-

onment, and who has filed an appeal or a petition for a writ of certiorari, be detained, unless the judicial officer finds—

> (A) by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released under section 3142(b) or (c) of this title;[262] and

> (B) that the appeal is not for the purposes of delay and raises a substantial question of law or fact likely to result in—(i) reversal, (ii) an order for a new trial, (iii) a sentence that does not include a term of imprisonment, or (iv) a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process.

18 U.S.C. § 3143(b).

 Section 3143(b) creates a presumption against post-conviction release pending appeal. *See United States v. Miller,* 753 F.2d 19, 22 (3d Cir.1985) ("The [1984 Act] was enacted because Congress wished to reverse the presumption in favor of bail that had been established under the prior statute, the Bail Reform Act of 1966."); *United States v. Mathis,* No.Crim. 91–595–10, 1994 WL 22303, at *2 (E.D.Pa. 25 Jan. 1994). The Circuit has explained:

> Once a person has been convicted and sentenced to jail, *there is absolutely no reason for the law to favor release pending appeal or even permit it in the absence of exceptional circumstances.* First and most important, the conviction, in which the defendant's guilt of a crime has been established beyond a reasonable doubt, is presumably correct in law, a presumption factually supported by the low rate of reversal of criminal convictions in the Federal system. Second, the decision to send a

---

261. The purposes for which Bertoli was permitted by the Circuit to depart from his home (the "Pre–Approved Departures") were: (1) to meet with counsel; (2) to receive medical attention; (3) to attend religious services; (4) to attend court proceedings and (5) to visit Pretrial Services offices and probation offices upon request of either office. *See* 15 Sept. 1993 Circuit Order at 1. In addition, Bertoli was permitted to depart from his home "for other reason[s] subject to the

*prior approval* of the Pretrial Services office. (emphasis added)" *Id.*

262. Section 3142(b) provides for release on personal recognizance or unsecured appearance bond. 18 U.S.C. § 3142(b). Section 3142(c) provides for release on conditions. 18 U.S.C. § 3142(c).

convicted person to jail and thereby reject all other sentencing alternatives, by its very nature includes a determination by the sentencing judge that the defendant is dangerous to the person or property of others, and dangerous when sentenced, not a year later after the appeal is decided. Third, release of a criminal defendant into the community, even after conviction, destroys whatever deterrent effect remains in the criminal law.

*Miller,* 753 F.2d at 22 (quoting H.Rep. No. 907, 91st Cong., 2d Sess. 186–87 (1970) (emphasis added)).

Accordingly, under the 1984 Act, *"the defendant has the burden* of establishing:"

(1) that the defendant is not likely to flee or pose a danger to the safety of any other person or the community if released;

(2) that the appeal is not for the purpose of delay;

(3) that the appeal raises a substantial question of law or fact; and

(4) that if that substantial question is determined favorably to defendant on appeal, that decision is likely to result in reversal or an order for a new trial of all counts on which imprisonment has been imposed.

*United States v. Messerlian,* 793 F.2d 94, 95–96 (3d Cir.1986) (emphasis added); *see United States v. Smith,* 793 F.2d 85, 87 (3d Cir.1986), *cert. denied,* 479 U.S. 1031, 107 S.Ct. 877, 93 L.Ed.2d 832 (1987).

i. *The Risk of Flight*

■■■ The factors to be considered in assessing the risk of flight include: (1) the nature and circumstances of the offense, (2) the defendant's family ties, (3) the defendant's employment status, (4) the defendant's financial resources, (5) the defendant's character and mental condition, (6) the length of defendant's residence in the community, (7) any prior criminal record and (8) any flight or failures to appear in court proceedings prior to or during the time of trial. *United States v. Lamp,* 606 F.Supp. 193, 200 (W.D.Tex.1985), *aff'd,* 868 F.2d 1270 (5th Cir. 1989); *see also* 18 U.S.C. § 3142(g) (setting forth similar considerations with respect to bail pending trial).

■■ A defendant's financial condition and the length of the sentence he or she faces are of particular importance in assessing the risk of flight. *See United States v. Londono–Villa,* 898 F.2d 328, 329 (2d Cir. 1990) (in spite of strong family and financial ties to community, defendant posed flight risk where he was subject to lengthy sentence, was a commercial pilot with familiarity with foreign airstrips and had substantial foreign financial resources); *United States v. Castiello,* 878 F.2d 554, 556 (1st Cir.1989) (defendant posed flight risk where he faced lengthy sentence and was not United States citizen); *United States v. Malquist,* 619 F.Supp. 875, 878–79 (D.Mont.1985) (in spite of strong family ties, defendant not entitled to bail pending appeal where he faced substantial prison term, was unemployed, could be employed in any part of country, and had divested himself of his local assets); *United States v. Kenney,* 603 F.Supp. 936, 939 (D.Me.1985) (defendant not entitled to bail pending appeal where he faced lengthy prison term and second prosecution, notwithstanding that he had no criminal record, owned a home and had strong family ties to community).

Bertoli has done little to carry his burden of proving, by clear and convincing evidence, that he poses no risk of flight. Bertoli argues only that he "has certainly demonstrated he is neither a flight risk nor a danger to the community. He has been released pursuant to the Third Circuit's order for nearly four months, without incident, and will appear on the date of sentence." 15 December 1993 Bertoli Brief at 2.

To the extent Bertoli argues the issue of risk of flight was conclusively determined by the Circuit in the 27 August 1993 Circuit Order, his argument fails. The 27 August 1993 Circuit Order addressed only the issue of bail pending sentencing. The issue of bail pending appeal was not before the Circuit, and the Circuit gave no indication it was addressing the likelihood of Bertoli's fleeing after sentencing. *See* 27 Aug. 1993 Circuit Order.

In this context, any finding the Circuit made with respect to Bertoli's likelihood of

flight pending sentencing would be inapposite to his likelihood of flight pending appeal. Before sentencing, Bertoli and his attorneys could not be certain of the sentence Bertoli would face. However, at this stage of the proceedings, when Bertoli has been sentenced to a term of 100 months and a $7,000,000.00 fine, there can be no mistake as to the consequences of remaining in custody. The risk of flight at this stage of the proceedings is, therefore, a great deal more pronounced than at the pre-sentencing stage.[263] *See Malquist,* 619 F.Supp. at 878 (though defendant was released pending sentencing, he was detained pending appeal because his "situation ha[d] changed," in that he "now face[d] a substantial prison term"); *Kenney,* 603 F.Supp. at 939 (same); *see also United States v. Giannetta,* 725 F.Supp. 60, 63 (D.Me.1989) ("Defendant now faces the *certainty* that he will serve an extended term of incarceration; he no longer has any basis to hope or expect that ... he will be extended significant leniency in the imposition of sentence. That certainty persuasively reinforces the [c]ourt's prior conclusion [in the context of bail pending sentencing] that [d]efendant represents a high risk of flight if admitted to bail." (emphasis in original)). Accordingly, the 27 Aug. 1993 Circuit Order does not control the instant inquiry into Bertoli's risk of flight; the issue must be considered independently in light of the facts now before the court.

263. For similar reasons, the fact that Bertoli did not flee prior to sentencing does not establish that he will not flee after sentencing. Prior to sentencing, Bertoli apparently believed he faced only ten to sixteen months of incarceration. *See* Letter of Bertoli to Court, dated 19 January 1994. At the Sentencing Hearing, Bertoli learned his sentence was several times the length he had anticipated. He therefore has far greater incentive to flee incarceration at this point than he did when he was awaiting sentencing. Moreover, he has between $7,000,000.00 and $8,000,000.00 within his control in accounts outside the United States. Accordingly, the fact that Bertoli did not flee while awaiting sentencing does little to inform the instant inquiry.

264. As indicated, the testimony at trial established that, in 1990, Bertoli caused the money from the Third Set of Paget–Brown Companies to be transferred from the control of Coleman at Paget–Brown to the control of Foster. Under

A review of these facts indicates Bertoli does in fact pose a serious risk of flight. Bertoli has no financial ties to the community. He has been in personal bankruptcy since 1983 and is currently unemployed. Title to the domestic assets which he does own, including his home, is in his wife's name. Bertoli's family ties are equally dubious, as evidenced by his willingness to involve family members in his stock manipulation scheme by trading the stocks mentioned in the Redacted Second Superseding Indictment in their names. Bertoli's weak roots in the community militate strongly against granting him bail pending appeal. *See Lamp,* 606 F.Supp. at 200. As well, he committed an offense, Count Six, while on pretrial release in this case.

While Bertoli has no financial roots in the community, he does have access to millions of dollars abroad. For example, Bertoli has access to the millions of dollars in funds which were transferred from the Cayman Islands to Andorra in 1990.[264] Bertoli also has access to the over one-half million dollars transferred from the Berco Trust account at Swiss Bank to an account in the Cayman Islands which is beyond the reach of the Government.[265] Though the Government has, at various times, pointed out Bertoli's access to offshore assets, Bertoli has not denied he has such access.[266] Bertoli is also thoroughly familiar with international financial transactions, and has the ability manipulate his offshore funds. The fact that Bertoli

Bertoli's direction, this money, which totalled approximately $8,700,000.00, was transferred to the Fosca Account in Andorra. As stated, it was established at trial that Bertoli controls these funds.

265. As indicated, Cannistraro testified, at his 1993 Plea Allocution, that he had, during his 1987 Prosecution, actively concealed the Cayman Accounts held by Bertoli, Eisenberg and Cannistraro. Cannistraro further testified that his concealment of the Cayman Accounts was at the direction of Bertoli. In 1987, these accounts contained several million dollars generated by the Stock Manipulation Schemes. *See* 1993 Cannistraro Plea Allocution at 33–34.

266. In the Bertoli 1 Dec. 1993 Letter, Bertoli states he "take[s] no position regarding" the "[G]overnment's claim that he has access to substantial funds." *Id.* at 1.

has access to the financial means to flee weighs strongly against granting him bail pending appeal.[267] *See Londono–Villa,* 898 F.2d at 329.

The Government has also presented evidence that Bertoli has, while released on bail pending sentencing, violated the conditions of release imposed on him by the 27 Aug. 1993 Circuit Order and the 15 September 1993 Circuit Order. Specifically, at the Sentencing Hearing, the Government introduced evidence that, on or about 5 November 1993, Bertoli visited an office at 50 Broad Street in New York City, New York, and had lunch in a nearby restaurant known as "Harry's." Sentencing Tr. at 16. The Government's evidence indicated that, on that date and at those places, Bertoli met with an individual named Morton Kantrowitz ("Kantrowitz"). *Id.* The Government indicated Kantrowitz was a securities trader who had been indicted by a New York state grand jury on stock fraud charges in January 1991. *Id.* at 16–17. In October 1992, Kantrowitz pled guilty to one count of falsifying business records, a class A misdemeanor under New York state law, and was sentenced to one year conditional discharge. *Id.* at 17. Pretrial Services neither knew of nor authorized Bertoli's meeting with Kantrowitz.[268]

Under the 27 Aug. 1993 Circuit Order and the 15 Sept. 1993 Circuit Order, Bertoli was required to notify Pretrial Services of any departure from his home and obtain Pretrial Services' approval for such departures. He was specifically required to obtain Pretrial Services' approval for departures other than the Pre–Approved Departures. It is doubtful Pretrial Services would have approved Bertoli's meeting with a known criminal who was convicted of engaging in conduct so similar to that of which Bertoli was convicted.[269] Bertoli's violation of the conditions of his release demonstrates that he is unwilling to abide by bail conditions, and accordingly that he cannot be trusted not to flee custody. As the Government points out, "Bertoli could just as easily drive to the airport as drive to 50 Broad Street." 14 February 1994 Government Brief at 27.

Bertoli does not contest the Government's contention that his meeting with Kantrowitz constituted a violation of the conditions of his release. He merely argues the meeting is not indicative of his intention to flee custody.[270] *See* 1 March 1994 Bertoli Brief at 4. Bertoli's argument in this regard is unconvincing. Though his meeting with Kantrowitz may not have been on the subject of Bertoli's flight, and may not directly evidence his immediate intention to flee, it does evidence his lack of respect for the restrictions imposed on his freedom by the Circuit and by this court. These restrictions are not technical or of slight importance; they serve the crucial function of ensuring that a convicted felon with vast foreign financial re-

---

**267.** These factors were considered in issuing the Remand Order. However, as stated, their indication of Bertoli's ability and inclination to flee custody is intensified several fold in the instant context. *See Malquist,* 619 F.Supp. at 878.

**268.** Laurence J. Paquette ("Paquette"), the Probation Officer-in-Charge in Bertoli's case, stated in a memorandum to Pretrial Services, dated 10 March 1994 (the "10 March 1994 Probation Memo"): "[A]t no time did I give Mr. Bertoli permission to visit 50 Broad Street, New York, New York on 11/5/93 or at any other time." 10 March 1994 Probation Memo at 1. It appears from the 10 March 1994 Probation Memo that Paquette had approved Bertoli's request to visit his counsel, at 148 East 78th Street, New York, New York, on that date. *Id.*

**269.** In the 10 March 1994 Probation Memo, Paquette stated he advised Bertoli on 18 February 1994 that permission to visit with counsel or to have lunch did not entail "driving out of his way ... to have lunch." 10 March 1994 Probation

Memo at 1. Paquette further stated that, on 2 February 1994, he advised Bertoli's counsel that "a lunch at 50 Broad Street, when [Bertoli] is supposed to be at his attorney's office on 78th Street, would appear to be questionable, since 50 Broad Street is probably 4 + miles away from 78th Street. [Paquette] told [Bertoli's counsel] that this would seem to be something beyond the intent of the [approved] leave time...." *Id.* at 2.

**270.** Bertoli also argues that "on other occasions, when he planned in advance to have a luncheon with someone, he has put the appointment in his itinerary." 1 March 1994 Bertoli Brief at 4. This statement, whether true or not, is of little relevance in determining whether Bertoli's meeting with Kantrowitz violated the conditions of his release. Indeed, such a fact would only indicate that Bertoli, by departing from his established practice, consciously and actively concealed his meeting with Kantrowitz from Pretrial Services.

sources does not flee the country to escape punishment. In light of the importance of these restrictions, Bertoli's transgression of them cannot be lightly excused.

Based on the foregoing, Bertoli has failed to establish by clear and convincing evidence that he does not pose a risk of flight. Accordingly, his motion for bail pending appeal is denied. *See Messerlian,* 793 F.2d at 95–96.

### ii. *Danger to the Community*

When assessing danger to the community, "danger may, at least in some cases, encompass pecuniary or economic harm." *United States v. Reynolds,* 956 F.2d 192, 192 (9th Cir.1992) (denying bail pending appeal to defendant convicted of mail fraud); *see United States v. Provenzano,* 605 F.2d 85, 95 (3d Cir.1979) ("We ... hold that a defendant's propensity to commit crime generally, even if the resulting harm would not be solely physical, may constitute a sufficient risk of danger to come within the contemplation of the Act."); *United States v. Leonetti,* No. Crim. 88–003, 1988 WL 61738 at *2 (E.D.Pa. 9 June 1988) (*Provenzano* "instructed that community danger not only meant a crime of physical violence, but also included the commission of future economic crimes as well."); *United States v. Moss,* 522 F.Supp. 1033, 1035 (E.D.Pa.1981) (same), *aff'd,* 688 F.2d 826 (3d Cir.1982); *see also United States v. Strong,* 775 F.2d 504, 507 (3d Cir.1985).

A defendant's commission of further crimes while released on bail weighs heavily against the granting of bail pending appeal. *See United States v. Anderson,* 670 F.2d 328, 330 (D.C.Cir.1982) (defendant not entitled to bail pending appeal where "shortly after he was placed on probation he committed the same narcotics violation a second time"); *United States v. Giannetta,* 725 F.Supp. at 61 (bail pending appeal not appropriate where defendant, while on probation, continued criminal activity); *United States v. Lujan,* 716 F.Supp. 477, 479 (D.Or.1989) (bail pending appeal not appropriate where defendant had continued criminal activity while released on state court appeal bond); *see also* 18 U.S.C. § 3142(g)(3)(B) (In deciding whether to release defendant on bail pending trial, court should consider "whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence....").

In the instant case, a significant portion of the criminal activity of which Bertoli was convicted occurred while Bertoli was free on pretrial release. As indicated, Bertoli was arraigned on the Superseding Indictment on 6 November 1989; since that date, Bertoli has been free on bail. Bertoli was convicted, *inter alia,* of obstructing justice by conspiring to cause and causing racketeering proceeds to be transferred from the Cayman Islands to Andorra "in or about March and April 1990." Count Six; *see* Count Three, ¶ 27. The jury determined beyond a reasonable doubt, therefore, that Bertoli had engaged in criminal activity while free on bail pending trial. Bertoli's commission of criminal activity while on pretrial release weighs heavily against granting him bail pending appeal. *See Anderson,* 670 F.2d at 330; *Lujan,* 716 F.Supp. at 479.

In addition, it was established at trial that Bertoli illegally induced Foster to evade deposition by the Government in 1991. Specifically, it was established that in March 1991, Bertoli offered Foster $50,000.00 to leave the Cayman Islands for three months to avoid being deposed. Later, in September 1991, Bertoli again instructed Foster to leave the Cayman Islands to avoid deposition by the Government. It was only on Bertoli's instruction that Foster returned to the Cayman Islands, three days after the Government had completed its depositions. Tampering with a witness in this manner was both illegal and in violation of the conditions of Bertoli's pre-trial release. Commission of such acts while released on bail pending trial militates strongly against the grant of bail pending appeal. *See Anderson,* 670 F.2d at 330; *Lujan,* 716 F.Supp. at 479.

The conclusion that Bertoli continues to pose a danger to the community is further supported by his meeting with Kantrowitz in November 1993. As stated, Bertoli, in defiance of the conditions of his release pending

sentencing, met on 5 November 1993 with Kantrowitz, a person convicted of falsifying business records in violation of New York state law. The similarity of Kantrowitz's conviction with the acts for which Bertoli was convicted gives rise to, at least, the inference that Bertoli continued to engage in illicit activity while released on bail pending sentencing.

It is also observed that the instant conviction is not Bertoli's first. As indicated, he has previously been convicted of seventy-seven counts of securities, mail and wire fraud. In addition, in connection with the Rutherford Suit, the Superior Court found that Bertoli had engaged in transfers "with the intent of defrauding the unmatured claims of shareholders and creditors of [Executive Securities]." *Rutherford Op.* at 17. The economic danger that Bertoli has posed to the community in the past is a strong indication of the danger he presently poses. *See Reynolds,* 956 F.2d at 192.

Bertoli's commission of criminal acts while free on pretrial release demonstrates that no conditions of supervised release can prevent him from posing a danger to the community. Bertoli has offered nothing in support of his burden of proving he is not a danger to the community. Under these circumstances, bail pending appeal is inappropriate on the independent ground that Bertoli poses a danger to the community. *See Anderson,* 670 F.2d at 330.

### iii. *Substantial Question of Law or Fact*

▮ The Third Circuit has held a "substantial question" is one which is "fairly debatable." *Smith,* 793 F.2d at 89–90 (adopting standard articulated in *United States v. Handy,* 761 F.2d 1279, 1281–82 (9th Cir. 1985), and rejecting "close question" formulation stated in *United States v. Giancola,* 754 F.2d 898, 901 (11th Cir.1985)); *see Messerlian,* 793 F.2d at 96. The defendant must show not only that the issues presented on appeal are "debatable among jurists of reason," but also that they are "significant." *Smith,* 793 F.2d at 88–89.

The Circuit has elaborated that the court "must find that the significant question at issue is one which is either novel, which has not been decided by controlling precedent, or which is fairly doubtful." *Miller,* 753 F.2d at 23. Moreover, "[a] question of law or fact may be substantial but may, nonetheless, in the circumstances of a particular case, be considered harmless, to have no prejudicial effect, or to have been insufficiently preserved." *Id.* In order for a question to be "significant" in a particular case, it must be "so integral to the merits of the conviction on which a defendant is to be imprisoned that a contrary appellate holding is likely to require reversal of the conviction or a new trial." *Id.*

Bertoli raises six issues which he contends are "substantial" for the purposes of section 3143(b). Specifically, Bertoli contends the court erred:

(1) in its investigation of possible juror misconduct,

(2) in precluding Bertoli from presenting to the jury evidence concerning the Government's motives to prosecute Bertoli,

(3) in quashing the Cahill Subpoena,

(4) in sending the jury transcripts of witnesses' testimony and the jury books used during trial,

(5) in denying Bertoli's 6 July Motion for Mistrial and

(6) in denying Bertoli's Sentencing Recusal Motion.

*See generally* 19 January 1994 Bertoli Brief. Each of these contentions of error was addressed when raised by Bertoli at trial and was discussed in detail above; none of them present a substantial question of fact or law likely to result in reversal.

### Bertoli's Allegations of Juror Misconduct

Bertoli's first assignment of error is without merit. As indicated, the inquiry into Bertoli's allegations of juror misconduct was fully adequate and dispelled any possibility that such misconduct affected the outcome of the trial. *See supra* at 301. Because Bertoli cannot establish he was prejudiced by juror misconduct, his allegations of juror misconduct would not provided a basis for reversal of his conviction on appeal. Bertoli's argument as to juror misconduct fails, therefore, to raise a "significant" and "substantial" question for appeal within the meaning of

section 3143(b). *See Smith*, 793 F.2d at 89; *Miller*, 753 F.2d at 23.

*Preclusion of Bertoli from Presenting Evidence Concerning Selective or Vindictive Prosecution to Jury*

Bertoli next contends it was error for the court to prevent him from presenting a defense based on vindictive prosecution to the jury. *See* 19 Jan. 1994 Bertoli Brief at 6. As indicated, Bertoli was properly precluded from introducing evidence of prosecutorial motive to the jury. As stated, questions relating to selective or vindictive prosecution and prosecutorial misconduct are properly addressed to the trial judge, and not to the jury. *See supra* at 237; *Engler*, 806 F.2d at 430; *Berrigan*, 482 F.2d at 174–75. Bertoli's arguments regarding vindictive prosecution and Government misconduct were properly addressed and rejected by the court. Submission of these arguments, and evidence in support thereof, to the jury would have been inappropriate and was properly disallowed. *See supra* at 237; *Young*, 470 U.S. at 13; *Pungitore*, 910 F.2d at 1127.

Because the preclusion of Bertoli from presenting evidence of vindictive prosecution to the jury was proper under the relevant law, Bertoli's reassertion of this issue does not present a "substantial" issue for appeal within the meaning of section 3143(b). *See Miller*, 753 F.2d at 23.

*Quashal of the Cahill Subpoena*

Bertoli also argues the quashal of the Cahill Subpoena constituted reversible error. *See* 19 Jan. 1994 Bertoli Brief at 19. Contrary to Bertoli' assertions, he was properly prevented from subpoenaeing Special Agent Cahill. As indicated, none of the proffers presented by Bertoli's counsel indicated he had a good faith basis for questioning Special Agent Cahill regarding undue influence on the testimony of Government witnesses. Moreover, the testimony which would have been solicited from Special Agent Cahill would have served no purpose beyond that which was already served by Bertoli's cross-examination of the Government's witnesses. *See supra*, at 1084–1087. The quashal of the Cahill Subpoena was therefore proper and does not give rise to a substantial question of

fact or law which would justify granting bail pending appeal. *See Miller*, 753 F.2d at 23.

*Submission of Trial Transcripts and Jury Books to Jury*

Bertoli further argues it was error to submit the trial transcripts and jury books to the jury. *See* 19 Jan. 1994 Bertoli Brief at 29. As stated, however, the submission of the trial transcripts to the jury was well within the court's discretion, if not required by the law of the Circuit. *See supra*, at 1070; *Zarintash*, 736 F.2d at 70. Moreover, the submission of the Government Jury Books and Bertoli Jury Books to the jury was also proper. *See supra*, at 1072. Because the submission of the trial transcripts and jury books to the jury did not constitute reversible error, these rulings do not give rise to a substantial question of law or fact under section 3143(b). *See Miller*, 753 F.2d at 23.

*Denial of the 6 July Motion for Mistrial*

Bertoli contends the court erred in denying the 6 July Motion for Mistrial. *See* 19 Jan. 1994 Bertoli Brief at 38. The comments cited by Bertoli in support of that motion could not have prejudiced the jury, and, in any event, were made out of the presence of the jury, and therefore could not have been prejudicial to Bertoli. Because there was no showing of prejudice, Bertoli's 6 July Motion for Mistrial was properly denied. *See supra*, at 1048; *Tarantino*, 846 F.2d at 1413. The denial of the 6 July Motion for Mistrial does not, therefore, create a substantial question of law or fact for appeal. *See Miller*, 753 F.2d at 23.

*Denial of Sentencing Recusal Motion*

Finally, Bertoli assigns error to the denial of the Sentencing Recusal Motion. *See* 19 Jan. 1994 Bertoli Brief at 43. Contrary to Bertoli's suggestion, there was neither bias nor the appearance of bias on the part of the court in this case. Bertoli's Sentencing Recusal Motion was, therefore, properly denied. *See supra*, at 1125; *Edelstein*, 812 F.2d at 131. Because the denial of the Sentencing Recusal Motion is not likely to result in reversal of Bertoli's conviction it does not

create a substantial issue for appeal under section 3143(b). *See Miller*, 753 F.2d at 23.

Bertoli has failed to carry his burden of establishing the existence of an issue of law or fact likely to result in reversal or an order for a new trial. He has further failed to carry his burden of establishing, by clear and convincing evidence, that he would not pose a risk of flight or a danger to the community if released on bail pending appeal. Accordingly, Bertoli's motion for bail pending appeal must be denied.[271] *See Messerlian*, 793 F.2d at 95–96.

### Conclusion

This opinion is meant to address Bertoli's motion for bail pending appeal, and to facilitate the processing of his appeal. Pursuant to Third Circuit Rule 8(4), it is intended to clarify and amplify the rulings made during pretrial proceedings, at trial and through sentencing. As already indicated, this opinion is not intended to stand alone, and should be read in conjunction with prior orders and opinions, as well as the pre-trial and trial transcripts in this case.[272]

### APPENDICES NOT INCLUDED FOR PURPOSES OF PUBLICATION

271. As noted, in order to be entitled to bail pending appeal, Bertoli must also establish "that the appeal is not for the purpose of delay...." *Messerlian*, 793 F.2d at 95. In light of the issues Bertoli has designated for appeal, all of which are patently unmeritorious, there is a strong probability that his appeal is intended for the purpose of delay. In fact, throughout these proceedings, Bertoli has attempted to prolong and delay the disposition of his case whenever possible. Examples of such conduct include, but are not limited to Bertoli's application for the Cayman Islands *Ex Parte* Injunction, *see supra;* at 998, his constant and frivolous objections and motions relating to documents and testimony from the Cayman Islands Depositions and his repeated baseless attempts at obtaining recusal.

Bertoli has, in fact, employed similar tactics at other times when he has faced civil or criminal liability. *See, e.g., supra*, at 1120 (Bertoli baselessly attempted to obtain recusal of Judge Tracy, who was presiding over the 1975 SEC Proceedings, and baselessly demanded the indictment of Judge Lacey and Judge Stern while under investigation by a Federal grand jury in 1977). For example, the record reflects that during his prosecution on the 1977 Indictment, Bertoli, representing himself, engaged the court in a suppression hearing which lasted "forty-something trial days." Rule 104 Hearing Tr. at 8.

In light of Bertoli's history of attempting to put off judgment through delay tactics, there is a strong likelihood that the instant appeal is similarly aimed at delaying the proceedings. Such a likelihood precludes the grant of bail pending appeal. *See Messerlian*, 793 F.2d at 95.

272. The decisions reflected in this opinion were reached on or before 28 March 1994. Cite-checking, editing, printing and duplicating were not completed, however, until 30 March 1994. Accordingly, while the opinion was filed 30 March 1994, it is dated 28 March 1994.